**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

DEC – 2 2015

JAMES W. McCORMACK, CLERK
By:_____
DEP CLERK

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS**

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) |
| | ) |
| THEODORE E. SUHL | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |

Criminal No. 4:15 CR 00300 JLH

**Count One: 18 U.S.C. § 371**
**(Conspiracy to Commit Bribery &**
**Honest Services Fraud)**

**Counts Two-Four: 18 U.S.C. §§ 1343,**
**1346**
**(Honest Services Fraud)**

**Count Five: 18 U.S.C. § 666(a)(2)**
**(Federal Funds Bribery)**

**Count Six: 18 U.S.C. § 1952(a)(3)**
**(Interstate Travel in Aid of Bribery)**

## INDICTMENT

The Grand Jury charges:

### GENERAL ALLEGATIONS

At all times material to this Indictment:

1.      The defendant, THEODORE E. SUHL, was the owner of two for-profit mental

health companies that provided mental health services to juveniles in Arkansas.   From 2007

through 2012, SUHL's companies received more than $90 million in Medicaid reimbursements

through the Arkansas Department of Human Services (ADHS).

2.      ADHS was an agency of the government of the State of Arkansas.   ADHS was

Arkansas's largest state agency, with more than 7,500 employees.   Among other things, ADHS

worked with a system of community mental health care centers to provide mental health services

for adults and juveniles.   ADHS regulated the business and activities of SUHL's companies, including Medicaid billing and payment.

3.      During each calendar year from 2007 through 2012, ADHS received more than $10,000 from the United States government under federal programs involving grants, contracts, subsidies, loans, guarantees, insurance, and other forms of assistance.

4.      Steven B. Jones was a deputy director of ADHS from in or about April 2007 to in or about July 2013.   Jones was responsible for, among other things, overseeing five of ADHS's ten divisions.   Jones worked directly with the division directors in areas that included state and federal programs, including at-risk youth and delinquent youth services facilities.   As an agent of ADHS, Jones had a fiduciary duty to act in the best interests of ADHS and the citizens of the State of Arkansas.

5.      Person A was a resident of Crittenden County, Arkansas.   Person A was the Pastor and Superintendent of a church located in West Memphis, Arkansas.

6.      Phillip W. Carter was a probation officer in Crittenden County and a city councilmember for West Memphis, Arkansas.   Carter was also a member of Person A's church.

## COUNT ONE
### Conspiracy
### (Violation of 18 U.S.C. § 371)

7.      The introductory allegations set forth in paragraphs 1 through 6 are realleged and incorporated by reference as though fully set forth herein.

### The Conspiracy

8.      From in or about April 2007 through in or about February 2012, in the Eastern District of Arkansas and elsewhere, the defendant, THEODORE E. SUHL, together with Steven

-2-

B. Jones, Phillip W. Carter, Person A, and others known and unknown, did knowingly and unlawfully conspire, confederate, and agree together and with each other:

  a. to corruptly give, offer, and agree to give, anything of value to any person, intending to influence and reward Jones, an agent of ADHS, an agency of the State of Arkansas, in connection with a business, transaction, and series of transactions of ADHS involving $5,000 or more, in violation of 18 U.S.C. § 666(a)(2);

  b. for Jones, an agent of ADHS, an agency of the State of Arkansas, to corruptly solicit and demand for the benefit of any person, and accept and agree to accept, anything of value from any person, intending to be influenced and rewarded in connection with a business, transaction, and series of transactions of ADHS involving $5,000 or more, in violation of 18 U.S.C. § 666(a)(1)(B); and

  c. to devise and intend to devise a scheme and artifice to defraud and deprive the citizens of the State of Arkansas of their right to the honest services of Jones, a deputy director of ADHS, through bribery, in violation of 18 U.S.C. §§ 1343 and 1346.

## Purposes of the Conspiracy

9. It was a purpose of the conspiracy for SUHL to enrich himself and to protect and expand his companies' business with ADHS by providing money to Jones, through Carter and Person A, in exchange for Jones taking and agreeing to take official action to benefit SUHL and his companies.

10. It was also a purpose of the conspiracy for Jones to enrich himself by soliciting and accepting money from SUHL, through Carter and Person A, in exchange for providing and agreeing to provide favorable official action for SUHL and his companies.

-3-

11. It was a further purpose of the conspiracy to hide, conceal, and cover up the nature and scope of SUHL's dealings with Jones, Carter, and Person A, including the true source and nature of the payments SUHL provided to Jones.

## Manner and Means

12. The conspiracy was carried out through the following manner and means, among others:

a. SUHL paid Jones. In order to conceal the scheme, SUHL avoided making payments directly to Jones and instead used intermediaries, Carter and Person A. Before, during, or after their periodic meetings at restaurants, SUHL would provide Carter with checks from a company associated with SUHL, made payable to Person A's church. Carter would provide the checks to Person A, who used multiple bank accounts associated with Person A's church to deposit and cash the checks in an attempt to conceal the source of the money. Person A then would provide Carter with cash, and Carter, in turn, would provide cash payments to Jones. Person A and Carter would also keep portions of the cash for themselves. On occasion, Carter himself would cash SUHL's checks with Person A's agreement and approval, and Carter would provide some or all of the cash to Jones.

b. Jones solicited and received money from SUHL, through the use of intermediaries, Carter and Person A.

c. SUHL, Jones, and Carter held meetings at restaurants to discuss matters involving SUHL's companies and to discuss SUHL's requests for assistance from Jones as a deputy director of ADHS. At those meetings, Jones agreed to engage in official acts to benefit SUHL and his companies, including providing internal ADHS information to SUHL.

-4-

d.     SUHL, Jones, and Carter kept the nature of their relationship secret by, among other things, holding their meetings at restaurants in Memphis, Tennessee, and other locations outside of West Memphis, Arkansas, to avoid being seen together or recognized.

e.     In order to conceal their activity, SUHL and Jones used Carter as an intermediary to relay messages to one another and to schedule meetings.   When speaking on the telephone, SUHL and Carter often avoided using Jones's name, and instead referred to Jones as "buddy" or "friend."   In turn, when speaking on the telephone, Jones and Carter would often avoid using SUHL's name, and instead refer to SUHL as "our friend."

f.     In return for the cash bribe payments, Jones performed and agreed to perform official acts in his capacity as a deputy director of ADHS that were favorable to SUHL and his companies.

