**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS**

| | | |
|---|---|---|
| **UNITED STATES** | ) | |
| | ) | |
| | ) | |
| **v.** | ) | **CRIMINAL NO. 4:15-cr-00300-BRW** |
| | ) | |
| **THEODORE E. SUHL** | ) | |
| | ) | |

**BRIEF IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS
THE INDICTMENT FOR DELAY IN COMMENCING PROSECUTION**
(Defense Pretrial Motion No. 1)

The Government was ready to seek an indictment against Ted Suhl three years ago, but it decided to wait until December 2015 to do so.  By then, the most important witness in the case – Pastor John Bennett of the 15th Street Church of God in Christ – was dead.  Had the indictment been timely brought, Pastor Bennett would have testified at trial that the few thousand dollars in alleged bribes were not bribes at all, but were charitable donations to his church that were a drop in the bucket (less than two percent) of regular donations by Suhl and his family that exceeded $240,000 over nearly ten years.  We know this because that is what Pastor Bennett told a cooperating government witness, and there are recordings of Pastor Bennett's exculpatory statements to prove it.  That all of these payments were donations is also consistent with the Suhls' longtime history of giving generously to churches and other charitable causes.

In 2012, the government said that it anticipated indictment of Suhl that year.  By that time, the government had obtained all the so-called evidence that it has now.  The government was also aware in 2012 that Pastor Bennett would provide testimony that Ted Suhl was innocent.  And it knew that Pastor Bennett was critically ill.  Armed with that knowledge, the government decided not to seek an indictment in 2012 after all, but waited until 2015, after Pastor Bennett died in 2014.

1

Nearly half a century ago, the United States Supreme Court recognized in *United States v. Marion*, 404 U.S. 307, 324 (1971), that the Fifth Amendment's Due Process Clause protects a criminal defendant against unreasonable preindictment delay.[1]  When faced with such delay, "the Court must intervene to ensure that the constitutional rights of criminal defendants are not violated."[2]  The government's three-year delay warrants such intervention here because the delay rendered Pastor Bennett's critical testimony unavailable and makes a fair trial impossible.

## THE FACTS

### I.    The Indictment's Convoluted Alleged Scheme.

The Indictment attempts to cobble together a purported multi-step bribery scheme in which (1) Suhl donated to Pastor Bennett's church, (2) the checks were cashed by Pastor Bennett, (3) Pastor Bennett or Phillip Carter passed some cash to Steven Jones, Deputy Director of the Arkansas Department of Human Services, and (4) in exchange Jones took or agreed to take official action.[3]  But the facts alleged in the Indictment are not nearly that simple.

As an initial matter, nearly all of the donations cited in the Indictment actually stayed with the church, Pastor Bennett, and Carter.  They did not end up with Jones at all.[4]  Indeed, the allegations often put this money in Pastor Bennett's hands, as one might expect for church donations.[5]  Moreover, the Indictment does not actually allege official acts by Jones.[6]  Instead,

---

[1] *United States v. Miller*, 20 F.3d 926, 931 (8th Cir. 1994).

[2] *United States v. Gross*, 165 F. Supp. 2d 372, 385 (E.D.N.Y. 2001).

[3] Pastor Bennett is referred to as "Person A" in the Indictment.  *See* Indictment ¶ 5.

[4] *See, e.g.*, Indictment ¶¶ 28, 41, 48, 56, 65, 71, 84, 106, 109, 118, 127, 146.

[5] *See id.* ¶¶ 28, 41, 48, 56, 65, 71, 84, 98, 105, 109, 118, 126, 145-46.

[6] *See* Defense Pretrial Motion No. 2 at pp. 8.  The Indictment even alleges as an "official action" that Suhl allegedly asked Jones to support pending legislation, despite the fact that Jones flat out

the Indictment repeatedly alleges that Jones said he would "look into" an issue, rather than alleging any actual act or even an agreement to act.[7]

Given the lack of both payments and official acts, it is not surprising that the Indictment also fails to link alleged payments to alleged official acts.  Instead, the Indictment has separate sections for "Meeting and Payments,"[8] and "Official Actions & Suhl's Requests for Official Acts."[9]  Although it is the norm in bribery indictments to allege these together as quid pro quo, they were separated here because the alleged payments simply do not line up with the alleged "official acts."  For example, despite alleging no official acts from 2008 until January 2011,[10] the Indictment nevertheless spends sixty-one paragraphs across seven pages alleging payments from June 2009 until September 2010, none of which even allegedly made it to Jones.[11]  The fact that so much of the Indictment is devoted to time periods and church contributions that even the government does not attempt to tie to the supposedly bribed public official (much less to official actions by that official) raises serious questions about the sufficiency of these allegations.

