# Exhibit 1

U.S. Department of Justice
United States Attorney's Office
Eastern District of Arkansas
425 W. Capitol Ave., Ste. 500
Little Rock, Arkansas 72201-3536
Official Business

TRINITY BEHAVIORAL HEALTHCARE
PO BOX 315
WARM SPRINGS, AR 72478



U.S. OFFICIAL MAIL US POSTAGE
PENALTY FOR
PRIVATE USE
$300
★ ★ ★
FP ★ ★ ★   1STCLASS RTL
$ 00.46
Mailed From 72201
04/02/2013
037 A 000325032Q



**U.S. Department of Justice**

*United States Attorney*
*Eastern District of Arkansas*

Post Office Box 1229
425 W. Capitol Avenue, Suite 500
Little Rock, Arkansas 72203

March 30, 2013

TRINITY BEHAVIORAL HEALTHCARE
1033 OLD BURR RD
WARM SPRINGS, AR  72478

As part of an investigation by the Federal Bureau of Investigation, please be advised of the following:

On May 2, 2011 and amended May 3, 2011, in Case No. 4:11CM00023, United States District Court Judge Susan Webber Wright, Eastern District of Arkansas, authorized the interception of wire and electronic communications to and from telephone number [Redacted] subscribed to 15th Street Church of God in Christ, 201 S. 14th Street, West Memphis, Arkansas  72301, used by Phillip Wayne Carter for a period of thirty (30) days.  The authorized interception period included May 3, 2011 to June 2, 2011.  On June 6, 2011, all original recordings were sealed by Order of United States District Judge Susan Webber Wright, Eastern District of Arkansas.  Subsequent reauthorizations were made as follows:

• On June 9, 2011, U.S. District Court Judge Susan Webber Wright authorized the interception of wire and electronic communications to and from telephone number [Redacted] [Redacted] subscribed to 15th Street Church of God in Christ, 201 S. 14th Street, West Memphis, Arkansas  72301, used by Phillip Wayne Carter for a period of thirty (30) days.  The authorized interception period included June 9, 2011 to July 8, 2011.  On July 11, 2011, all original recordings were sealed by Order of U.S. District Judge Susan Webber Wright;

• On July 7, 2011, U.S. District Court Judge Susan Webber Wright authorized the interception of wire and electronic communications to and from telephone number [Redacted] [Redacted] subscribed to 15th Street Church of God in Christ, 201 S. 14th Street, West Memphis, Arkansas  72301, used by Phillip Wayne Carter for a period of thirty (30) days.  The authorized interception period included July 7, 2011 to August 6, 2011.  On August 8, 2011, all original recordings were sealed by Order of U.S. District Judge Susan Webber Wright;

• On August 5, 2011, U.S. District Court Judge Susan Webber Wright authorized the interception of wire and electronic communications to and from telephone number **Redacted**, subscribed to 15th Street Church of God in Christ, 201 S. 14th Street, West Memphis, Arkansas  72301, used by Phillip Wayne Carter for a period of thirty (30) days.  The authorized interception period included August 5, 2011 to September 2, 2011.  On September 7, 2011, all original recordings were sealed by Order of U.S. District Judge Susan Webber Wright;

• On September 2, 2011, U.S. District Court Judge Susan Webber Wright authorized the interception of wire and electronic communications to and from telephone number **Redacted** subscribed to 15th Street Church of God in Christ, 201 S. 14th Street, West Memphis, Arkansas  72301, used by Phillip Wayne Carter for a period of thirty (30) days.  The authorized interception period included September 2, 2011 to September 30, 2011.  On October 3, 2011, all original recordings were sealed by Order of U.S. District Judge Susan Webber Wright; and,

• On September 30, 2011, U.S. District Court Judge Susan Webber Wright authorized the interception of wire and electronic communications to and from telephone number **Redacted** subscribed to 15th Street Church of God in Christ, 201 S. 14th Street, West Memphis, Arkansas  72301, used by Phillip Wayne Carter for a period of thirty (30) days.  The authorized interception period included September 30, 2011 to October 30, 2011.  On November 2, 2011, all original recordings were sealed by Order of U.S. District Judge J. Leon Holmes.

During the period of authorized intercepted above, wire and/or electronic communications to or from your telephone were intercepted.  This notification is being sent to you pursuant to federal law, which requires notice to all parties to intercepted communications.

If you have any questions, you may contact me a **Redacted** or at the address above.

Sincerely,

CHRISTOPHER R. THYER
United States Attorney

PATRICIA S. HARRIS
Asst. U.S. Attorney

PSH:mg

# Exhibit 2

U.S. DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS

**FILED**

SEP 0 5 2012

IN OPEN COURT
JAMES W. McCORMACK, CLERK
BY: _____
DEPUTY CLERK

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 4:12-CR-00230 KGB |
| | ) | |
| HUDSON HALLUM; | ) | |
| KENT HALLUM; | ) | |
| PHILLIP WAYNE CARTER; and | ) | 18 U.S.C. § 371 |
| SAM MALONE | ) | |
| | ) | |

## INFORMATION

THE ATTORNEY FOR THE UNITED STATES, ACTING UNDER AUTHORITY
CONFERRED BY 28 U.S.C. § 515 CHARGES THAT:

### COUNT 1
### (TRAVEL ACT CONSPIRACY)

*A.    Factual Background*

1.    On or about January 26, 2011, the state representative for District 54 of the Arkansas

House of Representatives resigned his seat. Accordingly, a special primary election to fill the

seat was scheduled to take place in April 2011. At the time, Arkansas District 54 included West

Memphis, Marion, Earle, and Turrell, Arkansas, as well as other rural areas of Crittenden

County, Arkansas.

2.    Along with others, HUDSON HALLUM declared his candidacy as a Democrat in

the special primary election. Because neither HUDSON HALLUM nor any other Democratic

candidate obtained the required majority of votes in the April 20, 2011 special primary election, a

special primary runoff election took place on May 10, 2011.

3.    A special general election took place on July 12, 2011.

1

4.     KENT HALLUM, father of HUDSON HALLUM, managed the finances and certain logistics of his son's campaign for the District 54 seat, including the campaign's effort to solicit and secure votes cast by absentee ballot (hereinafter more fully described and referred to as "the HALLUM campaign's absentee ballot strategy").

5.     PHILLIP WAYNE CARTER, a West Memphis City Councilman and Crittenden County Juvenile Probation Officer with prior campaign experience, was recruited by HUDSON HALLUM to implement the HALLUM campaign's absentee ballot strategy.  PHILLIP WAYNE CARTER had previously used the same absentee ballot strategy in other state and federal elections on behalf of other candidates.

6.     In order to assist him in implementing the HALLUM campaign's absentee ballot strategy, PHILLIP WAYNE CARTER organized a group of other individuals, which included SAM MALONE, a West Memphis policeman, Crittenden County Quorum Court member, and Crittenden County School Board member.

7.     The HALLUM campaign's absentee ballot strategy involved identifying persons known to have voted by absentee ballot in past elections and identifying persons who were likely to vote in the 2011 District 54 special primary and special general election by absentee ballot.  In furtherance of these goals, HUDSON HALLUM, KENT HALLUM, PHILLIP WAYNE CARTER, and SAM MALONE coordinated with one another and with the Crittenden County Clerk's Office personnel to:

(a)     obtain and submit applications for absentee ballots on behalf of applicants;

(b)     track the mailing of absentee ballots by the Crittenden County Clerk's Office;

(c)     track the applicants' receipt of absentee ballots when delivered through the mail; and

2

(d)     track the return of the ballots by mail to the Crittenden County Clerk's Office.

8.     Arkansas law restricts the number of absentee ballots that an individual can possess at one time.  For example, a designated bearer is a person who is designated to possess no more than two absentee ballots at a time under specific circumstances.  Arkansas law also provides that if a person possesses more than ten absentee ballots at a time, that person is presumptively engaged in absentee ballot voter fraud.  Arkansas law makes it a felony to bribe any voter in exchange for his or her vote.

9.     The District 54 special primary election runoff was held on May 10, 2011.  During that election, HUDSON HALLUM received a total of 890 votes, with 394 of those votes having been cast by absentee ballot.  HUDSON HALLUM's opponent received a total of 882 votes, with 67 of those votes having been cast by absentee ballot.  As a result, HUDSON HALLUM was certified as the winner of the special primary election runoff  by 8 votes.

10.     The District 54 special general election was held on July 12, 2011.  During that election, HUDSON HALLUM received a total of 1,009 votes, with 384 of those votes having been cast by absentee ballot.  HUDSON HALLUM was subsequently certified as the winner of the House District 54 special election.

B.     *Object of the Conspiracy*

1.     The object of the conspiracy was to ensure the election of HUDSON HALLUM as the state representative for District 54 by, among other means, bribery of absentee ballot voters and the use of the United States Mail.

3

C. *The Charge*

From in or about February 2011 through in or about July 2011, in the Eastern District of Arkansas, the defendants,

HUDSON HALLUM,
KENT HALLUM,
PHILLIP WAYNE CARTER, and
SAM MALONE

knowingly and intentionally conspired with one another with intent to facilitate the promotion, management, and carrying on of any unlawful activity, that is, the bribery of voters from District 54 by offering and paying money and goods to influence their votes in violation of Arkansas Code Annotated, Section 7-1-104(a)(4), and in doing so, used the United States Mail. The defendants thereafter performed and attempted to perform an act to facilitate the promotion, management, and carrying on of such unlawful activity, in violation of Title 18, United States Code, Section 1952 (a)(3).

D. *Means and Manner of the Conspiracy*

1. As part of the conspiracy, HUDSON HALLUM and KENT HALLUM tasked PHILLIP WAYNE CARTER, SAM MALONE and others with identifying absentee ballot voters within certain geographic areas. These geographic areas were then divided among PHILLIP WAYNE CARTER, SAM MALONE, and others. Each of the coconspirators was responsible for obtaining absentee ballot votes in favor of HUDSON HALLUM from their assigned areas.

2. As a further part of the conspiracy, PHILLIP WAYNE CARTER and SAM MALONE obtained absentee ballot applications from the Crittenden County Clerk's Office and distributed the absentee ballot applications to particular voters for completion, providing assistance to the voter if necessary. The coconspirators retained copies of the completed

4

absentee ballot applications, but delivered the original absentee ballot applications to the

Crittenden County Clerk's Office through the United States Mail and other means of delivery.

3.   As a further part of the conspiracy, the coconspirators maintained contact with the

Crittenden County Clerk's Office on a routine basis to track when the absentee ballots were

mailed out to identified voters.

4.   As a further part of the conspiracy, the coconspirators made contact with recipients

of the absentee ballots that had been mailed by the Crittenden County Clerk's Office.  This

contact included offers by the coconspirators to assist the voters in completing the absentee

ballots, and actually completing absentee ballots in some instances without regard to the voter's

actual candidate choice.

5.   As a further part of the conspiracy, once the absentee ballots were completed, the

ballots were typically placed in unsealed envelopes and delivered by PHILLIP WAYNE

CARTER, SAM MALONE and others to either HUDSON HALLUM or KENT HALLUM for

inspection to ensure that the absentee ballot votes had, in fact, been cast for HUDSON

HALLUM.  After inspection by HUDSON HALLUM or KENT HALLUM, the absentee ballots

that contained votes for HUDSON HALLUM were sealed and mailed to the Crittenden County

Clerk's Office.  If a ballot contained a vote for HUDSON HALLUM's opponent, it was

destroyed.

6.   As a further part of the conspiracy, some absentee ballot voters received things of

value  from the coconspirators in exchange for their votes being cast for HUDSON HALLUM.

7. As a further part of the conspiracy, the coconspirators would routinely contact the Crittenden County Clerk's Office to inquire about and ensure absentee ballots that had been completed and marked for HUDSON HALLUM were, in fact, received by the Crittenden County Clerk's Office.

8. As a further part of the conspiracy, the coconspirators undertook various efforts to conceal their activities. For example, at times, the coconspirators used rental cars furnished by HUDSON HALLUM and KENT HALLUM when collecting absentee ballots in areas throughout Crittenden County. As another example, when mailing absentee ballots, coconspirators would deposit absentee ballots in mailboxes outside a post office instead of taking the ballots into the post office, thereby avoiding being seen in possession of more than 10 absentee ballots at a time. Additionally, when discussing absentee ballots, the coconspirators used coded language when referring to absentee ballots by using such words as "gold tokens," "duct work," and "watermelons."

9. As a further part of the conspiracy, PHILLIP WAYNE CARTER and SAM MALONE were paid by the HALLUM campaign for their efforts in connection with the HALLUM campaign's absentee ballot strategy. Such compensation included the payment of money, but also included other non-monetary compensation not publicly declared in HALLUM campaign election reports as required by state law.

E. *Overt Acts In Furtherance of the Conspiracy*

In furtherance of the conspiracy and to effectuate the objects thereof, one or more of the following overt acts was committed in the Eastern District of Arkansas:

1. On May 3, 2011, KENT HALLUM instructed PHILLIP WAYNE CARTER to bring absentee ballots to KENT HALLUM'S home.

6

2.     On or about May 3, 2011, PHILLIP WAYNE CARTER brought absentee ballots to KENT HALLUM'S home.

3.     On or about May 4, 2011, PHILLIP WAYNE CARTER contacted HUDSON HALLUM about a family of eight who had requested a "family meal" in exchange for their absentee ballot votes being cast in favor of HUDSON HALLUM.  PHILLIP WAYNE CARTER requested $20 from HUDSON HALLUM to pay for the food, to which request HUDSON HALLUM agreed.

4.     On or about May 5, 2011, KENT HALLUM deposited 67 absentee ballots in the mailbox outside the Marion, Arkansas post office for mailing to the Crittenden County Circuit Clerk's Office.

5.     On or about May 5, 2011, PHILLIP WAYNE CARTER notified HUDSON HALLUM that some absentee ballot voters were "holding on" to their absentee ballots because they needed money for food.  HUDSON HALLUM instructed PHILLIP WAYNE CARTER to obtain money for the absentee voters from KENT HALLUM.  HUDSON HALLUM further told PHILLIP WAYNE CARTER that $20 to $40 was too much to pay for one vote, but that this amount was acceptable to pay for the votes of multiple members of a household.

6.     On or about May 5, 2011, PHILLIP WAYNE CARTER and HUDSON HALLUM discussed how many votes HUDSON HALLUM had received that day in early voting for the special primary runoff election.  PHILLIP WAYNE CARTER and HUDSON HALLUM further discussed the HALLUM campaign's absentee ballot strategy relative to two Crittenden County towns.  During this conversation, HUDSON HALLUM told PHILLIP WAYNE CARTER, "We need to use that black limo and buy a couple of cases of some cheap vodka and whiskey to get people to vote."

7.  On or about May 7, 2011, PHILLIP WAYNE CARTER and KENT HALLUM spoke with an individual in Memphis, Tennessee about getting a discounted price for the purchase of 100 half pints of vodka for the campaign. A price of $200 was agreed upon and it was further agreed that KENT HALLUM could obtain the vodka on the Monday before the special primary runoff election.

8.  In or about May 2011, KENT HALLUM provided money to PHILLIP WAYNE CARTER so that PHILLIP WAYNE CARTER and SAM MALONE could buy a chicken dinner for an individual known to the Attorney for the United States in exchange for the absentee ballot votes of that individual and one other individual.

9.  In or about May 2011, PHILLIP WAYNE CARTER and SAM MALONE provided a chicken dinner to the individual referenced in the preceding paragraph in exchange for the absentee ballot votes of that individual and one other individual.

10.  In or about May 2011, PHILLIP WAYNE CARTER arranged with KENT HALLUM to pick up "bait" (referring to money) to "finish the mission in West Memphis."

11.  In or about May 2011, PHILLIP WAYNE CARTER discussed with another individual known to the Attorney for the United States the mailing of absentee ballots collected on behalf of HUDSON HALLUM from Memphis, Tennessee to the Crittenden County Clerk's Office so that the ballots would be received more quickly than if mailed locally, and to ensure that the ballots would be received by the Clerk's office prior to a deadline for receipt of such ballots.

12.  In or about May 2011, KENT HALLUM directed the other coconspirators to transport absentee ballot voters to a hearing before the Crittenden County Election Commission to affirm that their absentee ballots had been cast for HUDSON HALLUM in the special primary

8

runoff election. KENT HALLUM further instructed the other conspirators to pay $25 to each of the absentee ballot voters that appeared before the Crittenden County Election Commission.

13. On or about May 22, 2011, PHILLIP WAYNE CARTER discussed the HALLUM campaign's absentee ballot strategy with an individual known to the Attorney for the United States and stated, "Folk gonna vote for whoever pay them."

14. On or about June 10, 2011, as part of their daily tracking activities using information from the Crittenden County Clerk's Office, PHILLIP WAYNE CARTER and HUDSON HALLUM discussed that 265 absentee ballots had been mailed out by the Crittenden County Clerk's Office for the upcoming general election. HUDSON HALLUM inquired of PHILLIP WAYNE CARTER how many of the ballots PHILLIP WAYNE CARTER thought were "ours," to which PHILLIP WAYNE CARTER replied, "About 240."

