```
 1              IN THE UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF ARKANSAS
 2                     WESTERN DIVISION

 3   UNITED STATES OF AMERICA,
                         Plaintiff,
 4       v.                              No. 4:15CR00300-01 BRW

 5                                       July 19, 2016
                                         Little Rock, Arkansas
 6                                       9:04 a.m.
     THEODORE E. SUHL,
 7                         Defendant.

 8              TRANSCRIPT OF TRIAL - VOLUME 5
                BEFORE THE HONORABLE BILL WILSON,
 9          UNITED STATES DISTRICT JUDGE, and a jury

10   APPEARANCES:

11   On Behalf of the Government:

12       MR. JOHN D. KELLER, Trial Attorney
         MS. LAUREN BELL, Trial Attorney
13       MS. AMANDA R. VAUGHN, Trial Attorney
           United States Department of Justice -
14         Public Integrity Section
           1400 New York Avenue NW
15         Washington, D.C.  20530

16   On Behalf of the Defendant:

17       MR. ROBERT M. CARY, Attorney at Law
         MR. ALEX GISCARD ROMAIN, Attorney at Law
18       MR. SIMON A. LATCOVICH, Attorney at Law
         MR. THOMAS LANGDON HARRIS, Attorney at Law
19         Williams & Connolly LLP
           725 Twelfth Street NW
20         Washington, D.C.  20005-5901

21       MR. CHARLES A. BANKS, Attorney at Law
           Banks Law Firm, PLLC
22         Post Office Box 251310
           Little Rock, Arkansas  72225-1310
23
     Defendant Present.
24
         Proceedings reported by machine stenography and displayed
25   in realtime; transcript prepared utilizing computer-aided
     transcription.



                    Judith A. Ammons, RPR, CRR, CCR
                      United States Court Reporter
```

I N D E X - (Volume 5 - July 19, 2016)

| WITNESSES: (For the Defendant) | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| LAURA SUHL | 667 | 673 | | |
| JAMES ALAN EOFF | 675 | 680 | | |
| SCOTT MCLEAN | 687 | 688 | | |
| ROB SMITH | 689 | | | |
| PHILLIP SPAINHOUR | 691 | 697 | | |
| ERIC ETCHISON | 698 | 701 | | |
| TED SUHL | 707 | 764 | 807 | 809 |
| SHIRLEY SUHL | 815 | 826 | | |

| WITNESSES: (For the Government) | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| JANIE HUDDLESTON | 829 | 834 | | |

**EXHIBITS:**                                                    **RECEIVED**

Defendant's Exhibit 1775  ..............................P.677
Defendant's Exhibit 1776  ..............................P.679
Government's Exhibit 101  ..............................P.683
Government's Exhibit 38  ...............................P.694
Defendant's Exhibit 664 ................................P.711
Defendant's Exhibit 661 ................................P.712
Defendant's Exhibit 1719 ...............................P.718
Defendant's Exhibit 541 ................................P.719
Defendant's Exhibit 1690 ...............................P.720
Defendant's Exhibit 1691 ...............................P.721
Defendant's Exhibit 1695 ...............................P.722
Defendant's Exhibit 1705 ...............................P.722
Defendant's Exhibit 1687 ...............................P.724
Defendant's Exhibit 1688 ...............................P.729
Defendant's Exhibit 658 ................................P.734
Defendant's Exhibit 1780 ...............................P.742
Defendant's Exhibit 1774 ...............................P.744
Defendant's Exhibit 1152-A .............................P.759
Defendant's Exhibit 1671 ...............................P.763

* * * * *

JURY INSTRUCTIONS CONFERENCE ...........................P.838

Judith A. Ammons, RPR, CRR, CCR
United States Court Reporter

L. Suhl - Direct

1        (Proceedings continuing in open court at 9:04 a.m.; jury

2    present.)

3            THE COURT:  Be seated, please.

4        Hearts and minds, insofar as this case is involved,

5    anybody's heart and mind not as pure as when you left last

6    night, raise your hand.  Again, no hands.

7        I brought one six-pack of eggs this morning Mr. Davis

8    didn't produce.  They are not too good of eggs anyway.

9        All right.  You may proceed.  Call your next witness,

10   please.

11           MR. BANKS:  We call Laura Suhl.  She's right out

12   there, Judge.

13           THE COURT:  All right.

14           MR. BANKS:  Ms. Suhl, if you'll come up here and be

15   sworn.

16       **LAURA SUHL, DEFENDANT'S WITNESS, DULY SWORN**

17           MR. BANKS:  Take this witness stand right up here,

18   please, ma'am.

19           THE COURT:  If you'll speak right into the mic,

20   please.

21                     DIRECT EXAMINATION

22   BY MR. BANKS:

23   Q.   How are you this morning?

24   A.   I'm doing well.  How are you?

25   Q.   I want you to state your name, please, ma'am, and spell it

1    for the record for the ladies and gentlemen of the jury.

2    A.    Laura Suhl, L-a-u-r-a S-u-h-l.

3    Q.    And where do you live, Ms. Suhl?

4    A.    Warm Springs, Arkansas.

5    Q.    And, of course, your husband is Ted Suhl?

6    A.    Yes.

7    Q.    And how long have you been married to Ted?

8    A.    19 years.

9    Q.    Do you have a family?

10   A.    Yes, we have two children.

11   Q.    Let me tell you, we're going to be very brief, and I'm

12   going to talk to you about some specific facts and a date in

13   July.  But, first, I want to ask you about three or four

14   questions of context to lead us up to that.

15         Tell me, if you would, where did you first meet Ted Suhl?

16   A.    At Baylor University.

17   Q.    And why were you there and why was he there?

18   A.    I attended Baylor and I had begun engineering, and

19   switching to international business, but fell in love with

20   Christian camp counseling all through the years of the summers

21   between my college years.  And I saw that The Lord's Ranch was

22   hiring to help work with -- in a Christian community to help

23   work with troubled kids, so I applied.

24   Q.    So that was an interview?

25   A.    He came and interviewed me.

1    Q.    And what qualifications or education did you have that you

2    think qualified you for that job?

3    A.    Just a calling to serve the Lord, and I had worked with

4    Christian camp counseling with kids for those summers during my

5    Baylor years.

6    Q.    Were you hired?

7    A.    I was.

8    Q.    And did you actually go to Warm Springs and work?

9    A.    I did.  I did.

10   Q.    What did you do?

11   A.    I'm sorry?

12   Q.    What did you do there?

13   A.    I lived with the girls, troubled girls from all over the

14   different -- the streets of Chicago and Dallas and -- who had

15   real troubles and trauma in their lives, and lived with them

16   and through --

17   Q.    How long did that work last?

18   A.    That was six years.

19   Q.    And during that time frame, you fell in love with Ted and

20   married?

21   A.    Yes.  Yes.

22   Q.    And after six years, you didn't work outside the home in

23   that capacity anymore, is that correct?

24   A.    Right, after I had my son.

25   Q.    Now, I want to fast-forward you ahead some of those years

L. Suhl - Direct                                    670

1    to July the 5th of 2008.  Do you remember that particular date?

2    A.   Yes, I do.

3    Q.   And do you remember the facts and circumstances

4    surrounding the date of July the 5th of 2008?

5    A.   Yes, I do.

6    Q.   If you would, tell me, who is Gertrude Bolin?

7    A.   Gertrude Bolin was my grandmother.

8    Q.   And what happened in on -- I guess it was June the 28th, I

9    believe --

10   A.   Yes.

11   Q.   -- of 2008 that --

12   A.   Right.

13   Q.   -- that caused you to remember the circumstances

14   surrounding --

15   A.   Well, I had grown up with my grandmother and my mother

16   together raising us.  And she had passed away June 28th.  And

17   so --

18   Q.   Did you -- I'm sorry.  I don't mean to be interrupting

19   you.

20   A.   No.  We attended her funeral.

21   Q.   "We" is you and Ted?

22   A.   Ted and I, yes.

23   Q.   And where was the funeral?

24   A.   In San Antonio, Texas.

25   Q.   Do you recall the date of the funeral?

Judith A. Ammons, RPR, CRR, CCR
United States Court Reporter

1    A.    July 3rd.

2    Q.    And how did you -- do you remember how you got -- to kind

3    of speed it up a little bit, did you and Ted fly from Memphis

4    to San Antonio?

5    A.    Ted met us.  He was on a business meeting elsewhere and

6    met me and I came from Memphis.

7    Q.    And when was the funeral?  What was the date?

8    A.    July 3rd.

9    Q.    And I would take it you stayed at a motel there in San

10   Antonio?

11   A.    Yes.

12   Q.    And do you recall which one?

13   A.    I believe the Marriott.

14   Q.    And you got a rental car, is that correct?

15   A.    Yes.

16   Q.    And then you flew back after the funeral?

17   A.    Yes, we did.  We stayed for the funeral and stayed a day

18   to visit with family and flew back the next day.

19   Q.    And was the date of your return back to Arkansas July the

20   5th?

21   A.    Yes, it was.

22   Q.    And did you and Ted together fly back to Memphis?

23   A.    Yes, we did.

24   Q.    And was it dinner or evening hours for dinner when you

25   arrived back?

1    A.    Yes.  We arrived in the evening.

2    Q.    What did you do then?

3    A.    We -- we went to eat.

4    Q.    And where did you eat?

5    A.    The Texas de Brazil.

6    Q.    I take it you had eaten there before?

7    A.    Yes.

8    Q.    And Ted liked that restaurant, is that correct?

9    A.    Yes.  Everybody loves that restaurant.

10   Q.    Was it just the two of you that had dinner?

11   A.    Yes, it was.

12   Q.    Did you have a normal dinner as to how much time you spent

13   with you and your husband eating?

14   A.    Yes.  It was --

15   Q.    Did anyone else approach you or attempt to conduct any

16   type of business with your husband during that evening meal?

17   A.    No.

18   Q.    Did you see either Ted -- excuse me -- Steve Jones or

19   Mr. Carter during that meal at all?

20   A.    No.

21   Q.    Did your husband ever leave the table and conduct any type

22   of business out of your sight?

23   A.    No.

24   Q.    And when the meal was completed, where did you go then?

25   A.    We went home.

L. Suhl - Cross                          673

1    Q.   Okay.  There's no need to show you any exhibit, I would

2    take it, by way of your rental car to refresh your

3    recollection.  You already remember it, don't you?

4    A.   Yes.

5    Q.   You remember that accurately?

6    A.   Yes.

7    Q.   Thank you.  By the way, had you ever seen Ted Jones before

8    this week?

9    A.   Steve Jones?

10   Q.   I'm sorry.  Steve Jones?

11   A.   No, I never had -- not until the hearings began, had I

12   ever seen him.

13   Q.   Didn't know him.  Thank you.

14        MR. BANKS:  Pass the witness.

15                    CROSS-EXAMINATION

16   BY MS. BELL:

17   Q.   Good morning, ma'am.

18   A.   Good morning.

19   Q.   Just so I'm clear, you said that you flew down to San

20   Antonio for the funeral, the funeral which occurred on

21   July 3rd, 2008, correct?

22   A.   Uh-huh.

23   Q.   I need a yes or no.

24   A.   I'm sorry?

25   Q.   I need a yes or no rather than an uh-huh.


                    Judith A. Ammons, RPR, CRR, CCR
                      United States Court Reporter

L. Suhl - Cross

1    A.    Yes.

2    Q.    And you flew back the next -- on July 5th is your

3    testimony?

4    A.    Yes.

5    Q.    To Memphis?

6    A.    Yes.

7    Q.    I'm going to show you what's been previously marked as

8    Government's Exhibit 21-C.

9          Does your husband have an American Express Card?

10   A.    I believe -- yes, I believe he does.

11   Q.    Government's Exhibit 21-C, do you see this on the screen?

12   A.    I see it on the screen.

13   Q.    Turning to page 4 of Government's Exhibit 21-C, the

14   Government's Exhibit 21-C is your husband's statement for

15   American Express, correct?  Do you see your husband's name

16   there?

17   A.    Yes, I see his name.

18   Q.    In 2008, we're talking about eight years ago, correct?

19   A.    That would be eight years ago.

20   Q.    So page 4 of Government's Exhibit 21-C shows a Marriott

21   charge.  Do you see that?

22   A.    Yes, I do.

23   Q.    And it's saying the arrival date was July 2nd, 2008,

24   correct?

25   A.    That's correct.

Eoff - Direct

1    Q.    And a departure date of July 4th of 2008.  Do you see

2    that?

3    A.    Yes, I do.  I see it.

4    Q.    Okay.  And, ma'am, you were not with your husband at

5    dinner at Texas de Brazil on September 11th, 2011, correct?

6    A.    I'm sorry?

7    Q.    On September 11th of 2011, you were not with your husband

8    at Texas de Brazil, correct?

9    A.    September 11th, 2011?

10   Q.    Yes.

11   A.    I -- I've been with him several times to Texas de Brazil,

12   but that date -- that's 2011.

13   Q.    I understand.  Thank you, ma'am.

14         MS. BELL:  No more questions.

15         MR. BANKS:  No further questions, Your Honor.

16         THE COURT:  Jury questions?

17   You may stand down.  Thank you, ma'am.

18   Next witness.

19         MR. CARY:  The defense calls Alan Eoff.

20         **JAMES ALAN EOFF, DEFENDANT'S WITNESS, DULY SWORN**

21                       DIRECT EXAMINATION

22   BY MR. CARY:

23   Q.    Good morning, Mr. Eoff.  Could you please state your name

24   for the record and spell it for the court reporter, please?

25   A.    It's James Alan Eoff.  E-o-f-f, E as in Edward, O, F-F as

Judith A. Ammons, RPR, CRR, CCR
United States Court Reporter

1    in Frank.

2            (Court reporter clarification.)

3    Q.    And I'm sorry for mispronouncing your name, Mr. Eoff.

4    What do you do for a living, sir?

5    A.    I manage a restaurant in downtown Memphis.

6    Q.    What's that restaurant?

7    A.    It's Texas de Brazil.

8            MR. CARY:  Could I have for the witness only

9    Defendant's Exhibit 1775, please?

10   BY MR. CARY:

11   Q.    Can you tell me what Defendant's Exhibit 1775 is?

12   A.    It is a copy of a screenshot from a reservation system for

13   a restaurant.

14   Q.    And is that kept in the ordinary course of business at

15   Texas de Brazil?

16   A.    The particular report we're looking at on the screen?

17   Q.    Yes.

18   A.    It is not used often by our particular restaurant.

19   Q.    Was it -- does it accurately record the reservations back

20   in time, to your knowledge?

21   A.    Yes.

22   Q.    And does it reflect the data that was inputted as people

23   were dining or making reservations back throughout history?

24   A.    It -- it records the history on it, but I don't know all

25   the details on what it's actually telling you.  As in the two

1    dates at the bottom, I cannot tell you exactly what those two

2    dates mean.

3    Q.    Sir, if you were to pull up a reservation for

4    July 5th of 2008 -- let me ask you this.  Were you asked to

5    pull up the reservations for July 5th of 2008?

6    A.    Yes.

7    Q.    And for Mr. Suhl, in particular, Mr. Ted Suhl?

8    A.    Yes.

9    Q.    And is that what you were able to pull up on the machine?

10   A.    Yes.

11   Q.    And there's a -- how were you able to tell if this was

12   July 5th, 2008 -- the reservation for July 5th, 2008?

13   A.    We looked it up by that date and that date appears at the

14   bottom of this.

15          MR. CARY:  Move the admission of Defendant's Exhibit

16   1775, please.

17          MR. KELLER:  No objection, Your Honor.

18          THE COURT:  Admitted.

19       (Defendant's Exhibit 1775 received in evidence.)

20   BY MR. CARY:

21   Q.    So it ought to be on your screen now.  Do you see it?

22          And ask that it be published to the jury.

23          And could we focus on, first of all, the date in the

24   little right-hand corner, what does that signify?  Maybe we

25   could blow it up a little bit.

Eoff - Direct                                                678

1    A.    This is where I stated earlier I wasn't exactly sure about

2    the two dates, but this is the date -- when I look up by date,

3    this is what comes up.

4    Q.    And when you pulled up the reservations for July 5th,

5    that's what came up and that's what shows you July 5th --

6    A.    Yes.

7    Q.    -- is the reservation date?

8              MR. CARY:  And then could we go to the top, please?

9    BY MR. CARY:

10   Q.    And whose name is at the top?

11   A.    Ted Suhl.

12   Q.    And what time is the reservation reflected there?

13   A.    8:00 p.m.

14   Q.    And what's the duration?

15   A.    Two hours.

16             MR. CARY:  If I could have for the witness only

17   Defendant's Exhibit 1776.

18   BY MR. CARY:

19   Q.    And, sir, is this a similar document pulling up the

20   reservations for June 28th of 2009?

21   A.    Very similar with the exception of the dates from what I

22   can see.

23             MR. CARY:  Move the admission of Defendant's Exhibit

24   1776.

25             MR. KELLER:  No objection.


                    Judith A. Ammons, RPR, CRR, CCR
                      United States Court Reporter

1            THE COURT:  Admitted.

2            (Defendant's Exhibit 1776 received in evidence.)

3     BY MR. CARY:

4     Q.   And, sir -- if I can have that published for the jury.

5            The last updated number, that is what tells you that that

6     was a reservation for June 28th, 2009, correct?

7     A.   We looked it up by that date and this is what we found.

8            MR. CARY:  And then if I could go to the top of the

9     page.

10    BY MR. CARY:

11    Q.   And who is the reservation for, sir?

12    A.   Ted Suhl.

13    Q.   And how big is the party size?

14    A.   Two.

15    Q.   And what was the time?

16    A.   5:45 p.m.

17    Q.   And the duration?

18    A.   Two hours.

19            MR. CARY:  And if I could go back to 1775, I think I

20    forgot to ask one question about that.

21            If I could have the top of the page.

22    BY MR. CARY:

23    Q.   What was the party size for July 5th, 2008?

24    A.   What I'm looking at says two people.

25            MR. CARY:  Thank you, sir.


                    Judith A. Ammons, RPR, CRR, CCR
                    United States Court Reporter

1          Pass the witness.

2               MR. KELLER:  Your Honor, if I could have just a moment

3     to show the defense some exhibits I plan to use with this

4     witness.

5               THE COURT:  Beg your pardon?

6               MR. KELLER:  If I could have just a moment to show the

7     defense some exhibits I plan to use with this witness I don't

8     believe they've seen before.

9               THE COURT:  You may.

10         (Counsel confer.)

11              MR. KELLER:  Ms. Beard, if we could have the settings

12    so that the ELMO would only display for the witness, at least

13    initially.

14                          CROSS-EXAMINATION

15    BY MR. KELLER:

16    Q.   Mr. Eoff, I want to talk to you about some of the records

17    the defense just showed you.

18              MR. KELLER:  And actually, Ms. Beard, this can be

19    shown to the jury.  It was just admitted by the defense.

20         For identification purposes, which exhibit number was

21    this?

22              MR. CARY:  1775.

23    BY MR. KELLER:

24    Q.   Mr. Eoff, I'm showing you what's been previously admitted

25    as Defendant's Exhibit 1775.  Is this the record of reservation

1   that you were just describing on direct?

2   A.   May I state the date?

3   Q.   Yes.

4   A.   Yeah, this would be the July 5th that we looked at

5   earlier.  Yes.

6   Q.   All right.  So you said you don't know what that

7   July 27th, 2009, date signifies, is that right?

8   A.   That's correct.

9   Q.   And you don't know what that "covers this table" number

10  signifies on this sheet, is that right?

11  A.   I do not know.

12  Q.   And you don't know, based on this sheet, whether there

13  were actually two people at the restaurant that night, or

14  whether a third person may have joined the party, or whether

15  there were more than three people that night, do you?

16  A.   I can see that when it was put in, it was originally put

17  in for two people.

18  Q.   And that's what would have been input when the reservation

19  was actually made, is that right?

20  A.   Based on the information on this, yes.

21  Q.   But if someone makes a reservation for two people and then

22  they show up with three people, that wouldn't be reflected on

23  this sheet, isn't that right, or do you --

24  A.   It would be conjecture if I were to say I knew for certain

25  that they would change the covers on this table because I don't

Eoff - Cross

1    know if that -- I don't know what actually changes that

2    particular part of this report.

3    Q.   And if there were two people who sat down and ate dinner,

4    but a third people [sic] joined them and did not actually eat

5    dinner, you wouldn't be able to tell that from this sheet

6    either?

7    A.   I would not.

8           MR. KELLER:  And, Ms. Beard, if we could now have the

9    ELMO display just to the witness.

10   BY MR. KELLER:

11   Q.   Mr. Eoff, I'm showing you what's previously been marked

12   for identification purposes as Government's Exhibit 101.  And

13   I'm going to flip through these so that you can see them on

14   that screen there in front of you.

15          So this is page 1, page 2, page 3, 4.  The last few pages

16   here are sightly different.  Do you recognize all of these

17   documents?

18   A.   Yes.

19   Q.   And are these all documents that you pulled from Texas de

20   Brazil's records system?

21   A.   Yes.

22   Q.   And these are all records that are kept in the normal

23   course of the business at Texas de Brazil?

24   A.   Yes.

25   Q.   And they are maintained in that records system.  That's

Eoff - Cross                                    683

1    why you were able to pull them?

2    A.   They are on an electronic system.

3         MR. KELLER:  Your Honor, I move for the admission of

4    Government's Exhibit 101.

5         MR. CARY:  No objection.

6         THE COURT:  Admitted.

7       (Government's Exhibit 101 received in evidence.)

8         MR. KELLER:  If I could have just another moment, Your

9    Honor.

10        THE COURT:  You may.

11      (Counsel confer.)

12   BY MR. KELLER:

13   Q.   Mr. Eoff, I'm showing you what's previously been admitted

14   as Government's Exhibit 57.  Are you able to read that on the

15   screen in front of you?

16   A.   Yes.

17   Q.   Do you see the first date that's highlighted on that

18   chart?

19   A.   Yes.

20   Q.   And what's the date there?

21   A.   May 18th, 2008.

22   Q.   So then if we look at the first page of the exhibits that

23   I just showed you, Government's Exhibit 101, the records from

24   Texas de Brazil, what's the date on the bottom of your Texas de

25   Brazil record there, the last updated date?

Eoff - Cross                                                    684

1    A.    The last updated date is May 18th, 2008.

2    Q.    And does that match the first line of the chart that I

3    showed you, the highlighted line?

4    A.    The dates are the same.

5    Q.    What's the party size on that document, on the Texas de

6    Brazil document for that date?

7    A.    Three.

8    Q.    I'm showing you page 2 of Government's Exhibit 101 now.

9    If you look at the second highlighted line on the chart that I

10   showed you, what's the date on the chart?

11   A.    June 22nd, 2008.

12   Q.    And what's the date on the bottom of your Texas de Brazil

13   record?

14   A.    The same.

15   Q.    And what's the party size on that date?

16   A.    Three.

17   Q.    And then if we look at the fourth page of Government's

18   Exhibit 101, what's the last updated date on the fourth page of

19   your Texas de Brazil record?

20   A.    August 10th, 2008.

21   Q.    Does that match the fourth line on the highlighted chart,

22   the fourth highlighted line on the chart?

23   A.    Yes, the same date.

24   Q.    What's the party size on that date?

25   A.    Three.

Judith A. Ammons, RPR, CRR, CCR
United States Court Reporter

Eoff - Cross                                    685

1    Q.    And looking at the sixth page of Government's Exhibit 101,

2    what's the last updated date on that page of the Texas de

3    Brazil record?

4    A.    September 7th, 2008.

5    Q.    And does that match the fifth highlighted line on the

6    chart there?

7    A.    Yes, sir, it's the same.

8    Q.    And what's the party size on that date?

9    A.    Three.

10   Q.    I'm going to skip ahead here.  Mr. Eoff, not all of the

11   records that you provided showed a party size of three, is that

12   correct?

13   A.    That is correct.

14   Q.    Some of them have two?

15   A.    Yes.

16   Q.    And one of them might have had four?

17   A.    I believe so.

18   Q.    Skipping ahead to the last page of the printouts that you

19   provided, what's the created date on this document?

20   A.    September 11th, 2011.

21   Q.    And does that match the bottom line on the highlighted

22   chart?

23   A.    Yes.

24   Q.    Does the date match?

25   A.    Yes, sir.  It's the same.


Judith A. Ammons, RPR, CRR, CCR
United States Court Reporter

McLean - Direct

1    Q.    And what's the party size listed on the Texas de Brazil

2    document for this date?

3    A.    Three.

4              MR. KELLER:  No further questions, Your Honor.

5              MR. CARY:  No redirect, Your Honor.

6              THE COURT:  Jury questions?

7         You may stand down, sir.  Thank you.

8         Is he free to go?

9              MR. CARY:  He is, Your Honor.

10             MR. KELLER:  Yes.

11             THE COURT:  You can go about your business.

12        Next witness.

13             MR. ROMAIN:  Your Honor, the defense calls Scott

14   McLean.

15             THE COURT:  All right.  While Mr. McLean is coming in,

16   will counsel approach?

17        (Bench conference reported as follows:)

18             THE COURT:  Is this last witness kin to Dan?

19             MR. BANKS:  No, sir.

20             THE COURT:  That's Dan Eoff, a client of his.

21        Thank you.

22        (Proceedings continuing in open court as follows:)

23             **SCOTT MCLEAN, DEFENDANT'S WITNESS, DULY SWORN**

24             THE COURT:  Speak right into the mic, if you will,

25   please.

1                      DIRECT EXAMINATION

2    BY MR. ROMAIN:

3    Q.   Good morning, sir.

4    A.   Good morning.

5    Q.   Would you please state your name for the record and spell

6    it?

7    A.   Scott McLean, S-c-o-t-t M-c-L-e-a-n.

8    Q.   And where do you live, sir?

9    A.   Here in Little Rock.

10   Q.   And are you employed?

11   A.   I am employed.

12   Q.   Where do you work?

13   A.   Pathway to Freedom, Incorporated.

14   Q.   What is your title?

15   A.   I'm the founder/executive director of Pathway to Freedom.

16   Q.   And what is Pathway to Freedom?

17   A.   Pathway to Freedom is a Christ-centered Christian

18   faith-based program.  We provide pre-release, post-release

19   services to prisoners, ex-offenders, trying to help the state

20   break the cycle of incarceration and reduce recidivism rate.

21   At the same time, trying to lessen the government's burden by

22   not charging them for costs.  We're privately funded.  And at

23   the same time, we also are trying to build stronger communities

24   and break that cycle of victimization.

25       So at Pathway to Freedom, we also -- with the contract

McLean - Direct                                                                 688

1   with the state, we have a facility of 200 male inmates that the

2   state has given us that -- pre-release at no cost to us.  So

3   that's what we do.  It's a Christ-centered program.  It's a

4   volunteer program.  They can be of any faith or no faith at

5   all.  At the same time, it's not noncompulsory, and they can

6   opt out of the program at any time they choose.

7   Q.   Thank you.  Do you know Ted Suhl?

8   A.   I do know Ted Suhl.

9   Q.   And how long have you known him?

10  A.   I have known Ted for five years.

11  Q.   And you've met him?

12  A.   I have met Ted.

13  Q.   And have you communicated with him over the course of

14  those five years?

15  A.   We have.  We have.

16  Q.   Do you know his reputation for generosity to Christian

17  causes?

18  A.   Yes.

19  Q.   And what is his reputation for generosity to Christian

20  causes?

21  A.   In my opinion, Ted is very, very generous to Christian

22  causes.

23          MR. ROMAIN:  Thank you.

24      I'll pass the witness.

25                         CROSS-EXAMINATION


                    Judith A. Ammons, RPR, CRR, CCR
                       United States Court Reporter

1   BY MS. VAUGHN:

2   Q.   Hi, Mr. McLean.

3   A.   Good morning.

4   Q.   Do you know Steve Jones?

5   A.   I do not.

6   Q.   Do you know Phillip Carter?

7   A.   I do not.

8   Q.   Have you ever been to dinner with Ted Suhl, Steve Jones,

9   and Phillip Carter at Texas de Brazil?

