IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Criminal No. 4:15-cr-300 |
| ) | |
| THEODORE E. SUHL ) | |
| ) | |

### UNITED STATES' SENTENCING MEMORANDUM

Defendant Theodore Suhl put Steven Jones, a deputy director at the largest state agency in Arkansas, on his illicit payroll to pave the way for over $1.5 million in profits for his juvenile mental health counseling businesses. He bribed Jones not once, not twice, but more than a dozen times over a four-year period, and he did so under the pretense of charitable giving and religious activism. He falsely offered those qualities as innocent explanations for his bribe payments during his trial testimony—testimony the jury resoundingly rejected through its guilty verdicts. The defendant's sentence should reflect the immensity of the business that was at stake for his companies and his readiness to corrupt a taxpayer funded agency responsible for administering billions of dollars in aid to Arkansas' neediest populations.

The defendant's sentence is governed by Section 2C1.1 of the United States Sentencing Guidelines. U.S.S.G. § 2C1.1. The defendant's guidelines should be calculated as follows:

| | |
|---|---|
| Base Offense Level ……………………………………… | 12 (§ 2C1.1(a)(2)) |
| More than One Bribe ……………………………………… | +2 (§ 2C1.1(b)(1)) |
| Value of the Benefit $1.5–$3.5 million ………………… | +16 (§ 2B1.1(b)(1)(I)) |
| High-Level Decision Maker ………….......................... | +4 (§ 2C1.1(b)(3)) |
| Obstruction of Justice ……………………………………… | +2 (§ 3C1.1(a) & (b)) |
| **Total Offense Level:** | **36** |
| | |
| Criminal History Category I | (0 points) |
| Guidelines Sentencing Range | 188-235 months |

I. **The Benefit to be Received in Return for the Defendant's Bribe Payments was the Defendant's Companies' Prospective Profits from DHS Medicaid Payments.[1]**

On July 20, 2016, the defendant was convicted after a jury trial of two counts of honest services wire fraud, in violation of 18 U.S.C. §§ 1343 & 1346, one count of federal funds bribery, in violation of 18 U.S.C. § 666(a)(2), and one count of interstate travel in aid of bribery, in violation of 18 U.S.C. § 1952. Jury Verdict, ECF No. 125. During the bribery scheme for which the defendant was convicted, his companies, Maxus and Trinity Behavioral Health, made over $1.8 million in profits. Nearly all of those profits came from Medicaid money administered by the Arkansas Department of Human Services ("DHS"). *See, e.g.*, Trial Tr. at 771:2-11. At the inception of his scheme, in late 2007 and early 2008, shortly after new federal and state administrations had been elected, the defendant knew that millions of dollars of his future profits were at risk. The evidence at trial demonstrated that the defendant bribed Jones, the newly appointed, second-highest ranking official at DHS, to protect those profits and their future growth. Over the course of the scheme, from 2008 through 2011, those profits totaled over $1.8 million. Accordingly, a sixteen-level increase in the defendant's offense level should be applied pursuant to Sections 2C1.1(b)(2) and 2B1.1(b)(1)(I) of the Guidelines.[2]

    A. **The benefit to be received should be calculated by totaling Maxus's and Trinity's profits over the course of the bribery scheme.**

Section 2C1.1(b)(2) of the United States Sentencing Guidelines provides:

(2) If the value of the payment, the benefit received or to be received in return for

---

[1] The defendant objected only to the enhancement for the value of the benefit to be received (U.S.S.G. § 2B1.1(b)(1)(I)). *See* Def. Obj. to PSR; Def. Supp. Obj. to PSR. Accordingly, the government only addresses that enhancement in this memorandum.