## Overt Acts

13.     In furtherance of the conspiracy, and to effect its objects and purposes, defendant SUHL and others committed the following overt acts, among others, in the Eastern District of Arkansas, and elsewhere:

### I.     Meetings and Payments

#### December 2007 Payment

14.     On or about December 28, 2007, SUHL issued a check to Person A's church in the amount of $2,500 intending that Person A and Carter provide the money to Jones.

15.     On or about December 28, 2007, Carter and Jones exchanged multiple phone calls, Carter placed multiple phone calls to SUHL, and Carter called Person A.

16.     On or about December 29, 2007, Carter and Jones exchanged multiple phone calls.

-5-

17.     On or about December 30, 2007, Carter and Jones exchanged multiple phone calls, and Jones called Person A.

18.     On or about December 30, 2007, Person A's church issued four sequentially numbered checks, totaling $2,500, to Jones.  Jones advised Person A that he wanted to receive cash payments instead of checks in his name.  Person A provided Jones with cash instead of the checks.

19.     On or about December 30, 2007, Person A deposited or caused to be deposited the $2,500 check issued by SUHL into a checking account associated with Person A's church.

20.     On or about December 30, 2007, Person A caused his church to issue a check to Carter in the amount of $1,100.

21.     On or about January 3, 2008, the checks issued by Person A's church to Jones were deposited into a bank account for a childcare development center associated with Person A's church.

**May 2008 Payment**

22.     On or about May 16, 2008, SUHL issued a check to Person A's church in the amount of $2,000 intending that Person A and Carter provide the money to Jones.

23.     On or about May 17, 2008, SUHL and Carter exchanged multiple phone calls, and Carter and Jones exchanged multiple phone calls.

24.     On or about May 18, 2008, Jones called Carter, and SUHL and Carter exchanged multiple phone calls.

-6-

25. On or about May 18, 2008, SUHL met with Carter and Jones at a restaurant in Memphis, Tennessee. SUHL used a personal credit card to pay for their meal in the approximate amount of $201.22.

26. On or about May 19, 2008, Carter placed multiple phone calls to Person A.

27. On or about May 19, 2008, Person A caused the childcare development center to issue a $2,000 check to Person A with "loan" written in the memo line.

28. On or about May 19, 2008, Person A deposited the $2,000 check issued by the childcare development center into his personal bank account and received $1,800 back in cash. Person A provided cash to Carter.

29. On or about May 23, 2008, Carter and Person A exchanged multiple phone calls.

30. On or about May 23, 2008, Person A deposited or caused to be deposited the $2,000 check issued by SUHL into a bank account for the childcare development center.

### June 2008 Payment

31. On or about June 19, 2008, Carter called Jones, and SUHL called Carter.

32. On or about June 20, 2008, one of SUHL's companies issued a check to Person A's church in the amount of $3,000. SUHL intended that Person A and Carter provide the money to Jones.

33. On or about June 20, 2008, Carter and Jones called each other.

34. On or about June 21, 2008, Carter called Jones.

35. On or about June 22, 2008, Jones placed multiple phone calls to Carter, and Carter and SUHL exchanged multiple phone calls.

-7-

36.     On or about June 22, 2008, SUHL met with Carter and Jones at a restaurant in Memphis, Tennessee.   SUHL used a personal credit card to pay for their meal in the approximate amount of $182.45.

37.     On or about June 22, 2008, Carter placed multiple phone calls to Person A.

38.     On or about June 23, 2008, Carter and Person A exchanged multiple phone calls.

39.     On or about June 23, 2008, Person A deposited or caused to be deposited SUHL's check into a bank account for the childcare development center.

40.     On or about June 23, 2008, Person A caused the childcare development center to issue a $3,000 check to Person A with "exchange" written in the memo line.

41.     On or about June 23, 2008, Person A deposited the $3,000 check issued by the childcare development center into Person A's personal bank account and received $2,000 back in cash.   Person A provided cash to Carter.

42.     On or about June 23, 2008, Carter called Jones, and Jones returned Carter's call.

**July 2008 Payment**

43.     On or about July 5, 2008, Jones and Carter exchanged multiple phone calls, and SUHL called Carter.

44.     On or about July 5, 2008, SUHL met with Carter and Jones at a restaurant in Memphis, Tennessee.   SUHL used a personal credit card to pay for the meal in the approximate amount of $105.90.

45.     On or about July 6, 2008, Jones placed multiple phone calls to Carter, SUHL and Carter exchanged multiple phone calls, and Carter called Person A.

46.     On or about July 7, 2008, SUHL issued a check to Person A's church in the amount of $2,000 intending that Person A and Carter provide the money to Jones.

47.     On or about July 7, 2008, Person A caused the childcare development center to issue him a check in the amount of $2,000.

48.     On or about July 7, 2008, Person A deposited the $2,000 check received from the childcare development center into Person A's personal bank account and received $1,000 back in cash.   Person A provided cash to Carter.

49.     On or about July 7, 2008, Person A deposited or caused to be deposited the $2,000 check issued by SUHL into a bank account for the childcare development center.

### August 2008 Payment

50.     On or about August 8, 2008, SUHL issued a check to Person A's church in the amount of $2,500 intending that Person A and Carter provide the money to Jones.

51.     On or about August 8, 2008, SUHL called Carter.

52.     On or about August 9, 2008, Carter called Jones.

53.     On or about August 10, 2008, SUHL and Carter exchanged multiple phone calls, and Carter placed multiple phone calls to Jones.

54.     On or about August 10, 2008, SUHL met with Carter and Jones at a restaurant in Memphis, Tennessee.   SUHL used a personal credit card to pay for the meal in the approximate amount of $208.75

55.     On or about August 13, 2008, Carter and Person A exchanged multiple phone calls.

56.     On or about August 13, 2008, Person A cashed the $2,500 check issued by SUHL. Person A provided cash to Carter.

**September 2008 Payment**

57.     On or about September 5, 2008, SUHL issued a check to Person A's church in the amount of $3,000 intending that Person A and Carter provide the money to Jones.

58.     On or about September 6, 2008, SUHL called Carter, and Carter called Jones.

59.     On or about September 7, 2008, Carter and Jones exchanged multiple phone calls, and SUHL placed multiple phone calls to Carter.

60.     On or about September 7, 2008, SUHL met with Carter and Jones at a restaurant in Memphis, Tennessee.  SUHL used a personal credit card to pay for their meal in the approximate amount of $188.00.

61.     On or about September 7, 2008, Carter called Person A.

62.     On or about September 8, 2008, Carter and Person A exchanged multiple phone calls.

63.     On or about September 8, 2008, Person A deposited or caused to be deposited the $3,000 check issued by SUHL into a bank account for the childcare development center.