---

told Suhl he would not support the bill and the fact that Jones was not even a legislator.  *See* Indictment ¶ 151.  It is hard to square Jones' refusal with the definition of an official action, much less with allegations of bribery or deprivation of honest services.  The Indictment also alleges that Jones somehow provided Suhl with a monitoring report, *see id.* ¶ 159, but as addressed in other motions, this does not constitute an official action as a matter of law.

[7] *See* Indictment ¶¶ 149, 150, 152, 153.

[8] *Id.* at 5.

[9] *Id.* at 21.

[10] *See id.* ¶¶ 149-150.

[11] *See id.* ¶¶ 66-127.

## II.      The Government Secures Carter's Cooperation in 2011.

Phillip Carter, a Crittenden County Juvenile Probation Officer and a West Memphis City

Councilman, was hired as a campaign "consultant" by a candidate for State Representative.  The

government intercepted telephone conversations on Carter's telephone beginning in May 2011

and, with a few brief interruptions, continuing through October 30, 2011.[12]  These intercepts led

to evidence that Carter was the ringleader in an illegal election fraud scheme of stunning

audacity.  Carter was caught red-handed paying for votes for his candidate and conspiring to

destroy absentee ballots that were cast against his candidate – a "strategy" he had "previously

used . . . in other state and federal elections on behalf of other candidates."[13]  Confronted with

the evidence of what he had done, Carter began cooperating with the government to try to avoid

going to prison.

Carter told another government informant that in order to avoid prison he would, in his

own words, "help the FBI get as many 'Big Fish' as possible."[14]  "[A]ll he want[ed] to know"

was how the FBI wanted the fish prepared – "blackened, fried or grilled."[15]  Regarding Suhl,

"Carter said f[*%#] Ted Suhl, he would help take down whoever the FBI wanted."[16]  By

---

[12] Ex. 1.  Exhibit 1 is among the exhibits that have been partially redacted or excerpted.  These exhibits can be filed in their entirety under seal if the Court so requests.

[13] *United States v. Phillip Wayne Carter*, No. 4:12-CR-00230-KGB (E.D. Ark. 2012).  Ex. 2, ¶¶ A.5, D.1-9, E.8-13; Ex. 3.

[14] Ex. 4.

[15] Ex. 5.

[16] *Id.*  Carter also "joked that he was the FBI now." *Id.*

November 4, 2011, Carter had agreed to cooperate fully with the government and began wearing a wire and recording conversations with his alleged co-conspirators.[17]

### III.     The Government Secures Jones's Cooperation in Early 2012.

The first "big fish" Carter tried to cook for the government was Steven Jones, Deputy Director at the Arkansas Department of Human Services.  At the government's behest, Carter lured Jones into a sting operation on November 27, 2011, giving Jones $1,000 cash.[18] Amazingly, the FBI provided the $1,000; the cash was <u>not</u> money given to the 15th Street Church of God in Christ by Suhl.[19]  Two months later, on January 29, 2012, the government had Carter approach Jones again.  Assistant U.S. Attorneys and FBI agents confronted Jones, who agreed that day to cooperate with the government.[20]

### IV.     Pastor Bennett Was Recorded Providing Evidence of Suhl's Innocence.

The next day, Jones went to Pastor Bennett's home.  On February 1, 2012, Carter surreptitiously recorded a conversation he initiated with Pastor Bennett about Jones's visit.  In that conversation, Pastor Bennett repeatedly vouched for Suhl's innocence.  Pastor Bennett told Carter that:

- He was "ignorant" of any criminal conspiracy.[21]

- Suhl had given "donations" and "contributions" to the church, not bribes:  Suhl has "given my church man, <u>donations.  I said we've given him tax, ah, writeoffs</u>, man.  He's

---

[17] *See* Ex. 6.