All in violation of Title 18, United States Code, Section 371.

> JANE W. DUKE
> ATTORNEY FOR THE UNITED STATES,
> ACTING UNDER AUTHORITY CONFERRED
> BY 28 U.S.C. § 515
>
> PATRICIA S. HARRIS (AR Bar # 89208)
> ANGELA S. JEGLEY (AR Bar # 79100)
> Assistant United States Attorneys
> P.O. Box 1229
> Little Rock, Arkansas 72203
> Tricia.Harris@usdoj.gov
> Angela.Jegley@usdoj.gov
> 501-340-2600

# Exhibit 3

U.S. DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS

**FILED**

SEP 0 5 2012

IN OPEN COURT
JAMES W. McCORMACK, CLERK
BY: _____
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS

UNITED STATES OF AMERICA )
)
v. ) No. 4:12-CR-00230 KGB
)
PHILLIP WAYNE CARTER )

## PLEA AGREEMENT

The Attorney for the United States, acting under authority conferred by 28 U.S.C. § 515,

by and through Patricia S. Harris and Angela S. Jegley, Assistant United States Attorneys, and

Phillip Wayne Carter, defendant, represented by the undersigned counsel, hereby agree to the

following terms and conditions in connection with the above referenced proceedings.

1.     **GUILTY PLEA:** The defendant will waive indictment and permit the United

States to proceed by Information charging the defendant with conspiracy to violate the Travel Act

in violation of Title 18, United States Code, Section 1952(a)(3), therefore violating Title 18,

United States Code, Section 371. The defendant also agrees to enter a plea of guilty to the

Information. This is a Federal Rule of Criminal Procedure 11(c)(1)(B) plea agreement.

2.     **ELEMENTS OF THE CRIME:** The parties agree the elements of the offense to

which the defendant will plead guilty are:

A.     From in or about February 2011 through in or about July 2011, two or

more persons reached an agreement or came to an understanding to bribe voters by offering and

paying money and goods to influence their votes in violation of Ark. Code Ann. § 7-1-104(a), in

doing so used the United States Mail, and thereafter performed an act to facilitate the carrying on

of such unlawful activity, all in violation of 18 U.S.C. § 1952(a)(3);

B.     The defendant voluntarily and intentionally joined in the agreement or understanding, either at the time it was first reached or at some later time while it was still in effect;

C.     At the time the defendant joined in the agreement or understanding, he knew the purpose of the agreement or understanding; and

D.     While the agreement or understanding was in effect, a person or persons who had joined in the agreement knowingly did an act to effect the object of the conspiracy.

The defendant agrees that he is guilty of the offense charged and each of these elements is true.

3.     **PENALTIES:**

A.     <u>STATUTORY PENALTIES</u>:  The maximum penalty for the charge set forth in Count 1 is not more than 5 years imprisonment, a fine of not more than $250,000, not more than 3 years supervised release, and a $100 special assessment.

B.     <u>SUPERVISED RELEASE</u>: Supervised release is a period of time following imprisonment during which defendant will be subject to various restrictions and requirements. Defendant understands that if defendant violates one or more of the conditions of any supervised release imposed, the defendant may be returned to prison for all or part of the term of supervised release, which could result in defendant serving a total term of imprisonment greater than the statutory maximum stated above.

4.     **WAIVERS**:   The defendant acknowledges that he has been advised of and fully understands the nature of the charges to which the plea is offered, the mandatory minimum penalty provided by law, if any, and the maximum possible penalty provided by law.  The

2

defendant further understands that by entering into this Agreement and Addendum, he is waiving

certain constitutional rights, including, without limitation, the following:

        A.      The right to plead not guilty or to persist in that plea if it has already been

made, and the right to a speedy and public trial before a jury;

        B.      The right to be presumed innocent and to have the burden of proof placed

on the United States to establish guilt beyond a reasonable doubt;

        C.      The right to confront and cross examine witnesses;

        D.      The right to testify in his own behalf if the defendant so chooses, or, the

right to remain silent and not be compelled to testify, and to have that choice not used against the

defendant;

        E.      The right to call witnesses and to require those witnesses to appear by

issuing subpoenas.

      5.      **STIPULATIONS:** The United States and the defendant stipulate to the

following:

        A.      The parties agree that the base offense level is 12 pursuant to U.S.S.G. §§

2X1.1, 2E1.2, and 2H2.1.

        B.      The defendant is eligible for a 2 point reduction for acceptance of

responsibility unless the defendant takes any action between the entry of the guilty plea and

imposition of the sentence that is inconsistent with acceptance of responsibility.

        C.      The parties stipulate that no other enhancements or reductions under

Chapter 2 or Chapter 3 of the Guidelines apply.

      The parties understand that the Court is not bound by these stipulations. The defendant

further understands that if the Court does not accept the stipulations, the defendant is not entitled

to withdraw the guilty plea or otherwise be released from defendant's obligations under this Agreement and Addendum.

6.     **SENTENCING GUIDELINES:** It is specifically understood by the defendant that the Sentencing Guidelines are not mandatory but are advisory, and that the Court is to consult them in determining the appropriate sentence. The defendant understands that the determination of the applicability of the Guidelines and of the appropriate sentence will be made by the Court. The defendant is aware that any estimate of the probable sentencing range under the Sentencing Guidelines that the defendant may have received from the defendant's counsel, the United States, or the Probation Office, is merely a prediction, not a promise, and is not binding on the United States, the Probation Office, or the Court. The United States makes no promise or representation concerning what sentence the defendant will receive and the defendant cannot withdraw a guilty plea, or otherwise avoid the defendant's obligations under this Agreement and Addendum, based upon the actual sentence imposed by the Court. The parties understand and agree that if the guideline range is greater or less than the defendant or the United States expected it to be, and/or the sentence imposed by the Court is greater or lesser than anticipated, neither the defendant nor the United States will be allowed to withdraw, nor request withdrawal of, the guilty plea, nor be excused from any obligation under this Agreement and Addendum.

7.     **ALLOCUTION:** The United States reserves the right to bring any and all facts which it believes are appropriate to the attention of the Court.

8.     **COOPERATION IN THE SENTENCING PROCESS:**

    A.     The defendant agrees to truthfully provide all information to the Probation Office as is needed for preparation of the pre-sentence report, including, but not limited to,

criminal history information. The defendant shall voluntarily provide a complete and truthful written accounting of the defendant's criminal history to the Probation Office.

        B.      The defendant agrees to execute all waivers necessary for the preparation of the pre-sentence report.

        C.      The defendant understands and acknowledges that the defendant's obligation of disclosure regarding criminal history is not limited to arrests and convictions reported in computer databases, but requires the defendant to disclose all arrests and/or convictions, including any juvenile matters, regardless of whether the defendant believes the arrest/conviction counts under the Sentencing Guidelines.

        D.      The defendant is required to comply with these obligations no later than the expiration of the date on which objections to the pre-sentence report are due.

        9.      **FINANCIAL MATTERS:**

        A.      <u>FINANCIAL STATEMENT</u>:  The defendant agrees to fully and truthfully complete a Financial Statement provided by the United States Probation Office.

        B.      <u>FINES</u>:  The defendant understands that unless the Court determines that the defendant is financially unable to pay a fine, the Court must impose a fine pursuant to the Sentencing Reform Act of 1984.

        C.      <u>SPECIAL PENALTY ASSESSMENT</u>:  The defendant agrees to pay to the United States a special assessment of $100.00 per count, as required by Title 18, United States Code, Section 3013.  This special assessment is to be paid by bank cashier's check or money order as directed by the Court.  Cashier's checks or money orders should be made payable to "Clerk, United States District Court."

D.    RESTITUTION: The parties also state that restitution is not applicable, and that there are not victims who are due restitution from the defendant.

10.    **DOUBLE JEOPARDY AND SUCCESSIVE PROSECUTION**: The United States Attorney for the Eastern District of Arkansas will bring no further charges against the defendant for any acts or conduct arising out of the events described in the Information, which is the subject of this action, unless the defendant breaches this Agreement and Addendum.

11.    **RECORDS:** The defendant hereby waives all rights, whether asserted directly or by a representative, to request or receive from any department or agency of the United States any records pertaining to the investigation or prosecution of this case, including without limitation any records that may be sought under the Freedom of Information Act, 5 U.S.C. Section 552, or the Privacy Act of 1974, 5 U.S.C. Section 552a.

12.    **CIVIL CLAIMS BY THE GOVERNMENT:** Except to the extent otherwise expressly specified herein, this Agreement and Addendum does not bar or compromise any civil or administrative claim pending or that may be made against the defendant, including but not limited to tax matters.

13.    **EFFECT OF DEFENDANT'S BREACH OF PLEA AGREEMENT AND ADDENDUM:**

A.    Defendant acknowledges and understands that if the defendant violates any term of this Agreement and Addendum, engages in any further criminal activity prior to sentencing, or fails to appear for any subsequent proceeding including sentencing, the United States shall have, in addition to all other rights and remedies otherwise available, the right to:

(1)    terminate this Agreement and Addendum; or

(2)    proceed with this Agreement and Addendum and

6

> > > (a)     deny any and all benefits to which the defendant would
> >
> > otherwise be entitled under the terms of this Agreement and Addendum;
> >
> > and/or
> >
> > > (b)     advocate for any sentencing enhancement that may be
> >
> > appropriate.

> B.     In the event the United States elects to terminate this Agreement and
>
> Addendum, the United States shall be released from any and all obligations hereunder.  The
>
> defendant acknowledges and understands that the agreement of the United States to dismiss any
>
> charge is conditioned upon final resolution of this matter.  If this Agreement and Addendum is
>
> terminated or if the defendant's conviction ultimately is overturned, then the United States retains
>
> the right to reinstate any and all dismissed charges and to file any and all charges which were not
>
> filed because of this Agreement and Addendum.

> C.     The defendant hereby knowingly and voluntarily waives any defense based
>
> upon the applicable statute of limitations and/or the Speedy Trial Act, for any charges reinstated
>
> or otherwise filed against the defendant as a result of defendant's breach of this Agreement and
>
> Addendum, so long as the United States initiates any otherwise time barred action within one
>
> year of termination or revocation of this Agreement and Addendum.

> D.     In the event that the Agreement and Addendum is terminated or if the
>
> defendant successfully moves to withdraw their plea, any statement made by the defendant in
>
> negotiation of, or in reliance on this Agreement and Addendum:

> > (1)     may be used to cross examine the defendant should he testify in
> >
> > any subsequent proceeding; and/or
> >
> > (2)     any leads derived therefrom may be used by the United States.

7

The defendant waives any and all rights to the contrary and shall assert no claim under the United States Constitution, any statute, or any rule of procedure or evidence to the contrary.

14. **PARTIES:** This Agreement and Addendum is binding only upon the United States Attorney's Office for the Eastern District of Arkansas and the defendant. It does not bind any United States Attorney outside the Eastern District of Arkansas, nor does it bind any other federal, state or local prosecuting, administrative, or regulatory authority.

15. **MISCELLANEOUS:**

A. <u>MODIFICATION</u>: No term or provision contained herein may be modified, amended or waived except by express written agreement signed by the party to be bound thereby.

B. <u>HEADINGS AND CAPTIONS</u>: Subject headings and captions are included herein for convenience purposes only and shall not affect the interpretation of this Agreement and Addendum.

C. <u>WAIVER</u>: No waiver of a breach of any term or provision of this Agreement and Addendum shall operate or be construed as a waiver of any subsequent breach or limit or restrict any other right or remedy otherwise available. Any waiver must be expressly stated in writing signed by the party to be bound thereby.

D. <u>RIGHTS AND REMEDIES CUMULATIVE</u>: The rights and remedies of the United States expressed herein upon any breach hereunder by the defendant are cumulative and not exclusive of any rights and remedies otherwise available to the United States in the event of any breach of this Agreement and Addendum by defendant.

E. <u>JOINT NEGOTIATION</u>: This Agreement and Addendum has been mutually negotiated by the parties hereto, and any uncertainty or ambiguity existing herein shall not be

8

interpreted against any party by reason of its drafting of this Agreement and Addendum, but instead shall be interpreted according to the application of the general rules of interpretation for arms length agreements.

16. **NO OTHER TERMS:** This document and the Addendum completely reflect all promises, agreements and conditions made between the parties, constitute the entire agreement between the parties and supersedes any and all prior agreements or understandings between the parties, oral or written, with respect to the subject matter hereof.

17. **APPROVALS AND SIGNATURES:**

A. <u>DEFENDANT</u>: The defendant has read this Agreement and Addendum and carefully reviewed every part of it with his attorney. The defendant understands and voluntarily agrees to the terms and condition of this Agreement and Addendum. Further, the defendant has consulted with his attorney and fully understands his rights with respect to the provisions of the United States Sentencing Guidelines which may apply to this case. No other promises or inducements have been made to the defendant, other than those expressly contained in this Agreement and Addendum. In addition, no one has threatened or forced the defendant in any way to enter into this Agreement and Addendum. Defendant further acknowledges that defendant has entered into this Agreement and Addendum, consciously and deliberately, by defendant's free choice, and without duress, undue influence or otherwise being forced or compelled to do so, and this Agreement and Addendum constitutes the legal, valid and binding obligation of the defendant, fully enforceable against defendant in accordance with its terms. Finally, the defendant is satisfied with the representation of his attorney in this case.

B. <u>DEFENSE COUNSEL</u>: Defense counsel acknowledges that he is the attorney for the defendant, and that he has fully and carefully discussed every part of this Agreement and

9

Addendum with the defendant. Further, defense counsel has fully and carefully advised the

defendant of the defendant's rights, of possible defenses, and of the consequences of entering into

this Agreement and Addendum, including the possible consequences of not complying with this

Agreement and Addendum. To counsel's knowledge, the defendant's decision to enter into this

Agreement and Addendum is an informed and voluntary decision.

DATED this ___ day of ___ , 2012.

JANE W. DUKE
ATTORNEY FOR THE UNITED STATES,
ACTING UNDER AUTHORITY CONFERRED
BY 28 U.S.C. § 515

By: PATRICIA S. HARRIS (AR Bar #89208)
ANGELA S. JEGLEY (AR Bar # 79100)
Assistant United States Attorneys
Post Office Box 1229
Little Rock, Arkansas 72203
(501) 340-2600
tricia.harris@usdoj.gov
angela.jegley@usdoj.gov

PHILLIP WAYNE CARTER
Defendant

BILL STANLEY
Attorney for Defendant

# Exhibit 4

**Filing and Security**

**Primary Case:** 194A-LR-45357

**Case Title:** (U) PHILLIP WAYNE CARTER;
PEANUT CONSULTING TED SUHL;
ARKANSAS COUSELING
ASSOCIATES WEST MEMPHIS, AR;
SENSATIVE INVESTIGATIVE
MATTER
SENSITIVE INVESTIGATIVE
MATTER

**Serial Number:** 543

**Serialized:** 11/02/2011

**Category:** Full Investigation
**Initiated:** 09/23/2009

**Details**

**Serial #:** 543                                   **Type:** FD1023

**Document Title:** DELTA SERIAL: S-00022205-R-063

**Approval Date:** 11/03/2011
**Classification:** U

**Contents:** UNCLASSIFIED

FEDERAL BUREAU OF INVESTIGATION
CHS REPORTING DOCUMENT

Form Classification: UNCLASSIFIED
Source Id: S-00022205
Date: 2011-11-03
Case Agent Name: Spainhour,Phillip W
Field Office: Little Rock
Squad: Squad 12

Date of Contact: 2011-10-21
Participants/Witnesses: SA Phillip W. Spainhour


Type of Contact: Telephonic
Location
Country:
City:
State:
Date of Report 2011-11-03

Substantive Case File Number: 194A-LR-45357

Source Reporting:


Redacted

DOJ-00010732

Carter said the FBI talked with him about Superintendent John Bennett
laundering money through the 15th Street Church of God in Christ
(COGIC).Carter
said he had not and would not tell Bennett about meeting with the FBI
or his
cooperation with the investigation.


Carter talked to CHS again this morning at the juvenile
Department.Carter
reiterated that he wouldn't tell anyone about what he was doing or
about the
FBI's investigation.Carter said he would help the FBI get as many
"Big Fish" as
possible.Carter's goal was to provide enough assistance so that after
pleading
guilty to some felony charges he would get probation.Carter was very
afraid of
going to Federal prison.