10  A.   No, I have not.

11          MS. VAUGHN:  No further questions, Your Honor.

12          MR. ROMAIN:  No redirect, Your Honor.

13          THE COURT:  Jury questions?

14       You may stand down.

15       Is this witness excused?

16          MR. ROMAIN:  Yes, Your Honor.

17          THE COURT:  Did you say you had more questions?

18          MR. ROMAIN:  I do not.

19          THE COURT:  You may stand down.  You're free to go.

20       Next witness.

21          MR. ROMAIN:  The defense calls Rob Smith.

22          **ROB SMITH, DEFENDANT'S WITNESS, DULY SWORN**

23                      DIRECT EXAMINATION

24  BY MR. ROMAIN:

25  Q.   Good morning, sir.

                Judith A. Ammons, RPR, CRR, CCR
                  United States Court Reporter

Smith - Direct

1    A.    Good morning.

2    Q.    Would you please state your name for the record?

3    A.    Rob Smith.

4    Q.    And, Mr. Smith, are you employed?

5    A.    Yes.

6    Q.    And where do you work?

7    A.    The American Bible Society.

8    Q.    What's your title at the American Bible Society?

9    A.    Director of planned giving.

10   Q.    And would you describe the scope of your responsibilities

11   as director of planned giving?

12   A.    It's a national position.  I work with some people on

13   charitable estate planning, and I also do major gifts --

14   visiting with people who made major gifts, informing them about

15   what their gifts have accomplished and helping them with other

16   gifts.

17   Q.    And can you tell us what the American Bible -- what the

18   American Bible Society is and does?

19   A.    It's a 200-year-old organization founded by many of the

20   founders of America.  It's to make the Bible available all over

21   the world in every language and format in 200 countries.

22   Q.    Thank you.  And do you know Ted Suhl?

23   A.    Yes.

24   Q.    How long have you known him?

25   A.    Over 18 years.

1    Q.   And do you know of his reputation for generosity to
2    Christian causes?
3    A.   Yes.
4    Q.   And what is his reputation for generosity to Christian
5    causes?
6    A.   It's my opinion that he is very generous to Christian
7    causes.
8            MR. ROMAIN:  Thank you.
9        I'll pass the witness.
10           MS. VAUGHN:  We don't have any questions for this
11   witness, Your Honor.
12           MR. ROMAIN:  No further questions.
13           THE COURT:  No jury questions?
14       You may stand down.  You are free to go about your
15   business.
16       Next witness.
17           MR. CARY:  The defense calls Agent Phillip Spainhour.
18           THE COURT:  You're still under oath.
19       **PHILLIP SPAINHOUR, DEFENDANT'S WITNESS, PREVIOUSLY SWORN**
20                     DIRECT EXAMINATION
21   BY MR. CARY:
22   Q.   Good morning, Agent Spainhour.
23   A.   Good morning.
24   Q.   You were the lead case agent for this case, correct?
25   A.   Yes, sir.

Spainhour - Direct

1    Q.    And one of the things you looked into as part of your

2    investigation is whether the marketing agendas -- I'm sorry --

3    the monitoring agendas were subjected to FOIA, Freedom of

4    Information Act, requests, correct?

5              MS. VAUGHN:  Objection.  May we approach, Your Honor?

6              THE COURT:  You may.

7         (Bench conference reported as follows:)

8              MS. VAUGHN:  Your Honor, we've addressed this multiple

9    times.  FOIA is not relevant and it has not been relevant this

10   entire trial.

11             MR. KELLER:  He's intentionally brought this out in

12   front of the jury despite your ruling that this is not

13   admissible evidence.

14             MR. CARY:  Your Honor, he's the lead case agent.  They

15   went and interviewed Janie Huddleston on this very point back

16   in July that they were -- and as part of their investigation.

17   He's testified -- both he and Ms. Black have testified about

18   the investigation.

19             THE COURT:  FOIA has been ruled out.  Why did you ask

20   that question?

21             MR. CARY:  Because it is a matter of their

22   investigation.

23             MS. VAUGHN:  It's not relevant to Ted Suhl's guilt or

24   innocence.  It's not relevant to talk about matters that don't

25   relate to the investigation.

1          THE COURT:  I sustain your objection again.

2      (Proceedings continuing in open court as follows:)

3          MR. CARY:  Could I have Government's Exhibit 38-A on

4  the screen, please, which has been admitted?

5          THE COURT:  Counsel approach again, please.

6      (Bench conference reported as follows:)

7          THE COURT:  I've ruled out the FOIA.  The juror asked

8  a question -- a juror asked a question yesterday about FOIA.  I

9  don't want it mentioned again, period.

10         MR. CARY:  And, Your Honor, just so the record is

11  clear, Mr. Suhl will be testifying later this morning -- will

12  be testifying later this morning.  And the objection was that

13  until the -- the objection was there's no evidence that Mr.

14  Suhl knew about FOIA.  We're going to put on that evidence,

15  Your Honor.

16         THE COURT:  Before it's mentioned again --

17         MR. CARY:  I will approach.

18         THE COURT:  Before he takes the stand, we'll have a

19  hearing out of the hearing from the jury.  Remind me of this.

20         MR. CARY:  Yes, Your Honor.

21         THE COURT:  It's ruled out now.

22         MR. CARY:  Yes, Your Honor.

23     (Proceedings continuing in open court as follows:)

24         MR. CARY:  If I could have Government's Exhibit 38-A.

25  BY MR. CARY:

1    Q.   This is a letter that's been admitted into evidence,

2    correct?

3    A.   Yes, sir.

4    Q.   And you found it during the course of your investigation?

5    A.   We did.

6    Q.   And what I would like to do now is show you Government's

7    Exhibit 38, if I could.  And if we could put that on the

8    screen.  And my question, sir -- just for the witness.  And

9    what is that, sir?

10   A.   Appears to be an email.

11   Q.   And if we could flip to the next pages -- actually, let me

12   show you the hard copy here.

13        And, sir, is that the cover email that relates to

14   Government's Exhibit 38-A?

15   A.   It appears to.

16   Q.   And you found that as part of your investigation, correct?

17   A.   Yes, sir.

18        MR. CARY:  I move the admission of Government's

19   Exhibit 38.

20        MS. VAUGHN:  No objection, Your Honor.

21        THE COURT:  Admitted.

22        (Government's Exhibit 38 received in evidence.)

23        MR. CARY:  The next exhibit I'd like is -- for the

24   witness only -- Defendant's Exhibit 1123.  And I'd like to

25   focus on paragraph 150, which is on page 21.

Judith A. Ammons, RPR, CRR, CCR
United States Court Reporter

1    BY MR. CARY:

2    Q.   In fact, to keep it moving, I'll bring you a hard copy of

3    this one too.

4         Agent Spainhour, did you participate in the drafting of

5    the indictment in this case?

6    A.   Yes.

7    Q.   And you had input into the allegations, correct?

8    A.   Yes, sir.

9    Q.   And paragraph 150 relates to the allegations regarding the

10   50- to 30-mile radius, correct?

11   A.   Yes, sir.

12   Q.   And it provides that, "In or about January 2011, after

13   ADHS denied Suhl's application to operate a certified

14   Rehabilitative Services for Persons with Mental Illnesses

15   provider site in Forrest City, Arkansas, Suhl informed Carter

16   that he supported the expansion of the site radius for RSPMI

17   providers from 30 miles to 50 miles because one of his

18   companies could then operate in Forrest City."  Did I read that

19   correctly?

20   A.   Yes, sir.

21   Q.   And then it reads, "During a meeting between Carter,

22   Jones, and Suhl, Suhl asked Jones if he could help to get the

23   RSPMI radius expanded.  Jones agreed to look into the issue."

24   Did I read that correctly?

25   A.   Yes, sir.

1    Q.   And, sir, the allegations of the indictment were that this

2    issue related to the period of January 2011, correct?

3    A.   Yes, sir.

4    Q.   And that's based on a tape that you heard where Phillip

5    Carter was talking about the issue on January 22nd, 2011,

6    correct?

7    A.   Yes, sir.

8         MR. CARY:   If I could have Defendant's Exhibit 1258

9    for the witness only, please.

10   BY MR. CARY:

11   Q.   And, Agent Spainhour, it's true, is it not, that you -- as

12   part of your investigation, you determined that as of

13   August 30th, 2010, the Arkansas Children's Behavioral Health

14   Commission had already determined that there should be a policy

15   change and that the radius should be expanded to 50 miles, is

16   that correct?   If you like, you can refresh your recollection

17   with the second-to-last bullet point on that page.

18   A.   Yes, sir, I see it.   That's correct.

19   Q.   And, finally, sir, there was an issue in some tapes we

20   heard about Chip Barnes providing a document to Phillip Carter,

21   correct?

22   A.   Yes.

23   Q.   Did you hear that testimony or that tape?   And that

24   document that Chip Barnes provided to Phillip Carter was not a

25   confidential document, was it?

Judith A. Ammons, RPR, CRR, CCR
United States Court Reporter

1    A.   No.  My understanding, it was something he had gotten and

2    was a proposed -- some proposed changes from Scott Tanner.

3    Q.   And there was nothing secret about it, correct?

4    A.   Not to my knowledge.

5              MR. CARY:  No further questions.

6                        CROSS-EXAMINATION

7    BY MS. VAUGHN:

8    Q.   Good morning, Agent Spainhour.

9    A.   Good morning.

10   Q.   Agent Spainhour, I'm showing you what's already been

11   admitted, I believe, as Government's Exhibit 35.

12        Agent Spainhour, this is an email from Joel Landreneau to

13   Charlotte Carlson and Janie Huddleston, correct?

14   A.   Yes, ma'am.

15   Q.   And Charlotte Carlson and Janie Huddleston were officials

16   at DHS during this time?

17   A.   Yes.

18   Q.   And Joe Landreneau was working for the defendant at this

19   time?

20   A.   Yes.

21   Q.   And in this email, it is dated November 25th, 2008, isn't

22   that correct?

23   A.   Yes, ma'am.

24   Q.   So almost two years before that date Mr. Cary just showed

25   you?

                    Judith A. Ammons, RPR, CRR, CCR
                    United States Court Reporter

1    A.    Yes.

2    Q.    And in this email, Mr. Landreneau is requesting to expand

3    the radius in which RSPMI providers can operate, correct?

4    A.    Yes.

5    Q.    And in the course of your investigation, Agent Spainhour,

6    did you learn that when ADHS decided to change this policy,

7    expand the radius, it still had to seek approval from the

8    legislature?

9    A.    Yes.

10   Q.    So even if DHS decided in August 2010 to change it, it

11   still had to go through the legislature, correct?

12   A.    Yes.  That's my understanding.

13          MS. VAUGHN:  No further questions for this witness.

14          MR. CARY:  No further questions, Your Honor.

15          THE COURT:  Jury questions.  Got a jury question?

16   You may stand down again.

17          THE WITNESS:  Yes, sir.

18          THE COURT:  Next witness.

19          MR. CARY:  Defense calls Eric Etchison.

20          **ERIC ETCHISON, DEFENDANT'S WITNESS, DULY SWORN**

21                       DIRECT EXAMINATION

22   BY MR. CARY:

23   Q.    Mr. Etchison, could you please state your name and spell

24   it for the court reporter, please?

25   A.    Yes, Eric, E-r-i-c, Etchison, E-t-c-h-i-s-o-n.


                    Judith A. Ammons, RPR, CRR, CCR
                       United States Court Reporter

Etchison - Direct

1    Q.    What do you do for a living, Mr. Etchison?

2    A.    I work in the mental health field.

3    Q.    And who is your employer?

4    A.    Arkansas Counseling Associates.

5    Q.    What's your title with Arkansas Counseling Associates?

6    A.    I'm the clinical director.

7    Q.    And just -- is that Mr. Suhl's company, Arkansas

8    Counseling Associates?

9    A.    Yes, it is.

10   Q.    How long have you been the clinical director for Arkansas

11   Counseling Associates?

12   A.    Approximately about four years.

13   Q.    And before that, what did you do?

14   A.    I've been with the company about 12 years.  I worked as a

15   therapist for a number of years, worked as regional manager,

16   and then, like I say, clinical director for about the past

17   four.

18   Q.    What are your responsibilities as the clinical director

19   for Arkansas Counseling Associates?

20   A.    Accessibility to care, make sure training is in place,

21   relate to just the overall improvement, quality of services.

22   Q.    And is that a statewide position, sir?

23   A.    Yes, it is.

24   Q.    And I'd like to ask about the referral sources, if I

25   could, for Arkansas Counseling Associates.  Where does Arkansas

Etchison - Direct

1    Counseling Associates get its patients?

2    A.    From various sources.  The majority of them would be a lot

3    through our school-based programs that we do.  We'll also have

4    court referral; could come from physician offices.  So there's

5    multiple sources, but the school-based programs is our biggest

6    source of referral.

7    Q.    And what is the business strategy, if you will, for

8    seeking referrals?  Where does Arkansas Counseling Associates

9    focus its efforts?

10   A.    A lot of it is with the schools.  I spend a lot of my time

11   speaking with superintendents, principals, especially in the

12   rural areas for accessibility, so that's probably one of our

13   biggest areas.

14   Q.    Historically, has Arkansas Counseling Associates gotten

15   very many referrals from the DHS?

16   A.    We've gotten some, but it wouldn't be a huge source of

17   referrals for us.

18   Q.    And what sorts of referrals would come from DHS, to the

19   limited extent you get them?

20   A.    It could be anything that's going on as far as custody

21   issues, placement.  Could be various issues like that we may

22   get referral for.

23   Q.    And when you say custody issues, placement, what are you

24   referring to?

25   A.    Well, it could be what the child could be going through

1    through that process, so there could be behavioral or moving

2    instances that need to be addressed.  So it may be within that

3    process that we may get a referral.

4    Q.   And, historically, over time, have DHS referrals been a

5    major source of business for Arkansas Counseling Associates?

6    A.   I wouldn't say it would be a very big percentage.

7    Q.   Historically, over time, has it been a significant

8    marketing effort to get DHS referrals?

9    A.   No, sir.

10             MR. CARY:  Thank you.

11        Pass the witness.

12                     CROSS-EXAMINATION

13   BY MS. VAUGHN:

14   Q.   Good morning, Mr. Etchison.

15   A.   Good morning.

16   Q.   You said you've worked for Arkansas Counseling Associates

17   for 12 years?

18   A.   Yes, right at 12 years.

19   Q.   And Ted Suhl is your boss?

20   A.   Yes.

21   Q.   Ted Suhl pays your salary?

22   A.   Yes.

23   Q.   And you were talking about referrals, patient referrals,

24   to Arkansas Counseling Associates.  The majority of those

25   patients are on Medicaid?

Etchison - Cross

1    A.    Yes.

2    Q.    And so Arkansas Counseling Associates receives Medicaid

3    reimbursements for a majority of those patients?

4    A.    Yes.

5    Q.    Do you know Phillip Carter?

6    A.    Only by name.

7    Q.    And did you know that in the early 2000s, Phillip Carter

8    helped ACA get into the West Memphis School District?

9    A.    I'm not aware of that.

10   Q.    The Division of Youth Services, that's another division

11   within DHS, correct?

12   A.    Yes.

13   Q.    And the Division of Youth Services controls the juvenile

14   courts system, correct?

15   A.    Yes.

16            MS. VAUGHN:  I have no further questions for this

17   witness, Your Honor.

18            MR. CARY:  Nothing further.

19            THE COURT:  Jury questions?

20       You may stand down.  You're free to go about your

21   business.  Thank you.

22       Next witness.

23            MR. CARY:  Your Honor, you wanted to speak with us

24   before the next witness.

25            THE COURT:  All right.  Ladies and gentlemen, I'm


                    Judith A. Ammons, RPR, CRR, CCR
                      United States Court Reporter

1      going to ask y'all to leave.  Don't talk about the case.  Don't

2      start making up your mind.  Consciously avoid it.

3          Let the jury stand out.  Everyone else remain as you are.

4          (Jury exits the courtroom.)

5          THE COURT:  The jury is out.  Tell me what it is that

6      you plan to ask Mr. Suhl that I asked you to address.

7          MR. CARY:  Yes, Your Honor.  I intend to ask Mr. Suhl

8      whether he was aware of the Freedom of Information Act,

9      whether -- the Arkansas Freedom of Information Act, whether it

10     was used as a practice at his companies, and the frequency with

11     which they used it, and his understanding of what is available

12     under the Arkansas Freedom of Information Act.

13         THE COURT:  Come to the lectern, if you will.  I can't

14     see you when you're standing back there because of the glare.

15         MR. KELLER:  Understood, Your Honor.  We object to

16     that line of questioning for the reasons that we stated to the

17     Court before.  The fact that these documents may have been

18     available under FOIA is not relevant to the issue of whether or

19     not the defendant asked Steve Jones to provide these documents.

20     That's the first point.  Essentially, the point that just

21     because you can legally get a driver's license from the DMV

22     doesn't have anything to do with the fact that -- if you're

23     alleged to have paid a bribe to someone at the DMV to get you a

24     license, the fact that the DMV does also legally issue licenses

25     is not -- it's not relevant.

1      The more important point, I think, is that in the

2  questions that Mr. Cary just outlined, he did not note that

3  they expect the defendant to testify that he knew that this

4  specific document, these specific monitoring notes or documents

5  of this class, were available under FOIA.  In order for this to

6  even be minimally relevant, they would have to establish that

7  the defendant knew -- at the time he asked Steve Jones -- or

8  asked Carter to get these notes from Steve Jones, that he knew

9  at that time that those notes were available through FOIA.

10      MR. CARY:  First of all, in response to the last

11  question, Mr. Suhl will testify that the sort of information

12  that was in the monitoring agenda is exactly the sort of

13  information that he got all the time from DHS and that he

14  understood that that sort of information was available under

15  FOIA.

16      In terms of relevance, we've only had two jury notes in

17  this case, and those are -- both jury notes related to that

18  particular question.  It's clearly in the jury's mind, it's

19  clearly relevant, and it goes to the point --

20      THE COURT:  The fact that it's on the jury's mind does

21  not make it relevant necessarily.

22      MR. CARY:  It goes right to the heart of our defense,

23  Your Honor, because it doesn't make any sense for him to be

24  paying bribes for something that he could have gotten through

25  FOIA.  That's why it's relevant.

1      MR. KELLER:  We maintain our original position, Your

2  Honor.  And the fact that -- Mr. Cary is trying to dance around

3  the fact that -- from what he is saying, it doesn't sound like

4  the defendant is going to testify that he knew that these

5  monitoring agendas --

6      THE COURT:  I'm sure he will.

7      MR. KELLER:  Your Honor, our position is still that

8  even if they put on that testimony that the defendant knew that

9  these specific documents were available through FOIA, that that

10  is not relevant in this case, that introducing whether

11  something is or is not available through FOIA is not relevant

12  to this issue.

13      THE COURT:  Well, why wouldn't it be?  In other words,

14  if he knew it was available through the Freedom of Information

15  Act, why wouldn't that go to whether or not he would bribe

16  someone to get it for him?

17      MR. KELLER:  Well, Your Honor, the way that the

18  government's scheme is charged and the way that the evidence

19  has come in, he was paying Jones over a course of four years

20  kind of as a stream-of-benefits system of bribery, so that when

21  things arose, he asked Steve Jones for them.  The evidence and

22  the allegations have not been that he paid a bribe specifically

23  for these notes just to get these notes.  It's the fact that he

24  had Steven Jones on his payroll, and as part of that corrupt

25  relationship, he asked for these notes from Steven Jones.  I

1    don't think the fact that they were available through FOIA

2    makes it any less likely that when he heard that Steve Jones

3    had these notes, he would have asked Steve Jones for them.  In

4    other words, it makes -- we have the defendant on tape asking

5    for these notes.  Whether the notes were available through FOIA

6    isn't relevant.

7              THE COURT:  All right.  I'm going to take a recess and

8    think about it.  We'll be in recess for at least ten minutes by

9    this clock over here.

10             We're in recess.  Be at ease.

11             (Recess at 10:02 a.m.)

12                    C E R T I F I C A T E

13        I, Judith A. Ammons, Official Court Reporter, do hereby

14   certify that the foregoing is a true and correct transcript of

15   proceedings in the above-entitled case.

16

17   /s/ Judith A. Ammons, RPR, CRR, CCR   Date: July 19, 2016
         United States Court Reporter

18

19

20

21

22

23

24

25

```
 1        (Proceedings continuing in open court at 10:19 AM.)
 2            THE COURT:  I suppose a trier of fact could find
 3   that a defendant who knew about the act says Freedom of
 4   Information Act could still pay a bribe to a public official
 5   just to get his good will generally, but I think that's an
 6   issue for the trier of fact.  I'm going to allow the questions
 7   about the FOIA.  Let's bring the jury in, over the objection of
 8   the prosecution, save their exception.
 9        The fact that the jury asked a question about it did not
10   influence me because they sometimes ask about why the defendant
11   didn't take the stand.
12        (Jury enters the courtroom.)
13            THE COURT:  Be seated, please.  Call your next
14   witness.
15            MR. CARY:  We call Ted Suhl.
16        TED SUHL, DEFENSE WITNESS, DULY SWORN
17                DIRECT EXAMINATION
18   BY MR. CARY:
19   Q    Did you bribe Steven Jones?
20   A    Absolutely not.
21   Q    Did you ask Phillip Carter to bribe Steven Jones?
22   A    Absolutely not.
23   Q    Did you tell Phillip Carter that you would pay a
24   2,000-dollar fee to Steven Jones through the 15th Street Church
25   of God in Christ?
```

T. Suhl - Direct

```
1   A    Absolutely not.

2   Q    Did you ask Phillip Carter, "Is Steve happy"?

3   A    Absolutely not.

4   Q    Did Phillip Carter tell you, "Steve is happy"?

5   A    Absolutely not.

6   Q    Did you tell Phillip Carter, "You all know what to do

7   with it, do what you want with it"?

8   A    Absolutely not.

9   Q    Did you conspire with Pastor John Bennett to bribe Steven

10  Jones?

11  A    Absolutely not.

12  Q    Did you conspire with anybody to bribe Steven Jones?

13  A    Absolutely not.

14          MR. KELLER:  Your Honor, I'm going to object to

15  leading at this point.

16          THE COURT:  I don't believe that's leading.  Yes or

17  no answer.

18  BY MR. CARY:

19  Q    Did you travel to Memphis, Tennessee, sir, to bribe

20  Steven Jones?

21  A    Absolutely not.

22  Q    Did you meet with Steven Jones?

23  A    Yes.

24  Q    How did that come about?

25  A    Well, we had known Pastor Bennett since 2002 or sometime
```

1    in 2002.

2    Q       Who is we, Mr. Suhl?

3    A       My family.  My dad had originally become friends with him

4    because -- I don't know how my dad met him, but he had become

5    friends with him.  And I was driving down the road with Pastor

6    Bennett and I -- in fact, I think we'd been out to dinner, and

7    I was basically just venting to him about what we felt was

8    mistreatment by the DHS to our programs and our management team

9    due to our faith based or faith.  Maybe that was right, maybe

10   it was wrong, I don't know, but that's how we felt, and he

11   mentioned to me that, sometime a few months before, I don't

12   know when, that Steve Jones had been appointed to some position

13   in the DHS, he didn't even know, and he said I think he shares

14   our values.  He's a Christian, he loves Jesus, and if you'd

15   like to ever meet with him, he'd be a neutral to listen to your

16   complaints, if you will.

17   Q       Did you take up Pastor Bennett's offer?

18   A       Yes, I did.

19   Q       How many times did you meet with Steven Jones?

20   A       A few, a few times, but less than has been mentioned over

21   the last few days.

22   Q       What did you talk about when you met with Steven Jones?

23   A       Mostly we had an interest in Pastor Bennett.  He was a

24   mutual friend, a long-time friend of our family and I guess a

25   long-time friend of his.  We both wanted Pastor Bennett to be a

T. Suhl - Direct

1   Bishop, I did and my dad did and my mom did because we felt
2   like he was really of the Lord.  We felt like he was a Godly,
3   Christian man.
4   Q     Did you talk about your business at all?
5   A     We did.
6   Q     What did you tell him about your business?
7   A     Mostly it was just, again, venting, complaining about
8   what we perceived, right or wrong, that we were mistreated.
9   Q     Did your family give money to the 15th Street Church of
10  God in Christ?
11  A     Yes, we did.
12  Q     Generally what was that money for?
13  A     Well, to assist it.  It seemed like Pastor Bennett had
14  told us from the day my dad met him in 2002 that they were
15  always struggling, and that was our family's mission was to
16  help other ministries.
17  Q     And there's been -- I'll return to it in a minute, but
18  there's been a reference to a transportation contract in this
19  case.  Do you recall that?
20  A     Yes, sir.
21  Q     And just, briefly, we'll return to it in more detail in a
22  bit, but what was the purpose of that arrangement?
23  A     It was to assist the church.  It was a generous
24  arrangement to try to help the church.
25  Q     Did your family give money to Pastor John Bennett?

1    A    Yes, we did.

2    Q    And on what occasions do you recall giving money to

3    Pastor John Bennett?

4    A    Just pretty well any time we would -- almost you could

5    think about almost like when you're going to church, if we'd

6    see him, we would many times give him a check or cash.  He's a

7    pastor and we thought he was of the Lord.

8    Q    Did he preach at The Lord's Ranch?

9    A    He did.

10   Q    Could I have Defendant's Exhibit 664 for the witness,

11   please?

12        What is Defendant's Exhibit 664?  Do you have a photo on

13   the screen?

14   A    Yes.  That's Pastor Bennett speaking at our graduation

15   for our patients.  We had a school on grounds and so they were

16   graduating from high school.

17            MR. CARY:  Move its admission.

18            MR. KELLER:  No objection, Your Honor.

19            THE COURT:  Admitted.

20        (Defendant's Exhibit 664 received in evidence.)

21            MR. CARY:  Ask that it be published.

22            THE COURT:  It may.

23   BY MR. CARY:

24   Q    You were beginning to describe what this event was.

25   A    Yes.


                    Karen Baker, RMR, CRR, CCR
                    United States Court Reporter

T. Suhl - Direct

1   Q    Could you tell us just a little bit more about it
2   briefly?
3   A    Sure.  That was a graduation right just maybe a year or
4   two after we met him and we'd already become good friends with
5   him.  We thought he was -- would be a good, if you will,
6   speaker for our kids.  We always wanted to give our kids
7   anybody who had a good, if you will, testimony.  And Pastor
8   Bennett had had a rough life growing up before he became a
9   Christian and so we asked him if he'd be the keynote speaker
10  and he was.
11  Q    Could we have for the witness Defendant's Exhibit 661,
12  please?
13       What is Exhibit 661, sir?
14  A    That's a picture of my dad.  That was a picture of
15  myself, my dad, Pastor Bennett, Alonzo Jiles, and Gary Jackson.
16  Q    What occasion is this?
17  A    The same graduation.
18       MR. CARY:  And move its admission and ask that it be
19  published for the jury.
20       MR. KELLER:  No objection.
21       THE COURT:  Admitted.  Publish.
22       (Defendant's Exhibit 661 received in evidence.)
23  BY MR. CARY:
24  Q    Just, again, I know it can be difficult for you,
25  Mr. Suhl, but can you just describe who that is from left to

Karen Baker, RMR, CRR, CCR
United States Court Reporter

T. Suhl - Direct

1    right on the screen?

2    A    Sure.  I'm sorry.  I'm on the left, then that's my dad,

3    Pastor Bennett in the center, Alonzo Jiles, who was our deputy

4    administrator at the time, and Gary Jackson who was our deputy

5    director of residential services.

6    Q    We can take that down, please.

7         Mr. Suhl, do you have a family?

8    A    Yes, I do.

9    Q    Very briefly, can you describe your family?

10   A    It's my mom and my wife and two children, my son, Ben, 15

11   and my daughter, 13, and my two sisters.

12   Q    And did you go to college, sir?

13   A    I did.

14   Q    Where did you go to college?

15   A    I went to Wheaton College in Wheaton, Illinois.

16   Q    What kind of college is Wheaton College?

17   A    It's a Christian evangelical college.

18   Q    Do you consider yourself a Christian, sir?

19   A    I am.

20   Q    For how long?

21   A    Since, my mom says, I ran down the aisle at 7 years old.

22   Q    While you were attending Wheaton College, did you have

23   any unusual extracurricular activities?

24   A    I did.

25   Q    What was that, sir?

T. Suhl - Direct

1    A    Every Sunday, I ran a service, prison service, Christian

2    service for men at Cook County Jail every Sunday morning.

3    Q    We saw a picture of your father a minute ago and you've

4    made some references to your father.  Is he alive?

5    A    No, he's not.

6    Q    When did he die?

7    A    February 13th, 2010.

8    Q    What was his name?

9    A    Bud Suhl.

10   Q    Did your father have any impact on your family's

11   relationship with the 15th Street Church of God in Christ?

12   A    Yes, he did.

13   Q    Can you briefly describe the relationship as it relates

14   to that particular church?