[2] The defendant points out that Jones and a middleman through whom the defendant passed the bribes, Phillip Carter, were sentenced based only upon the amount of bribes paid. But Carter was a probation officer who passed money and messages for the defendant—the defendant's millions of dollars of profits were not a potential benefit to him. And similarly, Jones did not stand

> the payment, the value of anything obtained or to be obtained by a public official or others acting with a public official, or the loss to the government from the offense, whichever is greatest, exceeded $5,000, increase by the number of levels from the table in §2B1.1 (Theft, Property Destruction, and Fraud) corresponding to that amount.

U.S.S.G. § 2C1.1(b)(2). Section 2B1.1(b)(1)(I), in turn, provides for a sixteen-level increase in offense level if the amount of the benefit to be received exceeds $1,500,000. U.S.S.G. § 2B1.1(b)(1)(I).

"The value of the 'the benefit received or to be received' means the net value of such benefit. Examples: . . . (B) A $150,000 contract on which $20,000 profit was made was awarded in return for a bribe; the value of the benefit to be received is $20,000." U.S.S.G. § 2C1.1, *cmt*. n.3. Additionally, a court's ultimate benefit-to-be-received number need only be a reasonable estimate; it need not be exact. *See United States v. Anderson*, 517 F.3d 953, 963 (7th Cir. 2008) ("We are aware that benefit calculations cannot always be precise, and so we accept reasonable estimates based on the information available in the record."); *United States v. Hang*, 75 F.3d 1275, 1284 (8th Cir. 1996) ("[T]he value of the benefit received need not be determined with precision."). The defendant's companies profited at least $1,814,320 over the course of the defendant's bribery scheme, as reflected in the table below:

---

to benefit from the defendant's future profits. Further, Jones never intended to actually take any of the actions that the defendant sought and paid for. Lastly, the evidence demonstrating the profits received by the defendant's companies during the bribery scheme was not fully developed until the government's preparation for the defendant's trial; thus, the figures had not yet been analyzed and calculated at the time of the cooperators' pleas and sentencings.

**Annual Profits: Maxus d/b/a Arkansas Counseling Associates & Trinity Behavioral Health**

|  | 2008 | 2009 | 2010 | 2011 | Total |
|---|---|---|---|---|---|
| **Maxus**[3] | $243,010 | $134,382 | $206,247 | $478,673 | $1,062,312 |
| **Trinity**[4] | $146,340 | $241,322 | $364,346 | Unknown | $752,008 |
| | **Total Profits 2008-2011: $1,814,320** | | | | |

The profits to the defendant's companies were generated from Medicaid payments made by DHS—the agency where Jones served as the second-highest ranking official while the defendant was paying him bribes. And the defendant paid those bribes both for specific official acts and to keep Jones on retainer, so that Jones would be ready to help the defendant's companies when opportunities arose. As the defendant acknowledged at trial, DHS was citing, auditing, and reviewing his companies throughout the period of the charged scheme. *See*, *e.g.*, Trial Tr. 774:14—776:16. The evidence at trial showed the numerous deficiencies, questioned costs, recoupments, and violations of DHS policy attributable to the defendant's companies and investigated by DHS over the course of the bribery scheme. *See*, *e.g.*, Ex. 3 at 3-6 (Gov't Trial Ex. 32). The defendant voiced his concerns about DHS staff and their regulation of his businesses to Carter—his middleman—and to Jones, and he paid Jones to be at the ready. Among other things, he requested that Jones take over the Medicaid division at DHS. Trial Tr. at 495:8—498:11. Jones, in turn, "led him [Suhl] to believe that [he] would at least be open minded to it," "so that he [Jones] could keep getting paid." *Id.* at 498:6-11. Thus, the defendant paid bribes to buy Jones as

---

[3] The relevant pages of the tax returns for Maxus will be filed under seal as Ex. 1.

[4] The relevant pages of the defendant's tax returns listing profit from Trinity will be filed under seal as Ex. 2.

an insurance policy—an effort to ensure that no matter what happened with violations or policy changes, DHS would not cut off, and might allow for the expansion of, the Medicaid money flowing to the defendant's companies. The "benefit . . . to be received in return for the [bribes]," therefore, was the profits to be earned by the defendant's companies from DHS Medicaid money over the course of the scheme.