64.     On or about September 8, 2008, Person A caused the childcare development center to issue him a $3,000 check.   The phrase "ck exchange" was written in the memo line.

65.     On or about September 8, 2008, Person A deposited the $3,000 check issued by the childcare development center into Person A's personal bank account and received $2,000 back in cash.  Person A provided cash to Carter.

**June-July 2009 Payment**

66.     On or about June 28, 2009, Carter and Jones exchanged multiple phone calls, and Carter and SUHL exchanged multiple phone calls.

-10-

67.     On or about June 28, 2009, SUHL met with Carter and Jones at a restaurant in Memphis, Tennessee. SUHL used a personal credit card to pay for their meal in the approximate amount of $115.32.

68.     On or about June 28, 2009, Carter called Person A.

69.     In or about late June 2009, SUHL issued a check to Person A's church in the amount of $2,000 intending that Person A and Carter provide the money to Jones.

70.     On or about July 1, 2009, Carter and Person A exchanged multiple phone calls.

71.     On or about July 1, 2009, Person A cashed the $2,000 check issued by SUHL. Person A provided cash to Carter.

72.     On or about July 1, 2009, Carter placed multiple phone calls to Jones.

### August 2009 Payment

73.     On or about August 14, 2009, Carter called SUHL.

74.     On or about August 15, 2009, Carter and Jones called each other, and Carter called SUHL.

75.     On or about August 16, 2009, Carter placed multiple phone calls to SUHL, and Carter called Jones.

76.     On or about August 16, 2009, SUHL met with Carter and Jones at a restaurant in Memphis, Tennessee. SUHL used a personal credit card to pay for their meal in the approximate amount of $184.72.

77.     On or about August 16, 2009, Carter and Person A exchanged multiple phone calls.

78.     On or about August 17, 2009, SUHL issued a check to Person A's church in the amount of $2,500 intending that Person A and Carter provide the money to Jones.

-11-

79.     On or about August 17, 2009, Carter placed multiple phone calls to Person A, and Carter and Jones exchanged multiple phone calls.

80.     On or about August 18, 2009, Carter called Person A.

81.     On or about August 18, 2009, Person A deposited or caused to be deposited the $2,500 check issued by SUHL into a bank account for the childcare development center.

82.     On or about August 19, 2009, Person A caused the childcare development center to issue him a $2,500 check with "reimbursement" listed in the memo line.

83.     On or about August 19, 2009, Carter and Person A exchanged multiple phone calls.

84.     On or about August 19, 2009, Person A deposited the $2,500 check issued by the childcare development center into a personal bank account and received $1,000 back in cash. Person A provided cash to Carter.

85.     On or about August 19, 2009, Carter and Jones exchanged multiple phone calls.

**June 2010 Payment**

86.     On or about June 6, 2010, Carter and SUHL exchanged multiple phone calls, and Carter and Jones exchanged multiple phone calls.

87.     On or about June 10, 2010, Carter and Jones called each other.

88.     On or about June 11, 2010, Carter and SUHL exchanged multiple phone calls.

89.     On or about June 11, 2010, SUHL issued a check to Person A's church in the amount of $2,000 intending that Carter and Person A provide the money to Jones.

90.     On or about June 12, 2010, Carter placed multiple phone calls to SUHL.

91.     On or about June 13, 2010, Carter and SUHL exchanged multiple phone calls, and Carter and Jones exchanged multiple phone calls.

92.     On or about June 13, 2010, SUHL met with Carter and Jones at a restaurant in Memphis, Tennessee.   SUHL used a personal credit card to pay for the meal in the amount of $180.08.

93.     On or about June 13, 2010, Carter placed multiple phone calls to Person A.

94.     On or about June 14, 2010, Carter and Jones exchanged multiple phone calls, and Carter and Person A exchanged multiple phone calls.

95.     On or about June 14, 2010, Person A caused the childcare development center to issue a check to Carter in the amount of $1,500 with "transportation" written in the memo line.

96.     On or about June 14, 2010, Carter cashed the $1,500 check issued by the childcare development center and provided some or all of the cash to Jones.

97.     On or about June 16, 2010, Carter called SUHL.

98.     On or about June 16, 2010, Person A deposited or caused to be deposited the $2,000 check issued by SUHL into a bank account for the childcare development center.

### July 2010 Payment

99.     On or about July 9, 2010, Carter placed multiple phone calls to SUHL, and Carter and Jones called each other.

100.    On or about July 9, 2010, SUHL issued a check to Person A's church in the amount of $2,000 intending that Person A and Carter provide the money to Jones.

101.    On or about July 11, 2010, Carter and SUHL exchanged multiple phone calls, and Carter and Jones exchanged multiple phone calls.

102.    On or about July 11, 2010, SUHL met with Carter and Jones at a restaurant in Memphis, Tennessee.  SUHL used a business credit card to pay for their meal in the approximate amount of $173.08.

103.    On or about July 11, 2010, Carter and Person A exchanged multiple phone calls.

104.    On or about July 12, 2010, Jones called Carter.

105.    On or about July 12, 2010, Person A deposited or caused to be deposited the $2,000 check issued by SUHL into a bank account for the childcare development center.

106.    On or about July 12, 2010, Person A issued a check to Carter in the amount of $500.

107.    On or about July 12, 2010, Carter cashed the check from Person A.

108.    On or about July 13, 2010, Person A caused the childcare development center to issue him a check in the amount of $2,000 with "ck/cashed/refund" written in the memo line.

109.    On or about July 13, 2010, Person A deposited the $2,000 check issued by the childcare development center into a personal bank account and received $200 back in cash.

### August 2010 Payment

110.    On or about August 13, 2010, SUHL issued a check to Person A's church in the amount of $2,000 intending that Person A and Carter provide the money to Jones.

111.    On or about August 14, 2010, Carter and SUHL exchanged multiple phone calls, and Carter called Jones.

112.    On or about August 15, 2010, Carter and SUHL exchanged multiple phone calls, and Carter and Jones exchanged multiple phone calls.

-14-

113.    On or about August 15, 2010, SUHL met with Carter and Jones at a restaurant in Memphis, Tennessee.   SUHL used a personal credit card to pay for their meal in the approximate amount of $150.37.

114.    On or about August 16, 2010, Carter called Person A.

115.    On or about August 16, 2010, Person A deposited or caused to be deposited the $2,000 check issued by SUHL into a bank account associated with Person A's church.

116.    On or about August 19, 2010, Person A's church issued a check to Person A in the amount of $2,000, with "ck reimbursement" listed in the memo line.