[18] *See* Indictment ¶ 160.

[19] *See id.* ¶¶ 145-46, 160.

[20] Ex. 19.

[21] Ex. 7, at DOJ-00020425.  For the purposes of this motion, the Defense assumes the accuracy of the government's transcriptions of its recordings.

given us <u>over $60 some thousand dollars as contributions</u>. . . . [Ted Suhl's] dad [Bud Suhl] was, man, was crazy about me."[22]

- He and Suhl's father were "close friends, man.  I said he wanted me to be a bishop.  I said, in fact, that one time man, I said, ah, <u>he gave me some money to help me in a campaign for bishop</u>, you know?"[23]

On February 5, 2012, the government "tasked" Carter to meet with and record Pastor Bennett again, presumably to try to obtain evidence against Suhl.[24]  Pastor Bennett again provided statements establishing Suhl's innocence.  He said, among other things, that:

- He and the church never gave Jones anything ("[W]e ain't never did no business with [Jones]").[25]

- Suhl paid the church for "transportation service[s]."[26]

- Ted Suhl's father Bud Suhl helped Pastor Bennett financially when he needed a liver transplant.[27]

- "I ain't laundering no money."[28]

- Suhl's "always been donating to us.  That was a donation, man" and "everything [Suhl] gave me, I said was donation."[29]

- "I talk to anybody, man, I say I ain't, ain't got nothing to hide."[30]

---

[22] *Id.* at DOJ-00020419 (emphases added).

[23] *Id.* at DOJ-00020428 (emphasis added).

[24] Ex. 8.

[25] Ex. 9, at DOJ-00019944-45.

[26] *Id.* at DOJ-00019944.

[27] *Id.* at DOJ-00019945.  Pastor Bennett recalled that he sent Carter to tell the Suhls that he "needed [the] transplant."  *Id.*

[28] *Id.* at DOJ-00019949.

[29] *Id.* at DOJ-00019954; *id.* at DOJ-00019958-59.

[30] *Id.* at DOJ-00019955.

## V.  The Government Was Ready To Indict by March 2012.

By March 2012, the government had (1) Carter's cooperation, (2) Jones's cooperation, (3) hundreds of hours of recorded phone conversations, and (4) video surveillance of a September 2011 dinner attended by Carter, Suhl, and Jones that is the last alleged contact whatsoever between Suhl and Jones and the last act by Suhl alleged in the Indictment.[31]  In a March 2012 memorandum to the FBI's Public Corruption Unit Coordinator, the FBI's lead Special Agent reported that "bribery indictments are anticipated within the next few months against Carter, Jones, Bennett and Suhl."[32]

## VI.  The Government's June 2012 Raid of Suhl's Business Yielded Nothing.

Early on the morning of June 13, 2012, while the youngest of the approximately 100 children receiving in-patient treatment at Suhl's healthcare company Trinity Behavioral Health were heading to breakfast, at least 55 FBI agents, many brandishing firearms, stormed the premises.  Over the course of 31 hours the FBI seized computers and media totaling 12 Terabytes of data and enough filing cabinets to fill two trucks.[33]

The raid was apparently a bust.  The raid did not yield any new evidence, or at least nothing cited in the Indictment.

---

[31] *See, e.g.*, Indictment ¶¶ 139-141.

[32] Ex. 10 (emphasis added).  In December 2012, the Special Agent and a government cooperator, already thinking past the indictment, "discussed possible defenses Suhl and/or ACA attorney's [sic] may use if charged with any Federal criminal violations."  Ex. 11.  The FBI report does not detail the contents of this discussion, including whether Pastor Bennett – whom the government still had not interviewed – would be part of these "possible defenses."  *Id.*

[33] Ex. 12, at DOJ-00054070-77 (eight page seizure inventory); Ex. 13 (documenting 200 hours of labor by 10 of 55 FBI agents during seizure).