UNCLASSIFIED

DOJ-00010733

# Exhibit 5

**Filing and Security**

**Primary Case:** 194A-LR-45357

**Case Title:** (U) PHILLIP WAYNE CARTER;
PEANUT CONSULTING TED SUHL;
ARKANSAS COUSELING
ASSOCIATES WEST MEMPHIS, AR;
SENSATIVE INVESTIGATIVE
MATTER
SENSITIVE INVESTIGATIVE
MATTER

**Serial Number:** 542

**Serialized:** 11/02/2011

**Category:** Full Investigation
**Initiated:** 09/23/2009

**Details**

**Serial #:** 542

**Type:** FD1023

**Document Title:** DELTA SERIAL: S-00022205-R-064

**Approval Date:** 11/03/2011
**Classification:** U

**Contents:** UNCLASSIFIED

FEDERAL BUREAU OF INVESTIGATION
CHS REPORTING DOCUMENT

Form Classification: UNCLASSIFIED
Source Id: S-00022205
Date: 2011-11-03
Case Agent Name: Spainhour, Phillip W
Field Office: Little Rock
Squad: Squad 12

Date of Contact: 2011-10-24
Participants/Witnesses: SA Phillip W. Spainhour

Type of Contact: Telephonic
Location
Country:
City:
State:
Date of Report 2011-11-03

Substantive Case File Number: 194A-LR-45357

Source Reporting:


Redacted

DOJ-00010729

Redacted

Carter told CHS he is ready to get some "Big Fish."Carter joked that all he
wants to know is how the FBI wants the fish prepared, blackened, fried or
grilled.Carter said Leatrice Carter had been told to stay home and not be seen
out working or going to school during business hours to help legitimate the pay
check she received from Arkansas Counseling Associates (ACA).Leatrice got
fussed at once for going out to some schools.


Carter talked about Superintendent John Bennett taking/keeping money from Ted
Suhl that was intended for Steve Jones.Carter said he was going to tell the FBI
everything and joked that he was the FBI now, referring to his cooperation
role.Carter said fuck Ted Suhl, he would help take down whoever the FBI wanted.


UNCLASSIFIED

DOJ-00010730

# Exhibit 6



**U.S. Department of Justice**

*Phillip Carter*
*File*

*SubFile:*
*Carter proffer*
*agreement*

*United States Attorney*
*Eastern District of Arkansas*

Post Office Box 1229
425 W. Capitol Avenue, Suite 500
Little Rock, Arkansas 72203

501-340-2600
FAX 501-340-2725

November 4, 2011

Mr. Bill Stanley
Attorney at Law
Jonesboro, AR

VIA: Hand Delivery

  Re: Proffer of Phillip Carter

Dear Bill:

  You have indicated that your client is desirous of providing information to the government which would be of assistant in the criminal investigation and prosecution of others in return for favorable concessions to your client. This letter sets forth the ground rules covering any proffer of information by your client to the government.

  1. **Purpose**: The purpose of your client making a proffer is to provide the government with an opportunity to assess the value, extent, and truthfulness of your client's information about the criminal liability of the client and others.

  2. **Truth**: Your client's proffer must be completely truthful with no material misstatements or omissions of fact.

  3. **Recording**: At the government's option, the proffer interview may be tape-recorded, videotaped, or recorded through an agent's or government attorney's handwritten notes.

  4. **Polygraph**: Your client agrees to submit to polygraph examinations if the government so requests.

  5. **No Promises**: While your client hopes to receive some benefit by cooperating with the government, your client expressly understands that the government is making no promise of any consideration at this time.

  6. **No Direct Use**: The government agrees that statements or information contained in your client's proffer may not be used in the government's case-in-chief against your client should a trial be held.

November 4, 2011
Page 2

_____

7.    **Impeachment**: If your client should testify materially contrary to the substance of the proffer, or otherwise present in an legal proceeding a position materially inconsistent with the proffer, the proffer may be used against your client as impeachment or rebuttal evidence, or as the basis for a prosecution for perjury or false statement.

8.    **Derivative Use**:  The government may make derivative use of, and may pursue investigative leads suggested by, any statements or information provided by your client's proffer. This provision is necessary to eliminate the necessity of a *Kastigar* [1] hearing wherein the government would have had to prove that the evidence it sought to introduce at trial or in a related legal proceeding is derived from "a legitimate source wholly independent" of statements or information from the proffer.

9.    **Sentencing Information**:  Your client understands that if he becomes an indicted defendant, the government, pursuant to 18 U.S.C. § 3661, must provide to the client's sentencing judge the contents of the proffer.  Pursuant to U.S.S.G. § 1B1.8, however, the proffer may not be used to determine the appropriate guideline sentence, except as stated in the "Impeachment" paragraph above.

10.    **Brady Discovery**:  Your client understands that *Brady v. Maryland* [2] and its progeny require that the government provide any other indicted defendant all information known to the government which tends to mitigate or negate such defendant's guilt.  Should your client's proffer contain *Brady* material, the government will be required to disclose this information to the appropriate defendant(s).

11.    **Full Agreement**:  This document constitutes the full and complete agreement of the parties.

_____

[1] *Kastigar v. United States*, 406 U.S. 441, 460 (1972).

[2] *Brady v. Maryland*, 373 U.S. 83 (1963).

DOJ-00054267

November 4, 2011
Page 3

Very truly yours,

CHRISTOPHER R. THYER
United States Attorney

/s/ Patricia S. Harris

By: Patricia S. Harris
Assistant U.S. Attorney

Phillip Carter

Bill Stanley
Counsel for Phillip Carter

# Exhibit 7

194A-LR-45357
PWS:cml

1

       The following is a transcription of a consensually
monitored body recording between a CONFIDENTIAL HUMAN SOURCE and
PASTOR JOHN BENNETT on February 1, 2012.

       This transcription is provided as a listener's guide.   In
the event any discrepancy is perceived between the original tape
recording and the transcript, the tape recording is the final
authority.

Participants:  1.  CONFIDENTIAL HUMAN SOURCE = CHS
             2.  PASTOR JOHN BENNETT = BENNETT
Key to Abbreviations:

Phonetic = (PH)
Simultaneous Conversation = (SC)
Unintelligible = (UI)

Type of Conversation:  Body Recording

(SESSION FOUR)

CHS:            (Rustling noises, door opens and closes,
              beeping sound).  What's up BISHOP?

BENNETT:       Hey, man.

CHS:            What's going on man?

BENNETT:       What's going on?  You?

CHS:            Look, I couldn't hardly hear you because I was
              trying to get out of there because of ASHLEY.
              You know?

BENNETT:       Okay.

CHS:            She see me, she gonna go, PAPA, PAPA.

BENNETT:       Okay.  (Door closes).

CHS:            What that nigger STEVE say?

BENNETT:       Yeah, he came by, ah, told me, last night, man,
              he said, you, you threw him under the bus.  Ah,

DOJ-00020416

|           |                                                                    |
|-----------|--------------------------------------------------------------------|
|           | he said they jammed him up.  Ah, I think he told me Sunday night.   |
| CHS:      | He said I jammed him up Sunday night?                               |
| BENNETT:  | Yeah, he said.                                                     |
| CHS:      | And I threw him under the bus?                                      |
| BENNETT:  | You threw him under the bus, he said.  The FBI grabbed him and they took him.  He said they separated you all.  They took you. |
| CHS:      | And this happened Sunday night?                                    |
| BENNETT:  | Yeah, Sunday night.                                                 |
| CHS:      | Okay.                                                              |
| BENNETT:  | Said they took you down the hall, said you all were at the COMFORT SUITES.  They took you one direction, took him in another direction.  Said and ah, when they took him, said they ah, played some tapes that they had of him.  And ah, well, he said they showed him 4 checks that his name was on. |
| CHS:      | What were the checks from?                                         |
| BENNETT:  | I think he said they was from TED.                                 |
| CHS:      | Okay.                                                              |
| BENNETT:  | So I told him, I said, well, I told him, I said, I don't remember checks ah, you getting any checks man, myself.  I don't know.  So he said, I said, I told him, I said, if you did, that between you and TED.  You know, so. |
| CHS:      | Right.                                                             |
| BENNETT:  | So he said, well, ah, they had you and PHILLIP.  Said they had a conversation with you and PHILLIP.  You all were talking to, PHILLIP was talking to you and told you to give ah, that, that he was ready for that package or something like that and he said and you told PHILLIP, well I was going to give that to ah, your mother.  Said, said wasn't she working for you all or something at one time?  I said, yeah, she was subbing.  I said, but that ain't got nothing to |

DOJ-00020417

194A-LR-45357

3

|          | do with ah, I said, that was between PHILLIP and I.  I said that had nothing to do with no, ah, TED or nobody.  Man, I said that was, that was personal.  I said, in fact, I said PHILLIP got I said what he said, I said when I told him I was gonna give it to his mom, I said that was a joke.  Cause he told me, I said, cause he said something about, man, ah, man, ah, no, no you ain't.  I have me some man, I have to go over side her head or something like that. |
|----------|---|
| CHS:     | Yeah. |
| BENNETT: | I said, that was just, that was a joke between us.  So I said, um, I said but that ain't go nothing to do with me and you.  What, what, what, what, you know? |
| CHS:     | So that nigger said I threw him under the bus? |
| BENNETT: | Yeah, he said. |
| CHS:     | The FBI jammed us up Sunday night? |
| BENNETT: | Yeah. |
| CHS:     | That's what he said? |
| BENNETT: | Yeah, then he said, that ah, he told me that, that you gave him a grand and he said that the bills were marked.  And said that ah, that's how they got him.  Cause, saying they told him, say well, look, we got you.  And ah, so he said, man, he, he said, he was, so he got him, he said his attorney now is this guy by the name of BOOKER. |
| CHS:     | Ah, the black guy?  MICHAEL BOOKER? |
| BENNETT: | Yeah, BOOKER. |
| CHS:     | Ah-huh. |
| BENNETT: | So he said, that's his attorney said, and ah, said he wants to talk to me.  So I said, what does he want to talk to me for?  You know, I |

194A-LR-45357

4

| | |
|---|---|
| | mean, has the FBI seen you?  Ah, no, ain't nobody talked to me. |
| CHS: | STEVE asked you if the FBI seen you? |
| BENNETT: | Yeah, I said, no, I told him no, ain't nobody talked to me.  He said, well, I think they want to, man, I think they're gonna, they're gonna try to get you with ah, lau, ah, laundering, money laundering.  I said, man, I ain't, I say, hey, boy, (UI) I said go head on.  I said I used to work for TED and them.  I said, I worked, man, I said, I had a job with them man, trying to transport children.  I said, not only that, I said, but they, he's given my church man, donations.  I said, we've given him tax, ah, writeoffs, man.  He's given us over $60 some thousand dollars as contributions.  I said, and I've acknowledged that in a letter of contributions from him, I said, at church and so.  We've always done business.  His dad was, man, was crazy about me.  You know, that's how I met him.  I said... |
| CHS: | Man, that, that boy crazy, ain't he? |
| BENNETT: | So he... |
| CHS: | So, so. |
| BENNETT: | ...man, hey, he, he, man, I'm serious, boy, look. |
| CHS: | What, what did he drive over here? |
| BENNETT: | He didn't.  I'm telling you now. |
| CHS: | He didn't. |
| BENNETT: | He parked over here at the DODGES and... |
| CHS: | And walked over here? |
| BENNETT: | ...walked in a black, man, that nigger was dressed like a  ninja.  I, I. |
| CHS: | You're kidding? |

DOJ-00020419

194A-LR-45357

5

| | |
|---|---|
| BENNETT: | No, man, SIS BENNETT she said what the?  And then when he left, he made a point to tell me, he said, before he, before I went to open up the door, he said, cut the light out.  So I, I cut the light out cause this nigger was paranoid, man.  I didn't know man.  He just kinda threw me off so I went and got my pistol.  I, you know, I say? |
| CHS: | Yeah, yeah. |
| BENNETT: | I said, I say, I'll be right back.  So I sat in the front room with my pistol man.  I just laid my pistol, cause I said, if that nigger go off, I'm gonna, I'm gonna go on cap him right there. |
| CHS: | Man, he crazy, ain't he? |
| BENNETT: | Yeah. |
| CHS: | This, this, this boy's crazy. |
| BENNETT: | Now look, I've talked to ah, ah, MARVIN STEELE yesterday.  TOMMY trying to do his campaign. |
| CHS: | Ah-huh. |
| BENNETT: | And so I went up there with him, man, we stopped. Now, MARVIN still did say that because he, he was talking about the campaign.  So I told him, I said, well ah, cause TOMMY's trying to make his own little deal.  So I listen to TOMMY. TOMMY told em, I'm gonna charge you $40,000 and I, I can handle the campaign for you.  So MARVIN said, well, he said ah, is PHILLIP in this?  You know?  And ah, so I told him, I said, yeah.  I said, ah, but ah, we not with TOMMY.  You know? |
| CHS: | Um-hum. |
| BENNETT: | I said, we, we, we handling the black churches. |
| CHS: | Yeah, I, I, I ain't gonna deal with TOMMY on nothing. |

DOJ-00020420

194A-LR-45357

6

| | |
|---|---|
| BENNETT: | You know, I told him, we'll do the black churches.  So he said, well, he said, ah, the investigation is still going on, isn't it? |
| CHS: | That what MARVIN STEEL say? |
| BENNETT: | Yeah, yeah, so I told him, I said, no. |
| CHS: | I ain't heard nothing from no investigation. |
| BENNETT: | Cause I told him, I told him, I said no.  I said, I think you got that wrong.  So, then TOMMY talking about ah, ah, you sure?  Ah, MARVIN say, well, he say, I believe now, I'm not sure.  So I said, no, I said, uh-huh.  Cause I bumped into BILLY JOHNSON coming out of his office when we was up there. |
| CHS: | Um-hum. |
| BENNETT: | We went to, to his business.  BILLY was coming out, you know?  So they had already talked.  So I told him, I said, no, I said ah, no, but, but, I told him I said, but he's, he's in with me, like that. |
| CHS: | Yeah. |
| BENNETT: | And so, you know, so? |
| CHS: | Yeah. |
| BENNETT: | And I told him, I said, I'll get back with you cause he told TOMMY, he said, man, that too much. |
| CHS: | TOM, TOM, TOMMY try to hit him for $40,000 for a (UI). |
| BENNETT: | 40,000.  But now look, this is the deal, HOLT is gonna run from his sick bed. |
| CHS: | Wow. |
| BENNETT: | HOLT is running from his sick bed.  That's what he's scared of.  That HOLT is gonna get a sympathetic vote. |

194A-LR-45357

7

CHS:            Vote.

BENNETT:        Yeah.  And I told him, I said, well, I said, if
                I was you, I said, I wouldn't say nothing
                negative about him.  If he's, if he's (UI) said
                naw.

CHS:            No, just tell him, just tell him to run the race.

BENNETT:        I told him, I say, now what I would do, if it
                was me, I would always, I just talk about
                SHIBACKA (PH) and BASS as running the court.

CHS:            Right.

BENNETT:        And I said, that right there put fear in people.

CHS:            Right.

BENNETT:        They, they, they think that, that's who's
                running, running the show up there.

CHS:            That, that.

BENNETT:        Cause they say BASS gonna sue the, the State
                Board of Education, man.

CHS:            He is, he is.

BENNETT:        You know?  That was something else your boy said
                that night too.  He said that ah...

CHS:            That what STEVE said?

BENNETT:        Yeah, not, not, not about education.  But he
                said about CRUMBLY.

CHS:            What's up with CRUMBLY?

BENNETT:        He, he said he jam CRUMBLY up.  Some kinda way
                just like he did me.  Say he talk to CRUMBLY.
                Said I saw ah, JACK at one of the meetings and
                he said, I called JACK to the side and I asked
                JACK had he been ah, dealing with you and Jack
                told him, said ah, yeah, ah.

DOJ-00020422

194A-LR-45357

8

CHS:        Me and JACK done talked a couple times.

BENNETT:    Yeah, but he talking about like ah, he told JACK
            to be cool.  You know, so I told him, I said,
            well, I said, man, JACK wouldn't have been in
            office if it hadn't been for PHILLIP.

CHS:        Man, I done helped JACK so many times.  So, so,
            so if all this happened Sunday night, he must
            have told JACK this Monday.

BENNETT:    Yeah, he said, he, in fact he said he took off
            and drove up to Little Rock Monday night.  Say,
            he drove back, say he went on and drove.  I mean,
            not Monday night, but ah, Sunday night cause he
            said, man, he said, I couldn't sleep.  He said,
            cause he was downstairs and he woke up said the
            guy, he showed me the guy's card, man, that, that
            talked to him.  It's ah, somebody's name I
            couldn't see it, I didn't have my glasses but
            it was somebody named PHILLIP something.

CHS:        Oh, okay.

BENNETT:    Then on the back of the card there were 3 other
            names he had written.

CHS:        And he showed you that?

BENNETT:    Yeah, he showed me the back of the card, yeah,
            and he said listen and then he, but look, he
            wasn't gonna do no talking.

CHS:        He wasn't?