15   A    Sure.  Somehow he met Pastor Bennett, and I can remember

16   just like yesterday him coming back home and saying I met this

17   pastor who's a good man, I really like him and I can't wait for

18   you to meet him.  And it wasn't long after that I think he went

19   down to West Memphis and drove him up, brought him up to a

20   chapel service and I met him after that.  And he liked Pastor

21   Bennett, because as I mentioned earlier, he had -- before he

22   became a Christian, he'd had drug issues and those kinds of

23   issues and we'd always worked with people like that and he knew

24   he'd really made changes in his life and was trying to help

25   people who had had his troubles.

1  Q      Mr. Suhl, did your father have an impact on your attitude

2  towards charitable giving?

3  A      Well, my father made me everything that I am.  He was a

4  good man.  At 7 years old, when I was 7 years old, he became a

5  Christian.  He'd never been a Christian in his life, never knew

6  his dad, was raised in poverty, and had been blessed with a

7  successful business career, and at 7, wow, what a change, he

8  became a Christian.  And I can remember --

9  Q      Let me interrupt.  Were you 7 or was he 7?

10  A      He was 7 -- I was 7.  He was, I don't know, 40.  And I

11  can remember it was a huge change.  He went from being not a

12  Christian at all; always was a nice man, but not a Christian,

13  to where his whole life was about ministry.  And from 7 years

14  old on, he started, his whole goal was to serve the Lord if you

15  will.

16  Q      Mr. Suhl, can you give us maybe three or four examples of

17  things that you saw as a young person that affected you?

18  A      Sure.  Well, we were immersed from it.  He went from just

19  caring about sports and just normal things to wanting to help

20  people, and so our family's mission really became twofold.  His

21  was -- and I was just 7 then, but it was he and my mom, their

22  mission since he'd been blessed to have successful companies

23  was really twofold.  It was to identify other ministries that

24  needed help around the country and in a couple other countries

25  at the time.  For instance, my earliest memories, once he

1   became a Christian was when he'd get off from work, and I guess

2   it's fair to mention that if you'd asked my dad at that point

3   what's your job, he wouldn't have said a businessman, he would

4   have said, "I'm a preacher," even though he wasn't.  At 7 years

5   old on, I'm running around at a mission on the weekends and my

6   dad's there, a skid row mission in L.A., of which he provided

7   financial support, food, clothing, whatever they needed,

8   Bibles.

9          MR. KELLER:  Your Honor, may we approach?

10         THE COURT:  Yes.

11      (Bench conference reported as follows:)

12         MR. KELLER:  I understand that some of this line of

13  questioning may be relevant to give background, but Your Honor

14  has already excluded charitable giving from the Suhl family to

15  any entity other than the 15th Street Church of God in Christ

16  which is at issue in this case and they're starting to go far

17  afield into giving to other missions and other organizations.

18  Your Honor, I'm going to object to that.

19         THE COURT:  We're going to have an altar call in a

20  minute.  I'm going to sustain the objection.  I think we need

21  to get on to other things.

22      (Proceedings continuing in open court.)

23  BY MR. CARY:

24  Q    Let me ask about The Lord's Ranch if I could.  How did it

25  start?

1    A    My mom and dad founded it.

2    Q    At what stage in your family life did that get started?

3    A    I was still in high school.

4    Q    And you made a reference to being in California before.

5    Did there come a time when your family moved from California to

6    Arkansas?

7    A    Yes, sir.

8    Q    And where did you move to?

9    A    We moved to Warm Springs, Arkansas.

10    Q    And how did The Lord's Ranch start?

11    A    My dad got a call from one of his friends.  They knew of

12    his history of working with people who had troubles and he --

13    they said, Hey, we're having trouble with our child, would you

14    be willing to take him in and try to help him, because they

15    knew of his history.  And he said, Sure, send him out.  And

16    they brought the first -- it was a girl and they came out

17    and --

18    Q    How did it grow -- well, did it grow from there?

19    A    It did.

20    Q    Can you explain that briefly?

21    A    Well, when the other families heard that we were doing a

22    good job with the kids, we, my mom and dad, their friends

23    started calling and asking if they could send them to them, to

24    what was then The Lord's Ranch.

25    Q    And did it grow further from there?

T. Suhl - Direct

1    A      It did.

2    Q      Can you briefly explain how it grew from there?

3    A      It grew from two or three till they needed a license and

4    my parents realized that it was kind of growing just from the

5    friends networking, so they applied for a license.

6    Q      How did it get its name?

7    A      So a gentleman who my dad had helped take out of prison,

8    if you will, and given employment when we moved to Arkansas,

9    made a sign and he said, you know, the sign was The Lord's

10   Ranch.

11   Q      Could we have Defendant's Exhibit 1719 for the witness

12   only, please?

13          Is that a picture of the sign, sir?

14   A      Yeah, it is.

15                MR. CARY:  Move it into evidence.

16                MR. KELLER:  No objection, Your Honor.

17                THE COURT:  Admitted.  You can publish.

18          (Defendant's Exhibit 1719 received in evidence.)

19   BY MR. CARY:

20   Q      Sir, is this the first sign for The Lord's Ranch?

21   A      It is.

22   Q      What was the name of the gentleman who had that sign

23   made?

24   A      Bobby Garcia.

25   Q      He's the person you were referring to earlier that your

1  dad helped?

2  A    He was paroled by my dad out of the California Institute

3  for Men actually to Arkansas.

4  Q    And could we have Defendant's Exhibit 541 for Mr. Suhl,

5  please?

6      And what is Defendant's Exhibit 541?

7  A    That's a sign of The Lord's Ranch.  My dad designed those

8  signs including the Bible-Based Residential Child Care.

9           MR. CARY:  Move its admission, please.

10          MR. KELLER:  No objection.

11          THE COURT:  Admitted.  You can publish.

12      (Defendant's Exhibit 541 received in evidence.)

13 BY MR. CARY:

14 Q    Just briefly can you explain again now that it's

15 published for everybody what this is?

16 A    Sure.  I can remember when we put them up.  My dad went

17 through a lot of effort to make sure that everybody knew we

18 were a Christian, if you will, company and he put them up

19 including the crosses and the name.

20 Q    Did The Lord's Ranch eventually change its name?

21 A    Yes, we did.

22 Q    Why?

23 A    Because we felt, and we had many family discussions, my

24 mom and dad and I, we felt that we'd been, over the years,

25 discriminated against or certainly held to a different standard

T. Suhl - Direct

```
 1   and so we felt like changing the name might make people treat
 2   us more fairly.
 3   Q      What did you change your name to?
 4   A      Trinity Behavioral Health.
 5   Q      Could I have Defendant's Exhibit 1690 for the defendant,
 6   please?
 7          What is Defendant's Exhibit 1690 briefly, sir?
 8   A      That's a photo of our campus where we keep our horses.
 9   The horses aren't in it, but it's a lake with a photo where we
10   keep them on campus.  Just a historical note, that house is on
11   the historical register.  It was built in 1880.
12              MR. CARY:  Move its admission.
13              MR. KELLER:  No objection.
14              THE COURT:  Admitted.
15          (Defendant's Exhibit 1690 received in evidence.)
16   BY MR. CARY:
17   Q      Mr. Suhl, just again now that everybody can see this,
18   this is a picture of The Lord's Ranch campus?
19   A      Yes.
20   Q      Now called Trinity Behavioral Health?
21   A      Yes.
22   Q      If I could have 1691, please.
23          What is 1691, sir?
24   A      That's one of our units that the kids stay in.
25              MR. CARY:  Move its admission.
```

```
 1              MR. KELLER:  Your Honor, I'm going to object to
 2   cumulative at this point and relevance.
 3              MR. CARY:  I've got two more pictures like this,
 4   Your Honor.
 5              THE COURT:  I'm going to overrule the objection at
 6   this point.  How many more, two?
 7              MR. CARY:  Two after this one, yes.
 8              THE COURT:  All right.
 9         (Defendant's Exhibit 1691 received in evidence.)
10   BY MR. CARY:
11   Q    Mr. Suhl, can you just explain what this is now that we
12   can all see it?
13   A    Sure.  That's a unit where up to 12 kids live.  It's
14   about 5500 square feet for the kids to live in.
15   Q    And if I could have Defendant's Exhibit 1695, please.
16         What does 1695 depict?
17   A    That's kids -- we have a horse program and we're on
18   around 1,000 acres and so one of the programs we had was for
19   the kids to do trail rides and really learn how to care for
20   animals.  When you're treating kids, you want to help them who
21   have serious emotional and behavioral problems.  One way to
22   help them learn to bond is to work with animals and the horse
23   program was one of the things that we did to do that.
24              MR. CARY:  Move its admission.
25              MR. KELLER:  No objection.
```

T. Suhl - Direct

```
1              THE COURT:  Admitted.

2         (Defendant's Exhibit 1695 received in evidence.)

3    BY MR. CARY:

4    Q    Just briefly, again, this is the horse program or this

5    depicts some of your kiddos as Dr. Pearson called them?

6    A    Those were our kids getting ready to go on a trail ride.

7    And it's not to entertain them.  Kids who have serious

8    emotional and behavioral problems, lots of times they'll have

9    attachment disorders, meaning they have a hard time loving and

10   if they can bond with an animal, then they can bond with a

11   human and it hopefully changes their behavior.

12   Q    Finally, if I can have Defendant's Exhibit 1705, please.

13        What does 1705 depict?

14   A    That's a graduation of our kids.  Those are some of our

15   kids who were graduating from high school.

16              MR. CARY:  Move its admission.

17              MR. KELLER:  No objection.

18              THE COURT:  Admitted.

19        (Defendant's Exhibit 1705 received in evidence.)

20   BY MR. CARY:

21   Q    And this is a graduation ceremony for your school?

22   A    Yes.

23   Q    Did you have a school there at Trinity Behavioral Health?

24   A    Yes.  We have a fully accredited school that we've always

25   had certified teachers that teach the kids.
```

T. Suhl - Direct

1  Q    And some of the faces were blacked-out.  Is there a
2  reason for that, sir?
3  A    Because they were some of the -- those were the graduates
4  and due to HIPAA now, you have to be very careful, so we had to
5  black-out their faces.
6  Q    Now, how many beds do you have for Arkansas residents at
7  Trinity Behavioral Health?
8  A    92.
9  Q    I'm sorry, how many?
10 A    92.
11 Q    And how many beds total?
12 A    About 120.
13 Q    And was there a practice over the years as to how many of
14 those beds would be full?
15 A    Yes.
16 Q    What was the practice?
17 A    We'd have a target.  It was all based on making sure that
18 we provided the highest quality of care because it's all about
19 having great staff.  Anything when you're working with in the
20 medical field or any field, I suppose, is having great people,
21 and especially when you're trying to change kids' lives.
22 Q    I'm sorry?
23 A    I was just going to say so the target would move up and
24 down depending on our staffing and how many people we had who
25 we thought would do a good job.

T. Suhl - Direct                                    724

1    Q    Over the years were you generally at target, below

2    target, or above target?

3    A    We were generally right at target.

4    Q    How many employees did Arkansas, I'm sorry, did Trinity

5    Behavioral Health have at its peak?

6    A    225.

7    Q    What is Arkansas Counseling Associates?

8    A    It's another program that we started.

9    Q    And if I could have Defendant's Exhibit 1687, please, for

10   the witness.

11        What does 1687 depict?

12   A    That was offices that we had around the state or that we

13   have around the state for Arkansas Counseling Associates.

14   Q    Does it accurately show where you had Arkansas Counseling

15   Associates offices?

16   A    Yes, it does.

17             MR. CARY:  Move its admission.

18             MR. KELLER:  No objection.

19             THE COURT:  Admitted.

20        (Defendant's Exhibit 1687 received in evidence.)

21   BY MR. CARY:

22   Q    How many employees did Arkansas Counseling Associates

23   have at its peak?

24   A    About 400.

25   Q    How many patients did it have at its peak?

1    A     3 to 4,000.

2    Q     How many patients does it have today?

3              MR. KELLER:  Objection, Your Honor, relevance.

4              MR. CARY:  I'll move on.  Let me try another

5    question here.

6    BY MR. CARY:

7    Q     Is Arkansas Counseling Associates accredited?

8    A     Yes, we are.

9    Q     And has it been accredited over the years?

10   A     It has been.

11   Q     Is it accredited today?

12   A     We just were recently, in the last couple of months,

13   re-accredited from the joint commission on hospital

14   accreditation.

15   Q     Same question for Trinity Behavioral Health, has it been

16   accredited over the years?

17   A     Yes, it has been.

18   Q     What's its present accreditation status?

19   A     We were just, in the last couple months, recently

20   re-accredited from the joint commission on healthcare

21   organizations.

22   Q     Mr. Suhl, there's been some testimony in evidence about a

23   company called Millenia.  What is Millenia?

24   A     Millenia is a holding company that we have in Florida.

25   Q     And what was the purpose of Millenia?

T. Suhl - Direct

1    A    We established it, like many healthcare organizations,

2    simply to acquire other companies.

3    Q    And why is it based in Florida?

4    A    Well, many healthcare -- we just patterned, try to run

5    things by how other people do.  We pattern -- a lot of

6    healthcare companies are based in Florida and Tennessee and we

7    decided to establish it in Florida and we had other businesses

8    down there, so it was a good place to put it.

9    Q    How about Triennia, there was also some testimony about

10   Triennia.  What's Triennia?

11   A    Same thing, holding company that we founded, established

12   simply to acquire other companies, and put it in the same place

13   for the same reason.

14   Q    And why two companies, sir?

15   A    One was going to be for inpatient and one was going to be

16   for outpatient acquisitions.

17   Q    Have those companies been audited, sir?

18   A    By the IRS?

19   Q    By the IRS or auditors or anybody.

20   A    Sure.  They're audited every year by -- not every year by

21   the IRS, but yes, they've been audited.

22   Q    Have those -- can you tell me what sort of audit opinion

23   you got out after that audit was conducted?

24             MR. KELLER:  Objection, Your Honor.

25             THE COURT:  Sustained.

```
 1   BY MR. CARY:
 2            MR. CARY:  May I approach on that briefly, Your
 3   Honor?
 4            THE COURT:  You may.
 5         (Bench conference reported as follows:)
 6            MR. CARY:  There was some testimony from a forensic
 7   accountant yesterday with sort of some sarcasm about the fact
 8   that these are Florida companies, and I just wanted -- there
 9   was some suggestion, inference perhaps that they were
10   attempting to draw that there was something improper about that
11   and I just wanted to point out that there's nothing improper.
12   It wasn't in my outline until that came out yesterday, I simply
13   wanted to respond to what the government suggested.
14            MR. KELLER:  There was no testimony that there was
15   anything improper.
16            THE COURT:  I sustained the objection.
17         (Proceedings continuing in open court.)
18   BY MR. CARY:
19   Q    Could I have Government Exhibit 54, please, and it's in
20   evidence?
21         Have you seen Government's Exhibit 54 in this courtroom,
22   sir?
23   A    Yes, sir.
24   Q    What is it?
25   A    It's checks or a QuickBooks summary of checks that we
```

T. Suhl - Direct

1    paid to the 15th Street Church of God in Christ.

2    Q    And is it a particular type of check?

3    A    Arkansas Counseling Associates, yes.

4    Q    And what was the purpose of these checks?

5    A    They were for when we set up the van contract with the

6    church.

7    Q    When did the van arrangement start?

8    A    In 2003.

9    Q    If we could turn to I think it's the third page, when did

10   it end?

11   A    2007 basically, late 2007.

12   Q    Why did it end?

13   A    Because we found out that there was a lot of liability in

14   renting vehicles from anyone, another, if you will, entity.

15   Q    And was there a transition period where -- was there a

16   transition period with respect to this arrangement?

17   A    Sure.  We didn't want to hurt the church.  We did the van

18   contract with them to try to help them financially.  Pastor

19   Bennett said he needed help, told my dad and I and my mom, so

20   that's why we set it up.  We didn't want to cut them off.

21   Q    Can you describe the relationship between when services

22   ended and when the payments stopped?

23   A    Sure.  The services ended sometime late 2007, but we

24   really weren't using them much even in mid 2007 and so it ended

25   late 2007.

Karen Baker, RMR, CRR, CCR
United States Court Reporter

T. Suhl - Direct                                        729

1    Q    Have you had an opportunity to add up the figures in this
2    QuickBooks report?
3    A    I think it's about 126,000, 125,000.
4    Q    Did Arkansas Counseling Associates need transportation
5    for kids?
6    A    Sure, yeah, we needed transportation.
7    Q    Did you need to use the church for transportation for
8    kids?
9    A    No, we didn't.
10   Q    Could I have Defendant's Exhibit 1688 for the witness,
11   please?
12        What does Defendant's Exhibit 1688 depict?
13   A    That's a photo of some of our vans.  We own a lot of vans
14   to transport kids around the state.
15              MR. CARY:  Move the admission of 1688.
16              MR. KELLER:  No objection.
17              THE COURT:  Admitted.
18        (Defendant's Exhibit 1688 received in evidence.)
19   BY MR. CARY:
20   Q    Just, again, Mr. Suhl, what does this depict?
21   A    Those are the vans that we own that we transport kids
22   around the state in.
23   Q    Where is this photo taken?
24   A    At The Lord's Ranch or Trinity Behavioral Health.
25   Q    Could I have Government Exhibit 55, please?

T. Suhl - Direct

1        Have you had a chance to see Government Exhibit 55 in the

2  courtroom?

3  A    Yes, sir, I do.

4  Q    And what does that reflect?

5  A    Those are donations to the 15th Street Church of God in

6  Christ.

7  Q    What's the relationship, if any, between these donations

8  and the transportation contract?

9  A    Well, we started them early in 2007 because we didn't

10  want the church -- we were kind of transitioning them and we

11  didn't want to hurt them financially, so we started them to

12  help them get used to the change.

13  Q    Are these bribes, sir?

14  A    Absolutely not.

15  Q    What were they?

16  A    Donations to help Pastor Bennett and his church because

17  the church is the pastor, and if the pastor is good then the

18  church is good.

19  Q    How did you decide whether and when to give money to the

20  15th Street Church of God in Christ?

21  A    You know, usually when we would see Pastor Bennett or

22  he'd come visit us or call us and tell us he needed help like

23  with many ministries, they'll come ask you for help or call you

24  or see you, then you'd donate to them.

25        THE COURT:  All right.  Counsel approach, please.


                    Karen Baker, RMR, CRR, CCR
                    United States Court Reporter

1          (Bench conference reported as follows:)

2              THE COURT:  This is not in line with what's going on

3     right now, but do you have any case law or treatise law on the

4     admissibility of good reputation for charity being relevant in

5     a bribery type case?  I've never had that come up before, but

6     if you got any cases or treatise, I'd like to -- at your

7     convenience.

8              MR. CARY:  I'll have to check at the next break.

9              THE COURT:  The reason I called you to the bench, I

10    didn't want to announce this out loud, but I didn't want to

11    disparage it.

12             MR. KELLER:  Your Honor, is this in reference to the

13    proposed jury instruction?

14             THE COURT:  Yeah.

15             MR. KELLER:  Our position is that the only relevant

16    character trait would be character for law abidingness.

17             THE COURT:  You got any case law or treatise law?

18             MR. KELLER:  That excludes charitable --

19             THE COURT:  Yeah.

20             MR. KELLER:  We'll take a look.

21             THE COURT:  All right.  We're going to take a break.

22         (Returning to open court.)

23             THE COURT:  Ladies and gentlemen of the jury, don't

24    talk about the case or anybody involved in it.  Let the jury

25    stand out.  We'll start back at five after by the clock on the

Karen Baker, RMR, CRR, CCR
United States Court Reporter

```
1    wall.  Let the jury stand out.  Everyone else remain as you

2    are.

3            (Jury exits the courtroom.)

4            (Recess from 10:54 AM until 11:09 AM., jury present.)

5                THE COURT:  You may proceed.

6    BY MR. CARY:

7    Q     If I could have Government Exhibit 55 again, please.

8          There are two 20,000-dollar checks on there.  Do you see

9    those, sir?

10   A     Yes, I do.

11   Q     Do you remember those particular checks?

12   A     Yes, I do.

13   Q     And what was the purpose of those checks?

14   A     Well, Pastor Bennett was going to run for Bishop and my

15   family thought, my dad and I and my mom, thought that was a

16   good thing.  We thought he was a good man so we wanted to help

17   him.  We understood he needed help to run for Bishop and we

18   donated that to the church so he could run.

19   Q     What was your impression of Pastor Bennett?

20   A     He'd been a man who'd grown up and had a rough life and

21   had changed.  He told us he'd used all kinds of drugs growing

22   up and that his uncle had led him to the Lord and that changed

23   his life.  He quit using drugs, quit drinking, quit running

24   around.  That's what he said.

25   Q     Could I have Defendant's Exhibit 1724, please?
```

1      And do you see on Defendant's Exhibit 1724 a picture of

2  Pastor Bennett there?

3  A      Yes.

4  Q      And do you see where it says for jurisdictional Bishop?

5  A      Yes.

6  Q      Did you have an understanding of whether Pastor Bennett

7  was running for Bishop?

8  A      It was my understanding that if he would have been

9  elected Bishop, he would have been over 137 churches or some

10  large amount.  I don't know.

11  Q      There's a reference to Operation PULL.  Did you hear

12  about Operation PULL at the time?

13  A      We did.

14  Q      What did you understand Operation PULL to be?

15  A      To be working in the community to help people who had all

16  kinds of issues, who had maybe addiction issues and just needed

17  to come in and meet with people and talk to them about it.

18  Q      If I could have Defendant's Exhibit 658 for the witness

19  only, please.

20          Do you see Defendant's Exhibit 658, sir?

21  A      Yes, I do.

22  Q      I have sort of a foundational question for you first.

23  Did this particular document have an impact on you as it

24  related to the 15th Street Church of God in Christ?

25  A      Yes, it did.

T. Suhl - Direct

```
1    Q      What was that impact, sir?
2    A      Well, that was brought to my dad's funeral.  In fact,
3    Pastor Bennett wanted to bring it, but he couldn't.  He sent
4    Phillip Carter and a couple other guys, I don't remember who
5    they were, to bring it to my dad's funeral just to tell us,
6    Hey, thank you.  First off, he and my dad were such good
7    friends, he said that -- he called me later and said, I just
8    wanted to tell you I'm sorry your dad passed and we were good
9    friends and we loved each other.  And it was just, I guess, to
10   honor my dad and their friendship.
11   Q      What is Defendant's Exhibit 658?
12   A      It's a resolution.  If you read it, it's just about --
13   Q      Just I need to move its admission first.
14   A      It's a resolution about my dad and his life and his
15   character, I guess, and their friendship.
16              MR. CARY:  Move the admission of 658.
17              MR. KELLER:  No objection, Your Honor.
18              THE COURT:  Admitted.  You can publish.
19        (Defendant's Exhibit 658 received in evidence.)
20   BY MR. CARY:
21   Q      Just briefly, as you were beginning to do, just describe
22   what this is and the impact that it had on you.
23   A      Well, again, the relationship was basically I was friends
24   with him, but the first relationship was with my dad.  So it
25   moved me and my mom.  I can remember taking it to show it to my
```

```
1    mom after they gave it to us and it just let you know, I
2    appreciated it because I knew Pastor Bennett was not feeling
3    well at the time, and for him to go through the effort to do it
4    and send three guys to my dad's funeral just to say we're here
5    to say thanks for supporting the church and for your friendship
6    and your dad's friendship, it moved me and my mom.  We
7    appreciated it.
8    Q    And could I have Government's Exhibit 55 again, please?
9         And just to reoriented ourselves, these are the donations
10   to the church, correct?
11   A    Yes, they are.
12   Q    Could you remind us when your father passed away first of
13   all?
14   A    February 13th, 2010.  It was the day before Valentine's
15   Day, so it wasn't a good Valentine's Day as you can imagine.
16   Q    How many donations were made to the church after your
17   father died?
18   A    About six.
19   Q    Was there a period of time when the donations slowed down
20   a bit?
21   A    Or five maybe, I'm sorry.
22   Q    Yeah, so let's make sure we got that right.  How many,
23   sir?  Take your time.
24   A    Six.  No, five, I'm sorry.  Five.
25   Q    Because one was actually voided out?
```

T. Suhl - Direct

```
1   A    Yeah, exactly.  That's what keeps tricking me, I'm sorry.
2   Q    Was there a period when the donations slowed down
3   somewhat?
4   A    Yes.
5   Q    Why?
6   A    So when you give to ministries, the people call and talk
7   to you more and they'll call and after you talk to them or you
8   see them, many times right after, it's kind of like going to
9   church, then you'll send them a check at that time.  We weren't
10  hearing as much from them, I suppose, because Pastor Bennett
11  was not as well.
12  Q    Did you consider Phillip Carter a friend?
13  A    I did.
14  Q    Were there times when you fell out of touch with Phillip
15  Carter?
16  A    There was.
17  Q    Was the summer of 2011 such a time?
18  A    Yes.
19  Q    Did you eventually catch up?
20  A    We did.
21  Q    And did you listen to some tapes here in this courtroom
22  and did that refresh your memory of what you said when you
23  caught up?
24  A    Sure.
25  Q    And what's your refreshed recollection as to what you
```

T. Suhl - Direct                              737

1    talked about with Phillip Carter when you caught up?

2    A      He told me about somebody that he had run a campaign for.

3    Q      And what was your reaction to that?

4    A      He wanted to introduce me to them.  I said sure, I'll be

5    glad to meet them.

6    Q      Did you ever meet him?

7    A      No.

8    Q      What else did you talk about as your memory has been

9    refreshed?

10   A      For sure I asked him how Pastor Bennett was because I was

11   always concerned about Pastor Bennett's health since he had a

12   bad liver and diabetes and I think he had lost his kidneys at

13   that point.  I don't know.

14   Q      Is there anything else you talked about?

15   A      I think I mentioned to him that I was upset about an

16   issue regarding Mid-South.

17   Q      And what was that issue, sir?

18   A      That the state was sending every single referral to a

19   provider without regard to the benefit or need of the child or

20   the patient.

21   Q      Did you have an understanding of whether that was good

22   policy or bad policy?

23   A      Well, it's illegal policy.  It violates federal law.

24   Q      What was the scope of this policy?  You said every single

25   referral.  What sorts of referrals did you understand that they

1    were making?

2    A       Referrals that were in the custody or referrals that the

3    DHS had involvement with.  It was -- and I don't know what the

4    number was, if it was ten a month or three a month, but my goal

5    was always the best interest of the kids.

6    Q       What was the geographical limitation, if any, of this

7    referral policy as you understood it?

8    A       Northeast Arkansas.

9    Q       And did you have an understanding, sir -- well, let me

10   back up.  Was DHS referrals a big part of your company's

11   business?

12   A       No.  It was so few.  It was a few in the whole company

13   out of 4,000 patients, just a few.

14   Q       But why did you raise this issue if it was just a few

15   patients?

16   A       I guess the principal of it.  If you're in the medical

17   business and we view it as a ministry, but it is a business, I

18   suppose.  Patients should have a choice to go to whatever

19   provider, whatever medical provider they want to go to, period.

20   If you want to go to a certain cancer doctor, you want to go to

21   that doctor.  And it should be in their best interest.  And

22   with kids who have emotional problems, there are certain

23   therapists who can treat certain kinds of issues, if they've

24   been sexually abused or attached, they might need certain kind

25   of therapists, and every company has different kinds of

1    therapists, they might not have every type, so to limit case

2    managers on the ground who work for the state to one company

3    certainly isn't the best interest of the kids, it should be the

4    people on the ground deciding.

5    Q      Mr. Suhl, were you looking for special treatment?

6    A      No, I was not.

7    Q      I'd like to play a clip from an August 4th phone call if

8    I could and then I've got a question to ask you about it.

9           Could I get Government Exhibit 8-D played, the clip,

10   please?

11          (Government 8-D played in open court.)

12   BY MR. CARY:

13   Q      So I want to know what you're referring to when you said,

14   "I think I know what it is."

15   A      Well, I was referring to what we would call corrective

16   action plans.  And whatever they sent us, the State sends you a

17   corrective action plan immediately after they visit.  I don't

18   know, generally they'll have a policy two weeks or a month,

19   they send you the corrective action plan, and so -- and then

20   those are just regulations that you have to meet and you make

21   changes to make sure you're following the regulations.

22   Q      When you said he might have some inside information on

23   whatever Janie is saying, what were you referring to there?