In attacking the use of his profits as the thing of value to be received in exchange for his bribe payments, the defendant argues that Jones "never diverted one cent of government business to Mr. Suhl's companies" and that protection of his business is not an official act. Def. Supp. Obj. to PSR at 1. According to the defendant, therefore, his companies' profits "cannot form the basis for a . . . sentencing adjustment." *Id.* With respect to his first claim, that Jones did not take any consequential action, the defendant ignores—as he has throughout this case—that the failure of his bribery scheme to actually obtain official acts from Jones has no bearing on his *intent* to engage in a bribery scheme in the first place. Section 2C1.1(b)(2) is clear that an enhancement is appropriate based not just on the benefit actually obtained but also on the benefit *to be* obtained. "The fact that [Defendant's] bribery scheme was ultimately unsuccessful," and that he was able to earn the reflected profits without any official action from Jones "are of no moment." *United States v. Edwards*, 496 F.3d 677, 682 (D.C. Cir. 2007) ("[Defendant] maintains that because [bribe payor] paid $10,000 to obtain approval for a less expensive abatement to which it *was* lawfully entitled, the value to the contractor was zero. There is nothing in the phrase 'benefit ... to be received' that suggests this difference in treatment. . . . The fact that [Defendant's] bribery scheme was ultimately unsuccessful, and that [bribe payor] was later permitted to implement [the] abatement plan without paying $10,000, are of no moment." (emphasis in original)). In other words, paying a bribe to win business is illegal regardless of whether the bribe was necessary to win the business and regardless

of whether the public official actually did anything to influence the award of the business.  In such a case, the benefit to be received is appropriately measured as the profit to be made from the additional business for which the bribes were paid.

Moreover, although where a bribe is successful in influencing an official act, "the Court must take care to take into account benefits that would have been received in any event," *United States v. Ring*, 811 F. Supp. 2d 359, 377 (D.D.C. 2011), "[t]he mere fact that [a] bribe was not successful does not prevent [the court] from using the ascertainable benefit that the bribe intended to influence in order to enhance [the defendant's] sentence," *United States v. Muhammad*, 120 F.3d 688, 701 (7th Cir. 1997).  Further, the government need not prove that the bribes directly caused the benefit.  *See United States v. Kinter*, 235 F.3d 192, 198 (4th Cir. 2000) ("The threshold for the causation inquiry for § 2C1.1 calculations is relatively low."); *United States v. Sapoznik*, 161 F.3d 1117, 1118-1119 (7th Cir. 1998) (government need only show that the bribes "facilitated" the benefit); *Ring*, 811 F. Supp. 2d at 377 ("The threshold for establishing a causal connection under § 2C1.1(b)(2)[] is low, and the government need not prove that the bribes were the 'but for' cause of the benefit. (internal quotation marks and citation omitted)); *cf. United States v. Cohen*, 171 F.3d 796, 804 (3d Cir. 1999) (rejecting "but for" causation under analogous commercial bribery Guideline § 2B4.1(b)(1)).  Thus, the defendant's payment of bribes to Jones to facilitate his Medicaid business renders the defendant's profits on that business the "benefit . . . to be received," U.S.S.G. § 2C1.1(b)(2), regardless of Jones's inaction.

With respect to the defendant's second objection—that protection is not an official act—the defendant misses the point.  The government proved at trial that the defendant sought several official acts from Jones, the ultimate benefit of which was protection for the defendant's companies' profits and future growth.  For example, he asked Jones to take over Medicaid at DHS

to facilitate the Medicaid payments to the defendant's companies, Trial Tr. at 291:14-21; 497:7-21, and he wanted Jones to "put the stop" to an exclusive referral policy benefiting a competitor, Ex. 4 at 1, *see* Ex. 4 at 1 (Gov't Trial Ex. 8a). As the government has demonstrated and as this Court has held, these acts fall squarely within the definition of "official act" as articulated in *McDonnell*. The question now, at sentencing, is simply what benefit the defendant sought from those paid-for acts. The defendant sought to protect and grow his profits from DHS-administered Medicaid.