117.    On or about August 19, 2010, Carter called Person A.

118.    On or about August 19, 2010, Person A cashed the check issued by Person A's church.   Person A provided cash to Carter.

119.    On or about August 19, 2010, Carter placed multiple phone calls to Jones, and Carter placed multiple phone calls to SUHL.

120.    On or about August 20, 2010, Carter and Jones exchanged multiple phone calls, Carter called Person A, and Carter placed multiple phone calls to SUHL.

### September 2010 Payment

121.    On or about September 7, 2010, Carter and SUHL exchanged multiple phone calls, and Carter and Jones exchanged multiple phone calls.

122.    On or about September 7, 2010, SUHL issued a check to Person A's church in the amount of $2,000 intending that Person A and Carter provide the money to Jones.

-15-

123.    On or about September 7, 2010, SUHL met with Carter and Jones at a restaurant in Memphis, Tennessee.  SUHL used a business credit card to pay for their meal in the amount of $192.91.

124.    On or about September 7, 2010, Carter and Person A exchanged multiple phone calls.

125.    On or about September 8, 2010, Jones called Carter, Carter placed multiple phone calls to SUHL, and Carter placed multiple phone calls to Person A.

126.    On or about September 8, 2010, Person A deposited or caused to be deposited the $2,000 check issued by SUHL into a bank account for the childcare development center.

127.    On or about September 8, 2010, Person A provided an $800.00 check to Carter from Person A's personal bank account.

### September 2011 Payment

128.    On or about July 25, 2011, during a recorded telephone conversation, SUHL contacted Carter to complain about the policy by ADHS that led to referrals of Medicaid-eligible persons in the Northeast Arkansas region exclusively to one of SUHL's competitors.  SUHL directed Carter to ask Jones to put a stop to this practice.

129.    On or about August 3, 2011, Carter conveyed SUHL's request to Jones in a recorded conversation.

130.    On or about August 28, 2011, during a recorded telephone conversation, SUHL asked Carter whether he had contacted Jones to see if they could meet.  Carter had separate conversations with SUHL and Jones later that day, attempting to schedule a meeting for the three of them.  Carter told SUHL that he wanted Jones to explain some legislation to SUHL.  Carter

-16-

informed SUHL that he should have a copy of the legislation for SUHL by the following day and SUHL stated that he might come to review the legislation before the meeting with Jones.

131.    On or about August 29, 2011, in a recorded conversation, Carter and his supervisor in the Crittenden County probation office discussed providing a copy of proposed ADHS-related legislation to SUHL.   Carter informed his supervisor that he was planning to meet with SUHL and Jones away from Little Rock, possibly in Carlisle, Arkansas.

132.    On or about August 29, 2011, during a recorded telephone conversation, Carter told SUHL, "My friend says we can meet Thursday, if you want to."   SUHL responded, "OK, can I update you on my schedule, say tomorrow?"

133.    On or about August 30, 2011, during a recorded telephone conversation, avoiding the use of SUHL's name, Carter discussed with Jones meeting with SUHL in Brinkley, Arkansas, where they had met "last time."

134.    On or about August 31, 2011, during four recorded telephone calls, Carter attempted to contact SUHL.   In one call, Carter left a voice message for SUHL, confirming, "my buddy said we can meet tomorrow night about 6:00."

135.    On or about September 3, 2011, during a recorded telephone call, Carter and SUHL discussed rescheduling the meeting with Jones, again avoiding the use of Jones's name.

136.    Between on or about September 3, 2011, and on or about September 10, 2011, Carter called Jones and SUHL separately on several occasions, attempting to schedule a meeting date.

137.   On or about September 8, 2011, during a recorded telephone conversation, SUHL and Carter arranged to meet that day at a restaurant in Marion, Arkansas.   SUHL used a business credit card to pay for the bill, which cost approximately $54.35.

138.   On or about September 9, 2011, SUHL issued a check to Person A's church in the amount of $2,000.

139.   On or about September 11, 2011, SUHL met with Carter and Jones at a restaurant in Memphis, Tennessee.   SUHL used a business credit card to pay for their meal, which cost approximately $189.64.   The meeting was captured on a video recording.

140.   On or about September 11, 2011, during the meeting at the restaurant in Memphis, Tennessee, while Jones was temporarily away from the table, SUHL handed Carter the $2,000 check made payable to Person A's church intending that Carter and Person A later provide the money to Jones.   Carter placed the check in his sock.

141.   On or about September 11, 2011, during the meeting at the restaurant in Memphis, Tennessee, Carter briefly left the table and used a cellular telephone to call Person A and notify him that Carter had received a check from SUHL:

Person A:      Hey there.

Carter:          Bishop, Bishop, it's gonna be a great day.   I'll talk to you later.   It's gonna be a great day.   I'll talk to you later.

Person A:      Alright.

Carter:          Alright.

142.   On or about September 11, 2011, during a recorded telephone conversation after the restaurant meeting, Carter called Jones and asked Jones: "Can you roll that information over in

your head real quick and let's come back to the table next weekend?"   Jones replied, "You know I can."   Jones and Carter then had the following exchange:

Carter:        Alright.   That's what we need to do.

Jones:         Ok.

Carter:        But he's adamant.   He just wants to know where you are on it.   And, you know, what's the pros and cons?

Jones:         Yeah, let me just, let me just weigh it and make sure that it's cool.   Because I know internally we have lots of discussions when those types of issues come up, so---

Carter:        Right.

Jones:         Let me think it through for a minute and I'll get back with you.

Carter:        Ok.   Ok.   Alright.   I appreciate you man.

143.   On or about September 11, 2011, after the dinner meeting, Carter met with Person A and provided Person A with the $2,000 check.

144.   On or about September 12, 2011, Carter called Person A and arranged to meet with Person A later that day at the childcare development center.

145.   On or about September 12, 2011, Person A deposited the $2,000 check issued by SUHL into a bank account for the childcare development center.

146.   On or about September 12, 2011, Person A caused the childcare development center to issue him a check for $1,000 with "church operation" listed in the memo line.   Person A cashed the $1,000 check the same day.   Person A provided cash to Carter.

### Controlled Cash Delivery to Jones

147.   On or about November 23, 2011, after Carter had been approached by the Federal Bureau of Investigation and began cooperating in the investigation, Jones agreed to meet with

-19-

Carter when Carter told him in a recorded conversation, "Listen are you going to be in town, 'cause I got that little package I owe you from our last meeting." Carter indicated, "I done went up there and blessed the food man, so, you know I got to bring it to the table." Jones replied, "You're the man---Yeah, you kinda like the Lord, he may not come when you want him, but you right on time." Carter informed Jones that Carter would need to cash the check before meeting Jones.