**VII.    The Government Knew That Pastor Bennett Was Suffering From Life Threatening Illnesses.**

By 2010, the government knew that Pastor Bennett suffered from extremely serious illnesses in the decade from 2004 until his death.  In 2004, Pastor Bennett went into a coma.[34] His "doctors informed [his wife] that he was not going to make it through [the] night and the best thing to do was call his siblings in and make funeral arrangements."[35]  His wife, however, insisted that doctors put Pastor Bennett on a respirator, and he emerged from the coma after three days.[36]  After he awoke, the doctors advised Pastor Bennett that "he should make out a will because he wouldn't live to see Christmas."[37]  Pastor Bennett lived, but only because he received a liver transplant, dialysis treatments to combat kidney failure, and other medical care during the seven months he spent in hospitals.[38]

Unfortunately for Pastor Bennett, his health problems did not end in 2004.  In April 2012, Carter informed the FBI that Pastor Bennett had been in the hospital and upon release was going to "receiv[e] dialysis three times a week."[39]

On May 3, 2014, Carter informed the FBI that Pastor Bennett had been hospitalized again.[40]  Later that month, he informed the FBI that Pastor Bennett had been admitted to the hospital yet again on May 21 "due to bleeding and had received a blood transfusion," and he

---

[34] Ex. 20, at DOJ-00006222.

[35] *Id.*

[36] *Id.*

[37] *Id.*

[38] *Id.*

[39] Ex. 14.

[40] Ex. 15.

reminded the government that Bennett received dialysis three times per week.[41]  On May 30,

Carter advised the Government that Pastor Bennett "was still in the VA Hospital in Memphis,

TN," and on June 23, 2014, that Bennett "had been released from the VA Hospital in Memphis,

TN, and was receiving treatment at home."[42]

Pastor Bennett passed away the next day at the age of 64.[43]  Apparently afraid that Pastor

Bennett would tell the government what he had told Carter,  the government chose not to

interview Pastor Bennett at any time during the investigation.

## VIII.   The Government Did Not Indict Until December 2015.

The government did not call any witness to testify before the Grand Jury regarding the

allegations in the Indictment until December 2, 2015, when it called three witnesses (the lead

FBI Special Agent, Pastor Bennett's widow, and Jones) in a single afternoon.[44]  Jones finished

testifying at 5:27 p.m., and the Grand Jury apparently returned an indictment immediately

thereafter.

---

[41] Ex. 16.

[42] Exs. 17-18.

[43] Ex. 18.

[44] Eight months earlier, in April 2015, two other witnesses testified, but their testimony has no
relevance to the December 2015 Indictment.



Figure. 1 - Timeline

**ARGUMENT**

As then-Chief Judge Richard S. Arnold explained in *United States v. Miller*, the Fifth

Amendment's Due Process clause requires dismissal of an indictment on the basis of

preindictment delay – even if it is brought within the statute of limitations – if the delay "actually

and substantially prejudiced the presentation of the[] defense" and the "delay was

unreasonable."[45]   "Under this standard, a showing of actual prejudice must first be established; if

it is, the court will then inquire into the reasons for the delay and balance those reasons against

the demonstrated prejudice."[46]   The standard does not require proof that the government acted in

---

[45] *United States v. Miller*, 20 F.3d 926, 931 (8th Cir. 1994).