BENNETT:    He had a notepad, man.  That nigger had a,
            that's what I'm telling you man, that kinda
            threw me off.  That nigger had a tablet.  With
            everything he wanted to say.  He wanted to talk
            to, he wanted me to know what's up.  He had it
            written on this tablet and ah, he had it hid down
            in his clothes and then finally when he pulled
            it out, cause he was whispering and I couldn't
            understand a lot of stuff he was saying.  But
            then he finally pulled out the tablet, but then

194A-LR-45357

9

| | |
|---|---|
| | finally he went on, his phone rang and he took his phone and laid it down.  He said, I don't even fool with my phone no more.  You know, he said, I don't answer no calls and so, then he kinda, he, he opened up a little bit then, began to talk. |
| CHS: | Wow. |
| BENNETT: | Yeah, but man, he was shaking I'm serious, the whole time he was just... |
| CHS: | (UI).  Shaking, paranoid. |
| BENNETT: | Yeah, I'm serious, man, he was just vague, you know?  Cause SIS BENNETT came in, she said, ah, is this ah, she said is this private?  And any other time, you know, he wouldn't mind but he said, ah, he said, yeah mother could you ah, you know, I need to talk to SUE, you know? |
| CHS: | Um-hum. |
| BENNETT: | Personally. |
| CHS: | Wow. |
| BENNETT: | So, then he's talking about his wife, said he was gonna tell her last night.  Said she don't know nothing.  Said, so I think I'm, so I'm gonna go on and, and, and confess to her and break it down.  But he told me, man, I can, I'm on the verge of losing everything.  Ah, you know, they can, they can get me outta there.  They, they, so I said, well, I said, what did you do STEVE?  You know?  You know, I ain't lying, what'd you do man, what, what,  what'd you do? |
| CHS: | I, I. |
| BENNETT: | I just, man, he said, man, ah, ah, PHILLIP, man he coulda did like BEN.  You know, he coulda went down, he just, man, he just threw me under the bus. |

DOJ-00020424

194A-LR-45357

10

| | |
|---|---|
| CHS: | He said I coulda went down.  Did like?  Is that nigger, is that nigger a fool? |
| BENNETT: | Said you threw him, something like, he, man, he just, I said, man, I said man, PHILLIP always been straight. |
| CHS: | Man, I been straight forward.  That, that dude there, man. |
| BENNETT: | See, I told him, I said them man those folks when I bought that, he told me, naw they, they, they really didn't want PHILLIP.  Well they had him, said, but they didn't want him, they, they, they want some big meet.  Cause they asked me, say, you come on help us, said, what can you give us? We can help you.  Say I know how you feel.  You know, so I told em, I said, man, STEVE I don't know what you're talking man.  I just, I said, I'm in the, I'm in the blind, man.  I'm just, I'm ignorant. |
| CHS: | That nigger there is crazy. |
| BENNETT: | You know, so I told him, you know, you be at the church Sunday.  I said they got you down for honoring you (UI). |
| CHS: | He at, he at our church Sunday? |
| BENNETT: | Yeah. |
| CHS: | Ah, I'm gonna have to go somewhere else, you know what I mean? |
| BENNETT: | Yeah, they're supposed to honor, yeah, they're supposed to give him... |
| CHS: | Who doing it, who doing it? |
| BENNETT: | MOTHER JOINER. |
| CHS: | Oh. |
| BENNETT: | Yeah, MOTHER JOINER.  That's right, she came by there, so that's what BENNETT was saying, that |

DOJ-00020425

194A-LR-45357

11

|          |                                                                                                                                                                                                                                                                                                                                                                                                                                          |
|----------|--|
| | what BENNETT say.  She thought that's what that was about. |
| CHS: | Ah-huh. |
| BENNETT: | She said ah, she said, well, he's not gonna be able to make it Sunday?  And I, I said, no, that was about something else.  I wasn't gonna tell her, that's about something else.  I said, he, he said, something going on in EARL.  And ah, you know, I say, I don't know.  I said I couldn't half understand what he was saying. |
| CHS: | So this man done told your BISHOP that the FBI jammed us up Sunday, he done showed you the man's card and 3 names on the back of the card and all this shit? |
| BENNETT: | Man and he said, you ah... |
| CHS: | And I threw him under the bus. |
| BENNETT: | Right, cause he said, when they brought him out, he said, you were gone.  Your, your, your, your SUV was gone.  Said they had you and him.  As soon as you all got in the, in the, you all got to the hotel.  He said they grabbed both, he said they grabbed you all as you all was entering the hotel and said they took him one way, took you another way.  Said and ah, they interrogated him and showed him what they had and, and, and beat him down.  You know? |
| CHS: | They beat him down? |
| BENNETT: | Whatever they said, I mean, verbally. |
| CHS: | Yeah, verbally, yeah. |
| BENNETT: | Yeah and said, and then they told him, said ah, you know, psychologically, they told him, they said now look, I know how you feel man.  And he said, at night, when he, when he went to Little Rock? |
| CHS: | Yeah. |

194A-LR-45357

12

| | |
|---|---|
| BENNETT: | And they called him up, he said about 3:00. Said this guy named PHILLIP called him and told him, said, look, how do you feel?  I know you haven't been able to rest.  I know what you're going through.  Ah, he said, man, he's right, man, I ain't been able to sleep.  He said well, he said, I understand.  Look, anytime you want to talk to me or whatever, he said, you got my number.  Said you call me, said we're gonna see what we can do to get you outta this.  Ah, whatever we can do and ah, he said, by that time his attorney called him. |
| CHS: | MICHAEL BOOKER? |
| BENNETT: | Right and he said, he told MIKE to hold on. Well, he told this guy to hold on, saying when he answered it, said he told MIKE, said man, I'm talking, that's the FBI I'm talking to.  So MIKE told him, said man, what the hell you doing talking to the FBI?  So you tell them to talk to me, I'm your attorney, you know?  He said, you know, he said, well, I don't want to, I don't want to piss em off.  Ah, you know, look nigger, that's why you hired me. |
| CHS: | Exactly. |
| BENNETT: | Yeah, he said, that's why you hired me. |
| CHS: | Yeah, that nigger, that man. |
| BENNETT: | Then he said MIKE wanted to, told him, said well, look, let me.  So they asked him, who is this, BISHOP, ah, BENNETT, ah DOCTOR BENNETT, ah, SUPERINTENDENT BENNETT or what, what is all this? |
| CHS: | Yeah. |
| BENNETT: | What is all these titles and, so, now he claims like he didn't do no talking but then last night when I was talking to him and then he finally said, well I'm gonna tell you what I did, I, I told em.  And ah, I just leaned into him and said well, STEVE, I said, you ain't tell, saying |

DOJ-00020427

194A-LR-45357

13

|  | |
|--|--|
|  | nothing on me.  I said, ah, I know, I know TED. I said, yes, I knew his daddy.  He and I was close friends, man.  I said he wanted me to be a bishop.  I said, in fact, that one time man, I said, ah, he gave me some money to help me in a campaign for bishop, you know?  And I said, but, then I said, we worked for him man, for years.  I said, you know, up until, I said, when I had my surgery.  so I said, that's nothing man.  I said, I got that relationship with him. So I said but ah... |
| CHS: | I don't believe this nigger don't sit, he done, this nigger done went off. |
| BENNETT: | Yeah.  But he, man, but he talking, yeah, man, I just, I just don't know man.  I, I and I, I wanted to do something. |
| CHS: | Hey, if, if that he want to do, I mean. |
| BENNETT: | No, that nigger don't want to do nothing. |
| CHS: | Hey, man. |
| BENNETT: | Talking about okay, cause he said man, CLARA called him. |
| CHS: | Is that right? |
| BENNETT: | Said CLARA called and said, how you doing? |
| CHS: | Well, well. |
| BENNETT: | And he think CLARA in, he think CLARA. |
| CHS: | Well, did, did MICHAEL BOOKER tell CLARA something? |
| BENNETT: | That's what he thought.  That's what he said he asked him.  He told him, MICHAEL BOOKER told him no, I ain't told CLARA nothing.  I ain't talked to CLARA.  But CLARA was up at the courthouse yesterday, he said. |
| CHS: | Ah-huh. |

DOJ-00020428

194A-LR-45357

14

BENNETT:        And he don't know if she picked up on something
                or what.  She said, I don't like to hear you like
                this, you know, I don't like to hear your voice
                like that or something, you know, so?

CHS:            Yeah.

BENNETT:        Like she done picked up on what's going on.  But
                I think it's all him on it myself.  I mean.

CHS:            Man, that nigger crazy, man.

BENNETT:        Yeah.

CHS:            He, he crazy.  He, he, he done lost it man.  Oh,
                yeah, I appreciate it.  I, I, I can ah, yeah hear
                ya see ASHLEY with them, you know, we get to
                talking loud.

BENNETT:        Okay.

CHS:            That's why I was half way going out of there,
                you know what I mean?

BENNETT:        Okay, yeah.

CHS:            You know, I wasn't ignoring you.  I was half way
                going out of there, man...

BENNETT:        No, no, it wasn't nothing.

CHS:            ...in there with those children and ASHLEY.
                Once she see me, she going PAPA, PAPA.  And
                start in, cause somehow I done started spoiling
                her.  You know what I mean?

BENNETT:        Okay, yeah, yeah, yeah.

CHS:            So, that's why I was gonna come back at you
                anyway and get the full detail.

BENNETT:        Yeah, yeah, yeah.

CHS:            Well, anyway, hey, I appreciate it man.

194A-LR-45357

15

| | |
|---|---|
| BENNETT: | I started, I started to, man, I said, man, I oughtta tape this nigger. |
| CHS: | Man. |
| BENNETT: | You know?  But he won't, he ain't gonna do no talking, so I said, man... |
| CHS: | But, but, but, he writing it down on paper? |
| BENNETT: | Yeah.  And I said, why don't you call me man? Ah, my phone tapped.  He told me, yours?  They probably done tapped your phone.  You hear?  I said, well, I said, if they is, man, I said, I ain't got nothing to hide, you know? |
| CHS: | Man, this dude is wild. |
| BENNETT: | So, I told him, I said, you know, and he, that nigger walked up here.  That's what got me, man. When he, that nigger, he's like a ninja fighter. Wrapped up in all black.  Had his head covered up.  I said, yeah, I said, man, when my daughter told me... |
| CHS: | He coulda got robbed between here and DODGES. |
| BENNETT: | Ah man, look, that nigger left his car.  He said it was a Dodge, but I don't think it's that Dodge cause I told JOHN, I said, hey man, JOHN, I said would you take BRO STEVE and drop him off at his car?  And he said, no, no, that's alright.  I'm gonna, I'm gonna walk.  I said, oh, okay.  He had me to cut the lights out so he could ease out in the darkness.  (Laughter). |
| CHS: | Let me go. |
| BENNETT: | Man. |
| CHS: | That nigger there, he, he done lost his mind, man, he done lost his mind.  Alright, BISHOP, I appreciate the information, man. |
| BENNETT: | Alright. |

194A-LR-45357

16

CHS:               I'll holler at you later.

BENNETT:           Alright, now.

CHS:               Alrighty, that boy wild, man.

                   (End of conversation)

DOJ-00020431

# Exhibit 8

**UNCLASSIFIED**

| **FD-209a** | **FEDERAL BUREAU OF INVESTIGATION** |
|---|---|
| | CHS CONTACT REPORT |
| (08/27/2011) | |

**HEADER**

Source ID: **S-00038769**

Date: **02/07/2012**

Case Agent Name: **Spainhour, Phillip W**

Field Office/Division: **Little Rock**

Squad: **Squad 12**

**CONTACT REPORT**

Date of Contact: **02/01/2012**

List all present including SA Phillip W. Spainhour
yourself.
(Do not include the CHS.):

Type of Contact: **Telephonic**

Anomalies: N/A

Life Changes: N/A

FBI investigative CHS was advised that writer believed they had received information regarding a
techniques/information meeting between Pastor John Bennett and Steve Jones. CHS did not immediately
revealed to source for provided all the details they knew to writer upon initial inquiry. CHS later explained
operational purposes: they wanted to get further details before providing information to writer. Writer
instructed CHS all information was to be reported immediately with additional details
to follow.

Other: CHS was tasked with conducting a consensual recorded conversation with Pastor John
Bennett.

**PROGRAM(S) ADDRESSED IN THIS REPORT**

HQ Division: **Criminal Investigative Division**

Program: **White Collar Crime Program**

Subprogram: **PC-Corrupt of St and Loc Pub Officials-Local Level**

HQ Division: **Criminal Investigative Division**

Program: **White Collar Crime Program**

Subprogram: **PC-Corrupt of St and Loc Pub Officials-State Level**

**FBI REQUIREMENT(S) ADDRESSED IN THIS REPORT**

FBI Requirement:

Citation:

**NIPF REQUIREMENT(S) ADDRESSED IN THIS REPORT**

Region:

Country:

National Intelligence Priorities Framework Requirements:

Substantive Case File Number:     **194A-LR-45357**

Signed by:

DOJ-00017780

Click here to sign this section

| **FD-209a** (08/27/2011) | FEDERAL BUREAU OF INVESTIGATION |
| --- | --- |

DOJ-00017781

# Exhibit 9

94A-LR-45357
PWS:cd

1

Date of conversation: February 5, 2012

Participants:  1. CHS = CHS
               2. PASTOR JOHN BENNETT = BENNETT

Key to abbreviations:

Phonetic = (PH)
Simultaneous Conversation = (SC)
Unintelligible = (UI)

Type of Conversation:  Body recording

| | |
|---|---|
| CHS: | What's up, Will? |
| BENNETT: | They talking about they bought decoration. |
| CHS: | Decoration? Please. |
| BENNETT: | Yeah. |
| CHS: | Naw, naw, hold on let me catch up with Bishop so I can come on back to church now, (laughs) see what I'm saying. Cause I sho don't want to skip. |
| BENNETT: | I ain't got no, uh, ya'll ain't got no Giant stuff in there do ya? |
| CHS: | Hey, who, who J.C. with? Cause |
| BENNETT: | J.C. with New England. |
| CHS: | Oh, man, I wanna ride with you, Bishop, you got J.C. with ya, I gotta go other way. (Laughs) |
| BENNETT: | (Laughs) He's New England, man. He came up Friday night and told me. |
| CHS: | Did he? |
| BENNETT: | Said yeah, he New England man. |
| CHS: | Hey, man, I really think New England is gon pull it though. You know, I think they done hyped those Manning boys up too much. |

DOJ-00019943

BENNETT:        Um huh.

CHS:            Peyton and uh, Eli.  They done hyped them up too much, so, uh, I wanna see them go down. Look, in our conversation the other day, this boy here, I know you said something that he said something about some checks.

BENNETT:        Yeah.

CHS:            Now, check the deal out.  Every check that we got from Ted, came to the church, you cash, you gave me cash, I gave him cash. How can he say that you launder, you didn't give him no money, you gave me money.

BENNETT:        That's right. That's what he said that they had. Four checks.

CHS:            From who?

BENNETT:        With his name on it.

CHS:            Where it come from?

BENNETT:        That's what I asked him.

CHS:            Let me ask you something.  Ah, did, did, did, uh,  the church or the daycare give him any kinda check?

BENNETT:        No. Never.

CHS:            OK.  Cause daycare was under his jurisdiction, you see what I'm saying?  So even if they did, what did he do charge him for trying to help the daycare or something? You know what I mean?

BENNETT:        Yeah, yeah. I told him, I said man, you, uh, I said we ain't never gave you nothing. I say, I ain't, my name ain't on nothing.

CHS:            Right.

BENNETT:        I told him I say that money Ted gave me, I said we work for Ted, I say , I said we had a contract with Ted. We did a transportation service, I said, man, I said old man loved me, man, cause I say SC

DOJ-00019944

194A-LR-45357

3

| | |
|---|---|
| CHS: | Bud. |
| BENNETT: | Yeah, cause I said old man would help me in any kinda way, I said and me and Ted I said when I was sick you know I told him I said man, Phil went up there and told them I needed a transplant, and man they sent SC |
| CHS: | Sho did. |
| BENNETT: | Me flowers and money SC |
| CHS: | And everything, yeah, yeah, yeah, yeah. |
| BENNETT: | I told him, then I said then plus I told him, I say we get Ted, I say I got, I can prove by my records that he gave us money and we gave him a tax write off |
| CHS: | Right, right, yeah, I'm trying to see where he come up with checks at. SC  Tal, tal, talk, talking about some checks, my thing is I gave him cash ever time you gave me money. You see what I'm saying, plus see, I wish, we shoulda clipped em everytime.  We shoulda clipped em SC |
| BENNETT: | But they said his name. He said that what got me when he said when he showed me four checks, I say... |
| CHS: | Four checks? |
| BENNETT: | I said, that's when I said well man, I said Steve, it had nothing to do with me. I told him, I said man, we ain't never did no business with you, I said I ain't never cashed a check with your name on it.  I said I never had anything with yo name. I said so, and I started going, man, he had me thinking going back I said naw, I said, man, I ain't never cashed nothing with yo name on it, Steve. I said no sir, I say you got anything from Ted, then that between you and Ted, I say, I don't know nothing about that. |

DOJ-00019945

194A-LR-45357

4

| | |
|---|---|
| CHS: | Right, right, right, SC/UI and see I don't think Ted gave him no check, uhn un, cause all... |
| BENNETT: | But, he was crying, man, I'm serious. |
| CHS: | Well, I mean, you know ain't no need his crying because... |
| BENNETT: | He did a lot a talking, too. Cause, see like I said once we got to talking, he finally kinda said, I say, I told him this, I listened to him, SC, I on tell you I said this it was all about me, and I told him. |
| CHS: | This thing between me, him, and Ted. This thing between me, him, and Ted. Me, him, and Ted was only ones at the table, |
| BENNETT: | I told him, yeah. |
| CHS: | So I gave him money. When you gave me that money cash, I gave him cash, so I'm trying to figure out where the checks come in at? |
| BENNETT: | I think man, what they did, I told him I say Steve, Dude, they showed you anything with your name on it, I said now, if you know that you didn't sign it, I told him I say they, they made up something on you. I said you, you, I said think about it, man. But evidently, man, he did, he got some money from somewhere. |
| CHS: | Did he? |
| BENNETT: | Yeah. He got something from somewhere, he ain't saying nothing, man, I don't know if he may have took a trip up there by hisself, he may have hit Ted up without you knowing it... |
| CHS: | Uh huh. |
| BENNETT: | Yeah, yeah, something, somethings up. Cause he don't fool me, man, that boy was like this, I'm serious, man, he was... |

DOJ-00019946

194A-LR-45357

5

CHS:            Yeah, yeah, yeah.