24   A      Well, again, our management team felt like especially

25   Janie didn't care for us because of our faith-based outlook,

T. Suhl - Direct

1    and if someone's talking bad about you, you want to know what
2    they're saying, that's just the bottom line.  And you hear
3    somebody's talking bad about you, your natural reaction would
4    be you want to know what they're saying, and if they're saying
5    you're doing something wrong, you want to fix it.  I'm a rule
6    follower and I want to follow every single rule.
7    Q    So Mr. Suhl -- could we have Government Exhibit 32?
8         Do you see that, sir?
9    A    Yes, I do.
10   Q    You remember seeing it in this courtroom, right?
11   A    Yes, I do.
12   Q    Before this trial, had you ever seen this document?
13   A    No, I had not.
14   Q    Have you had a chance to review it during the course of
15   this trial?
16   A    I have.
17   Q    Do you believe that there's anything confidential in it?
18   A    There's not.  It's simply a history report.  It's when
19   they came to visit you a year ago or six months ago or three
20   months ago, which you already know because they've already
21   shown up at your office.
22   Q    So Ms. Castleberry, did you hear Ms. Castleberry's
23   reference to something called the MFCU in this document?
24   A    Yes, I did.
25   Q    Did you have an understanding of what that issue referred

1  to?

2  A    I'd never heard of that before she referred to it, but

3  yes.

4  Q    Well, once you saw this document in the courtroom -- let

5  me back up.  Did there come a time where there was an issue

6  with respect to your office in Dumas?

7  A    Sure.

8  Q    What was that issue, sir?

9  A    Well, we identified -- we do constant self-audits to make

10  sure that we follow all the rules and to make sure that our

11  providers are following all the rules, and so one of either we

12  got a complaint or we found it through a self-audit, I'm not

13  sure which, it may have been a complaint.  We heard that we had

14  a provider not seeing their patients all the time, which is

15  fraud, and we don't tolerate that.  And so then we did a

16  self-audit which means we call the patients to make sure

17  they're following, that they're being seen, and we couldn't

18  determine if he'd seen them, you know, what percentage of time

19  he'd seen them, so we returned all the money from the day we

20  hired him.

21  Q    And if I could have Defendant's Exhibit 1780, please, for

22  the witness.

23        What is Defendant's Exhibit 1780?

24  A    That's a letter when we're letting the DHS know, Marilyn

25  Strickland, she was a, I don't remember her exact title then,

1  but she worked for the DHS, where we're letting her know that

2  we found fraud among one of our providers, and we fired him.

3  And I don't know if it says we fired him, but that's what we

4  did, and that we're returning the funds to the state from the

5  day we hired him.  No doubt, he provided a lot of services, but

6  we weren't going to take any chances.  We're rule followers, so

7  we returned from the day he became employed with us every

8  single dime the State had sent us.

9  Q    What's your understanding of the relationship between

10 this particular issue and what is reported in the Government

11 Exhibit 38, I'm sorry, 32?

12 A    It's my understanding that that's what that issue is

13 referring to, because it says the Dumas issue in 2009.

14 Q    Was there anything secret about it?

15 A    No.

16          MR. CARY:  Move the admission of Defendant's Exhibit

17 1780.

18          MR. KELLER:  No objection, Your Honor.

19          THE COURT:  Admitted.  You can publish it.

20     (Defendant's Exhibit 1780 received in evidence.)

21          THE WITNESS:  In fact, I think that's what it says,

22 that we wanted to guarantee that we hadn't been paid for any

23 services that --

24 BY MR. CARY:

25 Q    What was the purpose of Defendant's Exhibit 1780, sir?

1    A    To show that we had done the right thing.

2    Q    Who signed it?

3    A    I did.

4    Q    And what's the name on it?  Who's it addressed to?

5    A    It's Marilyn Strickland.

6    Q    Then if I could have Defendant's Exhibit 1774, please.

7         And what is Defendant's Exhibit's 1774?

8    A    That's a check.  The way it works when you return money

9    to Medicaid is, in fact, we wanted to send them a check right

10   that day once we identified it or once we identified the fraud

11   and you can't.  You have to send them -- you rebill it, you

12   send it to them, then they send you a bill later.  You can't

13   send them a check right then, so it's three or four months

14   later, I don't know the exact time frame, but I didn't get that

15   into the details of it.  We always make sure it happens.  So

16   that was the check however many months later when they finally

17   sent us a bill of what we had rebilled to them and they give

18   you an option, they can either take it out of what you're

19   billing already or you can --

20              THE COURT:  Talk just a little slower.

21              THE WITNESS:  I'm sorry, Your Honor.  I apologize.

22   They give you an option of either letting them take it out over

23   time or pay them back as soon as they send you a bill, and our

24   policy always was to pay them immediately.

25   BY MR. CARY:

T. Suhl - Direct

1    Q    And what is reflected in Defendant's Exhibit 1774?

2    A    That was the payment for the Dumas investigation where we

3    uncovered the fraud.

4            MR. CARY:  Move its admission, Your Honor.

5            MR. KELLER:  No objection.

6            THE COURT:  Admitted and you can publish it.

7            (Defendant's Exhibit 1774 received in evidence.)

8    BY MR. CARY:

9    Q    Could I have the check portion blown up, please?

10           And what is the amount of the Dumas refund?

11   A    $94,388.06.

12   Q    And, again, what year is this?

13   A    It's 2009.

14   Q    Mr. Suhl, I want to take you back to 2011 and ask what

15   your understanding of the Arkansas Freedom of Information Act

16   was.

17   A    Arkansas has a very broad Freedom of Information Act.

18   It's unique to this state.  Most states, it's not as broad.

19   It's my understanding in what our lawyers have always advised

20   us is if you do an FOI, the state has to actually, has to give

21   you that document within the same day.  It's courtesy, they'll

22   give it to you three days later.  Courtesy you'll say we'll

23   take it within three days, but the law is they have to give it

24   to you right then.

25   Q    Did your companies utilize FOIA during this time frame?

1  By the way, FOIA is the Freedom of Information Act, right?  Did

2  your company utilize the Freedom of Information Act?

3  A    We did.

4  Q    And with what frequency did you utilize the Freedom of

5  Information Act?

6  A    It was a routine basis whenever we felt like the state

7  was trained, we needed to know something that maybe the state

8  didn't want the general public to know, our lawyers would FOI

9  things.

10 Q    And did you have a understanding as to whether monitoring

11 information about your company could be received through FOIA?

12 A    I'm sure it could be.  I mean, it's my understanding it's

13 so broad other than patient information or employee personnel

14 information about employees, anything the state does including

15 every e-mail, unless it's related to, again, patient name, they

16 have to give you.

17 Q    There's been reference in this trial to another recording

18 where Phillip Carter talks about wanting to drive something up

19 to you from Chip Barnes.  Did you hear that?

20 A    I did.

21 Q    And did listening to that refresh your recollection of

22 what happened with that?

23 A    It was my understanding it was a piece of legislation.

24 Q    Was there anything confidential about it?

25 A    No.  Legislation is always public.

T. Suhl - Direct

1   Q    There were some tapes played where you used the word

2   "your buddy".  Did you hear those tapes?

3   A    I did.

4   Q    Did you hear yourself refer to Steven Jones as your buddy

5   a few times?

6   A    I did.

7   Q    In the very first -- let me ask you this.  Did you use

8   code when referring to Steven Jones on the phone?

9   A    No, I didn't.

10  Q    I want to play a clip from the very first recording in

11  this case.  If I could have Government's Exhibit 8-A played.

12       (Government's Exhibit 8-A played in open court.)

13  BY MR. CARY:

14  Q    Do you see the reference and did you hear the reference

15  to the word "Steve"?

16  A    Yes, I did.

17  Q    Was that your voice referring to Steve?

18  A    Yes, it was.

19  Q    Who is Steve?

20  A    Steve Jones.

21  Q    I'd like to play some other clips for you and they're

22  references to you using the word "buddy", and I'm going to ask

23  you to identify whose voice it is after each one.  If I could

24  have 8-C, which is an August 3rd conversation.

25       (Government's Exhibit 8-C played in open court.)

```
1           MR. CARY:  Then if I could have 8-N from
2   August 28th.
3           (Government's Exhibit 8-N played in open court.)
4           MR. CARY:  If I could have 8-U from September 3rd.
5           (Government's Exhibit 8-U played in open court.)
6           MR. CARY:  If I could have 8-AA from September 5th.
7           (Government's Exhibit 8-AA played in open court.)
8           MR. CARY:  If I could have 8-OO from September 8th.
9           (Government's Exhibit 8-OO played in open court.)
10          MR. CARY:  And, finally, 8-YY from September 11th.
11          (Government's Exhibit 8-YY played in open court.)
12   BY MR. CARY:
13   Q     Is that your voice on each of those clips?
14   A     It was.
15   Q     And do you use the word "buddy"?
16   A     I do.
17   Q     I want to move now to September 11th, 2011.  Did you have
18   dinner with Steve Jones and Phillip Carter on that day?
19   A     I did.
20   Q     And we saw -- well, let me ask you this.  Did you give a
21   check to Phillip Carter that day made out to the 15th Street
22   Church of God in Christ?
23   A     Yes, I did.
24   Q     Why did you give that check to him?
25   A     Well, nearly every time we would see Pastor Bennett --
```

1    and Carter was like his driver and kind of -- he was a deacon

2    in the church -- we'd usually give them a check.  Even when my

3    dad was on death's door in the hospital, Pastor Bennett -- and

4    I mean on death's door, he was in the hospital for three

5    weeks -- came up to see him several times and every time we'd

6    give him a check or cash.  They needed gas money, they needed

7    help.  And my mom and I talked about it and they never asked,

8    but we gave it to them.  So it was kind of a practice, if you

9    will.

10   Q    We saw on video, you look, and appears you were sitting

11   at the table, you looked away to Jones before you gave the

12   check.  Why did you do that?

13   A    Well, our family's giving is always, no matter what

14   ministry we gave to, our practice, and it started with my dad,

15   has always generally, you can't say every single time, but it's

16   been anonymously.  We don't like people knowing that we donate

17   to ministries.  The Bible says if you ask for recognition,

18   you've got it here, not in heaven.  We're not that way, we

19   don't want recognition.  So we didn't want anyone to know.  And

20   that's the way all of our giving, or the vast majority of it

21   has been.  So, of course, I would not want him to know.

22   Q    What do you remember about the discussion at dinner?

23   A    Again, mostly about Pastor Bennett, how the Bishop run

24   was going, how his health was going, what was going on in the

25   church, and how Steve's family was going.  He told me quite a

1    bit over the few times I met him about his dad and his health

2    and those kinds of things.

3    Q     Would you have discussed the DHS or business at all?

4    A     I'm sure I would have.

5    Q     And what do you recall about any such discussion?

6    A     Just in general, I'm sure I said the state is engaging in

7    illegal conduct because the federal law says that anyone who is

8    a Medicaid patient has the right to go to any provider they

9    want to go to.  And my -- it was not a large part of our

10   business.  My concern was that kids should be able to go to

11   where the people on the ground identify is the best treatment

12   for them just like going to a cancer doctor.

13   Q     Did Steve Jones agree to take any actions on your behalf?

14   A     No, he did not.

15   Q     Did you have an agreement with Steven Jones that he would

16   take action in exchange for money?

17   A     No, I did not.

18   Q     Shifting gears, did you hear the testimony of Phillip

19   Carter that you and he and Steven Jones met at Texas de Brazil

20   on July 5th, 2008?

21   A     Could you repeat that?

22   Q     Yes.  Sitting in this courtroom, did you hear the

23   testimony of Phillip Carter that you and Phillip Carter and

24   Steven Jones met and had dinner at the Texas de Brazil

25   restaurant on July 5th, 2008?

1   A    Yes, I heard that testimony.

2   Q    Did that happen?

3   A    No, it did not.

4   Q    Did you eat at Texas de Brazil restaurant on

5   July 5th, 2008?

6   A    Yes, I did.

7   Q    Did you have somebody else at dinner with you?

8   A    My wife, yeah.

9   Q    Who was it?

10  A    It was my wife, yeah.

11  Q    If I could have Government's Exhibit 21-C, please.  If I

12  could have the $105.90 charge at Texas de Brazil on July 5th,

13  if I could get that blown up.

14       Mr. Suhl, do you see what we've highlighted for you,

15  $105.90, at Texas de Brazil on July 5th?

16  A    Yes, I do.

17  Q    Is Texas de Brazil an expensive restaurant or a cheap

18  restaurant?

19  A    It's an expensive restaurant.

20  Q    Is that consistent with -- that charge, is that

21  consistent with dinner for how many people?

22  A    Two people.

23  Q    What was the occasion that took you to Texas de Brazil on

24  July 5th, 2008?

25  A    We'd been down for my wife's grandma's funeral.

1    Q    If I could have the previous page and if I could have the

2    July 2nd through July 5th charges.

3         Let's start with Pappadeaux Seafood in San Antonio on

4    July 2nd.  Do you see that?

5    A    Yes.

6    Q    What does that tell you on July 2nd?

7    A    I'm sure we had dinner at Pappadeaux.

8    Q    On July 3rd, 2008, what do the records reflect?

9    A    I'm sure we had dinner at Chili's.

10   Q    On July 4th, 2008, what do the records reflect?

11   A    We went back to Pappadeaux.

12   Q    Finally, on July 5th, 2008, what does the record reflect

13   with respect to National Car Rental?

14   A    We returned our car on July 5th.

15   Q    And can we highlight that July 5th date, please?

16        I've done my best to circle it there.  Do you see that,

17   Mr. Suhl?

18   A    Yes, I do.

19   Q    Is that consistent with your memory?

20   A    Yes, it is.

21   Q    If we could go to the next page, we heard some testimony

22   earlier.  If we could go to the Marriott charge the next day.

23        What does that reflect, sir?

24   A    My brother-in-law is a chiropractor in Austin, Laura's

25   brother, and he --

T. Suhl - Direct                          752

1    Q      Hold on, I think you're ahead of me just a little bit.

2    Does it reflect that you arrived at the Marriott on July 2nd

3    and left on July 4th?

4    A      Yes, it does.

5    Q      Is that consistent with your memory of attending your

6    grandmother-in-law's funeral?

7    A      It is.

8    Q      And do you have an explanation for why the departure date

9    is July 4th?

10   A      Sure.  My brother-in-law was staying with my

11   mother-in-law and he went home to Austin that day and so we, of

12   course, went to stay with my mother-in-law for that night.

13   Q      Could we have Defendant's Exhibit 1775, please?

14          Do you remember the testimony earlier from today that

15   this reflects a July 5th, 2008, reservation for two?

16   A      Yes, I do.

17   Q      And what time is that reservation for, sir?

18   A      8:00 p.m.

19   Q      Do you recall the testimony of Phillip Carter that on

20   June 28th, 2009, according to Mr. Carter, you, and he and

21   Mr. Jones had dinner at Texas de Brazil?

22   A      I do.

23   Q      Could I have Government's Exhibit 25-C, please?  And if

24   we could put the Texas de Brazil charge for that day.

25          Do you see that charge, sir?

1   A    I do.

2   Q    And that's the Texas de Brazil charge for

3   June 28th, 2009?

4   A    It is.

5   Q    And does it reflect the amount of dinner for how many

6   people?

7   A    Two people.

8   Q    And if I could have Defense Exhibit 1776, please.

9        Sir, do you remember the testimony about that this

10  morning?

11  A    Yes, I do.

12  Q    Does it reflect a reservation for June 28th, 2009, at

13  Texas de Brazil?

14  A    It does.

15  Q    For how many people, sir?

16  A    Two people.

17  Q    To shift gears, did you ever discuss with Phillip Carter

18  the possibility that his phone was being tapped?

19  A    I did.

20  Q    What was the context of that?

21  A    Well --

22        MR. CARY:  Your Honor, I should approach on this

23  before I elicit this answer.

24        THE COURT:  All right.

25        (Bench conference reported as follows:)

1          MR. CARY:  Your Honor, I anticipate him saying that

2    it's the election fraud investigation.  I simply need to put in

3    context what they put in evidence about the phone being tapped.

4    And one of the recordings they suggested he'd said the phone's

5    been tapped, I just want to put it in context.  I'll move on

6    quickly about that.  There'll be no details other than that.

7          MR. KELLER:  For this to be relevant at all he would

8    have to establish that the time of that conversation was after

9    the defendant learned about the voter fraud investigation.

10   When the calls that were recorded in this case were ongoing, no

11   one knew about the voter fraud investigation except the FBI.

12         MR. CARY:  Actually, there's evidence in this case

13   and there are other wiretaps where Carter and Jones were

14   talking about it quite a bit in the summer of 2011.  There was

15   a local investigation before there was an FBI investigation and

16   that's really all I'm talking about here.

17         MR. KELLER:  Carter and Jones, there's the call that

18   they've offered where they're talking about raffling a vehicle

19   for votes, but they don't talk about an underlying

20   investigation.

21         MR. CARY:  Here's what I could do, Your Honor --

22         THE COURT:  You through?

23         MR. KELLER:  Yes.

24         MR. CARY:  I'm willing to say an unrelated

25   investigation if that assuages the conversation.

```
1          THE COURT:  I'll allow that.
2          (Proceedings continuing in open court.)
3          MR. CARY:  Your Honor, may I have permission to lead
4   just a little bit so that I get the answer we discussed?
5          THE COURT:  Just a little bit.
6   BY MR. CARY:
7   Q    I just asked you, sir, what was the context, and let me
8   rephrase it just a little bit by saying did you have an
9   understanding that Phillip Carter was being investigated in a
10  matter that's unrelated to this one?
11  A    Yes.  He --
12         THE COURT:  Yes is enough.
13  BY MR. CARY:
14  Q    Just a yes or no, did you have a belief as to whether he
15  was guilty or innocent in that unrelated investigation?
16         MR. KELLER:  Objection.
17         THE COURT:  Sustain the objection.
18  BY MR. CARY:
19  Q    What was your impression of Phillip Carter at the time?
20  A    Well, he was a deacon in his church, he was a deputy
21  sheriff, and a probation officer.  So the few times I'd met
22  him, however many times, he'd been always a gentleman and
23  respectful.  So I felt he was a good man.
24  Q    We've heard some tapes where he uses offensive language.
25  Did he use offensive language around you?
```

1    A    Never.

2    Q    We've heard some tapes where he talks about being drunk.

3    Did he use alcohol around you?

4    A    Never.

5    Q    How did he present himself around you?

6    A    In fact, he presented himself when he and Pastor Bennett

7    would come up to visit my dad and my mom and I, I'd always

8    mention to him, I'd say, Phillip, you're blessed to have a man

9    like Pastor Bennett that said they were close to help you.  And

10   he'd said, If it weren't for Pastor Bennett, I'd still be out

11   drinking and going to strip clubs and using drugs, and Pastor

12   Bennett led me to the lord and I'm not doing that anymore.  So

13   it was quite a shock to find out.  Shock is not strong enough.

14         MR. CARY:  Your Honor, I'm actually at a transition

15   point if it's a good dinner time, this would be great.  If not,

16   I'm happy to keep going.

17         THE COURT:  All right.  So we'll have dinner.

18   That's a good idea, good "idy".  We'll start back at five after

19   one.  Don't talk about the case with anybody or amongst

20   yourselves and don't start making up your mind.  Let the jury

21   stand out.  Everyone else remain as you are.

22         (Jury exits the courtroom.)

23         THE COURT:  Anything before we break?

24         MR. KELLER:  One issue, Your Honor.  There's been a

25   lot of testimony on direct with this witness about The Lord's

 1   Ranch and being a rule follower and the best interest of the

 2   children.  I believe that's opened the door to the question on

 3   cross-examination of whether or not The Lord's Ranch was

 4   investigated for abusing children.

 5          MR. CARY:  That's very far afield and especially

 6   prejudicial in light of the fact that it's our understanding

 7   that there's never been any finding that they abused children

 8   at The Lord's Ranch.

 9          THE COURT:  In other words, the mere fact -- you

10   want to get into the mere fact that they were investigated?

11          MR. KELLER:  Yes, Your Honor.

12          THE COURT:  Is there any evidence that they were

13   found to be abusive?

14          MR. KELLER:  Nothing formal.

15          THE COURT:  I think that prejudice would be without

16   more -- sustained.  I'm not going to allow it.  Save your

17   exception.

18          MR. CARY:  Your Honor, I'm sorry, one housekeeping

19   matter.  We filed a couple of notices on the docket last night

20   with offers of proof, so a couple of notices, offers of proof

21   so we wouldn't have to take jury time and I assume that's

22   sufficient to preserve the record, we don't need to bring in

23   the witnesses, for example, and put them under oath?

24          THE COURT:  What is this on?

25          MR. CARY:  One is on charitable giving and then the

1    other one, I believe, was on what we think is really more of a

2    constructive amendment issue, the 2011 issue.

3            THE COURT:  To the extent I've got the authority to

4    say or rule that this is a sufficient offer of proof, I do so.

5            MR. CARY:  Thank you, Your Honor.

6            THE COURT:  Anything else?

7            MR. KELLER:  No, Your Honor.

8            THE COURT:  We're in recess.

9        (Recess at 11:47 AM.)

10                   C E R T I F I C A T E

11      I, Karen Baker, Official Court Reporter, do hereby certify

12   that the foregoing is a true and correct transcript of

13   proceedings in the above-entitled case.

14

15

16   /s/ Karen Baker, RMR, CRR, CCR
     --------------------------------         Date: July 19, 2016
17   United States Court Reporter

18

19

20

21

22

23

24

25

1          (Continuing at 1:09 p.m., jury present.)

2               THE COURT:  You may continue.

3    BY MR. CARY:

4    Q.   Mr. Suhl, we spoke this morning about a time in the summer

5    of 2011 when you fell out of touch with Phillip Carter.  Can you

6    describe what was going on in terms of communications between

7    him and you during the summer of 2011?

8    A.   I believe he was calling me trying to get a hold of me, and

9    I just was very busy at the time and wasn't able to talk much.

10              MR. CARY:  Your Honor, at this time I'd offer

11   Defendant's Exhibit 1152-A, which I believe is the last of the

12   messages -- and I don't need to play it -- which Mr. Carter left

13   for Mr. Suhl.

14              MR. KELLER:  No objection, your Honor.

15              THE COURT:  Okay.

16        (Defendant's Exhibit 1152-A received in evidence.)

17   BY MR. CARY:

18   Q.   Did you serve on a board called the Child Welfare Agency

19   Review Board?

20   A.   Yes, I did.

21   Q.   When did you serve on that board?

22   A.   From late '99 to March of 2008.

23   Q.   And what did that board do?

24   A.   It might have been 2000.  I apologize.  It wrote

25   regulations for several different kinds of groups and industries

 1   that take care of kids, from adoption, foster care, and

 2   psychiatric.

 3   Q.   How was it organized?

 4   A.   It was organized -- there were several members on it and

 5   they were all appointed members.

 6   Q.   And who appointed them?

 7   A.   The governor.

 8   Q.   And were you paid for this position?

 9   A.   No, we weren't.

10   Q.   How did you get appointed to the board?

11   A.   Governor Mike Huckabee appointed me.

12   Q.   And you said you served through March of 2008.  When did

13   your term expire?

14   A.   March of 2008.

15   Q.   Were you appointed for another term?

16   A.   I was not.

17   Q.   Did you have any belief at the time about what your chances

18   were of getting reappointed?

19   A.   I did not think I would be reappointed, no.

20   Q.   Why not?

21   A.   For whatever reason, I felt like Governor Beebe didn't care

22   for me too much, so --

23   Q.   Were you two of the same political party?

24   A.   No.  I'm a Republican and he's a Democrat.

25   Q.   Did you bribe Steven Jones to get reappointed?

1   A.   No, I didn't.

2        MR. CARY:  If I could have Government Exhibit 48,

3   please.

4   BY MR. CARY:

5   Q.   This is something called Senate Bill 218 from the 2011

6   session of Congress.  Not Congress, the Arkansas House.  My

7   question for you, Mr. Suhl, you've had a chance to hear about it

8   in this courtroom; right?

9   A.   Yes, I have.

10  Q.   Did it apply to your business?

11  A.   It did not.

12  Q.   In what ways did it not apply to your business?

13  A.   Two ways:  It was -- it only applied to nonprofits, and

14  both of our companies were for profits.  It was for DYS

15  contractors and we didn't contract with the DYS.

16  Q.   And what is the DYS?

17  A.   Division of Youth Services.

18  Q.   Is that part of the DHS, as you understood it?

19  A.   As I understood it, yes.

20  Q.   And what did the Division of Youth Services do?

21  A.   They provided services to kids who had been adjudicated and

22  locked up, basically placed in state custody for crimes, is my

23  understanding.

24  Q.   During the time Steven Jones was deputy director of DHS,

25  did you have any understanding of whether or not he supervised

1    Medicaid?

2    A.    It was my understanding he did not.

3    Q.    Who did, to your understanding?

4    A.    Janie Huddleston.

5    Q.    And did you have an understanding as to who Janie

6    Huddleston reported to?

7    A.    John Selig.

8    Q.    Did you have any understanding as to whether Steven Jones

9    had the ability to take over Medicaid?

10   A.    I don't even know how that would be possible.  The governor

11   appoints those people.

12   Q.    Did you bribe Steven Jones to take over Medicaid?

13   A.    Absolutely not.

14   Q.    Mr. Suhl, I'd like to play a January 22, 2011, clip of a

15   conversation between Steven Carter and Chip Barnes, and then I'm

16   going to ask you a couple of questions.

17          MR. CARY:  This is Government's Exhibit 9-E, already

18   in evidence.

19       (Government's Exhibit 9-E played in open court.)

20   BY MR. CARY:

21   Q.    Did you tell Phillip Carter in January of 2011 that the 50-

22   mile radius legislation was going to pass?

23   A.    No, I didn't.

24          MR. CARY:  Could I have Defendant's Exhibit 1671?  And

25   I frankly don't remember whether it's in evidence or not.

T. Suhl - Direct                                    763

1           Your Honor, I move this into evidence.

2                MR. KELLER:  I believe it is, your Honor.  If not, no

3     objection.

4                THE COURT:  Admitted.

5           (Defendant's Exhibit 1671 received in evidence.)

6     BY MR. CARY:

7     Q.   What is Defendant's Exhibit 1671?

8     A.   It's a manual for the RSPMI services.

9                MR. CARY:  Mr. Bennett, if we could go to the page

10    that talks about the 50-mile radius, please.

11                TECHNICIAN:  I'm sorry, what --

12                MR. CARY:  I believe it's section CC, as I recall.

13    BY MR. CARY:

14    Q.   Let's move on, Mr. Suhl.

15         Let me ask you this.  Just in the lower right-hand --

16                MR. CARY:  If you can blow that up.  Can you just blow

17    up the corner.

18    BY MR. CARY:

19    Q.   When was this revised, sir?

20    A.   January 1, 2011.

21    Q.   And you've seen this document in court, have you not?

22    A.   I have.

23    Q.   Do you have any understanding whether or not the 50-mile

24    radius is included in this document?

25    A.   I believe it is, yes.

1   Q.   Did you bribe Steven Jones to change the radius to 50

2   miles?

3   A.   Absolutely not.

4   Q.   Mr. Suhl, did you bribe Mr. Jones for anything at all?

5   A.   Absolutely not.

6   Q.   Did you conspire with anybody to bribe Steven Jones?

7   A.   No, I didn't.

8          MR. CARY:  Could I have Government Exhibit 55, please.

9   Government Exhibit 55, please.

10  BY MR. CARY:

11  Q.   What is Government Exhibit 55?

12  A.   I see it, yes, sir.

13  Q.   And what is -- what are those?

14  A.   Those are donations to the Church of God in Christ.

15  Q.   Are they bribes?

16  A.   Absolutely not.

17         MR. CARY:  Pass the witness.

18         MR. KELLER:  If I could have just a moment, your

19  Honor.

20         THE COURT:  You may.

21                    CROSS-EXAMINATION

22  BY MR. KELLER:

23  Q.   Mr. Suhl, I want to go over some of the things that you

24  talked about with Mr. Cary on direct examination.  At one point

25  I think you said that the first time Steven Jones's role at the

T. Suhl - Cross                                    765

1    Department of Human Services came up was after you were venting

2    to Pastor Bennett about some issues that you were having with

3    the department; is that right?

4    A.    Not issues.  Just we felt mistreated.

5    Q.    So the point I'm trying to get to is, is the first

6    time that Steven Jones's role at DHS came up is after a

7    conversation where you were venting to Pastor Bennett about the

8    department?

9    A.    About the way they treated us, yes.

10   Q.    The way they treated you, that being the Department of

11   Human Services?

12   A.    Yes.

13   Q.    And in that conversation, was that when you had first

14   learned that Steven Jones had just become deputy director at the

15   Department of Human Services?

16   A.    To the best of my recollection, yes.

17   Q.    So that was sometime in 2007; right?

18   A.    I don't think so.  I don't know exactly when.  Late 2007

19   maybe.  2008.  I don't know when.