Accordingly, based on the defendant's profits from 2008 through 2011—the benefit-to-be-received amount of $1,814,320—the offense level should be increased by 16 levels. *See* U.S.S.G. § 2B1.1(b)(1)(I).

### B. The benefit to be received may alternatively be calculated by applying Maxus's profit margin to the Mid-South business that the defendant sought to obtain.

If the Court declines to use the total profits of the defendants' businesses as the proper measure of the benefit to be received, the Court should alternatively use the narrower additional profits that the defendant pursued by bribing Jones to change DHS policy to allow the defendant to take business away from a competitor, Mid-South. On July 25, 2011, the defendant called Phillip Carter and stated "Hey, you know, um, uh, I wish – next time you see your buddy, I wish you would ask him. You know what, you know what, and I talked to him about this before and he could put the stop to this, without it being about us. . . . Uh, you know, the DHS in Northeast Arkansas, they give all their referrals to Mid-South in outpatient and that needs to have a stop put to it." Ex. 4 at 1 (Gov't Trial Ex. 8a). The defendant continued, "[I]t's not about Blytheville. It's all in Northeast Arkansas. It's Blytheville, Jonesboro, Paragould, Trumann." *Id.* at 5. The defendant wanted Mid-South's DHS-related business. *See id.* at 2 ("[I]t was a pilot program for Northeast Arkansas and it's been going on for years, and we just did decide to start marketing them

7

and, and talking to them. And uh so, we met some of them in Blytheville and they're friends, they're friends of our marketers there. . . . [S]he's like 'They said you got to call Little Rock, that there's – that they have a contract and they're supposed to send them all to Mid-South.'. . . The workers on the ground didn't wanna do it, but Mid-South, I'm sure, pushed it through as they saw more and more competition coming on.").

In 2011 and 2012, Mid-South operated provider sites in Jonesboro, Pocahontas, Walnut Ridge, Blytheville, and Paragould all within northeast Arkansas. Ex. 5 at 24-25 (Gov't Trial Ex. 33). These sites were paid $9,124,022.11 in Medicaid reimbursements in 2011 and 2012 for providing services to minors, the market in which Suhl's company competed with Mid-South:

| Mid-South Provider Site | 2011 Medicaid Received | 2012 Medicaid Received | 2011-2012 Total |
|---|---|---|---|
| Jonesboro 1 | $2,852,985.06 | $2,649,472.03 | |
| Jonesboro 2 | $50,223.30 | $35,575.86 | |
| Pocahontas | $271,893.30 | $263,346.46 | |
| Walnut Ridge | $253,448.70 | $324,644.72 | |
| Blytheville | $930,439.80 | $839,368.50 | |
| Paragould 1 | $5,026.20 | $467.40 | |
| Paragould 2 | $371,176.74 | $275,954.04 | |
| Total | $4,735,193.10 | $4,388,829.01 | $9,124,022.11 |

According to the gross proceeds and ordinary business income numbers listed in the tax returns for the defendant's company, Maxus—which competed directly with Mid-South—its profit margin in 2011 was 2.9%. *See* Ex. 1. Applying that profit margin to Mid-South's Medicaid revenue for youth services in northeast Arkansas—which the defendant was paying Jones to have the opportunity to obtain—results in a profit-to-be-received amount of $137,320.59 for 2011. In 2012, based on the tax return numbers for Maxus, its profit margin was 0.9%, meaning that the net benefit to be received by Maxus that year from Mid-South's clients would have been $39,499.46. *See id.* Adding the 2011 and 2012 net benefit amounts together results in a total benefit-to-be-

received amount of $176,820.05.  Based on this amount, the defendant's offense level should be increased by 10 levels.  U.S.S.G. § 2B1.1(b)(1)(F).  Under this calculation, the defendant's total offense level would be 30 and his guideline sentencing range would be 97-121 months.