148.    On or about November 27, 2011, Jones met Carter in West Memphis, Arkansas, and Jones accepted a $1,000 cash payment from Carter.

## II.   Official Acts & SUHL's Requests for Official Acts

### Child Welfare Agency Review Board

149.   After the Governor removed SUHL from the Arkansas Child Welfare Agency Review Board in 2008, SUHL asked Jones to get the Governor to re-appoint SUHL to the Board. Jones agreed to look into the issue.

### Provider Site Radius Expansion

150.   In or about January 2011, after ADHS denied SUHL's application to operate a certified Rehabilitative Services for Persons with Mental Illnesses (RSPMI) provider site in Forrest City, Arkansas, SUHL informed Carter that he supported the expansion of the site radius for RSPMI providers from 30 miles to 50 miles because one of his companies could then operate in Forrest City.   During a meeting between Carter, Jones, and SUHL, SUHL asked Jones if he could help to get the RSPMI radius expanded.   Jones agreed to look into the issue.

### Senate Bill 218

151.   Senate Bill 218 was introduced in the Arkansas Senate on or about February 3, 2011.   Among other things, Senate Bill 218 sought to provide no-bid youth service contracts to service providers that had provided juvenile counseling services for greater than five years. SUHL sought Jones's assistance in obtaining support for the passage of Senate Bill 218.   Jones informed SUHL that he would not support the bill.

### Jones's Assumption of Oversight of Medicaid at ADHS

152.   Over the course of the conspiracy, Jones's oversight as deputy director at ADHS did not include Medicaid billing.   SUHL asked Jones to assume responsibility for Medicaid

billing in hopes that SUHL could obtain favorable treatment from Jones regarding SUHL's

companies' Medicaid billings.   Jones agreed to look into the issue.

## **SUHL's Regional Competitor & Monitoring Notes**

153.   On or about July 25, 2011, during a recorded telephone conversation, SUHL

complained to Carter about the policy by ADHS that led to referrals of Medicaid-eligible persons

in the Northeast Arkansas region exclusively to one of SUHL's competitors, and SUHL asked that

Jones put a stop to this practice:

SUHL:   Hey you know---um---I wi---next time you see your buddy, I wish you would ask
him, you know what, I talked to him about this before and he could put the stop to
this, without it being about us.

Carter:   Uh huh.

SUHL:   You know, the DHS in Northeast Arkansas, they give all their referrals to
[competitor company] in out-patient and that needs to have a stop put to it.

Carter:   Is that right?

SUHL:   Yeah, and that was a pilot program that was started under [a previous governor] and
they didn't thankfully didn't spread to the rest of the state, but they need to quit
doin---all their Medicaid, all their families, and of course you can get some anyway
if you know their people, but he needs to put a stop to it.   But I don't want to have
a big meeting with him about it.   He just, you know the bottom line is if he wanted
to he could really help.   It be more competitive, I'm not asking for him to give
them all to us, I'm just saying, cause we've been working like the DHS in uh
Blytheville.

Carter:   Uh huh.

SUHL:   We talked to them and they're like well you need to call Little Rock, cause we're
supposed to give all our referrals to [competitor company].   See now that's wrong.

Carter:   Yeah, that's dead wrong.   That's dead wrong.   I sure will.   I will definitely get
with him---I'll get with him.

SUHL:   Remember I told him that before.

-22-

Carter:     Right.

SUHL:       He could definitely put a stop to that because that's under his purview.

Carter:     Uh huh, you absolutely right.

SUHL:       And all he'd have to do is send out a memo or start telling his department heads
            don't do that, he doesn't even have to send out a memo.  He could or he could just
            say don't be giving---it's any provider, whoever is providing the best job needs to
            be providing the out-patient services

Carter:     So they're basically trying to strong arm the market.

SUHL:       Oh, exactly!  That's what it's about.  It was a pilot program for Northeast
            Arkansas and it's been going on for years and we just did decide to start marketing
            them and talking to them, and so we met with some of them in Blytheville and they
            are friends of our marketers there.  You don't know the girl who's marketing for us
            there, but she's like, 'yeah, they said you gotta call Little Rock---that they have a
            contract and they are supposed to send them all to [competitor company].'  And
            see that went all the way back to [a previous governor].  It was just Northeast
            Arkansas that did that.

Carter:     Ok.

SUHL:       And, but it could be---you know there's no reason---and they didn't even want to do
            it, the workers on the ground didn't want to do it, but [competitor company] I'm
            sure pushed it through if they saw more and more competition coming on, you
            follow what I'm saying.

Carter:     Right, right, right.

SUHL:       And um---but I don't---you know he's so---even though he's a friend, I don't know
            if he's got the guts to do that, cause that will kick up a storm, if they say quit doing
            that---you know, whoever is doing the best job give them to.   You know there will
            be a big push back.

Carter:     Right, right, right, right---well, we will definitely address it with him Ted.   Like I
            said, now that ain't right.   That ain't right at all.   That ain't right at all.
            And---uh---I mean it ain't nothing but to have a minor conversation with him.
            And I think he'll get on the bandwagon and do just what he's asked to do.

SUHL:       Well it would be nice if he would---and it doesn't need to be about us, it needs to be

about the truth, every provider is cut out.   We just happened---I'm sure everybody knows---you follow what I'm saying---and it's wrong.   [Competitor company] is awful.

Carter:     Exactly.

SUHL:      You're not even getting---it's like---I mean they're the worst.

Carter:     Right.   Right.   And, and I know that they are a slouchy company in our area. Sure is.   I mean, my goodness man!   And this is in Northeast Arkansas?

SUHL:      In Northeast Arkansas, yep.

Carter:     Ok, ok.   Well, I'll put a call through to him tomorrow.   I'll definitely do that. Sure will.   Uh---uh---[Carter's supervisor] been uh, at us about, you know, uh, trying to, uh, you know we got some people that, in our office that, never been to [one of Suhl's companies].   So, you know, he, he was still asking about that tour.

SUHL:      Oh, well, I'll---we need to get that going.   'Course, uh, guess we need to get [Suhl's employee] on it so she can, uh, coordinate it.

Carter:     Right.

SUHL:      I'll get her going and see what she says.   Or, not see what she says, but get her [unintelligible]---have [another of Suhl's employees] call her and tell her to get going.

Carter:     Right, right.