[46] *Id. Miller* represents the earliest-in-time and therefore controlling Eighth Circuit standard, notwithstanding "inconsistent authority within the Eighth Circuit and a decades-long split among the circuit courts of appeals." *United States v. Jakisa*, No. 14-cr-119, 2015 WL 1810259, at *13 (D. Minn. Apr. 21, 2015).  In the Eighth Circuit, "when faced with conflicting prior panel opinions, the earliest opinion must be followed . . . ." *Mader v. United States*, 654 F.3d 794, 800 (8th Cir. 2011) (en banc).  *Miller*'s balancing standard traces back to at least *United States v. Jackson* in 1974:  "[W]e view the Fifth Amendment claim as one involving a process of balancing the reasonableness of the delay against any resultant prejudice to the defendant . . . ." 504 F.2d 337, 339 (8th Cir. 1974).  In *United States v. Taylor*, the Eighth Circuit reaffirmed the controlling nature of the balancing standard after *United States v. Lovasco*, 431 U.S. 783 (1977) – the Supreme Court's most recent preindictment delay case.  *See* 603 F.2d 732, 735 (8th Cir. 1979) (citing *Lovasco*, 431 U.S. at 790).
   The seemingly heightened standard that the delay must be "intentional and improperly motivated," *United States v. Scoggins*, 992 F.2d 164, 166-67 (8th Cir. 1993), is not the correct test.  In *United States v. Barket*, the Eighth Circuit rejected that standard, applying the *Miller* balancing test over the government's express objection on appeal that the defendant had "failed to demonstrate that the delay was <u>intentionally sought by the Government to gain tactical advantage</u>."  530 F.2d 189, 192, 196 (8th Cir. 1976); *id.* at 198 (Henley, J., dissenting) (recognizing that the majority affirmed on the basis of "culpable negligence" but contending that the standard should require "bad faith or improper motive" or "detrimental reliance by a putative defendant on the initial decision of the government not to prosecute").  Additionally, that different standard traces back no earlier than the 1980 panel opinion in *United States v. Dennis*. *See* 625 F.2d 782, 794 (8th Cir. 1980).  But *Dennis* inexplicably departed from the established balancing standard and cited *United States v. Page*, 544 F.2d 982, 984 (8th Cir. 1976), for a proposition nowhere to be found in the case:  that dismissal for preindictment delay under the Fifth Amendment requires "a deliberate delay for tactical advantage." *Dennis*, 625 F.2d at 794. To the contrary, *Page*, citing *Jackson*, expressly <u>endorsed</u> the balancing standard.  *See Page*, 544 F.2d at 984 ("[T]he determination of improper delay involves a process of balancing the

bad faith.[47]  It is enough to show the government acted with "culpable negligence"[48] or in

"reckless" disregard of the effect that delay would have on the defendant's ability to "adequately

defend himself."[49]  Here, the government's preindictment delay caused "actual and substantial

prejudice" because it made Pastor Bennett's exculpatory testimony unavailable, and the weight

of that prejudice requires dismissal in light of the government's reckless disregard of the

prejudicial effect that the unreasonable delay would have on Ted Suhl.

## I.    The Government's Preindictment Delay Has Actually and Substantially Prejudiced Suhl's Defense.

Actual and substantial prejudice is present where the delay has caused "<u>witnesses or</u>

<u>documents</u>" of sufficient importance to be "lost during the delay," and the "missing <u>testimony or</u>

<u>information</u> is not available through other sources."[50]  The Eighth Circuit recognizes that the

---

reasonableness of the delay against any resultant prejudice to the defendant." (citing *Jackson*, 504 F.2d at 339)).
    Like the Eighth Circuit, the Fourth, Seventh, and Ninth Circuits have similarly "interpret[ed] *Marion/Lovasco* as requiring a balancing test that weighs the prejudice to a defendant against the government's reasons for the delay."  *United States v. Santiago*, 987 F. Supp. 2d 465, 489 (S.D.N.Y. 2013) (citing cases); *see also Gross*, 165 F. Supp. 2d 372 at 379 (surveying law).

[47] *See, e.g.*, *United States v. Jackson*, 488 F. Supp. 2d 866, 873 (D. Neb. 2007) (explaining defendants need not show intentional or bad faith conduct "defined to mean [direct evidence that] the government <u>consciously tried to delay</u>" (emphasis added)); *Santiago*, 987 F. Supp. 2d at 497 (*Marion* and *Lovasco* do not hold "that a conspiracy-like scheme prompted by some evil motive is required").  It would be inconsistent with the *Miller* balancing standard to require a showing of bad faith because "[n]o defendant can get into the mind of a prosecutor to determine why a case was delayed, and certainly no prosecutor will ever admit to such bad faith purposes." *United States v. Sabath*, 990 F. Supp. 1007, 1018 (N.D. Ill. 1998).

[48] *Barket*, 530 F.2d at 196; *accord, e.g.*, *United States v. Ross*, 123 F.3d 1181, 1184 (9th Cir. 1997) ("Preindictment delay that results from negligence or worse may violate due process.").

[49] *Jackson*, 488 F. Supp. 2d at 873; *see also infra* p. 14 & n. 56.