BENNETT:        When he talked about trying to do something to
                you that's what kinda got me.

CHS:            Man, that gon be the worst mistake he ever made.
                SC And I'm on tell ya now, I got my eyes on him.

BENNETT:        Yeah.

CHS:            I got my eyes on him.

BENNETT:        He was talking about, he was talking about
                trying to do a hit.

CHS:            (Laughs)

BENNETT:        Yeah, man, I told him I say man, he say man,
                just, I wanna UI

CHS:            He ain't that mad.   He may be mad. He ain't that
                mad I guarantee you that.(Laughs)

BENNETT:        I told him I said naw, you don't wanna do that.

CHS:            He don't wanna do that.

BENNETT:        I told him, I say, man I say, I say them
                Carter's. They just like the young bloods.

CHS:            Man.

BENNETT:        And I say, you, you stretch out brother. I say
                you ain't, you ain't got but one brother, I say
                you ain't got nobody but Phillip, you know his
                brother name Phillip.

CHS:            Exactly.

BENNETT:        I told him I say, man, Phillip, don't know no,
                about no streets or nothing, I said...

CHS:            See, see, it's amazing, cause I got a brother
                name Steve and my name Phillip, and his name
                Steve. Yeah, you know, my brother named Steve.

DOJ-00019947

194A-LR-45357

6

| | |
|---|---|
| BENNETT: | Oh, yeah, yeah, yeah. |
| CHS: | Yeah, yeah, and my name Phillip, and yeah, yeah, his name Steve, he got a brother named Phillip.  But man, naw, that's the last thing, Bishop, that he won't even think about.  I'm telling you that's the last thing.  But yeah, it, it kinda got me man, cause I been thinking about that thing, I said, checks, checks, and I know, I know, I know 90% of the time we been dealing, me, him, and Ted, been at the, at the table. |
| BENNETT: | And I know, I told him I said man, I been, I think one time I went to a meeting, and that was at a BBQ place over in Memphis, that's where I think, that's when Steve first came on the scene, but Ted didn't talk no business with him then.  We had, that was my first time I went to a I think it was a Colton's we went to |
| CHS: | Uh huh |
| BENNETT: | And they, we all ate, and uh, it was way out somewhere in Memphis, man.  We had bbq, Steve was there. But it wadn't over, but, but, if him and Ted said |
| CHS: | I think I was with ya'll then. Yeah, yeah, yeah, yeah, yeah. SC |
| BENNETT: | Ted and what's my boys name, Lorenzo? |
| CHS: | Alonzo. Alonzo, yeah, yeah, yeah, yeah, and that's about the only meeting you were with, uh,  me and Ted and Steve in, you know what I mean? |
| BENNETT: | I'm telling you, I told, I tried to tell Steve, I say Steve, I said I'm not in it, man. And he said Ahh. |
| CHS: | You think he's trying to put you in it? |
| BENNETT: | Yeah, yeah, he already have. He already told himself, that's why he talking bout they gon, say, well they be trying to get you for |

DOJ-00019948

194A-LR-45357

7

|            | laundering money.  I say, Steve, I ain't laundering no money. I say, cause he said have they talk to you yet.  I say naw, ain't nobody said nothing to me, man. |
|------------|---|

CHS: Talking about UI, who talked to you?

BENNETT: FBI.

CHS: Is that right?

BENNETT: Yeah, so I told...

CHS: So, so you gave me money, I gave him the money.

BENNETT: I told him I ain't worried about it, but he told me, see, he,the main man, I think if you had seen how the nigger was dressed and the time of night it was you woulda said man, see he don't know since I was, since you and I already kind put me up on what's going on.

CHS: Yeah, I told you that me, him, and Ted was in trouble. That's it, that's it.

BENNETT: Yeah, well, you put me up on whats going on. I just kinda listen.  He came man, at night, man, walking, no car, no nothing.

CHS: Uh huh.

BENNETT: Dressed like a ninja.(Laughing) I think he came in to me, he's kinda planting something in, in my house cause what it was I left him in the front, I said well look man,let me, I be right back, have a seat. And when I come back, that nigger had a notebook. I wish you'd a seen it man, it...

CHS: So, so he ain't talk, he writing it down.

BENNETT: No, he'd already written it. He had a pad stuck in his back.

CHS: Uh huh

194A-LR-45357

8

BENNETT:        He went in his back and he took, took out the
                pad, you know he had that, had everything
                written down, so I went to grab it and he said,
                I wadn't gon talk, but, so then he start
                talking, you know and he said, man, Carter,
                man, threw me under the bus, man. I said threw
                you under the bus, what you mean, and he said
                ah, man, I ain't heard from in 10 months.  And
                then after New Years man, he call me and I went
                to go meet him over there at Cracker Barrel.
                I think he said Cracker Barrel.

CHS:            Yeah, yeah.

BENNETT:        Yeah, he met ya at Cracker Barrel. He say he
                came out and uh, gave me a, naw, naw, yeah, yeah,
                I started say, no, he saw he went to Texas De
                Brazil, that what he said.  Said he met Ted at
                Texas Day.

CHS:            Oh, oh, when he met Ted, I was with them.

BENNETT:        Ok, well he say he met Ted...

CHS:            And that was back in September, that was our
                last meeting SC because we try to get him to
                do something for us in Northwest Arkansas, and
                he say he was gonna do it.

BENNETT:        Ok, well see, he came, he told me like all this
                happen Sunday.  Say maybe you called him, say
                I met UI, you know what I think man, man, Terry
                saw him Sunday, but he wadn't at no Cracker
                Barrel where he was, he was going to, toward
                Oceola.  Cause Terry said man, there goes
                Steve.  And I said huh, Steve who, he say Steve
                Jones. I didn't say it, Terry did.  And uh, but
                anyway, he say he met you at Cracker Barrel,
                say after ya'll met, he say you'll walk up to the
                car and you gave him a thousand dollars. He say
                you gave him a thousand.  He say he went to put
                it in his pocket, he said next thing you know
                he said feds came down on him, say they grabbed
                him, and they took him, took you and him, said
                took ya'll over to Comfort Suites, said when
                all ya'll went to Comfort Suites, they went,

DOJ-00019950

194A-LR-45357

9

|  |  |
|---|---|
|  | they took you in, in another room, took him in a, they separated ya'll.  Say then they showed him some films and played him some tapes, and uh, played him a tape of me and you talking, uh, and on that tape, uh, I was, me and you was talking bout your mom.  You said, say ya'll was talking bout changing money, and you told him you was gonna give that to his mother.  I said man, look, I say that right there was, I say that didn't have nothing to do with no Ted or nothing like that, that was personal.  I said that was, I said man, that was Phillip's personal money, I said he had some personal money that uh, he wanted me to hold for him and I did, I said he called me and say he wanted it back. I said that was his, that was his money, I said and I gave it to him, I say, so, I say so what, I say I told him I want give it to his mom, so I say so what. |
| CHS: | (Laughs) |
| BENNETT: | And I say he told me he said naw man don't do that so and so and I say his mother she was working for he say yeah, when ya'll had her working, I say, yeah! |
| CHS: | She a substitute teacher. |
| BENNETT: | I told him |
| CHS: | She a substitute, substitute for school district and everything. |
| BENNETT: | I told him I said man she was teaching up there for us. I said why?  I say it ain't got nothing to do with you, what you talking about Steve. |
| CHS: | This thing between me, him, and Ted. |
| BENNETT: | But see he told me it's yeah, he say they, uh, uh, I say Steve, man, if they got you on anything you, I say you ain't, I say now you ain't did nothing, I say cause I say  Phillip even, I say when you recall yourself, I say Phillip told me he say man, Steve ain't doing |

DOJ-00019951

194A-LR-45357

10

|  | nothing. Steve ain't taking care of no business.  All Steve is doing... |
|---|---|
| CHS: | Just taking money. |
| BENNETT: | That's what I told him. I say he wadn't doing nothing but taking money, man, he wadn't doing no, no  business.  He said that Yeah! I said that's what I say, man, I say that was way back when. I say man, we knew that what you wadn't doing nothing. I said now what have you done? I said you tell me. He say well, it was the intent.  I say what you mean? |
| CHS: | Oh, he real smart, now. |
| BENNETT: | Yeah, he said, said they told him said just the mere fact that that's what that money was for you know. So I say, Steve, they got you on anything?  I say if you say, he say well that money that you gave me was marked.  He say that was bait money, that was bait money.  So I told I said well if that was the case I say that's what got you. I said you got yourself. I said yeah, you got yourself.  I said did you need the money?  Naw, I told em that that's what he owed me.  I told em say I loaned him some money, and uh, he was just paying his own debt, so I said well, I say, hey Steve that what you did, but then he say, evidently they made him start talking cause that when brought me up to mind, who let this Bishop Bennett, Doctor Bennett, Superintendent Bennett all of this. (Laughter)so he told em bout me, and he said, uh, yeah, they said they, they, they gon try to get you for laundering.  I say Steve, I ain't laundering no money, I said but try and let em come. I say I'm ready. I say I ain't got no problem, man. |
| CHS: | Yeah, yeah, yeah, yeah.  I was just trying to deal with these checks, man, because I don't know where he come, where he come on... |
| BENNETT: | He said they had his name on em.  He said they had his, when he told me that, |

194A-LR-45357

11

CHS:            uh huh

BENNETT:        I said well Steve...

CHS:            Let me ask ya something.

BENNETT:        I ain't never cashed nothing with your name on
                it.

CHS:            Are we sure that the church or the daycare
                didn't give him no checks or nothing?

BENNETT:        Never.

CHS:            Ok,ok, ok, yeah, cause I don't know where he
                get this from and this really been on my mind
                since told it. I know, all I give been in cash.

BENNETT:        You know what, you know what, it was only one
                check that didn't go through here, that I
                don't, but I but you told him to call me, and
                I met him up at the college.

CHS:            Ok, I gave him the check.

BENNETT:        You gave him the check.

CHS:            Uh huh.

BENNETT:        For, I think that check, man, may have been for
                1500. Yeah, I...

CHS:            And the check from Ted.

BENNETT:        From Ted, he had it, but it was made out to the
                church.

CHS:            Uh huh.

BENNETT:        See I had, when he gave it to me, I looked at
                it, made out to the church, so I said ah, ok,
                so I had it, went and cashed it and gave him
                back cash, gave him cash...

CHS:            Oh, ok, ok, ok, ok,ok.

194A-LR-45357

12

| | |
|---|---|
| BENNETT: | That's the only one. So me and Clara.  So like I was trying to tell him, I say man, Steve, I never seen your name on anything, man, I say I've never cashed a check with your name on it. So I don't know if your trying to say that I, you know, and I say, Phillip ain't never cashed nothing with your name on it. |
| CHS: | Naw, naw, naw, naw. |
| BENNETT: | I say every, all the money that we've gotten is really from Ted, from the health UI... |
| CHS: | Yeah, Millinium Health Care outta Florida. |
| BENNETT: | And I told him, I say he's always been donating to us. That was a donation, man. |
| CHS: | Right. |
| BENNETT: | So, yeah, I told him, I say man, we, I say he given us donations. And I say I gotta record of everything, and so I say now I don't know where you coming from, so I told him I say, and he was talking to the people evidently his lawyer he's got named Booker. |
| CHS: | Yeah, yeah. |
| BENNETT: | Told him said man, what you, what you doing talking.  He said well naw, he called, Steve said the guy called him bout 3 o'clock Monday morning. |
| CHS: | Uh huh. |
| BENNETT: | He said, I couldn't sleep, I couldn't rest, man, I just, I didn't know what to do, and uh, so I said I'm a go to Little Rock, so he said phone rang, then it was FBI, saying, they guy told him said uh, look said I know your, I know you're weary, and I know you got a lot on your mind, uh, you know, if there's anything you can do to, you know to help this, just let us know, said we could, said we gon, we gon try to make |

DOJ-00019954

194A-LR-45357

13

| | |
|---|---|
| | this stuff, you know, disappear, but you gotta help us, you know. |
| CHS: | Uh huh. |
| BENNETT: | He said by this time, his phone somebody called in, beeped in, he said he took it and it was this guy Booker.  Booker told him said hey, man, and uh, Steve said look I'm talking to the FBI, I got them on the other phone here, and this guy, his lawyer told him says look man, what the hell you doing talking to them. Said I'm your attorney. Say you don't talk to them. Say you tell them to call me.  So Steve said well, I don't wanna make em mad, and uh, so then he told the guy about me. |
| CHS: | Uh huh. |
| BENNETT: | And the guy, his lawyer, |
| CHS: | Uh huh |
| BENNETT: | Said he told him said well, I wanna talk to Bennett, I wanna talk to Bennett. I told him I said man, fine, you know. |
| CHS: | Yeah, yeah. |
| BENNETT: | I told him I ain't none of ya'll, I say, I talk to anybody, man, I say I ain't, ain't got nothing to hide. |
| CHS: | Yeah, yeah, so, so, so he here then, let me get clear clarification on check. Only check that you recall, the only check that happened, was that uh, when I gave Steve the check, and you and Clara met him at the college, you cashed the check for him and gave him cash. |
| BENNETT: | Gave him cash. |
| CHS: | Ok, ok, ok, yeah, cause I been kinda puzzled, I said, cause my thing is the money always came through me and I always gave him cash, SC, so, so, so where the check come from. |

DOJ-00019955

194A-LR-45357

14

| | |
|---|---|
| BENNETT: | I don't know that's what I told him, I say Steve, you, you, you got things mixed up.  And I told him, I said, now maybe they gave you something showed you some with Bud, you know, I said I didn't have nothing to do, I said when you first came up, see he was doing business with Bud, if you remember. |
| CHS: | Yeah, cause Bud gave him 2000 at the Cracker Barrel. |
| BENNETT: | See I don't know if they was cash, or did Bud give him a check. |
| CHS: | Bud gave him cash (laughs), you know he had that brief, he had that briefcase, that briefcase full of cash. |
| BENNETT: | Like I told him, I said man, that's the only thing I know.  I told him, I said everything else, I said I don't, I said you know I wadn't in on your business, man, I don't know. |
| CHS: | Yeah, well, I tell ya what. |
| BENNETT: | I told him I couldn't help him, man, UI. |
| CHS: | Naw, can't nobody help him. This was me, him, and Ted's doing.  And that was the bottom line. Me, him, and Ted's doing, so that's it. I was just trying to find out about these checks, man, that he talking about. It kindly hit me, I said, check, I been thinking this since we talk about it. |
| BENNETT: | So like I told him, I said that's the only thing I thought about was I wonder did Phillip take a check from him, but I say, but Phillip can't cash it. |
| CHS: | Right, right, right, right, right. Naw. |
| BENNETT: | Can't cash it cause it got nigger name on it, so like I told him, I said Steve we have not cashed anything with yo name on it. |

DOJ-00019956

194A-LR-45357

15

| | |
|---|---|
| CHS: | Uh huh, uh huh. |
| BENNETT: | So I said they showed you something, I said they made that up, I said now if, if you don't know nothing about it, I told him I said now unless you know it, that that was yours, then hey, man, you know, I say, but you, I say, maybe some you, you, I say, you did, and you done forgot. |
| CHS: | Right, right. |
| BENNETT: | I said we never received nothing with your name on it Steve. |
| CHS: | Naw, naw. |
| BENNETT: | Ted gave us was for Millenium, to 15th Street Church of God in Christ. |
| CHS: | Exactly, exactly, exactly, exactly, exactly. Well, I, good, good, good, I tell ya what. |
| BENNETT: | He called this morning, man, started talking about |
| CHS: | Oh, he ain't gon come get his black history award? |
| BENNETT: | No, sir. He already told Mother Joiner. |
| CHS: | He got to remember, this my church, and I really ain't comfortablep missing mine because of his. (Laughs) So. |
| BENNETT: | Pastor Bennett, I said, she said well, Steve won't be in this morning. I, well, I understand. |
| CHS: | Yeah, yeah, yeah, yeah.She don't know nothing about this, do ... |
| BENNETT: | Naw |
| CHS: | Naw, naw, naw. |