20   Q.    Well, after that conversation, you actually met with Steven

21   Jones; right?

22   A.    At some point, yes.

23   Q.    And you had talked to Pastor Bennett about -- or Pastor

24   Bennett suggested to you that he could set up a meeting with you

25   and Steven Jones based on the problems that you were saying you

1    were having with the department?

2    A.    He said he'd be glad to set up a meeting, yeah.

3    Q.    But you already knew Steven Jones; right?

4    A.    I think I'd seen him once in my life, or twice, maybe.

5    Q.    One of your companies had entered into a marketing contract

6    with Steven Jones; right?

7    A.    We had, yes.

8    Q.    A few years before that, in 2004; right?

9    A.    A few years before, yes.

10   Q.    A marketing contract under which you agreed to pay him a

11   thousand dollars a month; right?

12   A.    I can't recall what the --

13            MR. KELLER:  If we could have Government's Exhibit 40

14   right up on the screen.  It's already been admitted.  We may

15   need to switch over from the defense system to the government's

16   system, I think, to have that brought up.

17        I don't think we're connected.

18        Just a moment, your Honor.

19   BY MR. KELLER:

20   Q.    Mr. Suhl, I'm showing you what was previously admitted as

21   Government's Exhibit 40.  Do you remember when this was admitted

22   in court?

23   A.    Sure.

24   Q.    And who does it say it's to at the top there?  Government's

25   Exhibit 40.

T. Suhl - Cross                                          767

1    A.    It says it's to me.

2    Q.    And who is it from?

3    A.    It says it's from Steve Jones.

4    Q.    And flipping to page 2 of that exhibit, the title of this

5    document is Professional Marketing Agreement; right?

6    A.    It is, yes.

7    Q.    And if you look at the very first paragraph, it says that

8    the agreement is entered into between Burklyn Company, an

9    Arkansas corporation, hereinafter referred to as the company,

10   and Steve Jones.

11        Burklyn Company is one of your companies; right?

12   A.    It's my family's company.  My mom and dad and I.

13   Q.    And you entered into this contract with Steven Jones;

14   right?

15   A.    Burklyn Company did, yes.

16   Q.    I believe you testified a moment ago on direct that you and

17   Steven Jones entered into this contract; isn't that right?

18   A.    However you want to say it.  Yeah, we signed the contract.

19   Q.    Well, this contract was faxed to whose attention, sir?

20   A.    To mine.

21   Q.    And if you look down lower on the bottom of this page under

22   terms and compensation.  So I asked you whether you agreed to

23   pay Steven Jones a thousand dollars per month under this

24   contract, and I believe you testified that you weren't sure.

25   A.    That's what the contract says.

T. Suhl - Cross                          768

1    Q.   A thousand dollars a month; right?

2    A.   Yes.

3    Q.   To Steven Jones?

4    A.   Yes.

5    Q.   But Steven Jones didn't actually perform any services under

6    that contract, did he?

7    A.   No.  I don't agree with that, no.

8    Q.   Well, you paid him for services; right?

9    A.   It was years ago.  I believe he did some printing for us,

10   but I don't know.

11   Q.   And you paid him for that work; right?

12   A.   For whatever he did, printing or whatever.  I don't know.

13   I mean, we have hundreds of vendors.

14   Q.   Well, you paid him because he was in the state legislature;

15   right?

16   A.   Absolutely not.

17   Q.   But he was in the legislature at the time you entered that

18   contract with him?

19   A.   I believe so, yes.

20   Q.   You knew that; right?

21   A.   I don't know whether I did at the time.

22   Q.   But, nonetheless, based on this prior relationship that

23   you'd had with Steven Jones, the thousands of dollars that you

24   had paid him, when it came time to have a meeting with him after

25   he was deputy director at the Department of Human Services, you

1    went through Pastor Bennett; right?

2    A.    He wasn't a friend at the time.  He was Pastor Bennett's

3    friend.

4    Q.    And so despite your past relationship with him, you went

5    through Pastor Bennett; right?

6    A.    We have relationships with hundreds of vendors, literally

7    hundreds.

8    Q.    And so you went through Pastor Bennett as to this

9    particular person who you had a relationship with.

10   A.    He wasn't my friend at the time.

11   Q.    Mr. Suhl, I didn't ask you if he was your friend.  I'm

12   asking if you went through Pastor Bennett to set up this meeting

13   despite the fact that you had had a prior relationship with

14   Mr. Jones.

15   A.    Pastor Bennett offered to set up a meeting, yes.

16   Q.    And you took him up on that.

17   A.    Yes, I did.

18   Q.    And so you met with Steven Jones shortly after that, in the

19   2007-2008 time frame is what I believe you testified to.

20   A.    Sometime in that time frame, yes.

21   Q.    And then you met with him again; right?

22   A.    We met a few times, yes, we did.

23   Q.    And you met with him all the way up until the video that

24   we've seen multiple times here in court, in 2011; right?

25   A.    Yes.

T. Suhl - Cross                                                    770

1   Q.   So over at least a three-year period, maybe a little bit
2   more, from 2008 to 2011, you were meeting with Steven Jones;
3   right?
4   A.   On occasion.
5   Q.   At Texas de Brazil?
6   A.   Yes.
7   Q.   Mr. Suhl, we saw a lot of pictures of The Lord's Ranch
8   while you were testifying with Mr. Cary.  The Lord's Ranch was a
9   for-profit company; right?
10  A.   Yes.
11  Q.   So there are a lot of pictures of the kids and the grounds.
12  You made a lot of money from The Lord's Ranch, didn't you, in
13  these years?
14  A.   We did make money and we gave a lot of donations also.
15  Q.   And you made millions of dollars off The Lord's Ranch;
16  right?
17  A.   Not just to 15th Street Church of God in Christ, but --
18  Q.   Mr. Suhl, if you could limit your answers to the questions
19  that I ask you, sir.
20        THE COURT:  It's better to listen to the question and
21  answer it as briefly as you can.
22        THE WITNESS:  Yes, sir.
23        THE COURT:  Fairly.  I mean, you can expand if you
24  need to, but basically try to answer it as directly as possible.
25        THE WITNESS:  Okay.  Yes, sir.

1  BY MR. KELLER:

2  Q.    Mr. Suhl, you made millions of dollars off of The Lord's

3  Ranch over this time period; right?

4  A.    I don't know exactly what we made.

5  Q.    Well, you made a lot of money; right?

6  A.    We did make money, yes.

7  Q.    And it was Medicaid money; right?

8  A.    Our gross revenue came from Medicaid, yes.

9  Q.    Your gross revenue.  The money that was coming into that

10  company was Medicaid money; right?

11  A.    Yes, it was.

12  Q.    And that was Medicaid money that you made off of those kids

13  that we saw pictures of; right?

14  A.    Some -- yes.

15         MR. KELLER:  If we could have Defense Exhibit 1687,

16  please.

17  BY MR. KELLER:

18  Q.    Mr. Suhl, I believe you testified on direct that this shows

19  all the ACA locations in the state of Arkansas; is that right?

20  A.    I believe it does.

21  Q.    At some point, weren't you trying to open a facility or a

22  site in Forrest City, Arkansas?

23  A.    We were.  Yes.

24  Q.    Forrest City is not on this map, is it?

25  A.    No.

1           MR. KELLER:  And if I could have Defense Exhibit 1688.

2   BY MR. KELLER:

3   Q.   I believe you testified on direct that this shows a bunch

4   of vans that you had at your disposal when you needed to

5   transport clients or children or whomever.  Is that what this

6   shows?

7   A.   It does.

8   Q.   And this is a picture of vans up at The Lord's Ranch;

9   right?

10  A.   Yes.

11  Q.   Up in Warm Springs, Arkansas?

12  A.   Yes.

13  Q.   That's, what, roughly two hours away from West Memphis?

14  A.   It is, but those vans aren't in use now.  We had vans

15  scattered all over the state before.

16  Q.   Well, this picture shows that all these vans you had, at

17  least in this picture, they were all up in Warm Springs; right?

18  A.   They were at that time, yes.

19  Q.   Two hours away from West Memphis and Marion, Arkansas,

20  where Pastor Bennett and Phillip Carter and one of your provider

21  sites was; right?

22  A.   Yes.

23          MR. KELLER:  Do we have the government's system

24  running yet?

25          TECHNICIAN:  We're working on it.  I think we can play

1    the audio.

2              MR. KELLER:  No, I wanted to bring up a couple more

3    exhibits.  I can grab hard copies.

4         If I could have just a moment, your Honor.

5              THE COURT:  You may.

6    BY MR. KELLER:

7    Q.    Mr. Suhl, do you remember Mr. Cary asking you about this

8    document on direct?

9    A.    I do.

10   Q.    And so this lists checks from one of your companies,

11   Millenia, to the 15th Street Church of God in Christ?

12   A.    Right.

13   Q.    Do you see the two lines I've highlighted there?

14   A.    Yes, I do.

15   Q.    I believe Mr. Cary asked you what those checks were for,

16   and you testified that those checks were for Pastor Bennett's

17   bishop campaign; right?

18   A.    Yes.

19   Q.    Those checks are both dated in April of 2007; isn't that

20   right?

21   A.    Yes.

22   Q.    And those are the only donations you made to Pastor

23   Bennett's bishop campaign; isn't that right?

24   A.    No, that's not true.

25   Q.    Well, these two checks, anyway, the majority of your

1  donations to Pastor Bennett's bishop's campaign, those were

2  finished, completed, by April 16 of 2007, according to this

3  exhibit; right?

4  A.    Could you repeat the question?  I'm sorry.

5  Q.    The last $20,000 check, the second $20,000 check that's

6  highlighted, that check was written on April 16, 2007; right?

7  A.    Yes.  It was to kick it off.  It was a multi-time process.

8  Q.    Well, you testified that you didn't start meeting with

9  Steven Jones until late 2007 or 2008; right?

10  A.    Yes, that's right.

11  Q.    So almost a year after those two checks were written;

12  correct?

13  A.    Yes, that's right.

14  Q.    I'm showing you what was previously admitted as Defense

15  Exhibit 1780.  Do you remember Mr. Cary asking you about this

16  document?

17  A.    I do.

18  Q.    And this had to do with a repayment for money that had been

19  fraudulently billed from one of your provider sites.  I believe

20  it was specifically the Dumas provider site; is that correct?

21  A.    Dumas, yes.

22  Q.    And so this letter was admitting that there had been

23  fraudulent billing at that site; correct?

24  A.    What it was saying is, we were letting them know that we'd

25  found a provider, meaning a paraprofessional or a case manager,

1    who had -- yes, had committed fraud and that we'd let him go and

2    we were returning all the money from the day he started with us.

3    Q.    Just so there's no confusion, you tell me if I read this

4    right.    "ACA/Maxus management recently became aware that a case

5    manager was billing for patients that he did not actually see

6    for the full amount of time that he had billed for."

7          Right?

8    A.    Yes.  Uh-huh.

9    Q.    And the date of this letter is June 16, 2009; correct?

10   A.    It is, yes.

11   Q.    And I believe that you testified that Defense Exhibit 1774

12   was a copy of the check that was repaying that money; right?

13   A.    Yes.

14   Q.    And that's the check for $113,000, roughly, that was

15   fraudulently billed from one of your sites; correct?

16   A.    By a provider who we terminated, yes.

17   Q.    And the date of that check is December 3, 2009?

18   A.    Yes.

19   Q.    I believe you testified on direct that was the end of this

20   issue, as far as you knew; correct?

21   A.    As far as we knew.

22   Q.    So then if we look at Government's Exhibit 32, you've seen

23   this exhibit before; right?

24   A.    Yes, I did.

25   Q.    There's been a lot of talk about this exhibit during the

T. Suhl - Cross

1  trial.  These are the monitoring notes from the Department of

2  Human Services for one of their monitoring meetings; is that

3  right?

4  A.    That's what it says.

5  Q.    And if we turn to page 5 of that exhibit, there's a

6  highlighted line there saying that MFCU was reviewing the Dumas

7  report; right?

8  A.    Yes.

9  Q.    And that's the issue that you just referenced where you've

10  made the repayment in 2009?

11  A.    Yes.

12  Q.    And you heard testimony that MFCU was at the Attorney

13  General's Office in Arkansas; right?

14  A.    Yes.

15  Q.    And this was a fraud referral?

16  A.    That's what they said, yes.

17  Q.    That highlighted line says that the MFCU's next meeting on

18  that issue is scheduled for July 29, 2011; right?

19  A.    Yes.

20  Q.    Almost two years after you wrote that check that you just

21  referenced that you said you thought ended the issue; right?

22  A.    Yes.

23  Q.    You didn't know about that, did you?

24  A.    I didn't know about that meeting.  No, I didn't.

25  Q.    DHS didn't tell you about that, did they?

1    A.    I'm sorry?

2    Q.    The Department of Human Services didn't tell you about

3    that, did they?

4    A.    They might have mentioned it to staff, but I didn't know

5    about it, no.

6    Q.    And you didn't have a copy of those notes available to you

7    through the Department of Human Services, did you?

8    A.    No, I didn't.

9    Q.    You didn't get those through FOIA?

10   A.    I'd never seen that report before this trial.

11   Q.    You didn't get those through FOIA, did you, Mr. Suhl?

12   A.    I could have, but I didn't see it before this trial.

13         THE COURT:  I just thought of something.  Counsel

14   approach.

15         [Bench conference reported as follows:]

16         THE COURT:  I'm going to send the jury out.  I'd like

17   for you to walk over to your client and just caution him about

18   listening and answering directly.  He's doing better, but I

19   don't want to say anything else in front of jury.

20         MR. CARY:  Fair enough, your Honor.  Thank you.

21         [Continuing in open court:]

22         THE COURT:  Ladies and gentlemen, we're going to be in

23   recess about nine minutes.  Don't talk about the case or anyone

24   involved in it.  Don't start making up your mind.

25         Let the jury stand out.  Everyone else remain as you are.

T. Suhl - Cross                                            778

1           (Jury exited the courtroom.)

2              THE COURT:  We'll be in recess until about 15 till.

3    Be at ease.

4           (Recess at 1:37 p.m., until 1:50 p.m., jury present.)

5              THE COURT:  You may proceed.

6              MR. KELLER:  Thank you, your Honor.

7    BY MR. KELLER:

8    Q.   Mr. Suhl, before we broke, we were talking about

9    Government's Exhibit 32.  Do you remember that?

10   A.   Yes, I do.

11   Q.   And I believe you testified that you were not aware that

12   this fraud referral was still pending as late as July 29 -- that

13   this fraud referral was still pending as late as July 29, 2011;

14   right?

15   A.   Yes, that's right.

16   Q.   Because you had never seen this document before you came

17   into court for this trial; right?

18   A.   No, I hadn't.

19   Q.   You didn't FOIA this document?

20   A.   No, I didn't.

21   Q.   Mr. Suhl, Mr. Cary played a call for you between Chip

22   Barnes and Phillip Carter.  Do you remember that?

23   A.   Yes, I do.

24   Q.   I want to play another call for you between Chip Barnes and

25   Phillip Carter from September 15, 2010.  This has been

1    previously admitted as Government's Exhibit 9-B.

2          MR. KELLER:  Can we play a clip from this call.

3       (Government's Exhibit 9-B played in open court.)

4          MR. KELLER:  You can stop it there, Ms. Spells.

5    BY MR. KELLER:

6    Q.   I believe you testified earlier that you met with Steve

7    Jones for the final meeting on September 11, 2011, in that video

8    that we've seen throughout trial?

9    A.   I did.

10   Q.   And this call is from September 15, 2010.  That's a year

11   before that meeting where Phillip Carter is telling Chip Barnes

12   that you paid Steven Jones through the 15th Street Church of God

13   in Christ; right?

14   A.   That's what he said, yes.

15   Q.   Mr. Suhl, do you remember Mr. Cary asking you about Texas

16   de Brazil charges and showing you records from the restaurant?

17   A.   Yes.

18   Q.   Let me show you what's previously been admitted as

19   Government's Exhibit 101.  This document reflects down at the

20   bottom the created date and the last updated date of May 18,

21   2008; right?

22   A.   It does.

23   Q.   And it shows that the party size is three people; right?

24   A.   Yes, it does.

25   Q.   And I'm showing you what's been previously admitted as

1    Government's Exhibit 57-A.  There's a highlighted line on that

2    chart for May 18, 2008; right?

3    A.    Yes, it is.

4    Q.    And that shows a charge on your Am Ex card for $201.22;

5    right?

6    A.    Yes, it does.

7    Q.    I believe you testified earlier if we look down to July 5,

8    2008, there's a charge for $105.90.  Do you see that?

9    A.    Yes.

10   Q.    I believe you testified earlier that that was consistent

11   with a dinner for two people; is that right?

12   A.    Yes.

13   Q.    So if we look at that May 18, 2008, charge where the Texas

14   de Brazil record shows there were three people, that charge is

15   consistent with three people; right?

16   A.    It is.

17   Q.    And right underneath that, the next highlighted line,

18   182.45, that's consistent with three people; right?

19   A.    It could be three or four, yes.

20   Q.    And then skipping past the July 5 one, the next highlighted

21   line, August 10, that's consistent with three people; right?

22   A.    August 10, I'd say three or four.

23   Q.    And September 7, 2008, that's consistent with three people?

24   A.    Three or four, yes.

25   Q.    Well, Mr. Suhl, you testified that the May 18, 2008, date

T. Suhl - Cross                                        781

1    was consistent with three people, and that's a charge for

2    $201.22; right?

3    A.    If I -- three or four.

4    Q.    So now it's consistent with three or four people?

5    A.    Yes.

6    Q.    Well, all the other highlighted charges here, August 16,

7    2009; June 13, 2010; July 11, 2010, those are all consistent

8    with three people?

9    A.    Three or four, yes.

10   Q.    August 15, 2010?

11   A.    Yes.

12   Q.    September 7, 2010?

13   A.    Yes.

14   Q.    And September 11, 2010?

15   A.    Yes.

16          MR. KELLER:  Ms. Spells, if we could have 8-A1 played

17   for the witness.

18       This has previously been admitted, your Honor.

19       (Government's Exhibit 8-A1 played in open court.)

20          MR. KELLER:  If we could pause it right there.

21   BY MR. KELLER:

22   Q.    You've heard this call before in court; right?

23   A.    Yes, I have.

24   Q.    When you say your buddy, you're talking about Steven Jones;

25   right?

1    A.    I believe I was.

2    Q.    But you don't use Steven Jones's name, do you?

3    A.    I did not.

4          MR. KELLER:  If we can keep playing it.

5          (Audio continuing.)

6          MR. KELLER:  Could we stop it again.

7    BY MR. KELLER:

8    Q.    You were asking Phillip Carter to have Steven Jones put the

9    stop to a specific policy at the Department of Human Services;

10   right?

11   A.    That's not how I would define it, no.

12   Q.    You were asking Phillip Carter to have the stop put to this

13   referral policy that was referring patients to Mid-South in

14   outpatient.  Isn't that what you just said on the call?

15   A.    That's what I said.  I agree.  That's not how I would

16   define it.

17   Q.    So today you're saying those words mean something

18   different?

19   A.    I'm saying that it was -- do you want to know what I

20   thought, that it was --

21   Q.    I'm asking you today, are you saying that you meant

22   something different from what those words say in this call?

23   A.    I am saying that I felt it was illegal conduct.

24   Q.    And you wanted a stop put to it; right?

25   A.    Yes.

1  Q.   You wanted Steven Jones to put the stop to it; right?

2  A.   I wanted it to be fair for the kids and for all providers.

3  Q.   And so in order for it to be fair in your mind, this needed

4  to have a stop put to it; right?

5  A.   Illegal conduct should always stop.

6  Q.   And you were asking Phillip Carter to talk to Steven Jones

7  about this; isn't that right?

8  A.   I wouldn't say that.  I'd say I was describing a situation

9  that I thought was illegal conduct.

10          MR. KELLER:  Ms. Spells, if we could go back to the

11  beginning of this clip, please.

12          (Audio continuing.)

13          MR. KELLER:  Ms. Spells, if we could pause it and play

14  it again, I think the transcript might come back up, if we just

15  hit play.

16          (Audio continuing.)

17          MR. KELLER:  Could you stop it right there.

18  BY MR. KELLER:

19  Q.   Mr. Suhl, you were asking Phillip Carter to ask Steven

20  Jones to put a stop to this.  Isn't that right?  Isn't that what

21  you said in this call?

22  A.   That's what I said, yes.

23  Q.   And so you're asking Phillip Carter to talk to Steven Jones

24  about this, even though you had met with Steven Jones previously

25  through a meeting set up through Pastor Bennett; right?

1   A.   Yes, I had.

2   Q.   And you had had a prior marketing contract between your

3   business and Steven Jones; right?

4   A.   Yes, we had.

5   Q.   And Steven Jones had an open-door policy; isn't that right?

6   A.   That's my understanding, yes.

7   Q.   But instead of picking up the phone and calling Steven

8   Jones when he was at work at the Department of Human Services,

9   you called Phillip Carter; right?

10  A.   I didn't consider him a friend.  I did later, but I

11  didn't -- it was not like we were friends or close friends.

12  Q.   Mr. Suhl, my question is, instead of picking up the phone

13  and calling Steven Jones in his office at the Department of

14  Human Services, you called Phillip Carter; right?

15  A.   Yes, I did.

16        MR. KELLER:  If we could continue the call,

17  Ms. Spells.

18        (Audio continuing.)

19        MR. KELLER:  If you could stop it right there.

20  BY MR. KELLER:

21  Q.   You didn't want Steven Jones or Phillip Carter to make this

22  about you or your company; right?

23  A.   Yes, that's right, because we felt like we were

24  discriminated against, so --

25  Q.   You didn't want anyone to know that this request had come

1    from you.  You didn't want them to use your name or your

2    company's name; right?

3    A.    That's true.

4            MR. KELLER:  If we could play it, Ms. Spells.

5        (Audio continuing.)

6            MR. KELLER:  If you could pause it there.

7    BY MR. KELLER:

8    Q.    You said you didn't want to have a big meeting with him

9    about it.  You're talking about meeting with Steven Jones;

10   right?

11   A.    Exactly.

12   Q.    Because you had met with him before?

13   A.    I had, yes.

14   Q.    Met with him before to tell him about problems you were

15   having that were affecting your business?

16   A.    Mostly complaining about overregulation.

17   Q.    Complaining about issues that affected your business;

18   right?

19   A.    Sure.  Yeah.

20           MR. KELLER:  If we could continue the call,

21   Ms. Spells.

22       (Audio continuing.)

23           MR. KELLER:  If we could pause it there.

24   BY MR. KELLER:

25   Q.    You told him that before.  You're saying that you told

1    Steven Jones this before; right?

2    A.   I told a lot of people in the state that I thought it was

3    illegal conduct.

4    Q.   In this call you're referring to the fact that you had told

5    Steven Jones about this before; right?

6    A.   I probably had.

7    Q.   Mr. Suhl, I'm not asking whether you actually had or not.

8    I'm asking you if in this call you said that you had told Steven

9    Jones about this before.

10   A.   In this call, yes, I did.

11        MR. KELLER:  If we could play it again, please.

12        (Audio continuing.)

13        MR. KELLER:  If you could pause it again.

14   BY MR. KELLER:

15   Q.   You believed that all Steven Jones would have to do would

16   be to send out a memo to address this issue; isn't that right?

17   A.   I have to say I didn't -- that conversation is just typical

18   conversation.  I didn't believe that.  Nothing happens in this

19   state like that.

20   Q.   Well, you believed that Steven Jones could do something

21   about this, didn't you?

22   A.   I did believe that, yes.

23   Q.   And that's why you're asking Phillip Carter to talk to him;

24   right?

25   A.   I thought he could point out the conduct.

1          MR. KELLER:  If we could keep playing the clip,
2    Ms. Spells.
3          (Audio continuing.)
4          MR. KELLER:  Actually, I'm sorry.  If you could pause
5    it and move to clip two, same call, previously admitted as
6    Government's Exhibit 8-A.
7          (Audio continuing.)
8          MR. KELLER:  If you could pause it right here.
9    BY MR. KELLER:
10   Q.   You just described Steven Jones as a friend; right?
11   A.   I did, yes.
12   Q.   I think earlier you testified that he was not a friend yet
13   and that's why you were going through Phillip Carter to contact
14   him.  Isn't that what you said?
15   A.   I -- I saw him as a friend like you -- somebody you would
16   see a few times over a few-year period, and I felt like he was a
17   friend of Pastor Bennett's, yes.
18   Q.   But didn't you testify earlier that he wasn't a friend yet
19   and that's why you didn't pick up the phone and call him
20   directly?  Isn't that what you said, Mr. Suhl?
21   A.   There's two kinds of friends:  Those that you'll talk to a
22   lot and some that are friends of other people.
23         MR. KELLER:  If you can go ahead and play the clip.
24         (Audio continuing.)
25         MR. KELLER:  If you could pause it, Ms. Spells.

1  BY MR. KELLER:

2  Q.   You say it would be nice if he would -- you're saying it

3  would be nice if Steven Jones would get on the bandwagon and do

4  just what he's asked to do; right?  Isn't that what you said?

5  A.   That's what I said, yes.

6       MR. KELLER:  If you could play the clip, Ms. Spells.

7       (Audio continuing.)

8       MR. KELLER:  If we could move on to clip three,

9  Ms. Spells.

10      (Audio continuing.)

11      MR. KELLER:  If you could pause it right there.

12  BY MR. KELLER:

13  Q.   When you say, "He doesn't like those kinds of messes," and

14  when you say to Phillip Carter, when you're telling him when he

15  sees his buddy, you're talking about Steven Jones; right?

16  A.   Initially I was talking about the state rep -- I don't

17  recall his name -- who got elected who he offered to introduce

18  me to.  And then secondly, the second buddy was Steven Jones,

19  yes.

20  Q.   And you didn't use Steven Jones's name; right?

21  A.   No, I didn't.

22  Q.   And you say that Steven Jones, he doesn't like those kinds

23  of messes, you know.  And you knew that he didn't like messes

24  because you had met with him about issues for your business

25  before; right?

1   A.   I know he's a gentleman and so I didn't figure he'd want to

2   be in a hassle.

3   Q.   Well, you had seen how he reacted to issues that you'd

4   brought up to him before; isn't that right?

5   A.   He was always a gentleman.

6   Q.   And so you're saying that you had seen him react as a

7   gentleman when you had brought up business issues with him

8   before; right?

9   A.   Most of the issues were complaining about overregulation.

10  Q.   Right.  Overregulation, issues that affected your business;

11  right?

12  A.   Yes.

13  Q.   Overregulation by the very agency that he was the deputy

14  director of; right?

15  A.   Yes.

16  Q.   And you had met with him and talked about those things over

17  and over again; right?

18  A.   I don't know how many times, but, yes, we discussed it.

19  Q.   Well, enough times that you knew that he didn't like those

20  kinds of messes; right?

21  A.   Yes.

22  Q.   And despite having met with him all those times, despite

23  the fact that he was a friend, despite the fact that you had a

24  contract with him previously, you didn't call him directly, did

25  you?

T. Suhl - Cross                    790

1    A.    No, I didn't.

2    Q.    You called Phillip Carter; right?

3    A.    Yes, I did.

4          MR. KELLER:  If you could play the clip, Ms. Spells.

5          (Audio continuing.)

6          MR. KELLER:  If we could play the last clip from this

7    call, clip four.

8          (Audio continuing.)

9          MR. KELLER:  If we could pause it right there.

10   BY MR. KELLER:

11   Q.    When Phillip Carter is talking about he wants to make sure

12   this guy met you and he's on these major committees and

13   everything, he's talking about the person that just got elected;

14   isn't that right?

15   A.    That's what I believe, yes.

16         MR. KELLER:  If you could go ahead and play it,

17   Ms. Spells.

18         (Audio continuing.)

19         MR. KELLER:  If you could pause it.

20   BY MR. KELLER:

21   Q.    I believe you testified on direct that you never met this

22   person that had just been elected; right?

23   A.    I did not.

24   Q.    This Hudson Hallum, I think you testified on direct?

25   A.    Never met him in my life.

1    Q.    But you were all ready to have him help you out on this

2    issue that was affecting your business if Phillip Carter could

3    get him to help; right?

4    A.    I believe in competition, so yes.  Yeah.

5    Q.    You believe in going through whoever you've got connections

6    with; right?