The defendant objects to using the projected profits that he would have gained had he obtained Mid-South's business because, he claims, it is impossible to determine whether he would have "gain[ed] every Mid-South patient," Def. Supp. Obj. at 2.  Courts have rejected such arguments before.  In *Sapoznik*, for example, the defendant argued that he could not be held responsible for the gambling revenues of an entire operation because it could not be shown that every dollar of gambling revenue was attributable to the bribes that he solicited.  161 F.3d at 1118-19.  The Seventh Circuit rejected this position:

> Sapoznik challenges the $6 million figure on the ground that the government failed to show how much of it was actually due to his bribe-induced efforts to protect the illegal gambling. Maybe, since law enforcement is imperfect, there would have been illegal gambling in Sapoznik's jurisdiction whether or not he was bribed. Maybe, because of limitations on the resources allocated to law enforcement or the limitations of his own abilities, he could not have closed down the illegal gambling dens even if he had wanted to. But this is too speculative an inquiry to force on the sentencing process. To show that the bribes benefited the people paying them-here the operators of gambling dens and their gangster backers-it is enough for the government to show that the bribes facilitated the gambling operations.

*Id.*  Here, the defendant paid bribes to get access to Mid-South's client base.  If successful, the benefit to be received would have been the profits diverted from Mid-South to the defendant's companies.  The government need not prove that every Mid-South client would have been diverted to ACA; it is enough that the bribes would have "facilitated" the defendant's usurpation of Mid-South clients.

The defendant claims that *Sapoznik* undermines the government's position because "[t]he [*Sapoznik*] court held that the loss amount used by the district court was erroneous because the government's failure to quantify net profits left it 'profoundly unclear how much [the bribes]

contributed to the profits of the illegal gambling." Def. Supp. Obj. at 2 n.1 (citing *Sapoznik*, 161 F.3d at 1119-20)). But the court did not hold that using the entirety of the facilitated gambling business was incorrect, even if could not be shown with certainty that all of the business was attributable to the bribes. It held only that using gross revenue, instead of profits, as the measure of that business was error. *See Sapoznik*, 161 F.3d at 1119 ("[T]he relevant 'benefit received' is indeed profit (net revenue) and not (gross) revenue. But [the government] made no effort to net out the costs associated with the gambling that the bribes facilitated."). Here, the government has provided the net—not gross—benefit that the defendant's company would have received had his bribes been successful. The numbers are not speculative; they are taken from the defendant's company's own tax returns and from the Medicaid revenues received by Mid-South. The defendant argues that his sentence "should not be adjusted upwards based on a hypothetical scenario that the government admits is impossible to quantity [sic]." The government does admit that the situation is hypothetical—that is what "benefit . . . to be received," U.S.S.G. § 2C1.1(b)(2) necessarily implies. However, it is far from impossible to quantify: the business the defendant intended to receive was worth $176,820.05.

### C. The total amount of bribes paid does not accurately reflect the benefit the defendant sought to receive by engaging in the bribery scheme.

In an attempt to avoid the significant enhancement appropriately applied under Section 2C1.1(b)(2), the defendant argues that the correct figure to use for the guidelines calculation is the amount of bribes paid, which he contends is less than $6,500. For the reasons discussed above, the bribes paid amount does not properly reflect the benefit the defendant sought to receive by engaging in the bribery scheme of which he was convicted. *See Edwards*, 496 F.3d at 682 ("[The bribes paid] theory would have an illogical consequence: it would lead to identical Guidelines offense levels for [] schemes of vastly different proportions. . . . [T]he purpose of § 2C1.1 is to

measure the true harm from the crime, and to assign harsher sentences to defendants who participate in more harmful crimes." (internal quotation marks and citation omitted)); *see also* U.S.S.G. § 2C1.1 cmt. background ("[F]or deterrence purposes, the punishment should be commensurate with the gain to the payer or the recipient of the bribe, whichever is higher."). The defendant was paying to keep and grow millions of DHS Medicaid dollars flowing to his companies every year; a figure reflecting that business is the appropriate means of measuring the economic import of the offense.