SUHL:      Umm---the um---Ok well, why don't we talk in the next few days and we'll try to have lunch with your buddy who got elected.   That'd be great.   And, uh, and then when you see S---, when you see you're, uh, you're other buddy, if you talk to him about, um, about when he could, you know, if he could help on that, that would be awesome.   And he---it's only, should be a no-brainer.   But you know, that's, there's gonna be a big kickback and he doesn't like those kinds of messes, you know.

Carter:     Exactly, exactly.   Well, I'll put a call through to him tomorrow and, uh, and uh, raise that issue.   And, uh, uh---

SUHL:      And I know how he is, he wouldn't say it's about us, and we don't want him to make it about us.   He'd just say I'm hearing from these providers that nobody's able to get in.   And that's true.

-24-

Carter:      Exactly.  Exactly.  Exactly.  And he just need to make it known that they
             trying---they---they're strong arming the market up there.

SUHL:        Well, they're telling them---they're saying we're not supposed to give anything
             except to [Suhl's competitor company].

Carter:      Wow.  Wow.  That---that---Well, he---he'll definitely hear from me tomorrow.
             And, uh, I'll keep you posted on, you know, his response and everything else.

       154.  Later in the conversation SUHL and Carter again addressed the referrals to SUHL's

competitor:

SUHL:        OK, brother, I love ya.  Let's try to have dinner soon.  I'm---we'll, uh, try to get
             together and---I know you called me several times, I've just been so slammed.  I
             haven't even been even able to see straight.  We've just had one, one problem after
             another.  In fact, I've been planning to call you for three or four weeks after that
             girl told me which you'd been calling me and then she told me that she, uh, had
             had---that, when that guy told her that---and he was a friend, in, in, uh, Blytheville.
             But it's not about Blytheville, it's all of Northeast Arkansas.

Carter:      Right, right---

SUHL:        It's Blytheville, Jonesboro, Paragould, Trumann, you follow what I'm saying?
             They're all, like---

Carter:      Right.  Right.  Right.  Right.  Well, we'll definitely give our friend a call, and,
             uh, like I said, raise that issue, man.  And, uh, see where we go, but like I said,
             we've got some team players.  But I just want this guy to make sure, you know
             what I mean, that uh, that he met you and everything, so, and he's on those major
             committees and everything, and uh---this guy going to do just what we ask him to
             do.  And, uh, we shouldn't---we won't have any problems, especially since I was
             his campaign manager.  So, I just trying to turn him on to the---

SUHL:        He might be one who could help open it up, if---

Carter:      Right.

SUHL:        Obviously, Steve could do it without a big fight, I mean, that'd be the way to do it,
             is to get him to do it quietly.  But he could even say he's getting some calls from,
             uh, course I don't know if this guy, we don't want him mentioning our name or
             your name, so you gotta get somebody to do it who's not gonna---

Carter:     Right, right---well, I got a, I got a, I got a thousand people that I can get to do it.
            [Third party] works for uh, uh, a different agency and [same third party] was on the
            team, so it can get done.

SUHL:       Yeah, and uh, it's wrong.   We're not asking for anything special.   We're just
            saying everybody should have an option.

Carter:     Exactly.

SUHL:       It ought to be who the case manager, like it is in other DHS offices, who they think
            is good.   Not some---not Little Rock bureaucrats.

Carter:     Right, right, right, right.

SUHL:       Talk to you later, brother.   Love ya.   Sorry I woke you up.   I apologize.

Carter:     Hey no problem at all, man.   It's good to hear from you, you know what I mean?
            So hey, thank you for calling.

SUHL:       I'll be down and we'll—thank you for talking to me—I'll be down, we'll, we'll get
            together in the next couple weeks.

Carter:     OK – God bless you, man.

SUHL:       God bless you. Love you, brother.   Bye.

Carter:     Love you too.   Bye-bye.

    155.    On or about August 3, 2011, Carter conveyed SUHL's request to Jones in a

recorded conversation:

Carter:     Listen, this is what I called you about.   Our friend, uh, got some concerns about the
            way some of the referral process is going in Northeast Arkansas.   [Competitor
            company], it's like, everybody is, uh, obligated to give them to [competitor
            company].   I don't know if that's a move that was made by the State or what, but
            nothing has changed here in Crittenden County, we have a system as to how we
            refer. But, uh---

Jones:      I know you got that on lock. (laughing)

Carter:      Yeah, yeah.  He just had some concerns so, when you get home this weekend, if
             you can man, well it's state convocation [for Carter's church] this weekend, so we
             probably won't get a chance to touch.   But within the next two weeks.

Jones:       Yeah, I've actually been, I actually intended to call you a couple of weeks ago.
             Because some stuff, you know I told you I sit in on the monitoring meetings now.

Carter:      [speaking over Jones] Right.

Jones:       And some stuff came up with him regarding him at the last---not him
             personally, regarding his organization which is directed at him and I got
             the new monitoring reports yesterday---and I just---Monday, and I just
             haven't read them yet, but I was going to say, hell, you might, uh, get back
             on schedule.

Carter:      Ok.   Ok.   Ok.  Well, uh, well, well, state convocation end on Saturday,
             do you want to try to meet Sunday?   Would you be here Sunday?

Jones:       Let's see---I have---I got something going on here Sunday, uh---

Carter:      Well, well, why don't we do this: Why don't---the following weekend,
             next weekend---let's get together and try to nail some things down.

Jones:       That'll work.   Or uh, unless you want to do like we did that one time, you
             know meet in Brinkley, or something like that.   Just, you know, whatever.

Carter:      Alright, tell you what, I---I'll put a call through.

Jones:       I'll get him up to speed on what's been going on---you know---on some of
             the stuff that's been said, and you know.

Carter:      Right.   Right.   Right. Well, I'll put the call through and see what---what
             we can do.

Jones:       Ok.

Carter:      But anyway, I appreciate you calling back Steven.

Jones:       Just let him know that we still, you know, trying to look out on the inside.
             But I did not know about the referral thing changing, so we'll see about
             that---

Carter:      Exactly.   Right.

-27-

Jones:      ---About what's been going on with that.

Carter:     Right.   Ok, man, look, I appreciate you here.

Jones:      Appreciate you.   Alright.

Carter:     Thank you.   Later.

Jones:      Bye.

    156.   Later on or about August 3, 2011, during a subsequent recorded conversation between Carter and SUHL, Carter explained to SUHL that Jones had monitoring notes relevant to SUHL's companies and also addressed the issue of SUHL's regional competitor:

Carter:     Listen, um, my friend called me this morning 'cause I spoke with him last night, uh, about what we talked about.

SUHL:       Right.