[50] *United States v. Jackson*, 446 F.3d 847, 851 (8th Cir. 2006) (emphases added); *Santiago*, 987 F. Supp. 2d at 485 ("Actual prejudice in the context of the *Marion/Lovasco* paradigm generally means the loss of documentary evidence or the unavailability of a key witness.").

unavailability of a key defense witness as a result of the government's preindictment delay

establishes actual and substantial prejudice.[51]

Ted Suhl has suffered actual and substantial prejudice because the government's three-

year delay in seeking an indictment has rendered Pastor Bennett's testimony unavailable at trial.

As explained above, Pastor Bennett repeatedly insisted that Suhl was innocent on the

surreptitious audio recordings made by Carter, acting as the government's agent.  Pastor Bennett

was in the best position to know the purpose of Suhl's payments, and he emphasized that they

were donations or payments for legitimate services, including the use of church vans.[52]  Pastor

Bennett would also have given powerful live testimony that he was not involved in a conspiracy

with Suhl, Carter, and Jones from 2007 through 2012 to bribe Jones.[53]

---

[51] *See United States v. Lovasco*, 532 F.2d 59, 61 (8th Cir. 1976) (agreeing "the defendant ha[d] been prejudiced by reason of the death" of "a material witness on [the defendant's] behalf"), *reversed on other grounds*, 431 U.S. 783 (1977); *Barket*, 530 F.2d at 193 (finding "unique showing of prejudice" based upon factors including deaths of six defense witnesses); *accord Santiago*, 987 F. Supp. 2d at 485 (defendant "easily m[et] the standard for establishing . . . actual[] prejudice[]" on count one of indictment based on unavailability of eye witness who "ha[d] given several statements that at the very least undermine[d] the Government's theory of the case and could well result in [the defendant]'s acquittal"); *Sabath*, 990 F. Supp. at 1014 ("[W]itness deaths alone may meet the required showing of prejudice."); *id.* at 1010, 1014 (finding "concrete and substantial prejudice" based on factors including "three important witnesses ha[d] died during the government's delay in indicting th[e] case"); *United States v. Sample*, 565 F. Supp. 1166, 1177 (E.D. Va. 1983) ("actual and substantial prejudice" established where deceased witness's exculpatory testimony was documented in a deposition).

[52] *Supra* pp. 5-6; *see, e.g.*, Ex. 9, at DOJ-00019958-59 ("I used to work for the man, and I said he, <u>everything he gave me, I said was donation</u>, I said, in fact, he even help me with my campaign for bishop." (emphasis added)); Ex. 7, at DOJ-00020419 ("[H]e's given my church man, <u>donations</u>.  I said we've given him tax, ah, writeoffs, man.  He's given us over $60 some thousand dollars as <u>contributions</u>.  I said, and I've acknowledged that in a letter of <u>contributions</u> . . . ." (emphases added)); *id.* ("I had a job with them man, trying to transport children.").

[53] *Supra* pp. 5-6; *see, e.g.*, Ex. 9, at DOJ-00019948 ("I say Steve, I said I'm not in it, man."); *id.* at DOJ-00019952 ("[Jones] said . . . they gon try to get you for laundering.  I say Steve, I ain't laundering no money, I said but try and let em come.  I say I'm ready.  I say I ain't got no problem, man.").

Critically, Pastor Bennett would have been the <u>only</u> defense witness – other than Suhl

himself – who could have testified based on direct knowledge about the purpose of the

donations.  But Suhl can testify only by forfeiting his constitutional right not to testify.[54]  Pastor

Bennett would also have been the <u>only</u> defense witness who could have testified based on direct

knowledge about alleged cash transactions between Bennett and Carter and one alleged

transaction with Jones – transactions for which the alleged documentary evidence ended with

Bennett.[55]

## II.    The Delay Was Unreasonable and the Government Acted in Reckless Disregard of the Prejudicial Effect That Delay Would Have on Ted Suhl.

The government's reckless disregard of the prejudicial effect that delay would have on

Suhl's defense establishes the unreasonableness of the delay, warranting dismissal under the

*Miller* balancing test.[56]

---

[54] *See State v. Whitlow*, 326 P.3d 607, at 617-18 (Or. Ct. App. 2014) (discussing prejudice of unavailable impeachment evidence on issues that turn on a witness's credibility due to the lack of other types of evidence).