194A-LR-45357

16

| BENNETT: | I told her, he probably got some business somewhere, you know, I say speaking all over, you know. |

| CHS: | Yeah, yeah, he probably received some honorium for speaking other places, you know what I mean? Well anyway, let, let me go and try to get ready and get back, cause I be at the SuperBowl. I'm on try to come on back to church. I told the family that we, uh, we gonna skip today, you know, so I'm on come on back, uh, uh, uh, come on back to the Bowl, man. Anyway, I'm on try to get back to the service, too. I think I gotta enough time to do it. So anyway, I appreciate it. Let me, I just want to holler at ya, man, and catch you before everybody come get ya on Sunday morning, you know what I mean? |

| BENNETT: | Yeah. |

| CHS: | So anyway I'll holler. |

| BENNETT: | That boy be quiet, man. |

| CHS: | He better change his... train of thought, if he thinking about trying to do anything to me, he better change the thought. |

| BENNETT: | Yeah, because he's talking about |

| CHS: | He ain't, he ain't that mad.  He think he that mad, he ain't that mad.  (Laughs) |

| BENNETT: | Like I told him, I say Steve, UI, I say co-operate, man, you know, hey, that what you need to do.  I say, cause you ain't gon, you ain't hurting me, you know. |

| CHS: | Right. |

| BENNETT: | UI I told him, I said like, man, I'm telling you, I said I used to work for the man, and I said he, everything he gave me, I said was |

DOJ-00019958

194A-LR-45357

17

|  | donation, I said, in fact, he even help me with my campaign for Bishop. |
|---|---|
| CHS: | Right, right, right. Well, anyway, Bishop, I appreciate your time. Look, let me get on outta here, so I can try to get back. |
| BENNETT: | Alright. |
| CHS: | I'll, I'll see ya later. |
| BENNETT: | Let me go in here. |
| CHS: | See what they got, huh. SC I hear ya. |

DOJ-00019959

194A-LR-45357

18
—

(End of conversation)

(End of transcription)

DOJ-00019960

# Exhibit 10

(Rev 05-01-2008)

UNCLASSIFIED (U//FOUO)

# FEDERAL BUREAU OF INVESTIGATION

**Precedence:** ROUTINE                    **Date:** 03/06/2012

**To:** Criminal Investigative    **Attn:**    SSA Teresa Ramsey
                                               Public Corruption Unit
                                               Coordinator
                                               Redacted

                                               SSA Brian Fitzpatrick
                                               Election Crimes Unit
                                               Coordinator
                                               Redacted

**From:** Little Rock
          Squad 12/Marion RA
          **Contact:** SA Phillip W. Spainhour,    Redacted

**Approved By:** Peterson Jeffery E
                 Brunell Kimberly F

**Drafted By:** Spainhour Phillip W:pws

**Case ID #:** 194B-LR-45357 (Pending) — 729
               56C-LR-45910 (Pending)

**Title:** PHILLIP WAYNE CARTER;
           ET AL;
           CORRUPTION OF STATE AND LOCAL
           PUBLIC OFFICIALS - LOCAL LEVEL;
           CORRUPTION OF STATE AND LOCAL
           PUBLIC OFFICIALS - STATE LEVEL;
           SENSITIVE INVESTIGATIVE MATTER (SIM)

**Synopsis:** (U//FOUO) To update FBIHQ on the status of captioned investigation.

**Full Investigation Initiated:** 09/04/2009

**Reference:** 194B-LR-45357, Serials 428, 425, 374, 300 and 4.

UNCLASSIFIED

194B.LR.45357 - 729  066pws01.ec

UNCLASSIFIED

To:  Criminal Investigative  From:  Little Rock
Re:  194B-LR-45357, 03/06/2012

Redacted

Redacted

Redacted Federal
conspiracy to commit money laundering and bribery indictments are
anticipated within the next few months against CARTER, JONES, BENNETT
and SUHL. Redacted
Redacted

UNCLASSIFIED

DOJ-00012142

# Exhibit 11

**UNCLASSIFIED**

| **FD-209a** | **FEDERAL BUREAU OF INVESTIGATION** |
|---|---|
| (05/05/2012) | CHS CONTACT REPORT |

**HEADER**

Source ID: **S-00022205**

Date: **12/17/2012**

Case Agent Name: **Spainhour,Phillip W**

Field Office/Division: **Little Rock**

Squad: **Squad 12**

**CONTACT REPORT**

Date of Contact: **12/06/2012**

List all present including yourself. (Do not include the CHS.): SA Phillip W. Spainhour

Type of Contact: **In Person**

Country: **UNITED STATES**

Address Line 1: **I-55**

Address Line 2:

Address Line 3:

City: **Marion**

State: **AR**

Zip/Postal Code: **72364**

Anomalies: N/A

Life Changes: Redacted

FBI investigative techniques/information revealed to source for operational purposes: CHS and writer discussed possible defenses Suhl and/or ACA attorney's may use if charged with any Federal criminal violations.

Other: N/A

**PROGRAM(S) ADDRESSED IN THIS REPORT**

HQ Division: **Criminal Investigative Division**

Program: **White Collar Crime Program**

Subprogram: **PC-Corrupt of St and Loc Pub Officials-State Level**

HQ Division: **Criminal Investigative Division**

Program: **White Collar Crime Program**

Subprogram: **PC-Corrupt of St and Loc Pub Officials-Local Level**

**FBI REQUIREMENT(S) ADDRESSED IN THIS REPORT**

FBI Requirement:

Citation:

**NIPF REQUIREMENT(S) ADDRESSED IN THIS REPORT**

Region:

Country:

DOJ-00017703

National Intelligence Priorities Framework Requirements:

Substantive Case File Number:    **194A-LR-45357**

Signed by:

♟ Click here to sign this section

| **FD-209a** (05/05/2012) | FEDERAL BUREAU OF INVESTIGATION |
| --- | --- |

DOJ-00017704

# Exhibit 12

AO 93 (Rev. 12/09) Search and Seizure Warrant

**FILED**
EASTERN U.S. DISTRICT COURT
ARKANSAS
JUN 1 2012
JAMES W. McCO...
...CLERK
...CLERK

# UNITED STATES DISTRICT COURT

for the

Eastern District of Arkansas

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )
) Case No. 4.12SW6009-BD
the administration building located on the property of the )
Lord's Ranch aka Trinity Behavioral Health at 1033 Old )
Burr Road, Warm Springs, AR 72478 )

## SEARCH AND SEIZURE WARRANT

To: Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____Eastern_____ District of _____Arkansas_____
*(identify the person or describe the property to be searched and give its location)*:
See Exhibit A

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:
See Exhibit B

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property.

**YOU ARE COMMANDED** to execute this warrant on or before _____6-26-12_____
*(not to exceed 14 days)*

☑ in the daytime 6:00 a.m. to 10 p.m.   ☐ at any time in the day or night as I find reasonable cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to United States Magistrate Judge Beth Deere
_____*(name)*_____

☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)* ☐ for _____ days *(not to exceed 30)*.
☐ until, the facts justifying, the later specific date of _____

Date and time issued: 6-12-12   _____
Judge's signature

City and state: _____Little Rock, Arkansas_____   Hon. Beth Deere, United States Magistrate Judge
*Printed name and title*

DOJ-00054068

AO 93  (Rev. 12/09) Search and Seizure Warrant (Page 2)

| Return | | |
|---|---|---|
| Case No.: | Date and time warrant executed:<br>6/13/12    7:30AM | Copy of warrant and inventory left with:<br>Shirley Suhl |
| Inventory made in the presence of : Shirley Suhl | | |

Inventory of the property taken and name of any person(s) seized:

See Attached

## Certification

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: 6/15/12

_Executing officer's signature_

Lazar Pierre Jr / Special Agent
_Printed name and title_

FD-597 (Rev 8-11-94)

## UNITED STATES DEPARTMENT OF JUSTICE FEDERAL BUREAU OF INVESTIGATION
Receipt for Property   Received/Returned/Released/Seized

**File # 194B-LR-45357**

On (date)   6/13/2012

item(s) listed below were:
☐ Received From
☐ Returned To
☐ Released To
☒ Seized

| | |
|---|---|
| (Name) | ACA/Trinity Behavioral Health |
| (Street Address) | 1033 Old Burr Road |
| (City) | Warm Springs, AR |

Description of Item(s):

Misc documents to include:  training items, staff meeting logs, and personnel logs for employees

Employee surveys, training, schedule books, employee/patient rosters, etc

Employee evals, schedule books, training  documents, clinical minutes, etc

CD/DVD's  - training

Iomega zipdrive

Employee assessments, and continuing education paperwork

"ACA"    "2012"    "WI-Y"

Floppy disks, CD's, training material, HR software, Tuition reimbursement

Training orientation/certificates, age appropriate treatment modalities, passwords

2-Drawer file cabinet: parent/guardian surveys; peer reviews, employee documents

5-Drawer file cabinet "TBH employee records    A - Z

4-Drawer file cabinet "quality management records"

4-Drawer file cabinet "ACA 2011 employee records HAR - JONES thru WARD - Y

4-Drawer file cabinet "ACA records and employee records 2011 A - CA thru ED - HAN

4-Drawer file cabinet "ACA 2012 employee records HEN - JOTT thru SI - WH

4-Drawer file cabinet "ACA 2012 A - BON thru GAR - HEL

Training materials and work schedules

Court order, referals

Integrated summary with referral information

CD's

4-Drawer file cabinet "ACA 2011 Term T-2; employee records; handwritten notes regarding training.

DOJ-00054070

FD-597 (Rev 8-11-94)

### UNITED STATES DEPARTMENT OF JUSTICE FEDERAL
### BUREAU OF INVESTIGATION
Receipt for Property   Received/Returned/Released/Seized

**File # 194B-LR-45357**

4-Drawer file cabinet "TBH - containing ED - Test Outlines thru TBH - continuing ed - 2011 training

5 Drawer file cabinet "ACA A - B thru JO - ME"

4 Drawer file cabinet ACA MI - Q thru ACA Health

4 Drawer file cabinet 'ACA 2012 Term thru A Hendance"

5 Drawer File Cabinet 'TBH EO"

5 Drawer file cabinet 'ACA 2011 Term A - B thru P - S

4 Drawer file cabinet "TBH A - BO thru TBH H - J"

4 Drawer file cabinet "TBH JO - L thru T-Z

4 Drawer file cabinet "TBH 2012, "TBH Health"

4 Drawer file cabinet "TBH 2011 Term A - F thru U - Z

5 Drawer file cabinet "DEPT 10 "YELLOW" and TBH Privileging"

Box of Payroll forms and sign in sheets

Sign in sheets, training material, admin manual, 2012 attendance calendar, staff attendance

Lists of "problems encountered" Documents re to "Laserscopic Spinal Center of Florida, LLC", unlabeled videotape, phone book for AR Counseling, Transcript case load spreadsheet, list of AR medicaid patients, AR Counseling Assoc payroll sheets

Voided checks to campaigns, employee telephone directory, and applications, and thank you letters

Intake client folders

Judicial directory/court order lists, resident master code listing

Court order lists

Employee phone list, performance evaluation information for probation and court information, resident codes, employee leave, incoming/exiting documents, probation office lists, ACA list

Intake client forms

File cabinet Med recs with referrals

Court orders in red folder

Court orders from 2010 records noted as bac 27, 28, and 29 and 2011 boxes

Resident insurance numbers, correspondence with state, local, medical regarding clients

Lords Ranch employee handbook, job descriptions, and abbreviation listing.

Referral court orders, medicaid information

Referral by Christy Ruse; training material   (Rhonda Pearson office)

admission referrals

court order list, social work assignment, 2 CDs, 2 floppy disks

court order list, social work assignment/referral

FD-597 (Rev 8-11-94)

## UNITED STATES DEPARTMENT OF JUSTICE FEDERAL
## BUREAU OF INVESTIGATION
Receipt for Property   Received/Returned/Released/Seized

**File # 194B-LR-45357**

employee files, background checks, policies/plans, interview forms, emails, employee info, staff attendance, admin/intake files 2008, vendor payments, manual for BHC, leave forms, credentialing records- Daniel Bennett MD, TLR files- floppy disks, employee

2011 payroll form, 2011 attendance

employee recs, agreements, audit report, CD, photos, HR2004 video cassette, H2908 database

employee records

File cabinet - Discharge intake packets

File Cabinet - Admitted intake packets

heathcare management docs, employee listing, provider payment contracts w/ post it notes

application records for billing providers

court order by Judges

AR Medicaid Suthorization schedule Medicaid application, Resume, ACA offices court ordered list

Operations manual/policy binder

Operations manuals/policy binder

Admission paperwork with referral information

Authorization request, social work assingment

Referral documents awaiting filing and associated documents

Reimbursement and related employee expense documents

Referrals, intake information and related documents

Re imbursement records, patient info with referrals, contact list

employee listing, referral, court order, contacts

primary care referral binder

referrals and patient intake documents

court order list, payroll stub, billing records, phone lists, employee recs, AR Medicaid regulation, patient intake form w/ court docs

4 CD disks and 1 Ative blue thumbdrive

5 - Drawer File cabinet:  Billing statements of therapist

Billing statements for therapist

Alonza Jiles tax information, employee records/training; election letters, patient allegation letters

......g entry info 12/03/09- 12/31/09

Billing info for 2/28/08-3/27/08

Billing info for 4/3/08-5/1/08

Billing info for 5/7/09-5/28/09

FD-597 (Rev 8-11-94)

## UNITED STATES DEPARTMENT OF JUSTICE FEDERAL BUREAU OF INVESTIGATION
### Receipt for Property   Received/Returned/Released/Seized

**File # 194B-LR-45357**

| |
|---|
| Billing info for 1/3/08-1/24/08 |
| Billing info for 7/9/09-8/6/09 |
| Billing info for 8/7/08-8/28/08 |
| Billing info for 1/7/10-1/28/10 |
| Billing info for 5/8/08-5/29/08 |
| Billing info for 9/4/08-9/25/08 |
| Billing info for 7/10/08-7/31/08 |
| Billing info for 7/28/10-8/12/10 |
| Billing info for 4/22/10-5/27/10 |
| Billing info for 4/9/09-4/30/09 |
| Billing info for 10/29/09-11/26/09 |
| Billing info for 8/19/10-9/23/10 |
| Billing info for 10/30/08-11/27/08 |
| Billing info for 1/31/08-2/21/08 |
| Billing info for 12/4/08-12/25/08 |
| Billing info for 3/12/09-4/02/09 |
| Billing info for 12/09/10-12/30/10 |
| Billing info for 1/1/09-1/29/09 |
| Billing info for 11/04/10-12/02/10 |
| Billing entry info 3/11/10-4/15/10 |
| Billing info for 2/4/10-3/4/10 |
| Billing info for 9/30/10-10/28/10 |
| Billing info for 6/3/10-7/1/10 |
| Billing info for 6/4/09-7/2/09 |
| Billing info for 9/17/09-10/22/09 |
| Billing info for 6/5/08-7/3/08 |
| Billing info for 8/13/09-9/10/09 |
| Billing info for 10/2/08-10/23/08 |
| Void checks May 06- May 07 |
| intake and referral forms from patient files |
| intake and referral records/court orders |

DOJ-00054073

FD-597 (Rev 8-11-94)

## UNITED STATES DEPARTMENT OF JUSTICE FEDERAL
## BUREAU OF INVESTIGATION
Receipt for Property   Received/Returned/Released/Seized

**File # 194B-LR-45357**

bank records and employee lists, 2 USB drives

2 DHS docs, DBH Consultants, Steve Bryles letter

Medicaid codes, budget, ADH regulation, ADH policy manual, tax papers/balances, employee hours, license standards, floppy  disk, 2 thumb drives

Staffmark application, DHS Behavioral Health Options for School Draft - Dec 2011, Review confidentiality agreement,Envelope from CT & Walters Kluwer Business

AC proposal, Real Property Purchase, Insurance, Mellenia &  Associates, MDR Media Financial Statements, Training Manual

Articles of Incorp., email letter, Hourly information regarding employees

RMSPMI document; AHSPC document, empty file folders labeled house bill

Arkansas DHS document notification of site transfer.