7    A.    Whoever would be -- I would think would be a friend, I

8    suppose.

9    Q.    Whoever would be a friend to you and Phillip Carter and

10   your business; right?

11   A.    Whoever would be a friend is how I would put it.

12            MR. KELLER:  If you can continue the call, Ms. Spells.

13        (Audio continuing.)

14            MR. KELLER:  If you could pause it again.

15   BY MR. KELLER:

16   Q.    At the end of that clip, you were referencing Steve doing

17   this quietly; right?

18   A.    I think that's what it said, yes.

19   Q.    You wanted to keep this a secret; isn't that right?

20   A.    Not a secret.  I just didn't want to -- I knew we were, if

21   you will -- maybe it was just in my mind, but discriminated

22   against.  Maybe it's in my mind.  I don't know.

23   Q.    Well, you said you didn't want him mentioning your name or

24   our name.  Right?

25   A.    If people don't like you, you know they're not going to do

T. Suhl - Cross                                       792

1    the right thing even when you point it out.

2    Q.    Because you didn't want anyone to know that you were

3    passing these requests on to Steven Jones, that Ted Suhl was

4    passing these requests on to Steven Jones; right?

5    A.    That's true.  That we weren't cared for.

6    Q.    Thank you, sir.

7             MR. KELLER:  Ms. Spells, if we could have 8-C, what's

8    previously been admitted as 8-C, played for the witness and the

9    jury.

10        (Government's Exhibit 8-C played in open court.)

11            MR. KELLER:  If you could pause it.

12   BY MR. KELLER:

13   Q.    Do you remember Mr. Cary asking you on direct examination

14   about calls where you used the word "buddy"?

15   A.    Yes, I do.

16   Q.    And he played a bunch of examples where you said things

17   just like this, where you said, "Hey, Phillip, how are you,

18   buddy?"  Do you remember that?

19   A.    Uh-huh.  Uh-huh.

20   Q.    Right before you used the word "buddy," you used Phillip

21   Carter's name; right?

22   A.    I did, yes.

23   Q.    When you used the word "buddy" or "friend" to describe

24   Steven Jones, you weren't using his name, were you?

25   A.    I was not, no.

1          MR. KELLER:  If you could continue the call,

2   Ms. Spells.

3       (Audio continuing.)

4          MR. KELLER:  Can you pause it, Ms. Spells.

5   BY MR. KELLER:

6   Q.   When he says "my friend," he's talking about Steven Jones;

7   right?

8   A.   I believe so.

9   Q.   You knew that's who he was talking about, didn't you?

10  A.   I believe so, yes.

11         MR. KELLER:  Play the call, please.

12      (Audio continuing.)

13         MR. KELLER:  If you could pause it right there.

14  BY MR. KELLER:

15  Q.   You're asking Phillip Carter to ask Steven Jones to give

16  you or to give Carter those monitoring notes; isn't that right?

17  A.   Yes, it is.

18         MR. KELLER:  Go ahead and play the call.

19      (Audio continuing.)

20         MR. KELLER:  If you can pause it there.

21  BY MR. KELLER:

22  Q.   And you say then, "We'll get together when I'm back in

23  town."  You're proposing another meeting with Steven Jones and

24  Phillip Carter; right?

25  A.   Yes, I was.

1    Q.    To talk about an issue related to your business, to talk

2    about monitoring reports that related to your business; right?

3    A.    Not the monitoring reports, no.

4    Q.    So when you say, "See if he'll give them to you and then

5    see if I can call him and then we'll get together when I'm back

6    in town," you're not talking about meeting about the monitoring

7    reports that you just asked Phillip Carter to get?

8    A.    Not in my mind, no.  I'm sorry.  Not in my mind.

9            MR. KELLER:  If we can go ahead and play the call.

10           (Audio continuing.)

11           MR. KELLER:  If we could pause it again.

12   BY MR. KELLER:

13   Q.    You knew that Steven Jones generally liked to meet on the

14   weekends because you had met with him at Texas de Brazil on

15   Sunday after Sunday; isn't that right?

16   A.    I generally like to meet on weekends also because I'm busy.

17   I work all the time.

18   Q.    Mr. Suhl, my question was --

19   A.    Yes.  I'm sorry.  Yes.

20   Q.    -- you knew that Mr. Jones liked to meet on weekends

21   because you had met with him at Texas de Brazil on Sunday after

22   Sunday; isn't that right?

23   A.    I had met him on Sundays, yes.

24           MR. KELLER:  If we can continue the call.

25           (Audio continuing.)

1          MR. KELLER:  If you could pause it there.

2     BY MR. KELLER:

3     Q.   When you say, "What did he say about the other deal?",

4     you're asking about the Mid-South referral policy; isn't that

5     right?

6     A.   I don't know what I'm talking about there.  I can't

7     remember.  I'm sorry.  I'm sorry.

8          MR. KELLER:  If we could play it, Ms. Spells.

9          (Audio continuing.)

10         MR. KELLER:  If you could pause it there.

11    BY MR. KELLER:

12    Q.   Crittenden was the county where Phillip Carter worked as a

13    juvenile probation officer; right?

14    A.   Yes, it was.

15    Q.   And Phillip Carter made referrals to your company ACA,

16    didn't he?

17    A.   Actually, it was a birthday system that made the referrals.

18    Q.   Well, Phillip Carter talked to parents of children that

19    then requested to have their children referred to your company

20    ACA; isn't that correct?

21    A.   I don't know about that.

22    Q.   You talked to Phillip Carter over the phone about him

23    getting you referrals, didn't you?

24    A.   I don't know.  I'm sure over the years I did.  He would

25    probably call me and tell me some kids were coming up at times,

1    yeah.

2    Q.    And when you saw Phillip Carter, you often gave him cash;

3    isn't that right?

4    A.    No, that's not true.

5    Q.    When you saw him at the holiday meetings that you put on

6    for the whole juvenile probation department in Crittenden County

7    when you spent over a thousand dollars at Texas de Brazil on

8    juvenile probation officers and judges, when you would see

9    Phillip Carter at those meetings, you would put cash in his

10   hands; isn't that right?

11   A.    No, that's not true.

12   Q.    You wanted to encourage all of those officials to make

13   referrals to your company; isn't that right?

14   A.    I wanted to -- actually, those holiday parties were

15   requested by the judges.  The judges asked us if we'd sponsor

16   it, and we agreed to.

17   Q.    And you were happy to buy them dinner because you knew that

18   if they sent kids to your company, you would make more Medicaid

19   money; right?

20   A.    We were happy to buy them dinner.  We were just sponsoring

21   dinner for the whole -- for whoever wanted to come, yes.

22   Q.    You were happy to buy dinner for whatever public officials

23   could help out your business; right?

24   A.    We sponsored a dinner, yes, we did.  We sponsored a dinner.

25   Q.    You bought dinner for Steven Jones, too, didn't you?  On a

 1  number of occasions?

 2  A.    I did.  I did, yes.

 3           MR. KELLER:  Ms. Spells, if we could continue the

 4  clip.

 5       (Audio continuing.)

 6           MR. KELLER:  You can pause it, Ms. Spells.

 7       Can we go to what's previously been admitted as

 8  Government's Exhibit 8-D.  I believe it's clip two.

 9       (Government's Exhibit 8-D played in open court.)

10           MR. KELLER:  If you could pause it there.

11  BY MR. KELLER:

12  Q.    He's their boss.  You're referring to Steve Jones again;

13  right?

14  A.    I think I was referring to either Steve Jones or the people

15  who were directing the kids to Mid-South.  I can't recall

16  exactly.

17  Q.    Well, the whole lead-up to this conversation is about a

18  conversation between Phillip Carter and Steven Jones, isn't it?

19  A.    It is, yes.

20  Q.    And so when you say, "He's their boss," you're talking

21  about Steven Jones, the boss at the Department of Human

22  Services; right?

23  A.    Well, the only reason why I'm a little confused is because

24  direct supervisor is somebody who would send -- who would be

25  making those mandates.  But it could have been either.  I'm not

1   disagreeing with you.

2   Q.   Part of the reason why it's confusing is because you don't

3   use his name; right?

4   A.   No.  I'm talking about -- if I'm talking about the direct

5   supervisor, it would be whoever was sending the kids to

6   Mid-South.

7   Q.   But whoever you're talking about, you don't use their name.

8   A.   I don't know the -- I don't know any of those people.  I

9   don't know any of them.

10  Q.   Well, you certainly didn't use Steve Jones's name, did you?

11  A.   I did not.  No.

12            MR. KELLER:  If we can play the call.

13        (Audio continuing.)

14            MR. KELLER:  If you could pause it there.

15  BY MR. KELLER:

16  Q.   You're asking Phillip Carter to see if he can get together

17  with Steve Jones; right?

18  A.   I am, yes.

19  Q.   So that he can get paperwork from Steve Jones; right?

20  A.   Yes.  I am.

21            MR. KELLER:  If you can play the call.

22        (Audio continuing.)

23            MR. KELLER:  If you could pause it.

24  BY MR. KELLER:

25  Q.   "He might have some inside information on whatever Janie's

1    saying."  Again, that's Steven Jones; right?

2    A.   I felt like Janie might be talking bad about us.  So I

3    would want to know what she was going to say, yes.

4    Q.   The "he" who you referred to in that call who might have

5    inside information was Steven Jones; right?

6    A.   Yes, I believe so.

7         MR. KELLER:  If we can play 8-D, clip three, please, a

8    later clip from the same call.

9         (Audio continuing.)

10        MR. KELLER:  If you could pause it.

11   BY MR. KELLER:

12   Q.   "You're really going to have to press him, though."  You're

13   telling Carter he's really going to have to press Steven Jones

14   to get that paperwork; right?

15   A.   I did say, "You're going to have to press him," yes.

16   Q.   And you say, "You know how he is.  He'll put it off, and

17   I'd like to see them."  You're saying you know how Steve Jones

18   is; right?

19   A.   Yes.

20   Q.   He'll put it off.  Because you had asked Steve Jones to do

21   things for you before and he had put things off.  Isn't that

22   right?

23   A.   I never asked him to do anything for us.  No, I didn't.

24   Q.   Well, you seem to know in this conversation just how Steve

25   Jones is when he gets asked to do something; right?

1    A.   I know he's a gentleman.

2    Q.   Well, you know he'll put it off.  That almost sounds like a

3    complaint.  Do you usually complain about gentlemen, Mr. Suhl?

4    A.   It's not a complaint.

5    Q.   So you were happy with the fact that he would put things

6    off.

7    A.   It was just -- it is what it is.  It wasn't a complaint.

8    Q.   Well, you wanted Phillip Carter to press him so that he

9    wouldn't put it off.  Isn't that the whole point?

10   A.   I thought they were doing illegal conduct where I think

11   someone should stop it, yes.

12   Q.   So you wanted Phillip Carter to press Steve Jones so he

13   wouldn't put it off; right?

14   A.   I felt like they were -- yes.  I felt like they were --

15            MR. KELLER:  If we could play the call, Ms. Spells.

16        (Audio continuing.)

17            MR. KELLER:  If we could go to 8-K, Ms. Spells,

18   please, what's previously been admitted as Government's Exhibit

19   8-K.

20        (Government's Exhibit 8-K played in open court.)

21            MR. KELLER:  Ms. Spells, if you could pause it.

22        If we could get the full call, the full call for 8-K,

23   please, starting at the beginning.  Starting at the beginning.

24        (Audio continuing.)

25            MR. KELLER:  If you could pause it, Ms. Spells.

1   BY MR. KELLER:

2   Q.   Mr. Suhl, you're talking to Phillip Carter about church in

3   this call; right?

4   A.   Yes, I am.

5   Q.   You're talking to him about specifically the 15th Street

6   Church of God in Christ; right?

7   A.   Yes, I am.

8   Q.   You don't mention anything about a check or a charitable

9   donation for the church in this call, do you?

10  A.   No, I don't.

11  Q.   You don't mention that next time you see him, you're going

12  to drop off a check for the church; right?

13  A.   No, I don't.

14  Q.   That next time you see him, you're going to drop off a

15  check for Pastor Bennett?

16  A.   No, I don't.

17  Q.   In fact, in none of these calls that we've heard so far

18  have you said anything about a check for the church; isn't that

19  right?

20  A.   That's true.

21       MR. KELLER:  If you can continue playing the call,

22  Ms. Spells.

23       (Audio continuing.)

24       MR. KELLER:  If you could pause it, Ms. Spells.

25  BY MR. KELLER:

1  Q.   You wanted to see if he got a hold of his buddy.  Talking

2  about Steven Jones again; right?

3  A.   Yes, I was.

4  Q.   You don't use his name, do you?

5  A.   No, I didn't.

6  Q.   And you're requesting a meeting with Steven Jones through

7  Phillip Carter again; right?

8  A.   Yes, I was.

9        MR. KELLER:  If we could go to what's previously been

10  admitted as Government's Exhibit 8-OO.

11      (Government's Exhibit 8-OO played in open court.)

12        MR. KELLER:  If you could pause it.

13  BY MR. KELLER:

14  Q.   Mr. Suhl, this is another call that your attorney played

15  for you where you say, "Hey, Phillip, how are you, buddy?" as an

16  example of you using the word "buddy"; right?

17  A.   Uh-huh.  Yes.

18  Q.   Just before you used the word "buddy," you used Phillip

19  Carter's first name; right?

20  A.   Because I was talking to him directly, yes.

21  Q.   Well, when you talked about Steven Jones to Phillip Carter

22  and you called him buddy, you didn't use his name, did you?

23  A.   I wasn't talking to him directly, but you're right.

24        MR. KELLER:  If you could play the call.

25      (Audio continuing.)

1          MR. KELLER:  If you could pause the call, Ms. Spells.

2    BY MR. KELLER:

3    Q.    I believe you testified on direct that the frequency of the

4    donations to the 15th Street Church of God in Christ, the

5    frequency of your donations, it decreased over time; is that

6    right?

7    A.    That's right.

8    Q.    And you testified that that was because Pastor Bennett was

9    ill and you saw him less and less often; is that right?

10   A.    That's true.

11   Q.    And you said really the only thing that precipitated a

12   donation to the church is when you would see Pastor Bennett or

13   when you would see Phillip Carter, who was his driver; right?

14   A.    That's right.  That's right.

15          MR. KELLER:  If we could play the call.

16       (Audio continuing.)

17   BY MR. KELLER:

18   Q.    Mr. Suhl, you did, in fact, meet with Phillip Carter at

19   Colton's that day, didn't you?

20   A.    Sure I did.  Yeah.

21          MR. KELLER:  If we could see Government's Exhibit

22   11-B, please.  Previously been admitted.

23       If we could blow up that photograph.

24   BY MR. KELLER:

25   Q.    That's you in your Hummer in the parking lot of Colton's,

1    isn't it?

2    A.    Yes, it is.

3    Q.    And that's Phillip Carter standing next to you next to his

4    car; right?

5    A.    It is, yes.

6    Q.    So you and Phillip Carter went into the restaurant; right?

7    A.    Yes, we did.

8    Q.    You guys met, had a meal or had some drinks or whatever it

9    was; is that right?

10   A.    Had a meal, yeah.  I think I bought him dinner.

11   Q.    You didn't give Phillip Carter a check for the church then,

12   did you?

13   A.    I think I'd just gotten off a plane.  I don't know for sure

14   because it's years ago, but I think I'd just gotten off a plane,

15   called him and said, "Hey --" and I hadn't seen him in I don't

16   know how long.  A long time.  And I said, "Let's get together."

17   Q.    Mr. Suhl, the question was, you didn't give him a check

18   that day for the church, did you?

19   A.    I apologize.  No, I didn't.  I was just telling you the

20   circumstances.  I apologize.

21   Q.    As we're looking at your vehicle there, you actually had a

22   check printer in that vehicle, didn't you?

23   A.    No, I did not.

24   Q.    You didn't have a printer in any of your vehicles that

25   would allow you to print a check?

1    A.    Absolutely not.

2    Q.    So you didn't give Phillip Carter a check that day; right?

3    A.    Not to my knowledge.

4    Q.    And that's because Steven Jones wasn't at that meeting, was

5    he?

6    A.    No, that's not true.

7    Q.    Steven Jones was not at that meeting, was he?

8    A.    He wasn't at that meeting.  You're right.  Yes, that's

9    right.

10          MR. KELLER:  If we could play Government's Exhibit

11   8-ZZ, Ms. Spells.

12       (Government's Exhibit 8-ZZ played in open court.)

13          MR. KELLER:  If we could pause it.

14   BY MR. KELLER:

15   Q.    When you say "let him know," you're talking about Steven

16   Jones; right?

17   A.    I believe so, yes.

18   Q.    But you don't use his name, do you?

19   A.    I did not, no.

20          MR. KELLER:  If you could play the call.

21       (Audio continuing.)

22          MR. KELLER:  If you could pause it, Ms. Spells.

23   BY MR. KELLER:

24   Q.    You actually did meet with Phillip Carter and Steven Jones

25   at Texas de Brazil that day, didn't you?

T. Suhl - Cross

1    A.    I did, yes.

2    Q.    And on your way to Texas de Brazil, you swung by the

3    Cracker Barrel and picked up Carter; right?

4    A.    I did, yes.

5    Q.    I believe you testified on direct that the reason why you

6    waited for Steven Jones to leave the table at Texas de Brazil

7    that day, the reason why you waited until he left to give

8    Phillip Carter that check, was because you wanted your

9    charitable donations to be anonymous; is that right?

10   A.    That's right.

11   Q.    You wanted privacy with regard to your donations to the

12   church; is that right?

13   A.    Yes.  All of our donations were generally anonymous.

14   Generally.

15   Q.    When you swung by the Cracker Barrel to pick up Phillip

16   Carter, he got in the car with you; is that right?

17   A.    He did, yes.

18   Q.    It was just you and him in the car?

19   A.    He did, yes.  Yes, he did.  It was he and I.  I'm sorry.

20   Q.    Just the two of you?

21   A.    Just the two of us.

22   Q.    You didn't give him that check for the church in your car

23   when you picked him up at Cracker Barrel, did you?

24   A.    No.  I was driving.  No, I didn't.

25   Q.    You didn't give him that check for the church on your way

1    over to the Cracker Barrel, did you?

2    A.    No, I didn't.

3    Q.    And when you parked in the parking lot at Texas de Brazil

4    and it was just you and Phillip Carter in the vehicle, you

5    didn't give him the check for the church then, did you?

6    A.    No, I didn't.

7    Q.    You waited until you had sat down at the table with Steven

8    Jones; right?

9    A.    I did, yes.

10   Q.    And not until you saw Steven Jones's face did you give that

11   check to Phillip Carter; right?

12   A.    He -- I waited until he left.

13   Q.    Mr. Suhl, you waited until you saw Mr. Jones at the

14   restaurant before you gave that check to Phillip Carter.  Isn't

15   that right?

16   A.    I don't agree with the way you're phrasing it, but yes.

17   Q.    And that was the last check you wrote to the 15th Street

18   Church of God in Christ, wasn't it?

19   A.    It was, yes.

20   Q.    Because there were no more meetings with Steven Jones after

21   that day, were there?

22   A.    There were not, no.

23            MR. KELLER:  No further questions, your Honor.

24                     REDIRECT EXAMINATION

25   BY MR. CARY:

1   Q.   Mr. Suhl, Mr. Keller asked about a Crittenden County

2   dinner.  Can you just describe -- at Texas de Brazil.  Can you

3   describe the circumstances of that dinner.

4   A.   Sure.  We'd been requested by the judges years before if we

5   would sponsor their Christmas party, and we agreed to do it and

6   it just became an annual deal.

7   Q.   To your knowledge, there were some questions about

8   referrals in Crittenden County.  To your knowledge, was there

9   any study done of the frequency of referrals in Crittenden

10  County?

11  A.   I believe the judges did a study, yes.

12  Q.   And what were the results of that study?

13  A.   That every provider was treated about the same.

14  Q.   And did you have an understanding as to whether there was a

15  general system that was used in Crittenden County to refer

16  cases?

17  A.   Yes, and I've never been in the court, but this is what I

18  was told, that they had a birthday system and they just -- the

19  way I understand it is, they just -- every provider, however

20  many providers were in the court, they divided it by that number

21  and had some letters.  So if there was six providers, the

22  first -- it was divided between those six providers by the

23  letters for -- or last letter in their name.  That's the way I

24  understand it.  I don't know.  I never discussed it in depth

25  with anyone.

1    Q.    Did you have direct involvement in that process?

2    A.    Never.

3    Q.    But have you testified to your understanding?

4    A.    That's my understanding, yes.

5              MR. CARY:  No further questions.

6                        RECROSS-EXAMINATION

7    BY MR. KELLER:

8    Q.    Mr. Suhl, Mr. Cary asked you about a study that was done

9    regarding the referral process in Crittenden County.

10   A.    Yes.

11   Q.    The reason why that study was done was because there were

12   allegations that you had put someone on the payroll to give

13   referrals to your company; isn't that right?

14   A.    I have no knowledge of that.

15   Q.    Well, you had two probation officers' wives on your payroll

16   at different times in Crittenden County; isn't that right?

17   A.    We had -- you know, we had 600 employees, so I don't know.

18   Q.    Mr. Suhl, did you have Phillip Carter's wife on the payroll

19   for a while?

20   A.    She did work for us, yes.

21   Q.    Was Phillip Carter a probation officer in Crittenden

22   County?

23   A.    Yes.

24   Q.    Did you have Chip Barnes's wife on the payroll?

25   A.    Years before she'd worked for us, yes.

1    Q.    And was Chip Barnes a juvenile probation officer?

2    A.    Yes.

3    Q.    Was he actually the supervisor of that office?

4    A.    He was.

5    Q.    And there were allegations that they were referring people

6    to your companies because you had their wives on the payroll;

7    isn't that right?

8    A.    I'm not aware of those allegations.

9              THE COURT:  Jury questions?  Whoops.

10             MR. CARY:  I had nothing, sir.

11             THE COURT:  Jury questions?

12        All right.  You may stand down.  Thank you, sir.

13             THE WITNESS:  Thank you, your Honor.

14             THE COURT:  Counsel approach.

15        [Bench conference reported as follows:]

16             THE COURT:  Do you mind disclosing to the Court who

17   your next -- you have two more witnesses?

18             MR. CARY:  Yes, your Honor.

19             THE COURT:  Do you mind disclosing them?

20             MR. ROMAIN:  Yes.  The first is professor John Watkins

21   and the last will be Shirley Suhl.

22             THE COURT:  Will be who?

23             MR. ROMAIN:  Shirley Suhl.  Mr. Suhl's mother.

24             THE COURT:  Okay.

25             MR. ROMAIN:  With respect to Professor Watkins, the

1    Court had previously ruled that he might not come or be allowed

2    to testify and that you would consider it and he ought to be

3    available as a witness.  He would testify regarding --

4              THE COURT:  I'm going to send the jury out on this.

5         [Continuing in open court:]

6              THE COURT:  Ladies and gentlemen, we'll be in recess

7    until five minutes till three.  Don't talk about the case or

8    anybody involved in it and consciously avoid starting to make up

9    your mind.

10        Let the jury stand out.  Everyone else remain as you are.

11        (Jury exited the courtroom.)

12             THE COURT:  I understand that you propose to call

13   Professor John Watkins; is that right?

14             MR. ROMAIN:  Yes, your Honor.  The Court had

15   previously ruled that we could not call Professor Watkins but

16   that you would consider it because the issue might become

17   relevant and so we ought to keep him available as a witness.

18   We've done so and we think that the question of relevance has

19   already, frankly, been determined.  The government has spent a

20   lot of time questioning numerous witnesses, including Mr. Suhl,

21   about this very issue.  So the question really becomes one of

22   whether or not Professor Watkins's testimony would actually help

23   the jury, and we think that it would, your Honor.

24             THE COURT:  How?

25             MR. ROMAIN:  First I would acknowledge that the jury

1    has asked a question about it, but he could provide testimony

2    about the practices and procedures regarding public access to

3    these documents and the types of documents that are actually

4    available.  The government has been very explicit in suggesting

5    that these documents are not publicly available and that

6    Mr. Suhl did not actually try to get them.  The testimony

7    Professor Watkins would provide goes directly to rebut those

8    issues.

9              THE COURT:  I thought your client testified that his

10   lawyers had advised him they were easily accessible, that we had

11   the best Freedom of Information Act in America.

12             MR. ROMAIN:  He did say that, your Honor.  I think --

13             THE COURT:  All right.  Let me hear from the

14   prosecution, see what they say about Professor Watkins, about

15   his proposed testimony.

16             MR. KELLER:  Your Honor, we believe that the Court's

17   ruling on the motion in limine should stand.  Professor Watkins

18   at this point doesn't have any relevant testimony to provide.

19   Mr. Suhl has testified that he had never seen those notes

20   before, that -- and he certainly didn't testify that he thought

21   they were available through FOIA.  Whether they actually were or

22   were not available through FOIA is not relevant at this point.

23   And I don't even know that Professor Watkins is going to testify

24   to that point, but certainly the intricacies of how FOIA works,

25   how someone submits a request and the general types of documents

1    that are available under FOIA is not relevant.

2                THE COURT:  I feel a ruling coming on.

3         I have the greatest respect for Professor Watkins.  I've

4    known him for many, many years.  Haven't had much contact with

5    him recently, but we served on the Arkansas Supreme Court

6    Committee on Civil Practice for several years.  He is a first-

7    class scholar, first-class gentleman, and I'm sure he knows a

8    lot about the Freedom of Information Act.  But I think his

9    testimony would be surplusage, and I think that we don't need

10   that.  His testimony is not needed.

11        For that reason, I'm going to continue, stay with my ruling

12   on the motion in limine.  I note your objection and save your

13   exception.

14        Who is the other witness?

15                MR. ROMAIN:  Your Honor, one other point that we

16   wanted to make.  I just wanted to point out that we had also

17   requested that if the Court decides not to allow Professor

18   Watkins to testify, that the Court actually instruct the jury

19   that as a matter of law, this document was publicly available.

20                THE COURT:  I'm denying that at this time.  Save your

21   exception.

22        What's the -- who is the other witness?

23                MR. ROMAIN:  Shirley Suhl will be our last witness.

24                THE COURT:  Oh, okay.  All right.  What time did I

25   tell the jury?  My mind has gone bad on me.

1              THE COURTROOM DEPUTY:  Five till three.

2              THE COURT:  Five till?  All right.  We'll be in recess

3    until five till by this clock on the wall.  Be at ease.

4         (Recess at 2:42 p.m.)

5                        REPORTER'S CERTIFICATE

6         I certify that the foregoing is a correct transcript from
     the record of proceedings in the above-entitled matter.

7

8                                    Date:  July 19, 2016

     /s/ Christa R. Jacimore, RDR, CRR, CCR
9         United States Court Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Proceedings continuing at 3:03 p.m.; jury present.)

2              THE COURT:  Next witness.

3              MR. BANKS:  Yes, Your Honor.  Thank you.  If the Court

4    please, we would like to call Mrs. Shirley Suhl.

5          **SHIRLEY SUHL, DEFENDANT'S WITNESS, DULY SWORN**

6                          DIRECT EXAMINATION

7    BY MR. BANKS:

8    Q.   Your name is Shirley Suhl?

9    A.   Yes.  That's right.

10   Q.   Ms. Suhl, I think we all know how that's spelled by now.

11   If you would, just tell the ladies and gentlemen of the jury

12   where you live.

13   A.   Where do I live now?

14   Q.   Yes, ma'am.

15   A.   Yes.  In Warm Springs, Arkansas.

16   Q.   And do you live near the ranch?

17   A.   Yes, I do.

18   Q.   How many years have you lived at that residence in Warm

19   Springs?

20   A.   Since 1976.

21   Q.   And was that the year that you and your husband [sic], Ted,

22   chose to relocate to Arkansas and buy the property that was

23   originally called The Lord's Ranch?

24   A.   Yes.  That's right.

25   Q.   Just a couple of quick asides.  Of course, you are the

1    mother of Ted Suhl.

2    A.    That's correct.

3    Q.    And the mother-in-law of Laura Suhl, his wife?

4    A.    That's right.

5    Q.    Grandmother of both the children, Benjamin and Andrea?

6    A.    Yes.  That's right.

7    Q.    Now, I know that you've had just a recent health issue.

8    But you are feeling well now, and especially -- not to mention

9    your age, but you've been with us a while, just like I have

10   been.  And you are feeling good enough to testify today.

11   A.    I do, uh-huh.

12   Q.    And you are not taking any medication or anything that

13   would prohibit you from being able to understand what I'm asking

14   you.