In any event, even if the bribes paid were the appropriate measure, the correct amount would be all of the bribe checks that the defendant gave to Carter and Person A intending that the money be passed on to Jones, regardless of whether all of the money actually made it to Jones and regardless of the fact that the defendant was acquitted on two of the six charged counts. *See United States v. Bridges*, 569 F.3d 374, 377 (8th Cir. 2009) ("Under an advisory sentencing regime, 'the district court is entitled to determine sentences based upon judge-found facts and uncharged conduct' where the defendant is 'not sentenced in excess of the statutory maximum.'" (citation omitted)); *United States v. Anderson*, 517 F.3d 953, 963 (7th Cir. 2008) ("It is well settled that the sentencing judge may consider not only the conduct that formed the basis of the conviction but also 'relevant conduct.' Relevant conduct may include uncharged conduct and even conduct that formed the basis of an acquittal, as long as the judge makes factual findings based on the preponderance of the evidence." (internal quotation marks and citation omitted)). The total amount of bribes paid by the defendant is $29,500. As the government demonstrated throughout this case, it was the defendant's intent that rendered every charged check to the church a bribe—his intent that the money be paid to Jones to influence Jones in his official acts. *See, e.g.*, Trial Tr. at 339:25-340:10. The charged checks correspond in approximate amounts, meeting or exceeding Jones's

$2,000 fee; they were issued in close proximity to phone calls with and between Carter and Jones; and they were issued in close proximity to meetings at Texas De Brazil or other restaurants, *see* Trial Tr. 306:21-25—307:1-10; 498:14-16.  Accordingly, should the court ultimately agree with the defendant that the amount of bribes is the proper measure of the benefit received or to be received, each charged check should be included in the calculation.  The evidence at trial was more than sufficient to prove by a preponderance that each of those checks was a bribe.  *See, e.g.*, Trial Tr. 343:13-16; 343:25—344:2; 418:9-17.  With $29,500 in bribes, the corresponding increase in offense level would be 4, U.S.S.G. § 2B1.1(b)(1)(B); the defendant's total offense level would be 24; and the sentencing range would be 51-63 months.

## II. In Light of the Guideline Range and the Sentencing Factors Provided in 18 U.S.C. § 3553, a Guidelines Sentence is Appropriate.

The goal of sentencing is to impose a sentence that is "sufficient, but not greater than necessary." 18 U.S.C. § 3553(a).  "At sentencing, a district court must determine the appropriate guideline sentencing range . . . . 'Once the guidelines sentence is determined, the court shall then consider all other factors set forth in [18 U.S.C.] § 3553(a) to determine whether to impose the sentence under the guidelines or a non-guidelines sentence.'" *United States v. Porter*, 439 F.3d 845, 848 (8th Cir. 2006) (internal citations omitted).  The factors a sentencing court must take into account include "the nature and circumstances of the offense; the history and characteristics of the defendant; the need to provide deterrence, protect the public, and rehabilitate the defendant; and the kinds of sentences available." *Porter*, 439 F.3d at 850; *see also* 18 U.S.C. § 3553(a).  Further, "[t]he district court has wide latitude to weigh the § 3553(a) factors in each case and assign some factors greater weight than others in determining an appropriate sentence." *Bridges*, 569 F.3d at 379.

Considering the factors listed above, a guidelines sentence is appropriate here.  The

defendant engaged in a four-year scheme to buy off the second-highest ranking official at the largest agency in the State of Arkansas. This agency controlled billions of Medicaid dollars—dollars on which the defendant and his businesses depended. His offenses are thus serious and represent an attempt to effect a breach of public trust for his personal gain. A guidelines sentence will properly reflect the seriousness of the crime and serve as an appropriate means of deterrence.