Carter:     And uh, he said uh, that he was intending to call me anyway because he got some monitoring---monitoring papers that came across his desk and that, uh, your organization's name was mentioned in one of those meetings.   So I said, 'is that right?' I said, 'well, tell me about it.'   And he didn't seem like he wanted to talk about it on the phone.   I said, 'well, look, do this, not this weekend, maybe next weekend, let me see what my friend is doing and maybe you can get the papers here and let us go over them and see what's going on.'

SUHL:       Yeah, see if he can get---I'm gonna---I'm out of town now and I don't know if I'll be back in a week or two---I don't know if I can do it in the next two weekends.

Carter:     Got it, got it.

SUHL:       Uh, but see if he'll, uh, give them to you.

Carter:     OK, yeah.

SUHL:       I think I know what they are, I mean it's not any big deal, I think I know what they---but.

Carter:     OK, ok.

SUHL:       You might want to, um, ask him and um, see if he'll give them to you. And, uh.

Carter:     Alright.

SUHL:       And then see if I can call him and we can get together when I'm back in town. But I'm in and out over the next couple of weeks.   I'm sure I won't be in on the weekends and that's generally when he likes to meet, you know what I mean?

Carter:     Right, right, right, right.   I understand.   I just told him, I said 'alright, well, that's fine.'   I told him 'I'll see what your schedule looks like.'

SUHL:       What'd he say about the other deal?

Carter:     Huh?

SUHL:       What'd he say about the other deal?

Carter:     Oh, uh, he said that he'll discuss it all.   I told him that he needs to step up and swing the bat during the staff meeting and, uh, raise some issues about it, you know what I mean? And I told him that wasn't going on in Crittenden.   Crittenden, we pretty much on our same system, but you know---

SUHL:       And all the courts are pretty fair, it's just the DHS, (UI), they're telling them---

Carter:     Right, and I told him in Northeast Arkansas is where it takes place at, you know what I mean?

    157.   Carter and SUHL then ended the call because someone drove into Carter's

driveway.   Carter called SUHL back minutes later.   After discussing the reason for the break in

the call, Carter and SUHL resumed talking about SUHL's competitor and the monitoring notes

that Jones could provide:

Carter:     But what I'll do, I'll try to get my hands on that paperwork and try to get it to you ASAP so you can go over it and what have you.   Well, uh, that's what he talking about.   But I told him, I said, 'well, it's in Northeast Arkansas, I mean, everybody is leaning toward [competitor company], quote-unquote the community based provider---is that something that y'all put in place or what?'   He said, 'nah.'   I said, 'well, you know, you need to start harping in your staff meetings, because that's exactly what's going on.'

-29-

SUHL:      Exactly, yep---they're telling us, 'hey, we're supposed to refer to [competitor company] and that's coming down from Little Rock.'   And he's their boss.   He's their direct supervisor.

Carter:    Exactly.   Exactly.   Exactly.   Exactly.   So, uh, he didn't seem like he wanted to talk too much about what was going on over the phone and everything---just said, 'look, look,' said, 'well, I'll just have to get a chance to get with you.' And I just told him, 'well, not this weekend,' I said, 'I don't know what my friend's schedule is, and I'll see after. But I know not this weekend---if I can do something it'll be probably the following weekend' and, uh, but you know like you---you out of town for the next two weekends, so hey, we'll just have to do what we can when we can.

SUHL:      Yeah, see if he'll get with you though and give you the paperwork.

Carter:    Right, right.

SUHL:      I know what it is, I'm pretty sure, if it hasn't gotten (unintelligible).   But I still would like to know that it's the same thing, you follow what I'm saying?

Carter:    Right.

SUHL:      And he might have some inside information on whatever [other ADHS deputy director] is saying.

Carter:    Right, right.

SUHL:      It was, the, uh, it was related to inpatient, so, and them trying to cite us for regs that aren't regs.   And that's all [other ADHS deputy director], trying to cite us for stuff that aren't regs.

Carter:    Ah, ok.

SUHL:      And so, it's just how much do you kick up a fight over it.

Carter:    Right, right.   Well, what I'll do, uh, uh, me and [Person A] going to Little Rock tomorrow anyway for the state convocation so what I'll do, I'll call Steve when I get to Little Rock to see can I run by his office, what have you, and get those papers.

SUHL:      Yeah, or have him, he could meet you after he's out and give you a copy of them. And---

Carter:    Right.

SUHL:       And uh, then you could fax them to us or you could---

Carter:     Exactly. Exactly. Exactly. So, well, I'll be in Little Rock all day and uh, till
            about eleven o'clock tomorrow night, uh, at the meeting, so what I'll do, I'll just try
            to contact him. Nine times out of ten he'll probably be at the, uh, state meeting.
            And, uh, but I'll make contact with him---

SUHL:       You're gonna have to really press him to get him to go get them though, 'cause you
            know how he is---he'll put it off, and I'd like to see them.

Carter:     Right.

SUHL:       I'm pretty sure, from what it is, I've already seen the reports---

Carter:     Right.

SUHL:       And I know what it is, and actually it looked pretty good other than stuff they're
            trying to cite us that weren't regs.

Carter:     Exactly. Exactly. Exactly. Exactly. And what I'll do – I'll try to get my hands
            on them tomorrow while I'm in Little Rock right up under his nose.

SUHL:       And, uh – but it's [other ADHS deputy director], and she's out of control. . . .

       158.    On August 4, 2011, Carter called Jones to discuss scheduling a meeting with SUHL

and to discuss obtaining the monitoring reports:

Carter:     Steve.

Jones:      Carter.

Carter:     What's going on man?

Jones:      Working hard, man.

Carter:     Look---good---Look. My boy is out of state for the next two weeks and uh---

Jones:      Ok.

Carter:     Yeah, my boy is out of state for the next two weeks.  Uh, I talked to him last night
            and he said he will be glad to sit down and chat with us once he get back in.   But he

did tell me that, um, he is aware of the, of the, complaint or something that they got going.  He said they probably trying to cite him and I told him I think you got ahold of the paperwork.  He told me, if he can, uh, uh, if he can, if I can get that paperwork from you and fax it to him and let him see what's going on.    But he out of state for the next two weeks and when he get back in he'll definitely schedule a meeting with us because he wanted to talk to you about something anyway.

Jones:       OK.  Deal.

Carter:      Alright, I---I'm in Little Rock, right in front of [church name] right now so you coming to meeting tonight?

Jones:       Yeah, I'll be there tonight.  We'll hook up then.

Carter:      Alright, yeah, yeah, just, yeah, yeah bring it up there and I'll get with you then, alright?

Jones:       Deal, man.  Alright.  Take care.