[55] *See* Indictment ¶¶ 18, 28, 41, 48, 56, 65, 71, 84, 118, 146.  Pastor Bennett also cannot testify based on direct knowledge about alleged transactions among church accounts and checks issued to himself or Carter.  *See id.* ¶¶ 20, 40, 47, 64, 82, 95, 106, 108, 116, 127, 146.

[56] *See, e.g.*, *Barket*, 530 F.2d at 196 (8th Cir. 1976); *Jackson*, 488 F. Supp. 2d at 873; *Santiago*, 987 F. Supp. at 497-98 (finding "a series of deliberate, non-inadvertent decisions by two sets of federal prosecutors" were "made in reckless disregard of a well-known circumstance that had the potential to (and in fact did) lead to the loss of the witness most important to the defendant"); *id.* at 498 ("If this showing is not sufficient to meet any test imposed by the Supreme Court in *Marion* and *Lovasco*, then those cases mean nothing at all."); *Sabath*, 990 F. Supp. at 1016-17, 1019; *Sample* 565 F. Supp. at 1185 (concluding government's delay was in reckless disregard of the circumstances).
Significantly, such recklessness satisfies even the *Scoggins* standard that delay be "intentional," 992 F.2d at 167, as that term is understood in the prejudicial preindictment delay context.  *See, e.g.*, *Jackson*, 488 F. Supp. 2d at 873; *Jackson*, 446 F.3d at 849 n.2 (Eighth Circuit "not[ing] that the Supreme Court has suggested in dicta that the state-of-mind prong might be satisfied if the government delay was in reckless disregard of its probable prejudicial impact upon the defendant's ability to defend against the charges." (internal quotations marks and citation omitted)).  As the Eighth Circuit has recognized, the government conceded in *Lovasco*

In *United States v. Barket*, the Eighth Circuit affirmed the district court's dismissal of a criminal indictment because the government's preindictment delay violated the defendant's Fifth Amendment Due Process rights.[57]  Applying the balancing test, the majority of the panel found prejudice based upon the government's four-year delay and the district court's factual finding that the delay caused the unavailability of "six material witnesses [who] had died and others had faded memory of events crucial to [defendant]'s defense."[58]  Like Pastor Bennett, several of those material witnesses had allegedly received monies and thus had unique knowledge about a "crucial issue" – the actual nature of a payment that the defendant claimed was a loan but the government alleged was a political contribution.[59]  The majority weighed this "severe" prejudice along with its finding that the delay was unreasonable in light of the government's "culpable negligence," including dysfunction and communication failures among government entities that extended the delay, and other factors including the "apparent weakness" of the government's case.[60]  The majority, over a dissent, rejected the government's argument on appeal that the defendant had "to demonstrate that the delay was intentionally sought by the Government to gain tactical advantage."[61]

---

that reckless conduct could violate due process.  *See United States v. Bartlett*, 794 F.2d 1285, 1293 n.10 (8th Cir. 1986) (observing in dicta "the government's concession" in *Lovasco* that a showing of "'prosecutorial delay incurred in reckless disregard of circumstances, known to the prosecution, suggesting that there existed an appreciable risk that delay would impair the ability to mount an effective defense,' would constitute a violation of the due process clause" (quoting *Lovasco*, 431 U.S. at 795 n. 17)).

[57] 530 F.2d at 196.

[58] *Id.* at 192-93.

[59] *Id.* at 193.

[60] *Id.* at 193-96.

[61] *Id.* at 192, 196-97.

In *United States v. Jackson*, then-Chief Judge Bataillon of the District of Nebraska had dismissed a criminal indictment based on the government's preindictment delay, but the Eighth Circuit remanded, holding, on the record before it, that the defendant had failed to show actual prejudice.[62]   On remand, the trial court found there was "no doubt" that the defendant suffered "actual and substantial prejudice" as a result of missing evidence.[63]   That evidence was an exculpatory online conversation for which "there [were] no original transcripts," "either because computers [were] missing or because instant-message conversations were not maintained or archived" by the government.[64]   "[I]f the charges had been promptly and properly filed against the defendant," the court held, "reliable evidence would likely have been available and not destroyed."[65]   Instead, "the government sat on th[e] case for a significant period of time and permitted the evidence to disappear."[66]   Despite "no direct evidence" that the Government "consciously tried to delay," the trial court found that it was "significant and very intentional" that "the file languished on the desk of [the prosecutor] for two years."[67]   Thus, "[t]here was an intentional decision not to make [it] a priority case, not to preserve evidence, and not to prosecute th[e] case."[68]   For these reasons, the *Jackson* court dismissed the indictment, holding

---

[62] 488 Supp. 2d at 868-69 (citing *Jackson*, 446 F.3d at 852).