Financial documents/notice of delinquent real estate tax

DHS documents, listing of employee names

Policy Manual, Probation officer list

Floppy disks

ADHS complaint, state subpoena re medicaid abuse

Mineral/other property listings, ACA personnel info, fraudulent billing documents, client wish list

Aircraft purchase, warranty deed, the Lord's Ranch handbook, republican accountant contact information

Referral forms and court order forms

Referral forms and court order forms

Referral forms

Various referral forms

Referral sheets

Various referral sheets

Referrals and court orders

Medical records

Medical records

Referral forms

Patient referral forms

Referral forms

Referral forms

Medical records

Medical records

FD-597 (Rev 8-11-94)

### UNITED STATES DEPARTMENT OF JUSTICE FEDERAL
### BUREAU OF INVESTIGATION
Receipt for Property   Received/Returned/Released/Seized

**File # 194B-LR-45357**

Medical records

Referral forms

Incoming Medical Records

Resident Count, Boys AR Medicaid Authorization, Admission , Social work assignments, emails

Fax of leases, income, expenses from life strategies of ar labeled "very confidential"

Tax, payroll records, computer backup disks for same

Letter from Sen Crumbly to AR DHS on behalf of ACA to open Forrest City facility

Non active inpatient intake forms

Referrals, Employee documents, business payments, tax documents, telephone/contact lists, employee rosters, corp communications, bus records, info on referral expectations, and ltr to phillipens and development project

Non active intakes

Non Active Intakes

Non Active Intakes

Payroll records

Payroll records

Payroll records

Payroll records

Payroll records

Payroll records

Payroll records

Payroll records

Payroll records

Payroll records

Payroll records

Payroll records

Payroll records

Payroll records

Payroll records

Payroll records

Payroll records

Payroll records

DOJ-00054075

FD-597 (Rev 8-11-94)

## UNITED STATES DEPARTMENT OF JUSTICE FEDERAL
## BUREAU OF INVESTIGATION
Receipt for Property   Received/Returned/Released/Seized

**File # 194B-LR-45357**

Payroll records

Payroll records

Payroll records

File cabinet containing: contracts yearly payroll info for Trinity Behavioral Trinity Dynamics, Triennial, Mellinia, Bulklyn

Medical records

Correspondence discussing business organization and filing requirements; bank statements

ACA Bonus payment statements and spreadsheets including payment to Leatrice Carter

Checks from Millenia to various consulting firms and entities

Millenia checks to political candidates, deposit books, other checks from millenia

ACA payroll other bank statements from Heritage bank 2012, Trinity Behav Health Care bank statements, Burklyn Co bank statements

Milienia checks to 15th st COGIC, checks to multiple consulting companies

Payroll info, bonus check stubs, sales spread sheets titled "Lists multiple companies", ACA sale label "Dummy com", quick book report with check highlighted along with bank stmt copy of check cut out of page

Lease between burklyn family llc and vw allabashi and associates, personal tax work sheets listing out business, email noting payments from strategic health care and eagle aviation

2011 bank statements and reconcilliation reports for ACA, Trinity Aerospace, Trinity Behav Health Care, the Lord's Ranch, Burklyn Company

ACA payroll and operating accounts, bank statements from 08 - 10

Org chart of CS Financial and other companies, SDG companies, purchase documents of property in Florida

Patient referral forms

Loose media from various locations:  eight usb thumb drives, fifteen floppy disks, one zip disk, and one usb drive

Misc: "christy mann", "AR DHS DCCECD", "14th Dist Juv Court" and "ACA Advance checks", Letters: John Bennett/Phillip Carter

Misc. "Sonic", Copies of checks to political candidates: "otis Davis; Tim Wooldridge, Roy Ragland, Daryl Pace, etc

Misc folder labeled "employee handbook", cont. Lord & ranch policy handbook and materials

Misc: voided checks to Senate campaigns for Henry Williams, Tracy Steele, Emma Heater Brown, Jay Bradford, Steve Ferris, and Barbara Horn

Accordian folders containing ACA payroll records 2006, 2007, 2008 and 2009

Medical Records,

Landreneau consulting and regal prop development check copies

letters from AR DHS and NC DHS

FD-597 (Rev 8-11-94)

## UNITED STATES DEPARTMENT OF JUSTICE FEDERAL
## BUREAU OF INVESTIGATION
Receipt for Property   Received/Returned/Released/Seized

**File # 194B-LR-45357**

Auto insurance, loan payments, water springs devel group llc, property ins for Texarkana, TX, Mountain Develop group, llc, Rolling Hills investments LLC, from Benton Co Assessors office

DHS NPIU letters, 5th street Church of God in Christ letter, Cranford colliation copy of check, GMAC letter for Phillip Carter, political candidate letters

Accordian folders containing ACA payroll records

Four thumbdrives and one CD

Outpatient file information with referrals

Out patient information with referrals

Outpatient information with referrals

CD's/floppy discs/thumb drives/HP:PAQ

Medical documents

Medical records

Medical Records

Referral documents

Biosocial forms and court orders

Medical referrals

Referrals, training material/phone rosters/school referrals/faxes that were whited out

Received By   _SA Philip W. Spencer_
(signature) _SA Philip W. Spencer_

Received From   _Shirley Suhl_
(signature)

# Exhibit 13

| ERT-1 | FEDERAL BUREAU OF INVESTIGATION |
|---|---|
| | **EVIDENCE RESPONSE TEAM CASE SUMMARY FORM** |

Field Office: Little Rock

Prepared By:   dlblakely
Sequence #:   32955

ERT Response:
Start Date   06/13/2012          File #:          194B-LR-45357
End Date     06/14/2012          Control File #:   308A-LR-C37478-Summary

| Bureau Case: ⦿ | Non-Bureau Case: ○ |
|---|---|

Case Caption:   The Lords Ranch

Names of ERT Personnel:   **Blakely, David L**
**Sweeden, Deborah E**
**Lunday, Carol M**
**SPAINHOUR, PHILLIP W.**
**Ross, Jerry Thomas**
**McCoy, Noland R**
**SIPNIEWSKI, MATTHEW T**
**Scott, Luke B.**
**Pittman, John Tillman**
**Aukerman, William M**

Number of ERT Personnel Involved:              10
Number of Hours:                              20
Time Expended (# of personnel * # of hours):   200

Type of Call Out:   Search Warrant/Consent Search          Investigative Priority:   White Collar

Event Narrative:   Lead search warrant execution at an inpatient mental health care provider. Over 150 boxes of records were seized, in addition to all the computers/servers that were imaged.

Interesting or
Unusual Events:

Advanced
Techniques:

Specialist Used:   ☐

Executive Management participated in or observed:   ☑

DOJ-00054086

# Exhibit 14

**Filing and Security**

**Primary Case:** 194A-LR-45357

**Case Title:** (U) PHILLIP WAYNE CARTER;
PEANUT CONSULTING TED SUHL;
ARKANSAS COUSELING
ASSOCIATES WEST MEMPHIS, AR;
SENSATIVE INVESTIGATIVE
MATTER
SENSITIVE INVESTIGATIVE
MATTER

**Serial Number:** 755

**Serialized:** 04/03/2012

**Category:** Full Investigation
**Initiated:** 09/23/2009

**Details**

**Serial #:** 755                           **Type:** FD1023

**Document Title:** DELTA SERIAL: S-00038769-R-028

**Approval Date:** 04/04/2012
**Classification:** U

**Contents:** UNCLASSIFIED

FEDERAL BUREAU OF INVESTIGATION
CHS REPORTING DOCUMENT

Form Classification: UNCLASSIFIED
Source Id: S-00038769
Date: 2012-04-04
Case Agent Name: Spainhour,Phillip W
Field Office: Little Rock
Squad: Squad 12

Date of Contact: 2012-04-04
Participants/Witnesses: SA Phillip W. Spainhour


Type of Contact: Telephonic
Location
Country:
City:
State:
Date of Report 2012-04-04

Substantive Case File Number: 194A-LR-45357

Source Reporting:


CHS advised 15th Street Church of God in Christ (COGIC) Pastor John
Bennett was
released from the VA hospital in Memphis, TN.Bennett will be
receiving dialysis
three times a week.

Redacted

DOJ-00011464



Redacted

UNCLASSIFIED

DOJ-00011465

DOJ-00011466

# Exhibit 15

**Import Form**

**UNCLASSIFIED**

**External System ID:** Delta

**Document Title:** (U) S-00038769-A-043.xml

**Form Imported:** FD-1023

**File:** (U) S-00038769-A-043.xml

**Synopsis:** (U) telephonic contact with CHS.

**Filing and Security**

**Primary Case:** 194A-LR-45357

**Case Title:** (U) PHILLIP WAYNE CARTER;
PEANUT CONSULTING TED SUHL;
ARKANSAS COUSELING
ASSOCIATES WEST MEMPHIS,
AR; SENSATIVE INVESTIGATIVE
MATTER
SENSITIVE INVESTIGATIVE
MATTER

**Serial Number:** 1050

**Serialized:** 05/07/2014

**Category:** Full Investigation
**Initiated:** 09/23/2009

**Details**

**Raw File Text:** On Saturday 5/3/14, 15th Street COGIC Pastor John Bennett was taken
to the VA Hospital then transferred to Methodist Hospital in
Memphis, TN. CHS planned to go see Bennett either today 5/5/14 or
tomorrow 5/6/14, because CHS was off work both days. CHS agreed to
provide writer with any information they receive concerning
Bennett's status. ███████████ Redacted ████████████
████████████████ Redacted █████████████████████
██████████████████████████████████████████████████

**Indexing**

**Reference - Existing**

  S-00038769

**Routing**

**Drafted by:** Phillip W. Spainhour

**Approved by:** Phillip W. Spainhour

DOJ-00011829

# Exhibit 16

**Import Form**

## UNCLASSIFIED

**External System ID:** Delta

**Document Title:** (U) S-00038769-A-047.xml

**Form Imported:** FD-1023

**File:** (U) S-00038769-A-047.xml

**Synopsis:** (U) Telephonic contact with CHS.

**Filing and Security**

**Primary Case:** 194A-LR-45357      **Case Title:** (U) PHILLIP WAYNE CARTER;
PEANUT CONSULTING TED SUHL;
ARKANSAS COUSELING
ASSOCIATES WEST MEMPHIS,
AR; SENSATIVE INVESTIGATIVE
MATTER
SENSITIVE INVESTIGATIVE
MATTER

**Serial Number:** 1055

**Serialized:** 05/29/2014

**Category:** Full Investigation
**Initiated:** 09/23/2009

**Details**

**Raw File Text:** Writer contacted CHS in reference to their work schedule and
availability for meeting with Pastor John Bennett next week. CHS
advised they were off on Monday (6/2) and Tuesday (6/3). CHS
received information that Bennett had been hospitalized at the VA in
Memphis on Wednesday 5/21, due to bleeding and had received a blood
transfusion. CHS later found out Bennett was scheduled to be
released from the hospital on Wednesday 5/28. CHS will confirm if
Bennett is in fact released. CHS said Bennett receives dialysis at
home on Monday's, Wednesday's and Friday's. Therefore, the best time
to meet with Bennett would be on Tuesday or Thursday morning.

**Indexing**

**Reference - Existing**

 **S-00038769**

**Routing**

**Drafted by:** Phillip W. Spainhour

**Approved by:** Phillip W. Spainhour

DOJ-00011835

# Exhibit 17

Import Form

**UNCLASSIFIED**

**External System ID:** Delta

**Document Title:** (U) S-00038769-A-048.xml

**Form Imported:** FD-1023

**File:** (U) S-00038769-A-048.xml

**Synopsis:** (U) Telephonic contact with CHS.

Filing and Security

**Primary Case:** 194A-LR-45357

**Case Title:** (U) PHILLIP WAYNE CARTER;
PEANUT CONSULTING TED SUHL;
ARKANSAS COUSELING
ASSOCIATES WEST MEMPHIS,
AR; SENSATIVE INVESTIGATIVE
MATTER
SENSITIVE INVESTIGATIVE
MATTER

**Serial Number:** 1058

**Serialized:** 06/11/2014

**Category:** Full Investigation
**Initiated:** 09/23/2009

Details

**Raw File Text:** On 05/30/2014, CHS advised that Pastor John Bennett was still in the
VA Hospital in Memphis, TN. CHS agreed to notify writer of any
updates on Bennett's condition and if he is released from the
hospital. On 05/31/2014, CHS attempted to visit Bennett at the VA
Hospital, but Ruthie Bennett, Bennett's wife, was not allowing any
visitors at that time. CHS improvised and passed a note into
Bennett's room through a nurse, which said that CHS's employer
wanted to make a donation to Bennett/15th Street COGIC due to his
health issues. CHS asked if the donation check should be made out to
the church or the daycare center. Ruthie Bennett came out of the
room and spoke with CHS. She said Bennett was sedated and would have
to be the one to decide how any checks were made out. On 06/01/2014,
CHS went by Bennett's house and by the 15th Street COGIC and
confirmed Bennett was not there. CHS said that meant he was still in
the hospital. On 06/02/2014, CHS heard from Clara Ferron that
Bennett had his leg amputated, which is why he is still in the
hospital. CHS will attempt to verify whether this information is
acurate and notify writer with any updates on Bennett's condition or
release.

Indexing

| Display Name | Enterprise Role | Entity Role | Entity Type | US Person |
|---|---|---|---|---|
| S-00038769 | CHS | Reference | PERSON | |

DOJ-00011887



Page       of 1            Displaying 1 - 1 of 1

Routing
    **Drafted by:**    Phillip W. Spainhour

    **Approved by:**    Phillip W. Spainhour

DOJ-00011888

# Exhibit 18

Import Form

**UNCLASSIFIED**

**External System ID:** Delta

**Document Title:** (U) S-00038769-A-050.xml

**Form Imported:** FD-1023

**File:** (U) S-00038769-A-050.xml

**Synopsis:** (U) Telephonic contact with CHS.

Filing and Security

**Primary Case:** 194A-LR-45357

**Case Title:** (U) PHILLIP WAYNE CARTER;
PEANUT CONSULTING TED SUHL;
ARKANSAS COUSELING
ASSOCIATES WEST MEMPHIS,
AR; SENSATIVE INVESTIGATIVE
MATTER
SENSITIVE INVESTIGATIVE
MATTER

**Serial Number:** 1061

**Serialized:** 06/27/2014

**Category:** Full Investigation
**Initiated:** 09/23/2009

Details

**Raw File Text:** On 06/23/2014, CHS advised they had heard through multiple sources
that 15th Street Church of God in Christ (COGIC) Pastor John Bennett
had been released from the VA Hospital in Memphis, TN, and was
receiving treatment at home. On 06/24/2014, CHS notified writer that
Pastor Bennett had died. CHS attended a meeting with church members
at the 15th Street COGIC regarding the death of Bennett. Redacted


Redacted

Indexing



| Display Name | Enterprise Role | Entity Role | Entity Type | US Person |
|---|---|---|---|---|
| S-00038769 | CHS | Reference | PERSON | |

Page    of 1    Displaying 1 - 1 of 1

Routing

**Drafted by:**  Phillip W. Spainhour

**Approved by:**  Phillip W. Spainhour

DOJ-00011892

# Exhibit 19

(Rev. 05-01-2008)

UNCLASSIFIED

# FEDERAL BUREAU OF INVESTIGATION

**Precedence:** ROUTINE                                    **Date:** 02/23/2012

**To:** Little Rock                 **Attn:** FOS Jacqueline M. Blacklaw
                                             FOS Rebecca Beard

**From:** Little Rock
         Squad 12/Marion RA
         **Contact:** SA Phillip W. Spainhour,    Redacted

**Approved By:** Peterson Jeffery EJEP/JCM    ASAC Shepard

**Drafted By:** Spainhour Phillip W:pws PWS

**Case ID #:** 194A-LR-45357- (Pending) 657

**Title:** PHILLIP WAYNE CARTER;
          ET AL;
          CORRUPTION OF PUBLIC OFFICIAL - STATE LEVEL;
          CORRUPTION OF PUBLIC OFFICIAL - LOCAL LEVEL;
          SENSITIVE INVESTIGATIVE MATTER (SIM)

**Synopsis:** Request payment reference UC credit card usage/expense.

**Details:** On 01/29/2012, writer and FBI SA Lazar S. Pierre, Jr.
met with CHS S-00038769 and target, Steven Brian Jones, at
Comfort Suites Hotel (CSH), 850 Stephen Boulevard, West Memphis,
Arkansas, 72301. At writer's request, CHS scheduled a meeting
with Jones at the CSH. Agents approached Jones and CHS in the
parking lot of the hotel. Jones and CHS consented to speak
privately with agents inside a hotel room, which was rented using
writer's UC identification and credit card. Agents showed Jones
a PowerPoint presentation detailing some of the governments
evidence against him and provided him with the opportunity to
cooperate in captioned investigation. Jones agreed to cooperate
and is scheduled to enter a proffer agreement at the USAO-EDA in
Little Rock, Arkansas, on 03/08/2012.