15   A.    No, no.

16   Q.    In fact, you do -- you still do a lot of work for Trinity,

17   for the family business, as far as writing checks and doing

18   things like that and being involved in the family's operation of

19   that business.  Is that correct?

20   A.    Yes, uh-huh.  I do.

21   Q.    Now, also one last thing too, were you born and raised in

22   Trumann?

23   A.    I was born and raised in Trumann, Arkansas, yes, sir.

24   Q.    And back in the 19 -- and that's over in extreme east

25   Poinsett County.  Is that correct?

1    A.    That's correct.

2    Q.    It would be south of Jonesboro?

3    A.    Yes, sir.

4    Q.    And north of Marion and West Memphis.  Is that right?

5    A.    That's right.

6    Q.    Now, when you came back to Arkansas, y'all purchased I

7    think it was like 1,100 acres there to move back to.  Were you

8    coming home to go back home, or were you coming here to begin a

9    different phase of ministry, you and your husband?

10   A.    Well, of course, it was wonderful to be back home.  But

11   that wasn't the reason we came.  We came -- we just felt led to

12   come here.  And we happened to find a place there when we were

13   on a trip.  We had been to a prison trip.  We used to do that

14   quite a bit.

15   Q.    And we're not going to spend a lot of time on -- there's

16   been a lot of testimony and information given to the ladies and

17   gentlemen of the jury.  But you were in California when you met

18   and married Mr. Suhl?

19   A.    Yes.

20   Q.    Bud Suhl?

21   A.    That's correct.

22   Q.    Is that correct?

23   A.    Yes, sir.

24   Q.    And sometime after that, that's when this ministry that

25   you've continued to follow through the years began out there.

1    A.    Yes, uh-huh.

2    Q.    When you first came to Arkansas, did you bring in young

3    people that had come from broken environments and were suffering

4    and had needs from all different places around, outside of

5    Arkansas?

6    A.    Yes, we did.

7    Q.    And as we've already heard, that in-residence service grew

8    and grew.  Is that correct?

9    A.    That's correct.

10   Q.    To what we've talked about in this trial.  I'm going to

11   show you one -- only one photograph, because there have been a

12   lot of photographs shown, about what the daily lifestyle is and

13   what things are given to the young people that made a home there

14   from y'all's care and treatment.

15   A.    Yes, sir.

16   Q.    And that is education.

17   A.    Yes.

18   Q.    I would like to show, if you would, to the ladies and

19   gentlemen of the jury, Ms. Suhl, DX-1706.

20         Can you put that up?

21         I know you've had a lot of pride in the fact that these

22   young people continue in education there, at an accredited

23   school there at the ranch.  Is that correct?

24   A.    That's correct.

25   Q.    Is this an instructor that teaches there?

1  A.   Yes, sir.  Yes.  He's one of the instructors we've had a
2  while, uh-huh.
3  Q.   And how many instructors do you have there or did you have
4  for the in-residence students?
5  A.   I was going to try to correct that, because at the end of
6  it, when we could no longer function, we have some kids, but not
7  like we did.  This gentleman was with us for many, many years.
8  Q.   Yeah.  I know you only have two in-house/residence patients
9  that are there.  But back at the point in time that we're
10  talking about in 2007, '08 and '09, in that era, you had a full
11  staff of instructors?
12  A.   Yes, we did.
13  Q.   And they were able to get both high school and GED diplomas
14  for their work.  Is that right?
15  A.   They did, uh-huh.
16  Q.   As well as elementary and junior high?
17  A.   That's correct.
18  Q.   All right.  Thank you.
19  A.   And senior high.
20  Q.   And senior high?
21  A.   Yes, sir.  The two children that we have now, however many
22  we always have, we have an instructor, a regular teacher,
23  uh-huh.
24  Q.   Now, sometime after you got back -- thank you.  You can
25  take that down.

1        Sometime after you got back and began your home resident

2   part of your services, you became licensed by the State of

3   Arkansas, as the jury has already heard.

4   A.    Yes, we did.

5   Q.    And the licensing, that required the state to monitor and

6   oversee the type programs, activities and care and treatment

7   that were going on.  Is that correct?

8   A.    Yes, sir.

9   Q.    Were you involved in the hiring of staff persons such as

10  highly qualified therapists and other professionals?

11  A.    We -- I was to begin with.  But later on, other people

12  hired, uh-huh.

13  Q.    Well, let's go to this.  When -- during the years -- we

14  know that you lost your husband in February, I believe, of 2010.

15  And prior to that time, were you actively involved with him in

16  the substantial or major decisions that were made in the

17  operation of the business?

18  A.    With my husband, yes.  We worked together all of our

19  married life.

20  Q.    And prior to his demise, did you also -- when Ted joined

21  the business, was it run between the three of you like what I

22  would call a tight-knit family business?

23  A.    That's correct.

24  Q.    Were decisions of a significant nature, such as donations

25  or expenditures or expansion, routinely involved between the

1    three of you?

2    A.    Yes.  We always discussed everything.

3    Q.    And in particular, after you lost your husband, did you

4    continue to interact with your son, Ted, on the same type

5    decisions?

6    A.    Yes, we did.

7    Q.    And would that include decisions such as who to make

8    donations to?

9    A.    Yes, we did.

10    Q.    And when you made those decisions, can you tell me in

11    particular what were two or three of the variables by which you

12    decided to make a contribution or a donation?

13    A.    Well, we would always discuss it.  We always had several

14    different groups we gave to routinely.  And we would discuss

15    that before we did it, you know, to see what we could do.

16    Q.    And did you know Pastor John Bennett?

17    A.    Yes, I knew him.

18    Q.    And as the jury already knows, he was a friend of Bud's?

19    A.    He was a good friend of Bud's.

20    Q.    And a friend of Ted's?

21    A.    Yes.

22    Q.    Now, when you gave -- were you involved in decisions to

23    give him money from time to time, meaning as to his church?

24    A.    We gave money to his church, yes, routinely.

25    Q.    Routinely?

S. Suhl - Direct                    822

1   A.    Uh-huh.

2   Q.    And did you give him money for preaching?

3   A.    We gave him money for donations.  We just donated.

4   Q.    For his ministry?

5   A.    For his ministry.  Whatever he needed, that's what we gave.

6   I mean, we gave regularly.  But he was -- he used it.  As other

7   people that we donated to, we didn't ask where they were going

8   to put it, you know.  We donated to Mexico and to an orphanage

9   there for quite a while.

10            MS. BELL:  Objection, Your Honor.

11            THE COURT:  Just a minute, please, ma'am.

12            THE WITNESS:  Okay.

13            MS. BELL:  Objection based on the Court's prior

14   ruling.

15            MR. BANKS:  I'm sorry.  I didn't hear it.

16            THE COURT:  You better come up.

17       (Proceedings at the bench as follows:)

18            THE COURT:  She objected based on my prior ruling.

19            MR. BANKS:  Prior ruling of what?

20            MS. BELL:  Motion in limine about the Suhl's family

21   charitable contributions to organizations besides the 15th

22   Street Church of God in Christ.  This witness is now talking

23   about giving money to organizations in Mexico.

24            MR. BANKS:  I wasn't trying to take her there.  I was

25   trying to take her --

1          THE COURT:  Someway ask a question to get her off of

2     that.  You've been at it long enough to figure out a way to do

3     that.

4          MR. BANKS:  Thank you.

5          (Proceedings continuing in open court as follows:)

6     BY MR. BANKS:

7     Q.    Ms. Suhl, let's go back and let me rephrase and ask you a

8     question this way.  I believe you've already said you routinely

9     gave to the church, 15th Street Church of God in Christ.  Is

10    that correct?

11    A.    Yes, sir.

12    Q.    And did you participate in the decisions and even sign

13    checks from time to time that would be involved in that?

14    A.    Yes, I did.

15    Q.    All right.  I want to, if you would, put up

16    Government's 21-B.  Go to page 3 or 4, where you've got -- here

17    we go.

18          Can you see that?  Can you enlarge it a little bit there?

19    Can you see that, Ms. Suhl?

20    A.    Yes, sir, uh-huh.  I can see it.

21    Q.    Do you recognize that to be your signature?

22    A.    Yes.  That's my signature.

23    Q.    And do you recognize what that -- you recognize, of course,

24    it's to the 15th Street Church of God in Christ.  Is that

25    correct?

1    A.    Yes.  That's correct.

2    Q.    And is that date accurate as to June the 24th of 2008?

3    A.    Yes.  I would assume the date is right.  It isn't real

4    legible here.  You say it's June what?

5    Q.    June the 24th.

6    A.    Yes, sir.

7    Q.    Now, here's my question.  What did you intend that

8    particular check to be for?

9    A.    Well, when we donated to Pastor Bennett's church, they were

10   always in need.  They had lots of needs for the church.  And we

11   just gave it with no particular -- that I can remember.  That's

12   been a long time, you know.

13   Q.    You would recall whether or not you intended this check to

14   that church to be for a bribe, wouldn't you?  It wasn't intended

15   to be a bribe, was it?

16   A.    Oh, goodness.  It wasn't a bribe, no, sir.  It certainly

17   was not, huh-uh.

18   Q.    Had you seen any check to that church that you signed or

19   that you personally approved that was for what you believed to

20   be an illegal purpose?

21   A.    No, sir.

22   Q.    Are you in any way familiar with the term I've heard before

23   for the designation of quotas for children that are outpatients

24   through the court system in Crittenden County?  Have you heard

25   the term called "birthday"?

1    A.    Repeat it, please.

2    Q.    Bad question.  Do you know anything about how cases are

3    assigned by the judges in Crittenden County of youngsters that

4    are court ordered to be residents in facilities such as yours?

5    A.    Uh-huh.  I wasn't involved in that.

6    Q.    Okay.  That's fair enough.  Now, let me ask you one other

7    question.  Do you know from your work in the home and through

8    your observation of Ted's work through these years as to whether

9    or not you have competitors in Mississippi County, first, that

10   are for-profit providers that do provide much of the same

11   services as what your family business does?

12   A.    Do I know them?

13   Q.    Do you know that you have them?

14   A.    Oh, sure, uh-huh.

15   Q.    Do you know how many there are?

16   A.    No, sir.

17   Q.    Do you know how many of them that also provide services for

18   needy children in the Delta -- well, Crittenden County and

19   Mississippi County?  Do you know?  Were you familiar with it?

20   A.    No.  There were other people.

21   Q.    That's fair enough.  Thank you for your time.  I appreciate

22   you coming to visit with us.

23   A.    Thank you.  Thank you.

24          MR. BANKS:  I pass the witness, Your Honor.

25          THE WITNESS:  Thank you.

```
1              THE COURT:  Just a minute.  Any questions?

2              MS. BELL:  A few, Your Honor.

3              THE COURT:  If you will, please, ma'am, we're going to

4     have questions by the prosecutor.

5              THE WITNESS:  Okay.  Thank you.

6                          CROSS-EXAMINATION

7     BY MS. BELL:

8     Q.    Good afternoon, ma'am.

9     A.    Good afternoon.

10    Q.    You testified that between -- from 2007 until your husband

11    passed away, the defendant, your son, became a part of your

12    family business.  Is that correct?

13    A.    Yes.

14    Q.    And it's fair to say that over the course of many years he

15    took a larger and larger role in the company.  Correct?

16    A.    Well, we worked together as a family.  When my husband

17    died, Ted and I still worked as a family, yes.

18    Q.    And your son consults you, of course, on business

19    decisions.  Correct?

20    A.    We both talk over everything, uh-huh.

21    Q.    And since you are talking over everything, you would talk

22    over money that's going out of the church -- out of the

23    companies.  Correct?

24    A.    We talk over as much as I can remember, yes, uh-huh.

25    Q.    And you stated that you and your family and the defendant,
```

1   your son, would routinely write checks to churches.  Correct?

2   A.    We did, uh-huh.

3   Q.    And in particular, you would routinely write checks to John

4   Bennett's church.  Correct?

5   A.    The 15th Street Church of God in Christ, yes, we did.

6   Q.    And there would be nothing odd about your son asking you to

7   sign a check written out to the 15th Street Church of God in

8   Christ.  Correct?

9   A.    He didn't come in and just ask me that.  You know, we would

10  talk it over, uh-huh.

11  Q.    I understand.  But my question, ma'am, is there wouldn't be

12  anything odd about it.  Correct?

13  A.    Well, I don't remember anything odd, no.

14  Q.    And Mr. Banks showed you a check.  I'll show you on the

15  ELMO.  And this check is from 2008.  Correct?

16  A.    That's the way it looks, uh-huh.

17  Q.    You don't personally have any knowledge today, do you,

18  ma'am, any personal memory about this check, do you?

19  A.    There were many checks that we wrote, not only that one,

20  but others.

21  Q.    But this check in particular from eight years ago, as you

22  sit here today, you don't have any memory about this check, do

23  you?

24  A.    No, huh-uh.

25  Q.    Thank you, ma'am.  No more questions.

1          MR. BANKS:  Nothing further, Your Honor.

2          THE COURT:  Jury questions?

3     You may stand down.  Thank you, ma'am.

4          THE WITNESS:  Thank you, sir.

5          MR. CARY:  The defense rests.

6          THE COURT:  I guess we better approach then.

7      (Proceedings at the bench as follows:)

8          THE COURT:  I assume that the defense raises its

9  motion for judgment as a matter of law on every point raised

10  earlier.

11         MR. CARY:  Yes, Your Honor.

12         THE COURT:  Is that correct?

13         MR. CARY:  Yes.

14         THE COURT:  I deny your motion, save your exception.

15    Do you have any rebuttal?

16         MR. KELLER:  We do, Your Honor.

17         THE COURT:  Who do you have in rebuttal?

18         MR. KELLER:  Janie Huddleston.

19         THE COURT:  Do you mind disclosing to us what you are

20  going to do in rebuttal?

21         MR. KELLER:  Sure, Your Honor.  The defendant

22  testified on direct that he believed Janie Huddleston treated

23  his companies different from other companies because they were

24  faith based.  So we're going to put Ms. Huddleston on to explain

25  how she treated his companies and whether she treated them any

 1    differently than anyone else's.

 2              THE COURT:  I'll allow it.

 3          (Proceedings continuing in open court as follows:)

 4              THE COURT:  I understand the government has a rebuttal

 5    witness.  Is that correct?

 6              MS. VAUGHN:  Yes, Your Honor.  The government calls

 7    Ms. Janie Huddleston.

 8              THE COURT:  Will you come forward, please, ma'am, and

 9    be sworn.

10        **JANIE HUDDLESTON, GOVERNMENT'S WITNESS, DULY SWORN**

11                         DIRECT EXAMINATION

12    BY MS. VAUGHN:

13    Q.   Good afternoon, Ms. Huddleston.  Can you please state your

14    name and spell it for the record, please.

15    A.   Janie Huddleston, H-u-d-d-l-e-s-t-o-n.

16    Q.   And what city and state do you live in, Ms. Huddleston?

17    A.   Little Rock, Arkansas.

18    Q.   Are you employed?

19    A.   I am.

20    Q.   And where are you employed?

21    A.   Zero to Three.

22    Q.   How long have you been at Zero to Three?

23    A.   Since October of 2014.

24    Q.   And where were you before October 2014?

25    A.   The Arkansas Department of Human Services.

1  Q.    And that's called DHS for short?

2  A.    Yes.

3  Q.    And how long were you at DHS?

4  A.    Sixteen years.

5  Q.    And at some point did you become a deputy director at DHS?

6  A.    I did.  In July of '04.

7  Q.    And you started in July of '04.  When did you stop being a

8  deputy director?

9  A.    October of '14.

10  Q.    You were also deputy director from 2007 to 2011?

11  A.    Yes.

12  Q.    Are you aware of a company called Arkansas Counseling

13  Associates or Maxus?

14  A.    Yes.

15  Q.    What kind of company is that?

16  A.    A behavioral health provider.

17  Q.    And are you aware of a company called Trinity Behavioral

18  Health?

19  A.    Yes.

20  Q.    What kind of company is that?

21  A.    Also behavioral health provider.

22  Q.    Do you know who owns or controls those companies?

23  A.    Ted Suhl.

24  Q.    And does DHS have oversight authority over those companies?

25  A.    Yes.

1   Q.   And Maxus and Trinity Behavioral Health, are those
2   faith-based providers?
3   A.   Yes.  I believe so.
4   Q.   And are they the only faith-based providers in the state,
5   or are there others as well?
6   A.   Oh, no.  We have a lot of faith-based providers in the
7   state.
8   Q.   Did you treat faith-based providers any differently from
9   any of the other providers in the state?
10  A.   No.  They all had to follow the same rules and regulations.
11  Q.   And did you have any opinion of faith-based providers as
12  opposed to any others in the state?
13  A.   I don't think in Arkansas we could do without faith-based
14  providers.
15  Q.   Have you ever met Ted Suhl?
16  A.   I have.
17  Q.   How many times?
18  A.   Probably a couple.
19  Q.   And would providers make their positions known to you about
20  various DHS policies?
21  A.   Yes.
22  Q.   And what are the channels through which they would do that?
23  A.   I attended a lot of meetings.  I actually asked if I could
24  come to provider meetings because we were going through a lot of
25  reform in the behavioral health system, so I tried to get out as

1    much as possible to talk about the changes that we were trying

2    to put in place and work with the providers to make those

3    changes.  So I would appear at meetings, in their meetings.  And

4    then people would call me as well or set appointments to come in

5    and see me.

6    Q.    So folks would call you directly?

7    A.    Yes.

8    Q.    And they would also set up meetings to meet with you, you

9    know, personally, just you, not at these larger provider

10   meetings.

11   A.    Yes.

12   Q.    And what would you do with the information or concerns that

13   the providers were giving to you?

14   A.    Well, usually it was about some specific issue that they

15   had not been able to resolve with one of our divisions within

16   the Department of Human Services, so I would work with that

17   division director and staff to try to resolve that issue for the

18   provider.

19   Q.    And did you take provider feedback into account when you

20   were making decisions about policy or other things that you were

21   facing?

22   A.    Yes.  With regard to the behavioral health system reform,

23   we had a group of providers that we worked with.  And so we, you

24   know, took their input, made changes based on their input into

25   the regulations that we set.

1    Q.    And would lobbyists contact you on behalf of providers?

2    A.    Yes.

3    Q.    What about lobbyists for Ted Suhl's companies?

4    A.    Yes.  He had staff that attended most every single meeting.

5    The person that I remember talking to the most was Joel

6    Landreneau.

7    Q.    You said Joel Landreneau?

8    A.    Uh-huh.

9    Q.    Did someone named Phillip Carter ever contact you on behalf

10   of Ted Suhl's companies?

11   A.    No.

12   Q.    And where would you see Ted Suhl's lobbyists?  Were they at

13   these larger provider meetings, or would they set up private

14   meetings with you?

15   A.    I don't remember having private meetings with any of them.

16   They mostly saw me at the meetings that I was attending, and

17   they would talk to me there.

18   Q.    And would owners of behavioral health providers, not the

19   lobbyists or not the staff, but the owners, would they reach out

20   to you as well?

21   A.    A lot of them were involved in the system reform.  Yes,

22   they would reach out as well.

23   Q.    And would they ask to set up meetings with you or call you

24   directly?

25   A.    Yes.

1    Q.    And was that approach that you took to the providers

2    generally, is that the same approach that you had toward Trinity

3    Behavioral Health and Maxus?

4    A.    Sure.

5    Q.    Were there any providers that you refused to meet with or

6    talk to?

7    A.    No.

8    Q.    And from 2007 to 2011, about how many times did Ted Suhl

9    himself try to contact you or ask to meet with you?

10   A.    I don't remember him meeting with me or calling me to ask

11   to meet with me.  He invited us to come up for a site visit,

12   which a group of us did.  I do not remember what year that was.

13   So we actually visited The Lord's Ranch.

14   Q.    But outside of that visit, do you remember any other time?

15   A.    No.

16         MS. VAUGHN:   No further questions, Your Honor.

17                       CROSS-EXAMINATION

18   BY MR. ROMAIN:

19   Q.    Good afternoon, ma'am.  My name is Alex Romain.  I

20   represent Ted Suhl.  You said that you were a deputy director of

21   ADHS from 2007 to 2011.  During that period you were a deputy

22   director?

23   A.    Yes.

24   Q.    And there was another deputy director, Steven Jones.  Is

25   that right?

1          MS. VAUGHN:  Objection.  Scope.

2          THE COURT:  Overruled.  Exception saved.

3  BY MR. ROMAIN:

4  Q.   There was another deputy director, Steven Jones.  Is that

5  right?

6  A.   Yes.  I think he came on board in May of '07.

7  Q.   And as deputy director, you were responsible for the

8  Division of Medical Services?

9  A.   Yes, I was.

10 Q.   Which was the division responsible for Medicaid?

11 A.   Yes.

12 Q.   You are not testifying that Jones ever directed that one

13 dollar of Medicaid funds be sent to ACA, are you?

14          MS. VAUGHN:  Objection.  Scope, Your Honor.

15          THE COURT:  Overruled.

16 BY MR. ROMAIN:

17 Q.   Let me ask the question again.  You are not testifying that

18 Mr. Jones ever directed that one dollar of Medicaid funds be

19 sent to ACA, are you?

20 A.   Could you tell me what you mean by ACA?

21 Q.   Arkansas Counseling Associates, Maxus.

22 A.   They would bill Medicaid.  And then Medicaid would make the

23 payments to them.

24 Q.   But you are not here to testify that Mr. Jones ever

25 directed that one dollar of Medicaid funds be directed to Maxus,

1    are you?

2    A.    I don't quite understand your question, but --

3    Q.    Outside --

4    A.    They billed Medicaid, and Medicaid would pay them as a

5    direct result of the billing that they turned in.

6    Q.    And you don't have any knowledge of Mr. Jones directing any

7    specific additional or particular payments to be made by

8    Medicaid to Maxus, are you?

9    A.    All of the billings would go directly to Medicaid from the

10   provider.  The provider would bill.  They didn't go through Mr.

11   Jones as far as I know.  That's my testimony.

12   Q.    Thank you very much.

13             THE COURT:  Jury questions?

14        You may stand down.  You are excused.  Thank you.

15             MR. KELLER:  No further evidence in rebuttal, Your

16   Honor.

17             THE COURT:  Any surrebuttal?

18             MR. CARY:  No, Your Honor.

19             THE COURT:  Ladies and gentlemen, both sides have

20   rested.  What we've got to do, I've got to meet with these good

21   lawyers and have them try to educate me on the final

22   instructions to give you.  So what I'm going to do, I'm going to

23   send you out right now and let you cool your heels for a little

24   bit.  And I'll see how fast they are able to educate me.  And if

25   we can get it done at a reasonable time, we'll come back, and

1    I'll give you the closing instructions.  And then we'll break

2    and come back and have closing arguments in the morning.  If it

3    looks like they are struggling with me, I may go ahead and send

4    you on home tonight in a little bit and then instruct you in the

5    morning.  I don't know right now how much trouble they will have

6    with me.

7         So don't talk about the case or anybody involved in it.

8    Don't start making up your mind.

9         Let the jury stand out.  Everyone else remain seated.

10        (Jury exits courtroom.)

11            THE COURT:  The jury is out.  All the evidence is in.

12   I assume that the defense renews every point of its motion for a

13   directed verdict, now known as a judgment as a matter of law.

14   Am I correct in that assumption?

15            MR. LATCOVICH:  It's a long walk to say that is

16   correct, Your Honor.

17            THE COURT:  The ruling is the same.  Your exception is

18   still saved.  Thank you.

19            MR. LATCOVICH:  Thank you.

20            THE COURT:  I'm advised that you need about five

21   minutes to get your proffered instructions ready, so we'll be in

22   recess five minutes.  Does anybody need longer?

23            MR. KELLER:  No, Your Honor.

24            THE COURT:  All right.  We're in recess.  Be at ease.

25        (Recess from 3:35 p.m. until 3:44 p.m.; jury not present.)

1      THE COURT:  All right.  I believe you've filed your

2    proposed instructions.  Is that correct?

3      MR. LATCOVICH:  Yes, Your Honor.  To speed up this

4    process, we put some objections and some proposed instructions

5    on the record, which I'll refer to.

6      THE COURT:  I'm sorry.  Let me get my hearing device

7    on.

8      You filed it?

9      MR. LATCOVICH:  Yes, Your Honor.  We just filed some

10   objections and some proposed instructions to supplement and

11   speed up this process so that I don't have to keep tendering our

12   proposed instructions.  I just intend to refer to what we just

13   filed on the record.

14     THE COURT:  When we go through them one by one, you

15   will tell me when we get to one that you objected to and you

16   already filed your objection.

17     MR. LATCOVICH:  Yes, Your Honor.  We will.

18     THE COURT:  All right.  Let me hear from you with

19   respect to whether I should give an instruction on character

20   evidence for charity.

21     MR. LATCOVICH:  Certainly, Your Honor.  Your Honor, we

22   think that evidence of Mr. Suhl's character of generosity and,

23   in particular, for Christian causes is relevant to the specific

24   intent element.  It shows that he did not have the necessary

25   corrupt intent when he made -- when he wrote those checks to the

1    15th Street Church of God in Christ.

2        This is governed by Rule 404(a), in particular, (a)(2)(A).

3    I think there's a case.  It's a very low -- it's a very low bar,

4    so it only has to be of minimal probative value, Your Honor.  I

5    think this quote explains why.  You will see why I like this

6    quote.

7        The rule is predicated on the notion, quote:  That the

8    defendant who, with the considerable forces of the government

9    arrayed against him and who may have little more than his good

10   name to defend himself, should not be precluded from presenting

11   even such minimally probative evidence.

12       And here, Your Honor, it's not minimally probative.  It's

13   overwhelmingly probative.  If the defense can successfully

14   establish that Mr. Suhl had a reputation of being generous

15   towards Christian causes, that would provide important evidence

16   for the jury to doubt that these checks to a Christian church

17   were somehow bribe payments for Mr. Jones.

18              THE COURT:  All right.  Let me hear from the

19   government.

20              MS. VAUGHN:  Yes, Your Honor.

21              THE COURT:  I can't see you there.  You will need to

22   come up here.

23              MS. VAUGHN:  Yes, Your Honor.

24              THE COURT:  I should have each one of you come up here

25   and see what that glare is like.  It's obnoxious.

1        MS. VAUGHN:  Your Honor, I think it's important to

2   start with the fact that character evidence is not admissible or

3   properly considered by a jury when it is essentially propensity

4   evidence.  And that is what charitable giving is in this case.

5   It's essentially a claim that because the defendant has a

6   reputation among some for charitable giving, it must have been

7   charitable giving here.

8        Instead, evidence about a defendant's reputation for a

9   character trait is only properly considered when it goes to a

10  pertinent trait.  And that in criminal cases is typically a

11  character for law-abidingness or a character for veracity.  But

12  here there's no essential element to the charges or to any

13  defenses.  In fact, there are no affirmative defenses at issue

14  in this case.

15       THE COURT:  Did you find any cases or treatises on

16  this issue?

17       MS. VAUGHN:  I did, Your Honor.  There's a very

18  helpful case in the 11th Circuit, U.S. v. Langford.  It's 647

19  F.3d 1309.  And there the circuit held that the district court

20  had properly rejected evidence that a bribery defendant had

21  donated a large number of suits to a pastor as improper

22  character evidence and noted that the defendant hadn't said that

23  went to his veracity or his law-abidingness.  And because that

24  philanthropy did not bear on his veracity or law-abidingness, it

25  was properly excluded.

Jury Instructions Conference                                841

1              THE COURT:  What was he charged with?  Bribery?

2              MS. VAUGHN:  Bribery.  So because it's not --

3    character for charitable giving is really just a propensity

4    argument, it's not properly considered by the jury.  So it's the

5    government's position the jury shouldn't be instructed to

6    consider it.

7              THE COURT:  Do you have a copy of that case available?

8              MS. VAUGHN:  I do not.  But we can get one for you,

9    Your Honor.

10             THE COURT:  Have you read the case?

11             MR. LATCOVICH:  I have not, Your Honor.  But as you

12   might suspect, I can cite cases that say the opposite.

13             THE COURT:  Okay.  That's what I would like.

14             MR. LATCOVICH:  I do want to clarify one thing.  To

15   the extent there's concern about the character trait being

16   charitable giving and a concern that that tends towards

17   propensity evidence, I think then if the character trait is

18   defined as generosity, Your Honor, that should satisfy the

19   government's concern about getting into propensity evidence.

20   And we would not object to changing that.

21             THE COURT:  I know the general rules on this, you

22   know, propensity and that.  But what I want is some specific law

23   on this specific proposed instruction.