The defendant may argue for a downward variance because his scheme was unsuccessful, but just as that is no defense to the crimes for which he was convicted, it should provide no basis for a variance here. The defendant did not intend to get nothing for his bribes: he intended to get Jones to take over the Medicaid division at DHS so that the defendant could operate with carte blanche; he intended to get back on the Child Welfare Review Board; he intended to get the RSPMI radius expanded; and he intended to get inside information to help him stave off DHS investigations. *See, e.g.*, Trial Tr. 290:24-292:2; 339:13-24; 505:20-510:9; 589:22-590:8. He intended to keep Jones on retainer so that he would have an inside man who could protect him from policy changes, audits, and other detrimental actions by DHS. The defendant thus intended to impact millions of taxpayer dollars—ensuring large profits for himself. And he intended to do so not just one time, or in one year, but on many occasions over the course of many years. It was only the government's investigation that ultimately put the stop to the defendant's scheme. The intended impact and scale of the defendant's offenses strongly militate in favor of a guidelines sentence.

Further, to the extent that the defendant argues that his lack of criminal history, family ties, history of business success, or the collateral consequences associated with his conviction support a downward variance from a guidelines sentence, his claims are without merit. The defendant is not unique among white collar defendants for lacking a criminal history; his lack of a record does

not constitute an exceptional or unusual circumstance. Further, the Guidelines generally prohibit consideration of socioeconomic status, successful employment history, and reputational collateral consequences in fashioning a sentence. *See* 28 U.S.C. § 994(d) ("The Commission shall assure that the guidelines and policy statements are entirely neutral as to … socioeconomic status of offenders."); U.S.S.G. § 5H1.10 (socioeconomic status not relevant); *see also* U.S.S.G. § 5H1.2 (vocational skills and education not ordinarily relevant); U.S.S.G. § 5H1.5 (employment record not ordinarily relevant); U.S.S.G. § 5H1.6 (family ties and responsibilities not ordinarily relevant). The federal courts have repeatedly agreed. *See, e.g.*, *United States v. Prosperi*, 686 F.3d 32, 47 (1st Cir. 2012) ("[I]t is impermissible for a court to impose a lighter sentence on white-collar defendants than on blue-collar defendants because it reasons that white-collar offenders suffer greater reputational harm or have more to lose by conviction."); *United States v. Kuhlman*, 711 F.3d 1321, 1329 (11th Cir. 2013) (vacating sentence of white collar criminal, stating, "The Sentencing Guidelines authorize no special sentencing discounts on account of economic or social status . . . unavailable to defendants of lesser means"). Nor does the defendant's claimed charitable history provide any basis for a downward variance. As the evidence at trial made clear—including the defendant's own testimony—the defendant did not hesitate to use the guise of charity to try to cover his scheme. The jury rejected his efforts to do so with its verdict. The Court should not allow the defendant to cloak himself in charity to avoid the consequences of his crimes.

The defendant was not convicted of engaging in a one-off bribe scheme of small consequence. He was engaged in a long-term, high-stakes scheme intended to affect millions of dollars. Considering the factors described above, a guidelines sentence is the proper means of addressing that crime.

        Respectfully submitted,

        ANNALOU TIROL
        Chief, Public Integrity Section

By */s/ John D. Keller*
        John D. Keller
        Amanda R. Vaughn
        Lauren Bell
        Trial Attorneys
        United States Department of Justice
        Public Integrity Section
        1400 New York Ave. NW
        12th Floor
        Washington, DC 20005
        (202) 514-1412
        John.Keller2@usdoj.gov

CERTIFICATE OF SERVICE

I certify that on today's date I electronically filed the foregoing using the CM/ECF system which will send notification of the filing to counsel of record for the defendant.

*/s/ John D. Keller*
John D. Keller
Trial Attorney