Carter:      Alright.  Thanks.  Thanks.  Alright.

159.    After additional calls scheduling the meeting, on September 11, 2011, Carter,

Jones, and SUHL met at a restaurant in Memphis, Tennessee, as alleged in paragraphs 139 through

142 above, to discuss the issues referenced in their phone conversations.  Either prior to, or

during, this meeting Jones provided ADHS monitoring documents to Carter or SUHL for SUHL's

review.

160.    On or about November 27, 2011, after Carter had been approached by the Federal

Bureau of Investigation and began cooperating in the investigation, during a recorded meeting in

which Carter made a controlled payment of $1,000 to Jones, Jones agreed to look into the issue

involving referrals to SUHL's competitor in the following exchange:

Carter        Yes sir.  Listen let me ask you something man.  What is this boy harping about with Northwest Arkansas?  You know last time we met.  You talking about Northwest Arkansas, he can't do no business because they were doing all the referrals at Northwest Arkansas.  What's going on?

-32-

Jones        You know I haven't looked into that but I will.   You know we got a new director.

Carter       Is that right?

Jones        Yeah, new girl out of Oklahoma.

Carter       She over that part.

Jones        She's [says name].   I've been having her up to my office there.   Taken her to
             lunch a couple of times kind of built a relationship there man.

Carter       Is that right?

Jones        Yeah, I was trying to go around [the current director] on this subject.   Obviously
             she might feel threatened I think.

Carter       Let me ask you something.   What, can you do anything to help curtail it?   Because
             the way he talking man that they just running havoc up there.   Like a private
             provider can't compete at all.

Jones        Yeah.   I'll take a look at it.   Tell me what's going on.

Carter       I don't know you know he mentioned it last time.   When we was at Texas de.
             Then he start talking about you know.

Jones        You have not heard anything else

Carter       Oh you hadn't.   No because we haven't had no business.   Let me ask you
             something else.   Then he talked about your wife.   Which one of his companies did
             your wife apply for?   She didn't.

Jones        She didn't apply.   She didn't.

Carter       Right.   Yeah do me a favor man.   See what you can do about that Northwest
             Arkansas problem.   You know he been kinda talking about it for like I had to go up
             there and get that.   You know what I mean.   'Cause that boy there tripping.   In
             2012, man, he gonna have to come up to speed.

Jones:       --ang right!

Carter:      He gonna have to come up to speed, man.

-33-

Jones:      But let me, I want to work with these new girls, man [a new ADHS director].
            She's, I think she's gonna be alright.

Carter      That right.

Jones       Yeah.

Carter      What's her name?

Jones       [Says name]

Carter:     See what you can come up with man and let me know.

Jones: Alright.   I'll be in touch.

        All in violation of 18 U.S.C. § 371.

## COUNTS TWO THROUGH FOUR
### Honest Services Wire Fraud
### (Violation of 18 U.S.C. §§ 1343, 1346, and 2)

161.     Paragraphs 1 through 160 of this Indictment are realleged and incorporated as though fully set forth herein.

162.     From in or about April 2007 and continuing until in or about February 2012, in the Eastern District of Arkansas and elsewhere, the defendant, THEODORE E. SUHL, and Steven B. Jones, Phillip W. Carter, and Person A, aided and abetted by each other, devised and intended to devise a scheme and artifice to defraud and deprive the citizens of the State of Arkansas, the government of the State of Arkansas, and ADHS of their right to the honest services of Jones, as the deputy director of ADHS, through bribery.

163.     Between in or about April 2007 and continuing until in or about February 2012, in the Eastern District of Arkansas and elsewhere, SUHL, Jones, and Carter, aided and abetted by each other and by others known and unknown to the grand jury, for the purpose of executing the above-described scheme and artifice to defraud and deprive, transmitted and caused to be transmitted by means of wire communications in interstate commerce, the following writings, signals, and sounds:

| Count | Date | Wire Transmission |
|-------|------|-------------------|
| TWO | 08/16/2010 | $2,000 check from Account No. XXX699 at RBC Bank (formerly Account No. XXX063 at Florida Choice Bank) deposited into Account No. XXX287 at Regions Bank. |
| THREE | 09/09/2010 | $2,000 check from Account No. XXX699 at RBC Bank (formerly Account No. XXX063 at Florida Choice Bank) deposited into Account No. XXX936 at Regions |

| | | Bank. |
|------|------------|-----------------------------------------------------|
| FOUR | 09/12/2011 | $2,000 check from Account No. XXX699 at RBC Bank deposited into Account No. XXX936 at Regions Bank. |

All in violation of 18 U.S.C. §§ 1343, 1346, and 2.

## COUNT FIVE
### Bribery Concerning Programs Receiving Federal Funds
### (Violation of 18 U.S.C. §§ 666(a)(2)(B) and 2)

164.    Paragraphs 1 through 160 are realleged and incorporated by reference as though fully set forth herein.

165.    From in or about August 2010 and continuing until in or about November 2011, in the Eastern District of Arkansas and elsewhere, the defendant, THEODORE E. SUHL, did knowingly and corruptly give, offer, and agree to give something of value to another person intending to influence and reward Steven B. Jones, a deputy director of ADHS—an agency of the government of the State of Arkansas—in connection with a business, transaction, and series of transactions of ADHS that involved $5,000 or more.

All in violation of 18 U.S.C. §§ 666(a)(2) and 2.

## COUNT SIX
### Travel Act
### (Violation of 18 U.S.C. §§ 1952 and 2)

166.    Paragraphs 1 through 160 of this Indictment are realleged and incorporated as though fully set forth herein.

167.    On or about September 11, 2011, in the Eastern District of Arkansas and elsewhere, the defendant, THEODORE E. SUHL, traveled in interstate and foreign commerce from a location in Arkansas to a location in Tennessee with the intent to promote, manage, establish, and carry on,

and facilitate the promotion, management, establishment, and carrying on, of an unlawful activity, to wit, bribery, in violation of Title 18, United States Code, Section 666(a)(2), and thereafter did perform and attempt to perform acts to promote, manage, establish, and carry on, and facilitate the promotion, management, establishment, and carrying on, of that unlawful activity; that is, SUHL travelled from Crittenden County, Arkansas, to Memphis, Tennessee, to meet with Steven B. Jones and Phillip Carter, and thereafter did corruptly give, offer and agree to give something of value to another person, intending to influence and reward Jones, an agent of ADHS, in connection with the business, transaction, and series of transactions of ADHS involving $5,000 or more.

All in violation of 18 U.S.C. §§ 1952 & 2.