[63] *Id.* at 872.

[64] *Id.* at 869-70.

[65] *Id.* at 873.

[66] *Id.* at 872 n.5.

[67] *Id.*

[68] *Id.*

that the government's reckless preindictment delay had "caused [the] defendant to be unable to adequately defend himself."[69]

As in *Jackson*, the record here permits no conclusion other than that the government recklessly disregarded the prejudicial impact that its delay would have on Ted Suhl.  It "sat on [its] case for a significant period of time and permitted" Pastor Bennett's testimony "to disappear."[70]

The Court does not have to take our word for it because the government itself expressly concluded that it anticipated an indictment against Ted Suhl in 2012.  The lead FBI Special Agent's March 2012 memorandum to the FBI's Public Corruption Unit Coordinator reported that "bribery indictments are anticipated within the next few months against Carter, Jones, Bennett and Suhl."[71]  As explained above, by 2012, the government had all the so-called evidence that it has now for its case against Suhl including Carter's and Jones's cooperation, hundreds of hours of recorded phone conversations, and video surveillance.  These facts alone justify dismissal, but the government knew more.  The government also knew that Pastor Bennett was suffering from life threatening illnesses and had been hospitalized for extended periods of time.[72]  The government had contemporaneous knowledge of Pastor Bennett's rapidly deteriorating health

---

[69] *Id.* at 873.

[70] *Id.* at 872 n.5; *Santiago*, 987 F. Supp. 2d at 497-98; *see also United States v. Alderman*, 423 F. Supp. 847, 857 (D. Md. 1976) (finding unreasonable preindictment delay where case was "ready for indictment" two years prior to indictment).  Even if the record here permitted the conclusion that the government did not act recklessly, there would be no question that the government was negligent, which in combination with the substantial prejudice to Suhl, warrants dismissal.  *See Barket*, 530 F.2d at 196.

[71] Ex. 10 (emphasis added).

[72] *Supra* pp. 8-9; *see, e.g.*, Ex. 20, at DOJ-00006222; Ex. 9, at DOJ-00019945 (liver transplant); Ex. 14 (FBI informed in April 2012 that Bennett had been hospitalized and upon release was going to "receiv[e] dialysis three times a week").

and repeated hospitalizations in the months immediately prior to his June 2014 death at the age of 64.[73]  Knowing that Pastor Bennett had repeatedly insisted that Suhl was innocent, and knowing that Pastor Bennett was critically ill, the government chose not to even interview Bennett before his death, much less to seek an indictment.

## CONCLUSION

The government's delay has made it impossible for Ted Suhl to have a fair trial.  His Fifth Amendment Due Process rights have been violated, and dismissal of the Indictment is required.

Dated:  April 7, 2016                                     Respectfully submitted,


                                                          By:    /s/ Robert M. Cary
                                                          Robert M. Cary (*pro hac vice*)
                                                          WILLIAMS & CONNOLLY LLP
                                                          725 Twelfth Street, N.W.
                                                          Washington, DC 20005
                                                          Telephone: (202) 434-5000
                                                          Facsimile: (202) 434-5029
                                                          rcary@wc.com

                                                          Charles A. Banks (Bar No. 73004)
                                                          BANKS LAW FIRM PLLC
                                                          100 Morgan Keegan Dr., #100
                                                          Little Rock, AR 72202
                                                          Telephone: (501) 280-0100
                                                          Facsimile: (501) 280-0166
                                                          cbanks@bankslawfirm.us

                                                          *Attorneys for Defendant Theodore E. Suhl*

---

[73] *Supra* pp. 8-9; *see, e.g.*, Ex. 15 (readmitted to hospital); Ex. 16 (readmitted to hospital again "due to bleeding and had received a blood transfusion"); Exs. 17-18.