Redacted

UNCLASSIFIED

# Exhibit 20

WWW.SPIRITMEMPHIS.NET JULY/AUGUST 2009 VOL. VI NO. 76

# Spirit ®

## PASTOR JOHN H. BENNETT

## A FAITHFUL SERVANT OF THE LORD

DOJ-00006216



**COVER STORY**

# PASTOR JOHN H. BENNETT
## A FAITHFUL SERVANT OF THE LORD

**05**

*Memorial Spirit*
*Cora Delsie Marshall*

**18**

**WEDDING SPIRIT**

CELEBRATING LOVE
FROM HEAVEN
A REAFFIRMATION
OF LOVE

**24**

PASTOR ANDREW ERVIN PEPENER & LADY SHIRLEY DENEEN PEPENER

*Congratulations*
*Cody Marsalis*
*Little*

**27**

**YOUTH ACHIEVER**

JESSE H. TURNER, JR.
CHAIRMAN & PRESIDENT

CL 05463856 B
L12

**MONEY MATTERS**

**SPIRIT MEMPHIS**
NATIONAL DAY OF PRAYER
CELEBRATING 40 YEARS OF PASTORAL MINISTRY

**30 & 32**

**THE PREACHER'S WIFE**
LADY PAMELA HELTON

**34**

**TRI-STATE BANK OF MEMPHIS**

**36**



**PUBLISHER/EDITOR**
MINERVA P. LITTLE

**STAFF WRITERS**
ERICA DALLAS
ERIKA FAIRLEY

**CONTRIBUTORS**
JESSE H. TURNER, JR.
DOROTHY I. MILLER
PAMELA HELTON
RUBYE B. MEEKS

**CREATIVE DESIGN & LAYOUT**
FELIX WALKER
FELIX WAY ADVERTISING

**PHOTOGRAPHERS**
EARL STANBACK
TYRONE EASLEY
COURTNEY LITTLE
CODY LITTLE
CARLA BOWERS

**EDITORIAL & ADVERTISING OFFICE**
**THE SPIRIT GROUP, INC.**
3826 MICKEY DRIVE
MEMPHIS, TN 38116
901.396.7957  901.346.7207 FAX
EMAIL: SPIRITMEMPHIS@AOL.COM
WWW.SPIRITMEMPHIS.NET

© 2008 SPIRIT MEMPHIS, INC.

WWW.SPIRITMEMPHIS.NET

DOJ-00006217



# PASTOR JOHN H. BENNETT
## A FAITHFUL SERVANT OF THE LORD

*By Erica P. Dallas*

*Verily, verily, I say unto you, He that believeth on me, the works that I do shall he do also; and greater works than these shall he do; because I go unto my Father. And whatsoever ye shall ask in my name, that will I do, that the Father may be glorified in the Son. If ye shall ask any thing in my name, I will do it.* 1 John 14: 12-14 (KJV)

Although we may not know it, we witness miracles every day. The signs and wonders of God are all around us in the sway of the trees, the essence of life and with each breath that we take. We often take for granted the many gifts that God has given to us. Through the power of believing and loving God along with faith-based prayer, all things are surely possible. Pastor John H. Bennett's story is truly compelling because it teaches how all things can work together for good and trouble cannot win against a life rooted in Christ.

John Henry Bennett was born into this world on July 11, 1949 to parents Jimmy Bennett and Ora Lee Bennett. As the third child of seven children of the Bennett family, he was certainly a child who understood responsibility at an early age. Though John was born in Crawfordsville, Arkansas, he was reared in St. Louis, Missouri. Having a steel worker for a father and an industrious mother who owned several businesses really gave Bennett an idea about how to apply his own work ethic in life. In fact, the best advice that he received from his parents was "Whatever you do, be the best at it and work hard." His parents also stressed that he receive a good education and that is just what Bennett went on to do with excellence.

DOJ-00006218

Bennett graduated from O. H. Close High School in Stockton, California in 1968. He went on to graduate from Philander Smith College in 1988 with a Bachelor of Arts degree. In 1991, Bennett earned and received a Master of Theological Studies from Jackson Theological Seminary. Upon graduation, he immediately went on to receive a Doctorate Degree of Divinity from Charles Harrison Mason Bible College in 1992 and another Doctorate of Theology from LT Walker/Charles Harrison Mason in 1993.

To Bennett, the day that the Lord saved him was as startling clear today as it was when it first happened. He remembers the day quite well. In 1986 on George Washington's birthday, Bennett gave his life to Christ in the comfort of his home. Only a week before, he surprised his wife by attending church service, one of the few visits in 15 years. He remembers the pastor preaching a dynamic sermon that day and he made a commitment to give his life to the Lord. Bennett was

initially very sincere, but was not really ready to give everything up. He still had one or two vices that were very much a part of his lifestyle. He made a conscious decision that once he finished partaking of those habits, he would be ready to serve the Lord.

On a fateful holiday in 1986, as Bennett began to 'indulge', a voice spoke to him several times inciting him to read a scripture rather than being offensive to God. He opened the family bible to a picture of Jesus. The caption read, "Jesus Christ is a Good Shepherd." Then he read in the New Testament of John 10:1 which states, "Verily, verily, I say unto you, He that entereth not by the door into the sheepfold, but climbeth up some other way, the same is a thief and a robber." Although he wasn't familiar with the bible, he understood what the text was saying to him. The Word was telling him, come as you are. Don't come through the back door. Come to him with all of your habits and faults and He will wash away your sins.



SHELIA BENNETT

JIMMIE LEE BENNETT

JOHN BENNETT

HENRY LEACHMAN (COUSIN)

JOE BENNETT

OTIS BENNETT

JEAN BENNETT (COUSIN)

06

DOJ-00006219



Bennett began to give God praise right then and there as he threw away the substances. He recalls that the spirit of the Lord worked quickly because the taste of alcohol and other habits went right out of his mouth. Bennett began reading more into the bible and as he finished reading, he understood that God was calling him to be a shepherd. It was a bit difficult to take in, as he had just become delivered, but Bennett sought the advice of his pastor. After contacting his pastor and revealing what was shown to him, his pastor invited him out to revival. That evening, Bennett was given the opportunity to share his testimony with the congregation and recalls how the church lit up with delight. His testimony prompted others in the congregation to confess their own habits. That night was also a night of miracles, because as he was sitting in the audience, Bennett could even feel his asthmatic reactions being faded away. This caused him to jump up and have church all over again. From that day forward, miracle after miracle happened in his life.

Since that most stirring event, church has been foremost in Bennett's life. "Church is my life. My family is important but God is first. The church is also significant, not just the people, but even God's house. I reverence His house. Even when nothing is going on I am here. My family may be looking for me and I'm at church.

It's something about being in God's house," says Bennett. Once he was called, he went straight into ministry. At the national COGIC level, he has been an adjutant, which is a servant of ceremonies such as sacraments, processionals, and recessionals.

In 1971, Bennett traveled from California to Little Rock, Arkansas to be sworn in to the U. S. Air Force. While staying with his aunt and uncle, he met the woman who has been his mate for 36 years: Ruthie Mae McEwen. What's ironic is that Bennett's mother met Ruthie 10 years prior and told her that she had a son named John she would like Ruthie to meet. Although Ruthie had initially offered to show Bennett a few sights around town, she fell ill for a few days and they lost contact. One night after a church service, Bennett's uncle took him to her house where they were united again. "We talked and after about a week, I proposed. I even told her in church one evening that the Lord told me she was going to be my wife," says Bennett. Bennett even humbled himself to ask her father for her hand in front of her siblings. The couple married in February of 1972. Children: Tosha Bennett Thrower and Shamada Bennett; Grandchildren: John Bennett, Marissa Thrower, Makayla Warford, LeRuby Thrower and Bennett Marc Trotter; Great grandchildren: John Bennett III and Shamada Bennett.

DOJ-00006220



In his opinion, Sister Bennett took the vows "For better or for worse, in sickness and health, til death do us part" literally and to heart. He considers marriage to be a wholesome and honorable institution ordained by God and one that really helped change his life. "I don't think I could have been blessed with a better companion than Ruthie because we are very compatible. She helped to mold me and make me the man that I am now. So in our marriage I look to her for not only my strengths but also my weaknesses. She is my critique. And my children are a blessing," says Bennett. When asked what has held their marriage together for 36 years, he answered, "God was the glue holding us together. Everything I had in God's word was in her. My wife also kept our marriage together. Once I saw that she was there with me even in my mistakes, I became more appreciative of what I had in her."

The concept of trusting God and one another leads to Bennett's favorite scripture from the book of Proverbs 3:5-6 which declares "Trust in the Lord with all thy heart and lean not to thine own understanding. In all thy ways acknowledge him and he shall direct thy path." The first church that Bennett pastored was the Earle Church of God in Christ in Earle, Arkansas. Bishop Leato Thomas Walker, Sr. sent him there after the

former pastor split the church, taking all of the young people with him and leaving 12 members. From 1993 to 1996, Pastor Bennett grew the church from a congregation of 12 to 300 people. This experience was Bennett's learning ground for hands on pastoring. The concept he used at that church proclaimed to the people that he was not only just a pastor of Earle Church but also the city of Earle. He recalls having a wonderful food and clothing bank in that area.

Bennett's transition to his present church was certainly one that he can never forget. After the passing of Pastor Smith, Bishop Walker stood in as interim pastor and Bennett was the executive secretary. On his anniversary at Earle Church, a woman got up and prophesied that Bennett would not be with their church long. One day while visiting the 15th Street COGIC to do some secretarial work, Bishop Walker informed the people that Bennett would be the new pastor. Bennett recalls that they had approximately 10 preachers at the time and was quite surprised at the news of his selection. However, Bennett was elated and began to tell a compelling narrative to urge the congregation to just give him a chance to turn the church around within six months. 15TH Street COGIC gave Pastor Bennett a chance beginning in 1997 and he is still the pastor today in 2009!

DOJ-00006221



The 15th Street COGIC has about 15 auxiliaries within the church. There are a few specific programs that Pastor Bennett really devotes his time to developing. The 15th St. Childcare Development Center ABC Program is an accredited school by the State of Arkansas. Under the direction of Ruthie Bennett, the program centers on providing a quality education to children in their preparation stages of entering the public education system. Operation PULL is another outreach program created by Pastor Bennett that really gives the youth an opportunity to receive counseling and other rehabilitative services. The Sober House, another program founded by Pastor Bennett, is an outreach ministry that provides residential housing for men that have found themselves victim to drugs and alcohol. The Sober House is a safe refuge that allows the men to have support as they participate in rehabilitative processes and change their purpose in life.

Pastor Bennett cites his greatest blessing in life as the time when God gave him another chance to live. In 2004, on a typical day like any other, Ruthie dressed and left home to go to the daycare while Pastor Bennett intended to make a trip to Little Rock, Arkansas. By the time Ruthie came back to her home in the afternoon, Pastor Bennett was still in his pajamas and feeling quite unwell. Ruthie left to pick up something to eat and when she returned, she found Pastor Bennett in worse health, coughing up black mucus all over the bathroom. The only thing that prompted Pastor Bennett to go to the hospital was the policemen that Ruthie called. In the process of prepping him to be moved from the local hospital to Memphis, Pastor Bennett went into a coma. They transported him to Memphis and when he arrived, the doctors informed her that he was not going to make it through night and the best thing to do was call his

siblings in and make funeral arrangements. It was then that they found out Pastor Bennett didn't have a functioning liver and without a liver, living would be impossible.

The hospital gave Pastor Bennett two floors and church members from all over came by to pray for him. At the advice of a nurse, Ruthie became insistent that Pastor Bennett be put on a respirator to keep his heart from exploding. He awoke from the coma after three days and had no recollection of what had happened. All he knew was that he was ready to go home. Ruthie wanted him to stay and asked the doctors to keep him for further observation. "The doctor said he would keep me for 24 hours and then release me. That was in April 2004 and I didn't leave the hospital until November 2004," said Bennett. The doctors were also very matter-of-fact about their medical observations. They told Bennett the next day that he should make out a will because he wouldn't live to see Christmas. Pastor Bennett refused to go by their assumptions and kept his eyes on God.

An appointment with Dr. Joseph Waters was the start of a miraculous turn of events. In fact, Pastor Bennett considers Dr. Waters to be his angel. Going in, Bennett was initially quite frustrated by his circumstances and it was apparent through his demeanor. The Bennett's wanted to know if having a liver transplant was possible and Dr. Waters assured them it was. The obstacles included passing tests to see if his body could handle the operation, the medical fee of over $300,000, and an approval from Washington, D.C. Pastor Bennett passed all of the tests, had the approval from Washington, and Uncle Sam paid for his transplant and other associated fees!

Meanwhile, as Pastor Bennett was waiting for the liver transplant, his kidneys shut down. They had him on dialysis and he lost activity of his legs. On June 3, they flew him to Nashville, TN to Vanderbilt where the transplant would take place. The doctor told Bennett that due to the fluctuating waiting list, it would be a two year wait for him to receive a liver. In other words, they would keep him alive until the operation. On June 10th, only seven days later, the Bennett's received a call saying that they have a liver being prepped in Chattanooga and ready for Pastor Bennett! The operation was a tremendous success, but the miracle wasn't over by a long shot.

As Pastor Bennett was talking to his doctor, had the urge to use the restroom, his doctor assured him that he was still on dialysis and in need of kidney assistance. Bennett immediately demonstrated that he didn't need the catheter, causing the doctors to exclaim, "You are a miracle!" He only replied, "God let you put the liver in but He said He'll take care of the kidney himself." Bennett was given the chance to see just how good the God he serves really is.

13

DOJ-00006222



ALDERMAN JAMES PULLIAUM    ELDER JOHN H. BENNETT    BISHOP DONNE L. LINDSEY

During the District Meeting held at 15th Street COGIC on June 3rd - 5th, 2009 a Proclamation was presented to Bishop Lindsey. The Mayor proclaimed June 4th, 2009 as "Bishop Donne L. Lindsey Day" in the City of West Memphis.

Pastor Bennett is currently running for Jurisdictional Bishop of Arkansas First Jurisdiction. Within the denomination of COGIC, the states are divided into jurisdictions and in under each particular area, there are 30 churches to oversee. In the state of Arkansas, there are four jurisdictions. The Arkansas First Jurisdiction has approximately 133 churches. Pastor Bennett's resume is certainly an impressive one, as he has held numerous positions as Executive Secretary, Chief Adjutant, and Administrative Secretary. He has served on the judiciary board, credentials committee and various capacities within the jurisdiction. He was also the Episcopal overseer for the Chamber of Bishops under such leaders as Bishop J. O. Patterson Sr., Bishop G.E. Patterson, and presently under Bishop Charles Blake. He notes that he has never tried to use the positions he has held to get appointments and remains humble. He has a great respect for his leaders and the office. "The reason that I want this position is not only because I am qualified and because of my service but because I have a vision. One of the platforms that I would



FORMER PRESIDENT
BILL CLINTON

like to institute is insurance for every pastor. It can all be done with the proposed budget that I plan to put in place. I would also like to take advantage of faith-based funding. Just like we have all these outreach ministries at the church we can institute that on a jurisdictional level with daycares, rehab facilities, at risk youth programs and several other areas," said Bennett.

14

DOJ-00006223

# C O V E R   S T O R Y



PASTOR OF 15TH STREET COGIC SUPT. JOHN H. BENNETT
CITY OF WEST MEMPHIS MAYOR WILLIAM H. JOHNSON
CITY OF WEST MEMPHIS HOUSING DIRECTOR/GRANT WRITER
KENNETH D. JOHNSON



SUPT. JOHN H. BENNETT & CLARA FERRON
TRUSTEE MIDSOUTH COMMUNITY
COLLEGE BOARD OF TRUSTEES



DISTRICT JUVENILE SUPERVISOR D. C. BARNES, JR.
SUPT. JOHN H. BENNETT & JUVENILE OFFICER
MELINDA WILSON



MR. ISAAC CHRISTOPHER, PRINCIPAL DAN HENDERSON,
JOSHUA JOINER, &  SUPT. JOHN H. BENNETT
AT WONDER JR. HIGH SCHOOL WEST MEMPHIS, AR



SUPT. JOHN H. BENNETT (CENTER) LEATRICE Y. CARTER,
SCHOOL/COMMUNITY FOR ARKANSAS COUNSELING ASSOCIATES
(RIGHT), ALDERMAN PHILLIP CARTER OF WEST MEMPHIS CITY
COUNCIL (LEFT), DISCUSSING MEASURES TO BETTER SERVE
INNER CITY YOUTH THROUGH COLLABORATIVE PARTNERSHIPS,
PROVIDING PREVENTION AND INTERVENTION PROGRAMS.

Pastor Bennett's story is particularly touching because
it demonstrates how God can deliver, heal, and bless
all at the same time. Bennett was taken through a severe
and intense set of circumstances and managed to stay
positive on his journey. He was rewarded for his
patience and faithfulness in God.  There are lessons that
we must take with us while we live on this earth. The
God we serve is forgiving, dependable, and true to His
Word. We do not have to wait for a certain time to
commit ourselves to Christ. We can come to Him with
all of our shortcomings and an open heart and mind.
There is no doubt that God used Bennett to tell his
testimony. Bennett has shown his appreciation in kind
by completely devoting himself to ministering to the
people. To this we can cheerfully say, "Well Done."



*Erica P. Dallas is a recent graduate from The University of Memphis
with a Master of Arts and Sciences in Sociology and a Bachelors of
Business Administration in Management. She is currently an employee
of Memphis City Schools, a freelance writer for various publications,
and part-time Marketing Assistant for local Mid-South organizations.
Erica Dallas aspires to be a full time journalist, novelist and screenwriter.*

15

DOJ-00006224