24             MR. LATCOVICH:  Sure, Your Honor.  We would refer the

25   Court to --

1          THE COURT:  Go slow, because I want to read it.

2          MR. LATCOVICH:  Absolutely, Your Honor.  And I

3   apologize.  I don't have a copy of this case on me.  But we will

4   certainly provide it.  United States v. Holloway,

5   H-o-l-l-o-w-a-y, 740 F.2d 1373.

6          THE COURT:  F.2d?

7          MR. LATCOVICH:  F.2d, yes, Your Honor, 1373, page 1378

8   to 79.  And that described a trial in which the defendant was

9   permitted to have two witnesses to testify to her honesty,

10  religious nature, and generosity.

11      Now, the difference between the cases that -- I can

12  distinguish her case without even reading it, Your Honor,

13  because I'm willing to bet that that bribery case, the supposed

14  scheme didn't actually involve transforming charitable donations

15  into bribes.  And that's what makes it so pertinent here.  It's

16  the actual facts in this case, Your Honor.  We're not just

17  saying he couldn't have bribed someone because he's a generous

18  man.  We're saying these donations, on-their-face donations,

19  are, in fact, donations because he's a generous man.

20         THE COURT:  Let me have a copy of your case and a copy

21  of your case.  I'm going to read them.

22      Mr. Morgan, will you give me a copy of the proposed

23  instruction?

24         MR. LATCOVICH:  I believe it's No. 9.

25         THE COURT:  All right.  I'm going to read for the

1    record the proposed instruction.  It's No. 9.  Are you with me?

2    Proposed Instruction No. 9.  Are you with me?

3              MR. LATCOVICH:  Yes, Your Honor.

4              THE COURT:  Following along with me?

5              MS. VAUGHN:  Yes, Your Honor.

6              THE COURT:  I have made a few word changes, if I were

7    going to give it.  I don't know yet.  But this is the way I

8    would give it.

9         "Mr. Suhl has called witnesses who have testified to his

10   good reputation in the community for charitable giving.  This

11   testimony is not to be taken by you as the witness's opinion as

12   to whether Mr. Suhl is guilty or not guilty.  That question is

13   for you alone to determine.  You should, however, consider this

14   character evidence together with all the other facts and all the

15   other evidence in the case in determining whether Mr. Suhl is

16   guilty or not guilty of the charges.  Such character evidence

17   alone may indicate to you that it is improbable that a person of

18   good reputation for charitable giving would commit the offense

19   charged."

20        "Accordingly, if, after considering the question of Mr.

21   Suhl's good reputation for charitable giving, you find that a

22   reasonable doubt has been created, you must acquit him of the

23   charges."

24        "On the other hand, if after considering all the evidence,

25   including that of Mr. Suhl's reputation for charitable giving,

1  you are satisfied beyond a reasonable doubt that Mr. Suhl is

2  guilty, you should not acquit him merely because you believe he

3  is a person with a good reputation for charitable giving."

4        Let me ask the defense this.  If I were to give the

5  instruction, is this the one you want, the one I just read?

6              MR. LATCOVICH:  Yes, Your Honor.

7              MS. VAUGHN:  Your Honor, if I may --

8              THE COURT:  If you come around here, please.

9              MS. VAUGHN:  I just want to point Your Honor in the

10 model instructions to Model Instruction --

11             THE COURT:  Just a minute.  Let me get my ear on here.

12 All right.

13             MS. VAUGHN:  To Model Instruction 4.03.  The proposed

14 instruction that the defense wants, this model instruction makes

15 clear that the Eighth Circuit, along with others, has

16 disapproved of giving the kind of standing-alone instruction

17 that they are looking for that proof of the defendant's good

18 character standing alone --

19             THE COURT:  This doesn't have standing alone in it,

20 does it, the one I just read?  I thought I took it out.  I agree

21 that standing alone should not be given.

22             MS. VAUGHN:  Sorry, Your Honor.  "Such character

23 evidence alone may indicate to you that it is improbable that a

24 person of good reputation for charitable giving would commit the

25 offense charged."

1              THE COURT:  What line is that in?

2              MS. VAUGHN:  That's the first line of the second

3    paragraph, Your Honor.

4              THE COURT:  Okay.  Yeah.  I agree with you on that

5    point.  I thought I had taken that out, even though I just read

6    it.

7         All right.  Let me think a little more here.  Now, the

8    Langford case you relied on?

9              MS. VAUGHN:  Yes, Your Honor.  That's the one we're

10   relying on.

11             THE COURT:  And you are relying on Holloway?

12             MR. LATCOVICH:  Yes, Your Honor.

13             THE COURT:  Quote:  We need not decide whether the

14   district court's ruling was erroneous or whether this is a

15   reviewable issue because if any error occurred, it was harmless.

16   Holloway had three character witnesses, Christiansen, her

17   brother Kenneth Marlette and a minister, Kenard Schaibley.

18   These witnesses were to present two different character traits,

19   honesty and religious charity.  Christiansen, as has been noted

20   above, was able to testify as to both Holloway's honesty and her

21   religious nature.  Holloway's brother was also called after the

22   district court's last ruling on the Ku Klux Klan evidence.  He

23   testified not only that Holloway was honest but also that she

24   was generous.  He stated that Holloway "would give you the shirt

25   right off from her back."  Thus, two of Holloway's three

1    character witnesses were able to testify as to the character

2    traits in issue without being impeached by the Ku Klux Klan

3    testimony.  Although Holloway did not call Schaibley to testify

4    as a character witness, even under her theory that the district

5    court's assertedly erroneous ruling on the Ku Klux Klan evidence

6    amounted to a coerced exclusion of character evidence, nothing

7    prevented him from testifying as to Holloway's character for

8    honesty.  Thus, two of Holloway's three character witnesses

9    fully testified and the third could have testified about her

10   character for honesty.  Since the testimony of Schaibley as to

11   Holloway's character trait of religious charity would have been

12   cumulative, any error which may have occurred was harmless.

13   Thus, this case is governed by the rule that, quote, errors in

14   the exclusion of evidence may be cured by the admission of other

15   evidence of substantially the same nature, end of quote.  Then

16   several cases cited that I won't call out.  They have Weinstein

17   & Berger's evidence treatise, which I used to rely on

18   considerably.

19        "Comparing the amount of testimony which Holloway claims

20   she was prevented from presenting with the amount of testimony

21   she had planned to present, we cannot conclude that it 'is more

22   probable than not that the exclusion affected the verdict, and

23   we thus find that any error which may have occurred was

24   harmless."

25        Well, I've allowed the evidence, but I'm not going to give

1  the instruction.  Note the defendant's objection, and I save

2  your exception.

3      All right.  Let's go through the rest of the instructions.

4          MR. LATCOVICH:  Your Honor, just so the record is

5  clear, I've also proposed an instruction for the good reputation

6  in the community for generosity as opposed to community giving.

7          THE COURT:  Yes.

8          MR. LATCOVICH:  Okay.

9          THE COURT:  I assume that's part of what you've got

10  filed?

11          MR. LATCOVICH:  I don't recall what we filed, because

12  I think it was based on this language that was in the Court's.

13  But I just want to make the record clear that to the extent

14  there was concerns about this being a pertinent trait and we're

15  trying to get some of that evidence, we would have accepted, and

16  we would propose actually -- let me just be clear.  We would

17  have proposed that --

18          THE COURT:  Just put the one that you proposed, give

19  that -- you can tear it out of there and give it to the

20  courtroom deputy.  It will be a part of the record.  I still

21  believe in paper.  I should say I'm a part of the minority that

22  believes in paper.

23          MR. LATCOVICH:  Your Honor, just so the record is

24  clear, it's the same as your instruction.  We've just replaced

25  "for charitable giving" with "for generosity."  I'll tender this

1    to Mr. Morgan.

2                THE COURT:  All right.  Let's go to Instruction No. 1,

3    on page 1.  I understand there's no objections.

4         Instruction No. 2 on page 2.  I understand there's no

5    objection.

6         No. 3 on page 3.  I understand that there's no objection.

7    Are y'all sure you want me to give this again?

8                MR. LATCOVICH:  Yes, Your Honor.

9                MS. VAUGHN:  Yes, Your Honor.

10               THE COURT:  I'm going to give it since you both

11   requested it.  But why?  I certainly wouldn't want to tell them

12   the closing argument is not evidence.  I would want them to

13   believe that it's the truth if it was my closing argument.  But

14   I'll give it.

15        No. 4.  This is the one we've pounded on before.  I

16   understand y'all want that given again.  Is that true?

17               MS. VAUGHN:  Yes, Your Honor.

18               MR. LATCOVICH:  Yes, Your Honor.

19               THE COURT:  Why?

20               MS. VAUGHN:  We just think since they haven't heard it

21   since the beginning of the trial, it would just make it clear

22   for them to include it again now.

23               THE COURT:  Just because you want it.  Is that right?

24   All right.

25        No. 5 on experts, we didn't have an expert, did we?

1            MS. VAUGHN:  No, Your Honor, we didn't.

2            THE COURT:  No. 5 will be removed.

3            MR. LATCOVICH:  We tried, Your Honor, but no.

4            THE COURT:  Over your objection, I didn't allow

5    Professor Watkins.

6        No. 6, reasonable doubt.  I understand there's no

7    objection.

8            MS. VAUGHN:  No, Your Honor.

9            MR. LATCOVICH:  No, Your Honor.

10           THE COURT:  No. 7, plea agreement witnesses.  Any

11   objection to that?

12           MR. LATCOVICH:  Yes, Your Honor.

13           THE COURT:  All right.  What is your objection?

14           MR. LATCOVICH:  Your Honor, this is found in ECF No.

15   115 that we just filed.  But we object to the exclusion of the

16   following language that we took from Sand, the Sand treatise on

17   jury instructions.  That would be this, Your Honor.

18       Quote:  In evaluating the credibility of Mr. Jones and Mr.

19   Carter, you should take into account this evidence they may

20   benefit in some way from the outcome of this case.  Such an

21   interest in the outcome creates a motive to testify falsely and

22   may sway the witness to testify in a way that advances his own

23   interests.  Therefore, if you find that Mr. Jones or Mr. Carter

24   have an interest in the outcome of the trial, you should bear

25   that factor in mind when evaluating the credibility of their

1    testimony and accept it with great care."

2            THE COURT:  I'm excluding that language.  I think it

3    overeggs the pudding.  Your record is made.

4            MR. LATCOVICH:  Great.  Then one other thing, Your

5    Honor.  We object to the portion of this in the second paragraph

6    that begins "a judge has no power to reduce the sentence" and

7    ends with "how to reduce it."  We think the significance of the

8    plea agreements for these witnesses is whether, in fact, the

9    prosecution will move to reduce their sentences.  What happens

10   after that is outside the witness's control and outside the

11   government's control.  And we think bringing in the procedural

12   aspects is more likely to confuse the jury than it is to assist

13   them in their evaluation of the witness's credibility, Your

14   Honor.

15           THE COURT:  So you want it all out, starting in the

16   second paragraph, starting with the second sentence?

17           MR. LATCOVICH:  Yes, Your Honor.

18           THE COURT:  What says the prosecution?

19           MS. VAUGHN:  Your Honor, this follows the pattern.

20   The government would advocate to stick with the pattern.

21           THE COURT:  Which pattern?  Is that the Eighth

22   Circuit?

23           MS. VAUGHN:  Yes, Your Honor, the Eighth Circuit.

24           THE COURT:  I used to be kind of an expert on Eighth

25   Circuit instructions when I served as chairman of that committee

1   for many years.  And I can't remember what was proposed and what

2   was adopted.  At any rate, I'll save your exception and overrule

3   your objection.

4           MR. LATCOVICH:  And one last thing, Your Honor.  We

5   also believe the last paragraph should include that the

6   witness's decision to plead guilty was a personal decision about

7   their own guilt, end quote.  We think that's particularly

8   important in this case when it's undisputed that it was Mr.

9   Jones and Mr. Carter who were filmed by the FBI exchanging a

10  thousand dollars in FBI money.  So there are real reasons why

11  they might plead guilty of a scheme that's very different from

12  the conduct that involves our client, Your Honor.

13          THE COURT:  Your exception is saved.

14          MR. LATCOVICH:  Thank you, Your Honor.

15          THE COURT:  No. 8, any objection?

16          MS. VAUGHN:  No, Your Honor.

17          MR. LATCOVICH:  No, Your Honor.

18          THE COURT:  All right.  No. 9 has been excluded over

19  the objection of the defense.

20      No. 10, any objection?

21          MS. VAUGHN:  No, Your Honor.

22          MR. LATCOVICH:  No, Your Honor.

23          THE COURT:  That's on page 10.  No. 11.

24          MS. VAUGHN:  No objection, Your Honor.

25          MR. LATCOVICH:  No objection.

1          THE COURT:  No. 12.

2          MS. VAUGHN:  No objection, Your Honor.

3          MR. LATCOVICH:  No objection, Your Honor.

4          THE COURT:  All right.  No. 13.

5      Mr. Morgan, where are we on the highlighted portion?

6          LAW CLERK:  I can't update it until we're done with

7  this hearing.

8          THE COURT:  Okay.  Any objections other than a

9  question left open on the next-to-last paragraph about

10 Instructions No. 16 and 18?

11         MS. VAUGHN:  No objection, Your Honor.

12         MR. LATCOVICH:  Yes.  We would have an objection, Your

13 Honor, as we explained ECF No. 115.  We object to the

14 instruction that would require the first element, an agreement

15 between, quote, two or more people, end quote.  We believe the

16 language should track the indictment on this, Your Honor.

17         THE COURT:  All right.  Your objection is overruled.

18 Your exception is saved.  We'll come back to the next to last

19 paragraph.

20     No. 14, which is on page 14 and 15.  Let me see if it goes

21 to 16.  All right.  That goes from 14 through 17.  All right.

22 On the first page, page 14, any objections on page 14?

23         MS. VAUGHN:  No objection, Your Honor.

24         MR. LATCOVICH:  I'm not sure how to do it page by

25 page, Your Honor.  I think we have some overall objections, two

1   quick overall objections for this.  I don't know page by page is

2   going to help for this particular instruction.

3           THE COURT:  I don't understand your answer.  Do you

4   have page 14 before you?

5           MR. LATCOVICH:  Sure do, Your Honor.

6           THE COURT:  Do you have any objection to any of the

7   language on page 14?

8           MR. LATCOVICH:  Not to the language that's here.  Our

9   objection is language that's not going to be included in this

10  instruction.

11          THE COURT:  On this page?

12          MR. LATCOVICH:  Next page, Your Honor.

13          THE COURT:  Go to page 15.  What is your objection on

14  page 15?

15          MR. LATCOVICH:  Your Honor, we believe that conspiracy

16  requires the same corrupt intent as the underlying offenses.  We

17  would ask the jury be instructed as such under element two.

18          THE COURT:  Overruled.  Exception saved.

19      Let's go to page 16.  We have an update in the first full

20  paragraph.  We have Instructions 16 and 18.  We've got to update

21  that.  I have removed the last paragraph before element three

22  over the defendant's objection.  Any other change?

23          MS. VAUGHN:  Not from the government, Your Honor.

24          MR. LATCOVICH:  Yes, Your Honor.  We believe there

25  should also be an instruction here about multiple conspiracies.

1   We heard testimony from Mr. Carter that he took these donations,

2   and those donations never, even if they were supposedly bribe

3   payments, never made it to Mr. Jones.  And we think an

4   instruction that clarifies the existence of two conspiracies for

5   the jury would be appropriate here.

6           THE COURT:  Overrule your objection and save your

7   exception.

8           MR. LATCOVICH:  Thank you, Your Honor.  We did propose

9   language in our filing we just filed.

10          THE COURT:  All right.  It's accepted as your proffer.

11          MR. LATCOVICH:  Thank you.

12          THE COURT:  Page 17, element four.  Does the

13  government have any objections?

14          MS. VAUGHN:  No objections, Your Honor.

15          MR. LATCOVICH:  No, Your Honor.

16          THE COURT:  Let's go to the next instruction, No. 15.

17          MS. VAUGHN:  No objection from the government, Your

18  Honor.

19          MR. LATCOVICH:  No objection, Your Honor.

20          THE COURT:  All right.  No. 16, page 19.

21          MS. VAUGHN:  No objection from the government, Your

22  Honor.

23          MR. LATCOVICH:  Your Honor, we have multiple

24  objections to this entire conspiracy -- excuse me -- to this

25  entire instruction.  We've also proposed alternative

Jury Instructions Conference                              855

1   instructions that would break it out element by element.  I can

2   give you a quick rundown of our --

3           THE COURT:  I know what they are.  I'm going to

4   overrule your proffer -- I'm going to deny it but accept your

5   proffer.

6           MR. LATCOVICH:  Does the Court incorporate all the

7   instructions or objections in our written pleading?

8           THE COURT:  Yes.

9           MR. LATCOVICH:  Thank you, Your Honor.

10          THE COURT:  I save your exception.  Does that take

11  care of the rest of this instruction?

12          MR. LATCOVICH:  Yes, Your Honor.  If you refer to our

13  written pleading, we've set forth all our objections to this,

14  Your Honor.

15          THE COURT:  All right.  I accept it as a proffer, but

16  I'm not giving your rendition.

17          MR. LATCOVICH:  Understood, Your Honor.

18          THE COURT:  I note your objection and save your

19  exception.

20      All right.  On Instruction No. 17, page 22, there's some

21  highlighted portions that I have taken out over the defendant's

22  objection.  That's in the last full paragraph.

23          MR. LATCOVICH:  Yes, Your Honor.  We would like to

24  preserve that objection.

25          THE COURT:  It's preserved.  Exception saved.

1           MS. VAUGHN:  Your Honor, the government does have

2     another note on page 22.

3           THE COURT:  All right.  Let me turn back to page 22.

4        Let me ask Mr. Morgan, are we going to have time to get

5     these two-blocked for the jury?

6        All right.  Let's call the jury back in.  I'm going to send

7     them home.  We'll have the instructions and argument in the

8     morning.

9        (Jury enters courtroom.)

10           THE COURT:  Ladies and gentlemen, I don't believe I

11    told you at the opening.  But if I have, I'm going to tell you

12    again, because I like to hear myself tell it.

13        When I was nominated for judge back in '93, some of my

14    alleged friends were having coffee at breakfast.  And one of

15    them said that a federal district judge didn't need to know much

16    law to be a pretty good judge.  And one of my other alleged

17    friends said, "In that event, Wilson is highly qualified."

18        These lawyers -- these are good lawyers.  They are bright,

19    and they are working feverishly with me.  But we've still got

20    some work to do on the instructions.  So we'll start at nine

21    o'clock in the morning.  I'll be prepared to give you

22    instructions at that time.  Then we'll have closing arguments.

23    They will be 45 minutes each.  The prosecution will have 30

24    minutes to open and then 15 minutes.  They have the burden of

25    proof, the prosecution.  It has the burden of proof, and they

1    have 15 minutes for rebuttal.  And then the defense will have 45

2    minutes.  After instructions and after the prosecution's opening

3    30 minutes, we'll probably take a break and then come back and

4    hear the defense and the prosecution's rebuttal.

5        Don't talk about the case, anybody involved in it.  Don't

6    start making up your mind.  You are real close to where the

7    rubber meets the road with you, so follow those instructions

8    carefully in your mind.

9        All right.  Let the jury stand out.  Everyone else remain

10   seated.

11       (Recess at 4:23 p.m.)

12                       REPORTER'S CERTIFICATE

13      I certify that the foregoing is a correct transcript from
     the record of proceedings in the above-entitled matter.

14

15   /s/Elaine Hinson, RMR, CRR, CCR      Date:  July 19, 2016.
     United States Court Reporter

16

17

18

19

20

21

22

23

24

25

1          (Continuing at 4:27 p.m.; jury not present.)

2              THE COURT:  Where were we at (sic)?

3      Put a S-I-C after the "at."

4      I believe the prosecution had the floor.  Will you come

5  around, please?

6              MS. VAUGHN:  Yes, Your Honor.  Your Honor, on page 22,

7  at the beginning of Closing Instruction No. 17.

8              THE COURT:  What paragraph?

9              MS. VAUGHN:  The very first paragraph, Your Honor.  In

10 the second sentence in that paragraph, the word "corruptly" is

11 there and, for consistency, it's not in the Closing Instruction

12 16.  So --

13             THE COURT:  Wait a minute.  I don't see a second

14 sentence.  I just see one sentence in the first paragraph.

15             MS. VAUGHN:  Maybe I have an older version.

16     The second line.  Sorry.

17             THE COURT:  Okay.  Corruptly gave Steven Jones

18 something of value in exchange for an official act?

19             MS. VAUGHN:  Yeah.  That word "corruptly" isn't

20 included in the honest services instruction, and this is

21 referring back to that instruction.  So the government would

22 propose instead saying:  Mr. Suhl gave Steven Jones something

23 of value with the intent to influence official acts in

24 exchange.

25             THE COURT:  What says the defense?

1        MR. LATCOVICH:  Your Honor, we think corruptly is an

2   accurate statement of the law and should stand.

3        THE LAW CLERK:  To be consistent, it needs to be

4   removed.

5        MR. LATCOVICH:  Mr. Morgan knows that's one of our

6   objections to the honest services fraud.  We believe it

7   requires corrupt intent.

8        THE COURT:  All right.  Let me do a little research.

9   That means I am going to talk to my lawyer.

10       After considerable research, I am going to leave it like

11  it is over the objection of the prosecution.

12       MS. VAUGHN:  Is that with respect to "corruptly" or

13  with "the intent to influence official act"?

14       THE COURT:  Let me consult with my lawyer again.

15       I think I am going to have to save the exception of the

16  defense, the prosecution, and my lawyer.  Here is the way I am

17  going to give it:  Counts 2, 3, and 4 require the prosecution

18  to prove beyond a reasonable doubt that Mr. Suhl gave Steven

19  Jones something of value with the intent to influence an

20  official act.  That's the way I am going to give it.

21       MS. VAUGHN:  That's fine with the government, Your

22  Honor.

23       MR. LATCOVICH:  Preserve our objection, Your Honor.

24       THE COURT:  Your objection is preserved.

25       Anything else on page 22?

1          MS. VAUGHN:  Nothing from the government, Your Honor.

2          MR. LATCOVICH:  From the defense, Your Honor, we

3    believe that official acts --

4          THE COURT:  Let me get my ear on again.

5          MR. LATCOVICH:  We believe that official acts also

6    apply -- and we set this forth in our paper.  We believe

7    official acts also applies to 18 U.S.C. 666, and therefore,

8    applies to all the counts here.  There is also -- we want to

9    preserve our objection on the language that you struck, and

10   there is also one sentence that was a direct quote from the

11   McDonnell Supreme Court case that described it, quote, It must

12   also be something specific and focused as --

13         THE COURT:  Whoa, whoa, whoa.  Slower.

14         MR. LATCOVICH:  Sorry, Your Honor.

15         THE COURT:  Is that in your proposed instruction?

16         MR. LATCOVICH:  It is in our object -- it is in our

17   written papers.  We can rely on that.

18         THE COURT:  Okay.

19         MR. LATCOVICH:  So those are our objections to the

20   official-act instruction, Your Honor.

21         THE COURT:  Overrule the objection.  Save your

22   exception.

23      All right.  Let's go to page 23.

24         MS. VAUGHN:  No objection to page 23 from the

25   government, Your Honor.

```
 1           MR. LATCOVICH:  We have a host of objections here that

 2     are spelled out in our papers, and if appropriate, we can rely

 3     on those.

 4           THE COURT:  Okay.  That's appropriate.

 5           MR. LATCOVICH:  And we also have proposed instructions

 6     as well that we have also tendered in ECF 115, Your Honor.

 7           THE COURT:  They are accepted as your proffer.

 8           MR. LATCOVICH:  Thank you, Your Honor.

 9           THE COURT:  Let's move now to page 25.  No. 19, what

10     about the prosecution?

11           MS. VAUGHN:  No objection from the prosecution.

12           MR. LATCOVICH:  Your Honor, briefly, we believe that

13     the Travel Act requires the same intent as the underlying

14     offense and there should be an instruction about corruptly

15     here.

16           THE COURT:  That's in your proffer?

17           MR. LATCOVICH:  Yes, Your Honor.

18           THE COURT:  Motion denied and exception saved.

19        What about Instruction No. 20 on page 26?

20           MS. VAUGHN:  No objection from the government, Your

21     Honor.

22           MR. LATCOVICH:  Even I am not going to object to our

23     own theory of the defense.

24           THE COURT:  Might as well.

25           MR. LATCOVICH:  No objection, Your Honor.
```

1          THE COURT:  All right.  No. 21, page 27.

2          MS. VAUGHN:  Yes, Your Honor.  The government objects

3    to this instruction.  The good-faith instruction is not

4    necessary where the jury is instructed that they must find an

5    intent to defraud, and the honest services instruction does

6    include that.  So necessarily, they would be finding that

7    defendant did not act in good faith if they find an intent to

8    defraud.

9          THE COURT:  You are saying, with what you propose, you

10   don't need the flip side here?

11         MS. VAUGHN:  No, Your Honor.

12         THE COURT:  I have given this a lot of thought, and I

13   think it is appropriate.  I am going to give 21.  Do you have

14   an objection?

15         MR. LATCOVICH:  No objection, Your Honor.

16         THE COURT:  Save the government's exception.

17      What about No. 22?

18         MS. VAUGHN:  No objection from the government, Your

19   Honor.

20         MR. LATCOVICH:  No objection, Your Honor.

21         THE COURT:  Well, a local U.S. Attorney used to object

22   to the final paragraph which is on 29.  I got that from the

23   inimitable, outstanding Judge Eisele.

24         MS. VAUGHN:  We were told objecting would be futile.

25         THE COURT:  All right.  Verdict form.  Look those over

1    carefully.  Any objections?

2            MS. VAUGHN:  The government doesn't have any

3    objection, Your Honor.

4            MR. LATCOVICH:  No objection, Your Honor.

5            THE COURT:  All right.  I tell what you we are going

6    to do.  We are going to be in recess until 15 till.  I want to

7    ask you-all to carefully go over these instructions and read

8    them and see if you find any solecisms or other errors that you

9    want to bring up because we are going to run off copies for

10   each juror.

11           And by the way, Mr. Morgan, you or the courtroom deputy,

12   you need to remind me to excuse the two alternates in the

13   morning.

14           Have you got something else?

15           MR. LATCOVICH:  I do, Your Honor.  We did propose a

16   series of other instructions, including about legitimate gifts,

17   about the right to petition the government; and it's my

18   understanding that the Court has overruled or is not going to

19   include those.

20           THE COURT:  I have rejected them, but they're

21   proffered.

22           MR. LATCOVICH:  They are proffered in ECF 115, Your

23   Honor, and I just want to make sure that everything we put in

24   there is preserved for the record.

25           THE COURT:  Absolutely.

1          MR. LATCOVICH:  Thank you, Your Honor.

2          THE COURT:  Anything else before we break for you-all

3   to proofread?

4          MS. VAUGHN:  Nothing from the government, Your Honor.

5          THE COURT:  I know it's hard to proofread when your

6   adrenaline is pumping, but we need to do it.  I am going to do

7   it myself, as a matter of fact.

8       We are in recess until -- I believe we will have time by

9   15 till.

10      (Recess at 4:38; until 4:45 p.m.; jury not present.)

11         THE COURT:  I assume we are still reading; is that

12  correct?

13         MS. VAUGHN:  Yes, Your Honor.

14         THE COURT:  I tell what you we are going to do.  Why

15  don't you-all -- at least one of you from each side stay here

16  and work with Mr. Morgan.  If there is any dispute, he can call

17  me on my cell phone and I will find out what your issue is and

18  we will meet in the morning at 8:30 if there are disputes.  I

19  would like to get it all ironed out tonight.

20      Does anybody have any suggestions other than that?

21  Mr. Morgan, how about you?

22         THE LAW CLERK:  No, sir.

23         MR. LATCOVICH:  That works for the defense.

24         MS. VAUGHN:  That works for the government, Your

25  Honor.

1          THE COURT:  See what I am trying to do is cut loose

2     myself and let you-all work.

3          All right.  We are in recess.  You can be at ease.

4     Appreciate y'all's good work.

5          (Overnight recess at 4:47 p.m.)

6

7                    C E R T I F I C A T E

8          I, Cheryl Nelson Kellar, Official Court Reporter, do

9     hereby certify that the foregoing is a true and correct

10    transcript of proceedings in the above-entitled case.

11

12    /s/ Cheryl N. Kellar, RPR, CRR, CCR   Date:  July 19, 2016
          United States Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25